**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 15-5120**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

LAURA HOLMES AND PAUL JOST,

*Plaintiffs-Appellants*,

*v.*

FEDERAL ELECTION COMMISSION,

*Defendant-Appellee.*

On appeal from the United States District Court
for the District of Columbia, No. 1:14-cv-1243 (RMC)

**Opening Brief for Plaintiffs-Appellants**

Allen Dickerson (D.C. Cir. No. 54137)
Tyler Martinez (D.C. Cir. No. 54964)

CENTER FOR COMPETITIVE POLITICS
124 S. West Street, Suite 201
Alexandria, Virginia 22314
Telephone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org
tmartinez@campaignfreedom.org

*Counsel for Plaintiffs-Appellants*

August 17, 2015

## Certificate as to Parties, Rulings, and Related Cases

Pursuant to Circuit Rule 28(a)(1), Appellants Laura Holmes and Paul Jost hereby submit their Certificate as to Parties, Rulings, and Related Cases.

### A. Parties and Amici

Before the United States District Court for the District of Columbia, Plaintiffs Laura Holmes and Paul Jost appeared against Defendant Federal Election Commission. No person filed as *amicus curiae* before the district court. On appeal, the parties are Appellants Laura Holmes and Paul Jost against Appellee Federal Election Commission.

Appellants Laura Holmes and Paul Jost are married to one another. Laura Holmes sometimes uses the name "Laura Holmes-Jost" when contributing to candidates. Appellants are residents of Florida and citizens of the United States, eligible to vote in any election for the office of President.

Appellee Federal Election Commission ("FEC" or "Commission") is the federal agency charged with "exclusive jurisdiction with respect to the civil enforcement" of the Federal Election Campaign Act ("FECA") and its amendments. 52 U.S.C. § 30106(b)(1). The FEC must "administer, seek to obtain compliance with, and formulate policy with respect to" the federal campaign finance regime. *Id.*

**B. Rulings Under Review**

This appeal seeks review of the Opinion and Order of United States District Judge Rosemary M. Collyer in *Holmes et al. v. FEC*. No. 1:14-cv-01243-RMC; Opinion (D.D.C. Apr. 20, 2015) ECF No. 33; Order (D.D.C. Apr. 20, 2015) ECF No. 34.

**C. Related Cases**

Pursuant to 52 U.S.C. § 30110, the district court certified questions to this Court, en banc, in Case No. 14-5281. This Court remanded the case for performance of "the functions mandated by § 30110" and development of "the factual record necessary for *en banc* review." *Holmes v. FEC*, No. 14-5281 Order (D.C. Cir. Jan. 30, 2015). This appeal arises from the district court's decision on remand.

**Table of Contents**

Certificate as to Parties, Rulings, and Related Cases .............................................i

    A. Parties and Amici................................................................................i

    B. Rulings Under Review......................................................................ii

    C. Related Cases..................................................................................ii

Table of Contents.................................................................................iii

Table of Authorities .............................................................................vi

Glossary of Abbreviations ..................................................................xii

Introduction ............................................................................................1

Jurisdictional Statement ........................................................................3

Statement of the Issue ...........................................................................3

Statutes and Regulations .......................................................................4

Statement of the Case.............................................................................4

    I.      FECA limits Appellants' ability to associate with particular candidates. ..................................................................................5

    II.    Ms. Holmes and Mr. Jost brought an as-applied challenge on First and Fifth Amendment grounds, which was initially certified to this Court, en banc..............................................................9

    III.   The district court developed a factual record but improperly resolved Appellants' case on the merits. .............................10

Summary of the Argument...................................................................11

Argument..............................................................................................15

I.    Standard of Review ................................................................ 15

II.    Standard for Certifying Questions Under 52 U.S.C. § 30110 .............. 16

    a.  For challenges to FECA, Congress provided an exclusive
       review provision—now codified at 52 U.S.C. § 30110—to
       ensure swift consideration of constitutional questions posed
       by federal campaign finance restrictions .......................................... 16

    b.  The district court's discretion to decline certification is limited. .... 17

    c.  The Supreme Court has rejected previous efforts to alter
       Congress's exclusive grant of merits jurisdiction to the en banc
       Court of Appeals. ........................................................................... 20

    d.  Certification is proper for as-applied challenges unless Supreme
       Court precedent directly forecloses the challenge. .......................... 22

          i.  This Circuit has held that constitutional questions should
           be certified unless the Supreme Court has precisely spoken
           to the issue .......................................................................... 22

         ii.  Sister Circuits require narrow, as-applied challenges to be
           resolved by the en banc Courts of Appeals ............................ 24

       iii.  The district court in this Circuit recognizes its narrow role
           under section 30110 and certifies questions to this Court
           even where the language of the question requires
           modification. ........................................................................ 28

III.   Appellants' case presents an unanticipated, as-applied, challenge to
    the division and timing of FECA's contribution limits ........................ 30

    a.  FECA imposes the artificial, per-election division at issue here. .... 31

    b.  The Supreme Court has neither considered nor decided whether
       the per-election limit furthers the government's interest in
       preventing *quid pro quo* corruption. ............................................... 34

       i.   *Buckley v. Valeo* did not consider or review FECA's per-election structure, and therefore cannot foreclose Appellants' challenge................................................................34

      ii.  The Supreme Court's most recent case reviewing contribution limits accords with Appellants' reading of the statute. ..................................................................37

    c.  Neither the Supreme Court nor any other court has considered Appellants' specific Fifth Amendment challenge...........................42

       i.  The facial opinion in *Buckley* did not reach the Fifth Amendment question. ..............................................................43

      ii.  Appellants bring a novel, justiciable, equal protection claim.........................................................................44

     iii.  *Wagner v. FEC* is not to the contrary. ....................................51

Conclusion ..........................................................................................................53

Certificate of Compliance ...................................................................................54

Addendum

    Addendum Table of Contents ............................................................ ADD i

Certificate of Service

# Table of Authorities[1]

## Cases

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
  564 U.S. \_\_\_, 131 S. Ct. 2806 (2011) ...................................................48, 49

*Bates v. City of Little Rock*,
  361 U.S. 516 (1960)................................................................................46

*Bread Political Action Committee v. FEC*,
  455 U.S. 577 (1982)...................................................................18, 20, 21

*Brown v. Socialist Workers Campaign Comm.*,
  459 U.S. 87 (1982)..................................................................................36

*Buckley v. Valeo*,
  424 U.S. 1 (1976)......1, 13, 14, 18, 24, 25, 26, 32, 35, 36, 43, 44, 45, 46, 47

*Buckley v. Valeo*,
  519 F.2d 817 (D.C. Cir. 1975)................................................................18

*California Medical Association v. FEC*,
  453 U.S. 182 (1981)..........................................................18-19, 21, 22, 33

*Cao v. FEC*,
  688 F. Supp. 2d 498 (E.D. La. 2010) .................................................24, 25

*Citizens United v. FEC*,
  558 U.S. 310 (2010)..........................................................................19, 52

*City of Rochester v. Bond*,
  603 F.2d 927 (D.C. Cir. 1979)................................................................17

*Connecticut Nat'l Bank v. Germain*,
  503 U.S. 249 (1992)................................................................................18

---

[1] Authorities upon which Appellants chiefly rely are marked with asterisks.

*Davis v. FEC*,
    554 U.S. 724 (2008)................................................................35, 44, 47, 48

*Doughty v. Underwriters at Lloyd's, London*,
    6 F.3d 856 (1st Cir. 1993).......................................................... 39

*Ex parte McCardle*,
    74 U.S. 506 (1869).................................................................... 20

*FEC v. Colo. Republican Federal Campaign Comm.*,
    533 U.S. 431 (2001)............................................................24, 25

*FEC v. Lance*,
    617 F.2d 365 (5th Cir. 1980) .................................................... 17

*FEC v. Massachusetts Citizens for Life, Inc.*,
    479 U.S. 238 (1986).................................................................. 43

*FEC v. Wisconsin Right to Life, Inc.*,
    551 U.S. 449 (2007)............................................................5, 41, 43

*Feinberg v. Fed. Deposit Ins. Corp.*,
    522 F.2d 1335 (D.C. Cir. 1975).......................................... 12, 23, 33

*Gabbs Exploration Co. v. Udall*,
    315 F.2d 37 (D.C. Cir. 1963)..................................................... 39

*Gilmore v. Montgomery*,
    417 U.S. 556 (1974).................................................................. 45

*Goland v. United States*,
    903 F.2d 1247 (9th Cir. 1990) ................................13, 15, 16, 19, 23, 24, 27

*Holmes v. FEC*,
    No. 14-5281 Order (D.C. Cir. Jan. 8, 2015) (Doc. 1531041) .................... 10

*IFC Interconsult, AG v. Safeguard Intl Partners*,
    438 F.3d 298 (3d Cir. 2006) ..................................................... 39

*Int'l Ass'n of Machinists and Aerospace Workers v. FEC*,
   678 F.2d 1092 (D.C. Cir. 1982) ................................................................. 22

*Int'l Ass'n of Machinists and Aerospace Workers v. FEC*,
   No. 80-354, slip. op. (D.D.C. Dec. 16, 1980) ............................................ 23

*Khachaturian v. FEC*,
   980 F.2d 330 (5th Cir. 1992) ......................................................... 19, 26, 27

*Libertarian National Committee v. FEC*,
   930 F. Supp. 2d. 154 (D.D.C. 2013) ..................................................... 28, 29

*Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration*,
   113 U.S. 33 (1885) ...................................................................................... 19

*Mariani v. United States*,
   212 F.3d 761 (3d Cir. 2000) ............................................................... 19, 36

*McConnell v. FEC*,
   540 U.S. 93 (2003) ...................................................................................... 35

* *McCutcheon v. FEC*,
   572 U.S. ___, 134 S. Ct. 1434 (2014) ........ 14, 30, 32, 37, 38, 39, 40, 41, 47

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992) ........................................................................................ 45

*Peterson v. Martinez*,
   707 F.3d 1197 (10th Cir. 2013) ................................................................. 39

*Republican Nat'l Comm. v. FEC (In re Anh Cao)*,
   619 F.3d 410 (5th Cir. 2010) ............................................. 13, 16, 24, 25, 26

* *Riddle v. Hickenlooper*,
   742 F.3d 922 (10th Cir. 2014) ....................................................... 49, 50, 51

*Rubin v. United States*,
   449 U.S. 424 (1981) .................................................................................... 18

*Solomon v. Vilsack*,
    763 F.3d 1 (D.C. Cir. 2014)........................................................................ 16

*SpeechNow.org v. FEC*,
    567 F. Supp. 2d 70 (D.D.C. 2008).............................................................. 28

*SpeechNow.org v. FEC*,
    No. 08-0248 (JR), 2009 U.S. Dist. LEXIS 89011 (D.D.C. 2009).............. 28

*SpeechNow.org v. FEC*,
    599 F.3d 686 (D.C. Cir. 2010).................................................................... 28

*United States v. McConney*,
    728 F.2d 1195 (9th Cir. 1984) ................................................................... 16

*United States v. Oakar*,
    111 F.3d 146 (D.C. Cir. 1997).................................................................... 39

*United States v. Raines*,
    362 U.S. 17 (1960)..................................................................................... 19

* *Wagner v. FEC*,
    717 F.3d 1007 (D.C. Cir. 2013)...........................................9, 10, 12, 17, 18

*Wagner v. FEC*,
    No. 13-5162, 2015 U.S. App. LEXIS 11625
    (D.C. Cir. July 7, 2015) .................................................................. 17, 51, 52

*Wisconsin Right to Life, Inc. v. FEC*,
    546 U.S. 410 (2006).................................................................................... 35

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886).................................................................................... 45

## Constitutions

U.S. CONST. art. I, § 8, Cl. 9 .............................................................................. 20

U.S. CONST. art. III, § 1 .................................................................................... 20

**Statutes**

28 U.S.C. § 1291 ............................................................... 3

28 U.S.C. § 1331 ............................................................... 3

28 U.S.C. § 2201 ............................................................... 3

28 U.S.C. § 2202 ............................................................... 3

52 U.S.C. § 30101(1) .......................................................... 6

* 52 U.S.C. § 30110 ....................................ii, 2, 3, 5, 12, 15, 16, 17, 53

52 U.S.C. § 30116(a) .......................................................... 31

52 U.S.C. § 30116(a)(1) ....................................................... 31

52 U.S.C. § 30116(a)(1)(A) .................................................... 4

52 U.S.C. § 30116(a)(2)(A) .................................................... 24

52 U.S.C. § 30116(a)(6) ....................................................... 5

52 U.S.C. § 30116(c) .......................................................... 31

Bipartisan Campaign Reform Act of 2002,
    Pub. L. 107-155, 116 Stat. 81 (2002) ........................................ xii

Federal Election Campaign Act of 1971,
    Pub. L. 92-225, 86 Stat. 3 (1972) .......................................... xii

Federal Election Campaign Act of 1974,
    Pub. L. 93-443, 88 Stat. 1263 (1974) .................................... xii, 31

**Rules**

11 C.F.R. § 100.2(a) ........................................................... 6

x

11 C.F.R. § 100.2(c)(5) ........................................................................ 6

11 C.F.R. § 110.1(b)(3)(i) ................................................................... 32

11 C.F.R. § 110.1(b)(5)(ii)(B) ....................................................... 32, 33

11 C.F.R. § 110.3(c)(3) ........................................................................ 6

**Other Authorities**

*Holmes v. FEC*, No. 14-5281, FEC Mot. for Remand (D.C. Cir. Jan. 2, 2015) ... 21

*Holmes v. FEC*, No. 14-1243 (RMC), FEC Brief Opposing Certification and in Support of Summary Judgement in Favor of the Commission (D.D.C. Mar. 13, 2015) (ECF 27) ........................................................ 21-22

STATEMENT OF SENATOR CHRIS DODD, 147 CONG. REC. S. 2536 (2001) ........... 47

Tim Higgins, *Presidential Fundraising: See Who's Spending, Who's Lagging, Who's Raising and Where*, BLOOMBERG, July 16, 2015, at http://www.bloomberg.com/politics/articles/2015-07-16/presidential-campaign-finance-reports-a-data-visualization ........................................ 32

60 Fed. Reg. 35292 (July 6, 1995) ....................................................... 43

72 Fed. Reg. 72899 (Dec. 26, 2007) .................................................... 43

## Glossary of Abbreviations

**BCRA** – Bipartisan Campaign Reform Act of 2002, Pub. L. 107-155, 116 Stat. 81 (2002).

**FEC or Commission** – Federal Election Commission

**FECA** – Federal Election Campaign Act of 1971, Pub. L. 92-225, 86 Stat. 3 (1972) and the Federal Election Campaign Act of 1974, Pub. L. 93-443, 88 Stat. 1263 (1974).

**JA** – Joint Appendix

**Introduction**

Consider two individuals, Adam and Briana, who each seek to contribute in a Congressional election. Adam supports the incumbent, who faces no primary challenger, and Briana does not. Adam gives $5,200 before the primary election to the unchallenged incumbent, earmarking $2,600 for the primary and $2,600 for the general election. Briana waits out the challenging party's primary before contributing, because she wants her money to be used to fight the incumbent rather than being wasted in an intraparty squabble. The result is that the incumbent can use all of Adam's $5,200 contribution for general election purposes, while Briana can now only give $2,600 to the challenging party's nominee.

Appellants Laura Holmes and Paul Jost closely mirror Briana in this example.

Appellants argue that this situation violates their First and Fifth Amendment rights. While Congress may limit the amount a particular individual gives to a particular candidate, its discretion in doing so is not limitless. Lacking "a scalpel to probe" such questions, *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), courts will generally defer to the legislature's judgment of the permitted contribution amount. But courts do not rotely defer to *any* type of restriction the state chooses to impose. It is improper for contribution limits to be artificially divided in ways that are not properly tailored to the prevention of *quid pro quo* corruption or that

1

provide advantages to certain types of candidates. Such schemes violate, respectively, the First and Fifth Amendments.

Appellants challenged the bifurcation of the Federal Election Campaign Act's contributions limit, as applied to their circumstances, pursuant to Congress's expedited judicial review procedure codified at 52 U.S.C. § 30110.[2] The § 30110 procedure requires the district court to make findings of fact and certify constitutional claims to the en banc court of appeals. Initially, the district court did so, certifying questions to this Court, en banc, in Case No. 14-5281. This Court subsequently remanded the case and required the district court to, *inter alia*, "provide the parties an opportunity to develop, by expedited discovery or otherwise, the factual record necessary for en banc review of the plaintiff's constitutional challenge." JA 59.

On April 20, 2015, the district court found facts and ruled on all parties' evidentiary objections. But the court denied certification of Appellants' questions and entered summary judgment for the FEC.

Appellants Holmes and Jost timely appealed, seeking review of the denial of certification. Because § 30110 is the exclusive means of bringing this challenge,

---

[2] On September 1, 2014, the Office of Law Revision Counsel recodified the Federal Election Campaign Act ("FECA") and its amendments from 2 U.S.C. §§ 431-57 to 52 U.S.C. §§ 30101-30146. This case was filed before that date and thus Appellants Holmes and Jost used the old codification in their initial filings. Appellants now use the updated codification.

and because the merits of Appellants' argument have never been considered by the Supreme Court or this Court sitting en banc, the district court—like a panel of this Court—lacked jurisdiction to decide this case, which should be swiftly certified to the en banc Court as Congress intended.

## Jurisdictional Statement

Appellants Holmes and Jost appeal a final decision of the district court. The district court had jurisdiction to hear the constitutional claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment). Under 52 U.S.C. § 30110, the district court had jurisdiction to make necessary findings of fact and certify constitutional questions to the en banc court of appeals. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 (review of final decisions of district courts).

## Statement of the Issue

Whether the District Court erred in declining to certify pursuant to 52 U.S.C. § 30110, as involving "questions of settled law," the following:

1. When federal law limits individual contributors to giving $2,600 to a candidate for use in the primary election and $2,600 to a candidate for use in the general election and denies Plaintiffs the ability to give $5,200 to a candidate solely for use in the general election, does it violate Plaintiffs' rights of freedom to associate guaranteed by the First Amendment, U.S. Const. amend, I?

2. When federal law limits individual contributors to giving $2,600 to a candidate for use in the primary election and $2,600 to a candidate for use in

the general election and denies Plaintiffs the ability to give $5,200 to a candidate solely for use in the general election, does it violate Plaintiffs' rights to Due Process, in the context of equal protection of the law, guaranteed by the Fifth Amendment, U.S. Const. amend. V?

## Statutes and Regulations

The relevant portions of the Federal Election Campaign Act ("FECA")—codified at 52 U.S.C. §§ 30101, 30110 and 30116—and the Federal Election Commission's supporting regulations—codified at 11 C.F.R. §§ 100.2, 102.9, 110.1 and 110.3—are reproduced in the Addendum to this brief.

## Statement of the Case

Appellants challenge Congress's determination that the non-corrupting nature of a $5,200 political contribution hinges on the timing of the gift. FECA requires at least half to be given on or before the date of the primary election, even if the campaign uses the entire $5,200 for general election purposes. Conversely, the entire $5,200 may *not* be given *after* the primary election, even if only the next day, and even though the same $5,200 will be used for the same general election. This bifurcation of a non-corrupting contribution serves no anti-corruption purpose and advantages those candidates who, not having faced a significant primary challenge, may take primary funds for use in the general election. Consequently, in the circumstances here, 52 U.S.C. §§ 30116(a)(1)(A) and (a)(6) violates the First and Fifth Amendments.

Because, pursuant to 52 U.S.C. § 30110, the merits of this argument may only be evaluated by a federal court of appeals sitting en banc, the district court erred in declining to certify Appellants' constitutional questions and instead entering summary judgment for the Federal Election Commission

## I.     FECA limits Appellants' ability to associate with particular candidates.

Ms. Holmes[3] and Mr. Jost each wished to associate with candidates in the 2014 general election by means of campaign contributions. This was not unusual; while this case is an as-applied challenge in the context of the 2014 election, Appellants have "a long history of contributing to their preferred candidates… [and] intend to make such contributions in the future." JA 291. Therefore, the district court found—over the FEC's objection—that the challenge was not moot under the "capable of repetition yet evading review" doctrine. JA 290-91 (citing and applying *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462 (2007)).

Appellants' ability to associate with candidates is limited by federal law, specifically Congress's decision to regulate contributions to candidates on a per-election basis. 52 U.S.C. § 30116(a)(6) ("the limitations on contributions to a candidate imposed by… this subsection shall apply separately with respect to each election…"); *see also* JA 272, ¶ 8. FECA defines "election" as, *inter alia*, "(A) a

---

[3] Ms. Holmes will, at times, contribute to candidates under the name "Laura Holmes-Jost." JA 270, ¶ 1.

general, special, primary, or runoff election….” 52 U.S.C. 30101(1). Importantly, the federal campaign finance regime operates under the legal fiction that a candidate facing no primary challenge nonetheless participates in a primary election, for which he or she may receive a full “primary” contribution. *Id*.; C.F.R. § 100.2(a) (“[e]lection means the process by which individuals, whether opposed or unopposed, seek nomination for election, or election, to Federal office”); 11 C.F.R. § 100.2(c)(5) (defining primary election for “major party candidate[s]” to include possibility of running unopposed and assigning primary election date for contribution purposes).

Moreover, federal regulations state that money given on or before the date of the primary election, even where designated for that purpose, may be used solely for general election expenses at a candidate’s discretion. 11 C.F.R. § 110.3(c)(3) (allowing transfers for “funds unused for the primary” to be used in the general election). Such discretion will, in practice, always be exercised where a candidate in truth participates in only one meaningful election: the general.

This appeal concerns two specific congressional contests that, like the overwhelming majority of such races, consisted of a primary and general election. Consequently, federal law permitted contributions of up to $5,200[4] to the

---

[4] The Bipartisan Campaign Reform Act (“BCRA”) amended FECA to raise the individual contribution limits and index future limits to inflation. JA 273, ¶ 9

candidates, provided those contributions were bifurcated between the primary and general elections.

In 2014, Carl DeMaio, a candidate for the Fifty-Second Congressional District of California, faced three competitors in the state's "blanket" primary, two of which were members of his party. JA 285, ¶ 61. Ms. Holmes did not make any contributions during that election because she was interested principally in supporting the ultimate nominee from her party against the incumbent congressional representative. JA 17 ¶ 39; *id*. at 23 ¶ 67.

As the district court noted, "Mr. DeMaio finished second in California's 'top two' congressional primary election," *Id*. at ¶ 64, giving him the right to face incumbent Congressman Scott Peters in the general election. *Id*. at ¶ 65. At that point, Ms. Holmes contributed $2,600 to Mr. DeMaio. JA 286, ¶67. Because she did not contribute for the primary, Ms. Holmes wished to contribute an additional $2,600 to the Republican nominee, but could not do so because "that contribution would have exceeded the $2,600 per-election contribution limit established by FECA…." *Id*. at ¶ 68.

---

(internal citation omitted). While this challenge was pending, the Federal Election Commission ("FEC") raised the limit for the 2015-2016 election cycle to $2,700 per-candidate, per-election. *Id*. at ¶ 10 (internal citation omitted). Thus, the base limits are now $5,400. The district court used the $5,200 number, and for clarity Appellants will continue to reference that amount.

7

Mr. Jost faced a similar quandary. Dr. Marianette Miller-Meeks won a contested primary, giving her the right to face incumbent Congressman David Loebsack in the general election for Iowa's Second Congressional District. *Id.* at ¶ 70. Mr. Jost did not make any contributions to Dr. Miller-Meeks for the primary, *id.* at ¶ 71, JA 287, ¶¶ 72-73, but contributed $2,600 to the Miller-Meeks campaign for the general election, *Id.* at ¶ 74. He too was barred by FECA's per-election contribution limit from contributing an additional $2,600, despite making no contribution during the primary election. *Id.* at ¶ 75.

These two elections demonstrate how, in practice, the per-election division of federal contribution limits imposes concrete burdens upon Appellants' constitutional rights. Congress clearly does not believe that a candidate for Congress is corrupted by accepting $5,200 from a donor in an election cycle, and both Ms. Holmes and Mr. Jost clearly could have contributed that full amount toward the general election had they supported either Congressman Peters or Congressman Loebsack. However, because they are not members of those representatives' party, and wished to see those incumbents defeated, they were limited to $2,600 for that same contest. It strains credulity to suggest, as present law does, that there is a higher risk of corruption when a candidate receives $5,200 for purposes of the general election, but not when that candidate's opponent receives $2,600 for the general election and $2,600 for an uncontested primary.

8

Ultimately, both Appellants' preferred candidates lost their respective general elections. JA 286, at ¶ 69; JA 287, ¶ 76. Nevertheless, Appellants intend to contribute to candidates for general, but not primary, election purposes in the future.

## II.    Ms. Holmes and Mr. Jost brought an as-applied challenge on First and Fifth Amendment grounds, which was initially certified to this Court, en banc.

Because they are barred from associating with their preferred candidates by means of non-corrupting contributions, Ms. Holmes and Mr. Jost brought an as-applied challenge to the Federal Election Campaign Act ("FECA), and requested certification of questions of law to the en banc Court of Appeals for the District of Columbia Circuit pursuant to 52 U.S.C. § 30110.

The § 30110 procedure is unusual. Congress recognized that regulation of activity centered on elections is constitutionally sensitive, and accordingly provided for expedited review of constitutional challenges to FECA. This procedure is mandatory for challenges of this type.

*Wagner v. FEC* explained the § 30110 procedure. First, a district court "must develop a record for appellate review by making findings of fact." *Wagner v. FEC*, 717 F.3d 1007, 1009 (D.C. Cir. 2013) (per curiam) (internal citations omitted). Second, the district court "must determine whether the constitutional challenges are frivolous or involve settled legal questions." *Id*. Third, the district court must

certify the "non-frivolous constitutional questions to the *en banc* court of appeals." *Id*.

Initially, the district court denied Ms. Holmes and Mr. Jost's motion for a preliminary injunction, Op. Denying Prelim. Inj., JA 37, and ordered Appellants to show cause why the order denying the preliminary injunction should not be converted into an appealable denial of their requested certified questions. JA 4. Satisfied with Ms. Holmes and Mr. Jost's prompt response, the district court proceeded to certify questions to the en banc Court. JA 4 (vacating order); JA 52 (Certification of Questions of Constitutionality of Federal Election Campaign Act).

This Court docketed the Certified Questions as case No. 14-5281. Before Ms. Jost and Mr. Holmes filed their opening brief, the Federal Election Commission filed a Motion for Remand, arguing that the district court had not fully discharged its duties under the Section 30110 procedure. This Court eventually agreed, remanding the case for "the functions mandated by § 30110" and development of "the factual record necessary for en banc review." JA 59. In the interim, this Court required Appellants to file their opening brief and appendix. *Holmes v. FEC*, No. 14-5281 Order (D.C. Cir. Jan. 8, 2015) (Doc. 1531041).

### III. The district court developed a factual record but improperly resolved Appellants' case on the merits.

On remand, the district court considered both parties' proposed facts,

resolved evidentiary objections, and produced seventy-six paragraphs of factual findings. JA 270-287. These include "legislative facts" which are "general facts which help the tribunal decide questions of law and policy, [but] are without reference to specific parties, and need not be developed through evidentiary hearings." JA 269. (internal citation omitted).

Having concluded that substantial project, the district court declined to recertify certify Appellants' constitutional questions to this Court, as mandated by 52 U.S.C. § 30110 and *Wagner v. FEC*. Instead, the district court asserted that "Plaintiffs' claims rest on issues of settled law" and therefore granted summary judgment to the Commission, resolving the merits of the case. *Id*.; *id*. at 309. The district court's order issued the same day. JA 310.

Ms. Holmes and Mr. Jost timely appealed. JA 311. This question here is whether the district court, on these facts, erred in not certifying constitutional questions pursuant to 52 U.S.C. § 30110.

## Summary of the Argument

The Federal Election Campaign Act ("FECA") restricts the amount that individual citizens may permissibly contribute to political campaigns. Recognizing, however, that such limitations—even where necessary—intrude upon core First Amendment rights to free speech and association, Congress provided for an unusual procedure intended to expedite constitutional challenges to FECA. Now

11

codified at 52 U.S.C. § 30110, this provision states that a "district court immediately shall certify all questions of [the] constitutionality of the Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc."

This court has acknowledged Congress's clear command, holding that "the plain text of section [30110] grants exclusive merits jurisdiction to the *en banc* court of appeals." *Wagner v. FEC*, 717 F.3d 1007, 1011 (D.C. Cir. 2013). Because the provision is jurisdictional, section 30110 is "the exclusive means of obtaining judicial review in those cases to which it applies." *Id.* (internal citation omitted). In short, certification of valid constitutional questions is mandatory.

Accordingly, the district court's involvement under § 30110 is limited. It must perform only three functions: develop a record to send to the *en banc* court of appeals, determine whether a challenge is frivolous or involves settled law, and certify the non-frivolous questions. Under the relevant test, challenges to FECA may only be dismissed if prior decisions of the Supreme Court have "foreclose[d] the subject" and left "no room for the inference that the question sought to be raised can be the subject of controversy." *Feinberg v. Fed. Deposit Ins. Corp.*, 522 F.2d 1335, 1339 (D.C. Cir. 1975). This is a low bar, necessitated by the clear language of § 30110 itself.

In determining whether the Supreme Court has "foreclosed" a subject, the mere fact that the high court has considered a facial challenge to a particular provision is insufficient. As the Ninth Circuit has noted, "[o]nce a core provision of FECA has been reviewed and approved by the courts, unanticipated variations also may deserve the full attention of the appellate court." *Goland v. United States*, 903 F.2d 1247, 1257 (9th Cir. 1990). Thus, even though *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), facially approved of FECA's contribution limits, constitutional challenges unanticipated by the *Buckley* Court have been certified to en banc courts of appeals. *See*, *e.g. Republican Nat'l Comm. v. FEC (In re Anh Cao)*, 619 F.3d 410, 423 (5th Cir. 2010) (certified question concerning FECA contribution limit).

Appellants Laura Holmes and Paul Jost bring such an unanticipated, as-applied challenge. They argue that once Congress has determined that a certain contribution amount poses little risk of quid-pro-quo corruption, it may not impose further restrictions on how that money is given, unless those additional restrictions also serve the government's anti-corruption interest. Appellants contend that the per-election division in FECA, as applied here, is improperly tailored to that interest. Therefore, it violates the First Amendment and, because it also works a disproportionate harm to contributors supporting candidates that face primary opposition, violates the Fifth Amendment.

13

No Supreme Court decision has decided these questions, or even addressed them in *dicta,* and so only the *en banc* Court of Appeals has jurisdiction to hear Appellants' claims. While *Buckley* upheld the propriety of contribution limits against a facial challenge, it gave no attention to Congress's decision to bifurcate those contributions between primary and general elections. Instead, while *Buckley* noted the "per election" character of the contribution limits, the Court went on merely to refer to "[t]he Act's $1,000 contribution limitation" throughout its analysis. 424 U.S. at 28.

Similarly, in its recent decision in *McCutcheon v. FEC*, 572 U.S. ___, 134 S. Ct. 1434 (2014), the Court reexamined *Buckley*'s laconic analysis of the longstanding limit on aggregate political contributions. There, in analyzing whether the statute was appropriately tailored to the actual risk that contributions would lead to quid-pro-quo corruption, the Court assumed that Congress had imposed a single contribution limit of $5,200. *McCutcheon*, 134 S. Ct. at 1442. The Court then held that if $5,200 given to a particular candidate was noncorrupting, there was no justification for preventing an individual from giving that same amount to additional candidates. *Id.* at 1452. That case was brought pursuant to a similar expedited review provision, without objection from the Commission—even though *Buckley* had explicitly reached the constitutionality of aggregate limits, unlike the bifurcation at issue here.

14

In short, the Court has not examined, much less approved, Congress's decision to artificially bifurcate a noncorrupting contribution and require half of it to be given for the purposes of a primary election. That fact alone is sufficient to require certification of Appellant's First Amendment claim.

Likewise, no court has considered the specific Fifth Amendment challenge brought below. Appellants' challenge is based on the asymmetry posed when a candidate who faces a primary challenge competes in the general election against a candidate who ran virtually unopposed during the primary. The only difference between Holmes and Jost, and donors supporting the general election opponents of the candidates favored by Holmes and Jost, was that those other contributors, provided they gave to an unchallenged incumbent, could give $5,200 solely toward general election use, while Appellants could not.

Since the Supreme Court has not heard these as-applied claims, the constitutional questions posed by Ms. Holmes and Mr. Jost's claims should be certified to this Court, sitting en banc, as Congress intended in enacting § 30110.

## Argument

### I.    Standard of Review

Courts of Appeals review *de novo* the failure to certify questions of law pursuant to 52 U.S.C. § 30110. *See*, *e.g.*, *Goland v. United States*, 903 F.2d 1247,

1252 (9th Cir. 1990).[5] Likewise, this Court reviews *de novo* a district court's entry of summary judgment. *See*, *e.g.*, *Solomon v. Vilsack*, 763 F.3d 1, 8 (D.C. Cir. 2014) ("We review *de novo* the district court's grant of summary judgment, and can affirm only if the record demonstrates both that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law") (internal citation and quotation marks omitted).

## II.    Standard for Certifying Questions Under 52 U.S.C. § 30110

### a. For challenges to FECA, Congress provided an exclusive review provision—now codified at 52 U.S.C. § 30110—to ensure swift consideration of constitutional questions posed by federal campaign finance restrictions.

Congress designed a special jurisdictional provision to provide quick and clear interpretation of FECA by the circuit courts of appeals:

> The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of

---

[5] In *Republican Nat'l Comm. v. FEC (In re Anh Cao)*, 619 F.3d 410, 415 (5th Cir. 2010) (en banc), the Fifth Circuit reviewed the denial of certification of questions under an "abuse of discretion" standard, citing *Goland*, 903 F.2d at 1252. But *Goland* held that the decision to certify questions is one of law subject to *de novo* review. *Goland*, 903 F.2d at 1252 ("We are confronted in this case with a question of law -- whether the caselaw reviewing and interpreting Federal Election Campaign Act amendments disposes of this constitutional challenge. Accordingly, our review is *de novo*") (citing *United States v. McConney*, 728 F.2d 1195 (9th Cir. 1984) (en banc)).

> constitutionality of this Act to the United States court of appeals for
> the circuit involved, which shall hear the matter sitting en banc.

52 U.S.C. § 30110. There is no dispute that Appellants are members of the class capable of bringing a case under the § 30110 review provision, which is "'*the exclusive means* of obtaining judicial review in those cases to which it applies.'" *Wagner v. FEC*, 717 F.3d 1007, 1011 (D.C. Cir. 2013) (per curiam)[6] (quoting and applying *City of Rochester v. Bond*, 603 F.2d 927, 931 (D.C. Cir. 1979) (emphasis in *Wagner*).

As *Wagner* explained, "the plain text of section [30110] grants exclusive merits jurisdiction to the *en banc* court of appeals." *Id*. *Wagner* further explained that "'Congress's obvious intent in enacting [§ 30110] was to deprive district courts and panels of the circuit courts of appeals of jurisdiction to consider the constitutionality of the FECA.'" *Id*. (quoting and applying *FEC v. Lance*, 617 F.2d 365, 367-68 (5th Cir. 1980) (*Lance I*)).

### b. The district court's discretion to decline certification is limited.

Section 30110 is not ambiguous. It requires district courts to "immediately" certify "all questions of constitutionality." 52 U.S.C. § 30110. The command is forceful and clear. The Supreme Court "ha[s] stated time and again that courts

---

[6] This Court, en banc, reached the merits of *Wagner* without modifying the panel's holding concerning 52 U.S.C. § 30110. *Wagner v. FEC*, No. 13-5162, 2015 U.S. App. LEXIS 11625 (D.C. Cir. July 7, 2015).

17

must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992) (collecting cases). Having noted and given effect to unambiguous statutory language, "judicial inquiry is complete." *Id*. (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).

Nevertheless, the district court serves three limited, but important, functions. First, it "must develop a record for appellate review by making findings of fact." *Wagner*, 717 F.3d at 1009 (citing *Bread Political Action Committee v. FEC*, 455 U.S. 577, 580 (1982) ("*Bread PAC*") and *Buckley v. Valeo*, 519 F.2d 817, 818-19, (D.C. Cir. 1975) (en banc) (per curiam) *aff'd in part and rev'd in part* 424 U.S. 1 (1976) (per curiam)). Second, the district court "must determine whether the constitutional challenges are frivolous or involve settled legal questions." *Id*. Third, the district court must certify the "non-frivolous constitutional questions to the *en banc* court of appeals." *Id*.

The relevant test is straightforward: constitutional challenges must proceed under the special review provisions unless they are "frivolous or involve settled legal questions." *Id*. (collecting cases). This phrasing suggests that "frivolity" and "settled legal questions" are separate standards, but this is misleading. In practice, courts often conflate the "frivolousness" standard with the "settled questions of law" formulation. *See California Medical Association v. FEC*, 453 U.S. 182, 192

n.14 (1981) ("*Cal. Med.*"); *Mariani v. United States*, 212 F.3d 761, 769 (3d Cir. 2000) (en banc). The relevant question is whether the specific question presented in a case has already been definitively decided.

Moreover, as the Ninth Circuit has noted, "[o]nce a core provision of FECA has been reviewed and approved by the courts, unanticipated variations also may deserve the full attention of the appellate court." *Goland*, 903 F.2d at 1257. The Third Circuit has similarly recognized that "a genuinely new variation on an issue raised under a particular section of the FECA that already has been challenged and upheld may give rise to a nonfrivolous challenge to that section." *Mariani*, 212 F.3d at 769 (applying *Goland* and citing *Khachaturian v. FEC*, 980 F.2d 330, 331 (5th Cir. 1992) (en banc) (per curiam)). This is unsurprising since facial rulings are necessarily rare and limited. As Chief Justice Roberts has noted, it is the Court's practice "'never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Citizens United v. FEC*, 558 U.S. 310, 373 (2010) (Roberts, C.J., concurring) (quoting *United States* v. *Raines*, 362 U.S. 17, 21 (1960) (quoting *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration*, 113 U.S. 33, 39 (1885)).

Thus, while "not every sophistic twist that arguably presents a 'new' question should be certified," district courts ought to certify questions which pose genuinely new questions. *Goland*, 903 F.2d at 1257. The Supreme Court has never

19

considered the constitutionality of the per-election limitation on contributions as it applies here. *See, e.g.*, JA 308 n.16 (district court noting that "the Supreme Court has not decided the appropriate level of scrutiny in cases challenging political contribution limits on equal protection grounds").

Because Appellants' arguments have never been reviewed by any court, and in particular not by the Supreme Court, they have not been settled and are not frivolous.

### c. The Supreme Court has rejected previous efforts to alter Congress's exclusive grant of merits jurisdiction to the en banc Court of Appeals.

Twice the Supreme Court has been asked to alter § 30110's jurisdiction, and twice the Supreme Court has rejected the suggestion out of hand.[7]

First, in *Bread PAC*, several PACs and trade associations sought to invoke § 30110's "unique system of expedited review" even though, as corporations and PACs, they were plainly not one of the "three carefully chosen classes of persons" named in the statute (the FEC itself, national party committees, and natural persons eligible to vote for President). 455 U.S. at 578-79, 581. The Court rejected this "expansive construction" in favor of the statute's "obvious meaning." *Id*. at 581. In doing so, *Bread PAC* noted the potential burden Congress placed upon the

---

[7] Congress enjoys plenary authority to set the jurisdiction of the inferior federal courts and the appellate jurisdiction of the Supreme Court. U.S. CONST. art. I, § 8, Cl. 9; *id*. at art. III, § 1; *see also*, *e.g.*, *Ex parte McCardle*, 74 U.S. 506 (1869).

judiciary in mandating expedited review of a statute, and concluded that in such cases "close construction of statutory language takes on added importance" because "[j]urisdictional statutes are to be constructed with precision and with fidelity to the terms by which Congress has expressed its wishes." *Id.* at 580 (quotation marks and citation omitted).

Second, in *Cal. Med.*, the FEC sought to narrow the scope of § 30110 review, asking the Court to "preclude the use of [§ 30110] actions to litigate constitutional challenges to the Act that have been or might be raised as defenses to ongoing or contemplated Commission enforcement proceedings." *Cal. Med.* 453 U.S. at 189. The Court declined to adopt this "cramped construction of the statute," noting the "all-encompassing language" of § 30110. *Id.* at 190; *see also id.* at 190 n.13 ("[§ 30110] expressly requires a district court to 'immediately…certify *all* questions of the constitutionality of this Act' to the court of appeals." (emphasis in original)). It further stated that the FEC's interpretation would "undermine the very purpose" of the statute: "to provide a mechanism for the rapid resolution of constitutional challenges to the Act." *Id.* at 191.

Below, the FEC emphasized the district court's role in easing the judicial burden of Section 30110. *See*, *e.g.*, *Holmes v. FEC*, No. 14-5281, FEC Mot. for Remand at 12 (D.C. Cir. Jan. 2, 2015); *Holmes v. FEC*, No. 14-1243 (RMC), FEC Brief Opposing Certification and in Support of Summary Judgement in Favor of

the Commission at 13 (D.D.C. Mar. 13, 2015) (ECF 27); *see also* JA 232-33 (at

hearing, FEC asserting screening role for district court). But *Cal. Med.* considered

that argument and cautioned against "exaggerat[ing] the burden [§ 30110] actions

have placed on the federal courts." 453 U.S. at 192 n.13. In particular, the Court

noted that "only a handful" of such cases had been heard, including six cases

during the two years from 1979-80. *Id*.

     In short, the Supreme Court has unambiguously rejected attempts to second-

guess Congress's judgment in enacting § 30110 or to circumscribe that provision's

clear language.

     **d. Certification is proper for as-applied challenges unless Supreme
       Court precedent directly forecloses the challenge.**

         **i. This Circuit has held that constitutional questions should be
           certified unless the Supreme Court has precisely spoken to
           the issue.**

     Section 30110 permits a district court to resolve a challenge to FECA in only

one instance: if the Supreme Court has already directly ruled on the certified

question so as to foreclose relief. If the Supreme Court has not done so, then the

case merits certification and dismissal is inappropriate. *Int'l Ass'n of Machinists

and Aerospace Workers v. FEC*, 678 F.2d 1092, 1096 (D.C. Cir. 1982) (en banc)

(Under § 30110, the district court certifies questions that are "neither frivolous nor

so insubstantial as to warrant dismissal for failure to state a claim") (quoting *Int'l

*Ass'n of Machinists and Aerospace Workers v. FEC*, No. 80-354, slip. op. at 10 (D.D.C. Dec. 16, 1980)); *see also id.* at 1118 (answering certified questions after approving claimants' standing).

Additional authority on this point comes from a related procedural context. For some cases, including in certain campaign finance challenges, Congress commands district courts to convene a special three-judge court with direct review by the Supreme Court. 28 U.S.C. § 2284. The courts have recognized that the standard for convening a three-judge court under that provision is similar to the standard for certification under § 30110. *Goland,* 903 F.2d at 1257-58.

Consequently, this Court's decision in *Feinberg v. Federal Deposit Insurance Corp.*, 522 F.2d 1335, 1336 (D.C. Cir. 1975), which arose in the § 2284 context, is enlightening. There, this Court held that a constitutional question is "substantial" unless prior Supreme Court decisions have "foreclose[d] the subject" and left "no room for the inference that the question sought to be raised can be the subject of controversy." *Id.* at 1339 (internal quotation and citation omitted). Appellants' proposed constitutional questions, having never been addressed, clearly meet this standard.

### ii. Sister Circuits require narrow, as-applied challenges to be resolved by the en banc Courts of Appeals.

Under § 30110, courts have found narrow, as-applied challenges to be sufficiently "substantial," and found certification of such questions appropriate, even where those cases challenge contribution limits upheld facially by the Supreme Court. In such cases, a district court's analysis in deciding the weight of the constitutional challenge "closely resembles that applied under [Federal] Rule [of Civil Procedure] 12(b)(6)." *Goland*, 903 F.2d at 1257-58.

Three cases highlight this liberal standard. In each case, even if the *en banc* courts eventually ruled against a challenge, the proper procedure was to allow that decision to be made in the first instance by the court of appeals.

*Cao v. FEC*, illustrates when a question *is* appropriate for certification. 688 F. Supp. 2d 498 (E.D. La. 2010) *aff'd som. nom. Republican Nat'l Comm. v. FEC (In re Anh Cao)*, 619 F.3d 410 (5th Cir. 2010). There, the United States District Court for the Eastern District of Louisiana certified several questions to the Fifth Circuit. Among them was whether the $5,000 contribution limit on PAC-to-candidate contributions under 52 U.S.C. § 30116(a)(2)(A) was unconstitutional as applied to a political party's PAC. This PAC-to-candidate contribution limit had been upheld in prior Supreme Court cases, including *Buckley v. Valeo*, 424 U.S. at 35-36, and *FEC v. Colo. Republican Federal Campaign Comm.*, 533 U.S. 431,

24

438-39 (2001) ("*Colorado II*"). Nevertheless, the *Cao* plaintiffs brought a challenge based upon the important role of established political parties in the electoral system. *Cao*, 688 F. Supp. 2d at 527 ¶ 117 (internal citation omitted). Given that central role, the *Cao* plaintiffs argued, a political party's PAC should not be subject to the PAC-to-candidate contribution limit. *Cao*, 688 F. Supp. 2d at 547.

The *Cao* district court concluded that this question was appropriate for certification because the Supreme Court had never directly considered that argument. "*Buckley* mentioned the predecessor to [the PAC-to-candidate limit], but did so only in the context of discussing ad hoc political groups as opposed to 'established interest groups.' Political parties were not mentioned, nor was the constitutionality of undifferentiated limits." *Id*. (quoting 424 U.S. at 36). The district court continued: "the portion of *Colorado II* cited by the FEC dealt exclusively with coordinated expenditures, not contributions," and "contributions and expenditures require distinct constitutional analysis. In fact, the *Colorado II* court suggested that parties might warrant additional constitutional protections, but declined to address the question." *Id.* (citing 533 U.S. at 448-49).

The en banc Fifth Circuit determined that this certification was appropriate, and answered the challenge on the merits. *In re Anh Cao*, 619 F.3d at 420-21 (approving of certification of question); *id*. at 422 (ruling on question certified by

25

district court). The appellate court ultimately ruled that political party PACs should be subject to the same contribution limit as other PACs. *Id.* at 423. But the procedural point remains: even though the underlying statute had been twice upheld, the courts of the Fifth Circuit recognized that certification was appropriate where the *Cao* plaintiffs had brought a novel claim based upon the application of that statute to specific facts.

Another Fifth Circuit case, *Khachaturian v. FEC*, is similarly instructive, and demonstrates the extremely high standard for declaring a case insubstantial. 980 F.2d 330. There, "Khachaturian argue[d] that the [individual contribution] limit [was] unconstitutional as applied to his independent candidacy. However, *Buckley* considered, and rejected, claims that the contribution limit invidiously discriminates against independent and minor-party candidates as a class." 980 F.2d at 331 (citing 424 U.S. at 33-35). This was a correct reading of *Buckley*. The *Buckley* Court had specifically stated that "the record [before it was] virtually devoid of support for the claim that the [then] $1,000 contribution limitation will have a serious effect on the initiation and scope of minor-party and independent candidacies." 424 U.S. at 34. Thus, the Supreme Court had considered *the precise claim* Mr. Khachaturian raised—that the individual-to-candidate contribution limit was unconstitutional in the context of an independent candidate. Further, Khachaturian had not shown that his situation was any different from that of the

26

minor-party and independent candidates that *Buckley* had considered. 980 F.3d at 332. As a result, unlike in *Cao*, certification was properly declined.

Finally, in *Goland v. United States*, the Ninth Circuit emphasized that it is not the specific provision of law at issue that determines a question's substantiality, but rather the factual posture and legal theory undergirding the case itself. 903 F.2d 1247. There, the plaintiff funneled over $120,000 through 56 people to fund campaign ads without disclosing his identity. *Id.* at 1252, 1251. After being indicted for violating FECA, Mr. Goland sought certification of three constitutional questions under the procedure Appellants invoke here. *Id.* at 1252. The Ninth Circuit dismissed as "sophistic" and "creative" Goland's suggestion that, because he contributed anonymously, the individual contribution limit upheld in *Buckley* was inapplicable to him. *Id.* at 1257, 1258. Nevertheless, even in rejecting Goland's claim, the Ninth Circuit reiterated that "[o]nce a core provision of FECA has been reviewed and approved by the courts, unanticipated variations also may deserve the full attention of the appellate court." *Id.* at 1257.

Therefore, as-applied challenges are appropriately certified where they arise in new factual contexts or raise novel legal arguments. Such is the case here.

### iii. The district court in this Circuit recognizes its narrow role under section 30110 and certifies questions to this Court even where the language of the question requires modification.

In *SpeechNow.org v. FEC*, No. 08-0248 (JR), 2009 U.S. Dist. LEXIS 89011 at *2 (D.D.C. 2009), Judge Robertson recognized the district courts' limited role under section 30110, stating:

> The task before me is not to answer any constitutional questions, or to render a judgment of any kind. Instead, I am to make findings of fact that will allow the Court of Appeals to answer the constitutional questions I certify.

This certification came despite the same district court denying SpeechNow.org's motion to enjoin enforcement of certain contribution limits under FECA. *SpeechNow.org v. FEC*, 567 F. Supp. 2d 70, 82 (D.D.C. 2008). Ultimately, this Court decided SpeechNow.org's challenge, striking down the limits that Judge Robertson likely would have upheld. *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc).

*Libertarian National Committee v. FEC*, 930 F. Supp. 2d. 154 (D.D.C. 2013),[8] went further, *modifying* a question to narrow the issue and preserve review by this Court. In that case, Judge Wilkins found that that the LNC's proposed certified question in a facial challenge was foreclosed by facial rulings of the

---

[8] Below, the district court in this case praised *Libertarian National Committee* for "provid[ing] a cogent overview of the law regarding campaign finance." Consequently the district court "relie[d] on that analysis." JA 297 n.6.

Supreme Court. *Id*. at 165. Nevertheless, the Court concluded that "on th[o]se facts, it appear[ed] that the anti-corruption interests that would be implicated by [the contribution limit challenged there] may be minimal." *Id*. at 171. Thus,

> After a careful review of the parties' positions, the facts, and the current state of the law in this area, this Court conclude[d] that, although the question presented by the LNC for certification does not merit review by the en banc Court of Appeals, there is a valid, narrower constitutional question raised by the [facts of the case] that presents an as-applied challenge that should be certified.

*Id*. Judge Wilkins certified the narrowed question and presented this Court with findings of fact. *Id*. *Libertarian National Committee*, therefore, shows how far district courts must go to assure novel constitutional challenges are heard by the en banc Court of Appeals.

As all these cases, at every level of the federal judiciary, show, the threshold inquiry is not whether the offending statute has ever before been subject to a constitutional challenge. Instead, it is whether *the specific facts and legal claims* of this as-applied challenge present a novel application of law that has not been ruled upon by the Supreme Court. If the case is an unanticipated, as-applied challenge to FECA, then the district court erred in failing to certify the presented questions to the en banc Court of Appeals.

### III.    Appellants' case presents an unanticipated, as-applied, challenge to the division and timing of FECA's contribution limits.

The Supreme Court has not had an opportunity to review the constitutionality of the per-election division of FECA's base limits, let alone subject it to the closely drawn scrutiny the Constitution requires. Tellingly, neither the Commission nor the district court below can point to a case that did so. That fact alone determines the outcome of this appeal.

The district court instead based its ruling upon the belief that Appellants' "challenge to FECA's temporal per-election restrictions on individual contributions to federal candidates constitutes a veiled attack on the contribution limit set by Congress and upheld by the Supreme Court as a legitimate means to combat corruption." JA 267. This view is mistaken.

The Supreme Court has repeatedly observed that the First Amendment injury imposed by limiting the freedom to directly associate with candidates via contributions may only be tolerated when the law serves to fight corruption or its appearance. *McCutcheon*, 134 S. Ct. at 1441 ("Any regulation *must* instead target what we have called '*quid pro quo*' corruption or its appearance") (emphasis added).

Appellants do not dispute that Congress may set a contribution limit. They dispute whether Congress may artificially divide that limit once the legislature

arrives at an amount deemed low enough to combat corruption. If the per-election division does not serve the government's anti-corruption interest, as-applied to these facts, then Appellants' associational freedoms has been infringed unlawfully. Accordingly, the district court ought to have certified this case to the en banc Court of Appeals.

### a.  FECA imposes the artificial, per-election division at issue here.

The district court rejected Appellants' arguments that FECA itself bifurcated the contribution limits, determining that "FECA does not dictate a maximum contribution limit of $5,200 that may be split between the primary and general elections." JA 300. Thus, the district court rejected Appellants' claim that the per-election limit is unconstitutional as-applied because "[t]he base limit is not $5,200." JA 301. In doing so, the district court rejected the clear language of the statute and ignored the realities of its application. JA 303-304.

A system of per-election contribution limits has been in place since 1974. *See* 52 U.S.C. § 30116(a); Federal Election Campaign Act of 1974, Pub. L. 93-443 § 101, 88 Stat. 1263 (1974). Originally set at $1000, the limit was doubled by Congress in 2002 and indexed for inflation. JA 272, ¶ 6; 52 U.S.C. §§ 30116(a)(1), (c) JA 273, ¶ 9. As a practical matter, it has always been recognized that a candidate may raise $5200 (originally $2000) from a donor in an election cycle. For example, the FEC has long allowed donors to a write a single check to a

candidate for the combined primary/general election limit, provided that the donor included a notation dividing the contribution between the primary and the general. 11 C.F.R. § 110.1(b)(5)(ii)(B). Similarly, the press routinely reports donor contributions to candidates in the aggregate. *E.g.*, Tim Higgins *Presidential Fundraising: See Who's Spending, Who's Lagging, Who's Raising and Where*, BLOOMBERG, July 16, 2015, at http://www.bloomberg.com/politics/articles/2015-07-16/presidential-campaign-finance-reports-a-data-visualization.

This division is not simply an exercise in legislative discretion as to setting dollar amounts. As a practical matter, there is little value to winning a primary if winning the general election does not follow. And, indeed, it is quite clear that the vast majority of members will sit in Congress knowing that certain donors contributed $5,200 to their efforts to be elected, and can contribute up to that amount, adjusted for inflation, should they seek reelection. In short, Congress has plainly determined that a candidate may collect $5,200 from a single contributor without danger of corruption. *Compare Buckley*, 424 U.S. at 30 *with McCutcheon*, 134 S. Ct. at 1452.

Furthermore, under the present system, a donor can even contribute $5200 to a primary victor *after* the primary election is over. But contributions earmarked for elections that have already taken place may only be used to retire outstanding debts from that specific, prior election. 11 C.F.R. § 110.1(b)(3)(i). Moreover,

32

contributions given for a primary can be carried over to a general election. 11 C.F.R. § 110.1(b)(5)(ii)(B). Thus, a contributor who gives $5,200 in earmarked contributions the day before a primary election may functionally give $5,200 for general election purposes. But if she seeks to do the same the day *after* the primary, her ability to provide general election support is halved to a single $2,600 contribution for the general election.

This per-election division *doubles* the scope of association that certain contributors enjoy, and does so as a matter of statutory and regulatory design.[9] It specifically works most intensely in favor of candidates who do not have primary opposition, and against donors who wish to support a particular party's nominee in the general election, regardless of which of the party's contenders is victorious in the primary.

Accordingly, the government must justify this division and show that it serves to prevent *quid pro quo* corruption. This question has never been subject to the scrutiny of judicial review, and thus warrants certification.[10]

---

[9] The existence of other elections, whether run-off elections which allow for three elections during a cycle, or the unusual "jungle" system used in Louisiana, is not to the contrary. Appellants here seek to give to candidates that have survived a primary challenge and are contesting a general election—no more and no less.

[10] Of course, the district court did reach the merits. But it had no jurisdiction to do so under 52 U.S.C. § 30110 because the Supreme Court had not foreclosed the subject. *See Cal.Med.*, 453 U.S. at 192 n.14; *Feinberg*, 522 F.2d. at 1339.

**b. The Supreme Court has neither considered nor decided whether the per-election limit furthers the government's interest in preventing *quid pro quo* corruption.**

**i. *Buckley v. Valeo* did not consider or review FECA's per-election structure, and therefore cannot foreclose Appellants' challenge.**

*Buckley v. Valeo* is the seminal case addressing the intersection between the First Amendment and campaign finance reform. Yet the plaintiffs in that case did not challenge the structure and timing of FECA's contribution limits, and *Buckley* is consequently silent as to the constitutionality of the per-election division of those limits. The district court nonetheless relied upon *Buckley* to foreclose Appellants' challenge. JA 301 ("The base limit is not $5,200…[it is] $2,600, and *Buckley* mandates deference to that limit").

The district court's view that *Buckley*'s general blessing of base contribution limits foreclosed future examination of the per-election division, a question not before the Court in 1976, is unpersuasive.[11] After all, even the district court agreed "that *Buckley* upheld the dollar value of FECA's individual contribution limit and did not address the constitutionality of setting contribution limits on a per-election basis." JA 301.

---

[11] Furthermore, *Buckley* did not have the benefit of subsequent guidance and regulation by Congress and the FEC. *See*, *id*. at 1446 (detailing subsequent changes to FECA by Congress); *see also id*. at 1447 (detailing same for FEC).

It is certainly true that *Buckley* provides the proper standard for determining when a contribution limitation infringes upon the First Amendment. But Buckley merely stands for the proposition that base limits are generally constitutional, but not that *any and every* base limit is constitutional. *Davis v. FEC*—which facially invalidated a base limit more than 30 years after *Buckley* was decided— conclusively demonstrates as much. 554 U.S. 724 (2008); *see infra* at 47.

The district court recognized, instead, that *Buckley* "found *generally* that individual contribution limits advanced a 'sufficiently important' state interest if they are appropriately designed to reduce *quid pro quo* corruption or the appearance of corruption." JA 297 (quoting *Buckley*, 424 U.S. at 28) (emphasis added). This is unsurprising, since *Buckley* was the *general* facial challenge to FECA, brought shortly after the Act became law. *See*, *e.g.*, *Buckley*, 424 U.S. at 8-9 ("The complaint sought both a declaratory judgment that the major provisions of the Act were unconstitutional and an injunction against enforcement of those provisions"). Under a First Amendment analysis, the *Buckley* Court upheld the individual limit against facial attack. *Id*. at 29. But *Buckley* does not foreclose as-applied challenges to particular limits. *See*, *e.g. Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410, 411-12 (2006) ("*WRTL I*") (allowing an as-applied challenge to BCRA provision upheld facially in *McConnell v. FEC*, 540 U.S. 93, 190 n.73 (2003)). Appellants' challenge, if successful on the merits, will in no way dislodge

35

*Buckley*'s reasoning. Rather, this case will determine if FECA's contribution limit, which sets forth Congress's judgment as to the level of contribution that can be permitted consistent with the government's anti-corruption interest, is in fact "*appropriately designed* to reduce *quid pro quo* corruption or the appearance of corruption" where it is artificially bifurcated across two elections. JA 297 (quoting *Buckley*, 424 U.S. at 28) (emphasis added).

Unsurprisingly, there have been a number of as-applied challenges brought against FECA after *Buckley,* belying claims that such challenges are foreclosed. For instance, while the *Buckley* Court upheld FECA's disclosure limits to all party committees, certain minor parties have been permitted a judicial exemption from the law's requirements. *Brown v. Socialist Workers Campaign Comm.*, 459 U.S. 87, 102 (1982). Not all such as-applied challenges have been successful, but when novel claims have been brought under the § 30110 procedure it has been the duty of the en banc Court of Appeals to determine whether FECA unnecessarily infringes upon constitutional freedoms. *Mariani v. United States*, 212 F.3d 761 (2000) (finding that plaintiff's challenge properly had been certified, but upholding, under § 30110 procedure, FECA's prohibition against direct corporate contributions to candidates).

### ii. The Supreme Court's most recent case reviewing contribution limits accords with Appellants' reading of the statute.

In 2014, the Court revisited, in part, its holding in *Buckley* and struck down the federal aggregate contribution limit. *McCutcheon*, 134 S. Ct. at 1462. In doing so, the Court reviewed the design of the aggregate limit as it related to the government's interest in fighting corruption, and found that the statute was not "closely drawn" to that interest. While the *McCutcheon* opinion has merited notice for its articulation of the relevant *quid pro quo* corruption that justifies campaign finance regulations in the first place,[12] it also directly spoke to FECA's base limits.

In order to review the aggregate limit for tailoring, the Court necessarily looked to the underlying base limits, and in doing so read FECA to work precisely as Appellants maintain that it does: by creating a base limit of $5,200. Specifically, the Chief Justice's controlling opinion held that "Congress's selection of a $5,200 base limit indicates its belief that contributions of that amount or less do not create a cognizable risk of corruption." *McCutcheon*, 134 S. Ct. at 1452. The *combination* of the primary and general election contribution limits was the basis for striking down the aggregate contribution limits.

---

[12] "Any regulation must instead target what we have called *quid pro quo* corruption or its appearance. That Latin phrase captures the notion of a direct exchange of an official act for money…Campaign finance restrictions that pursue other objectives, we have explained [are] impermissibl[e]." 134 S. Ct. at 1441 (punctuation altered, brackets added, citations omitted).

The district court below incorrectly disregarded the Supreme Court's holding as "taken out of context" and "dicta" in order to justify its finding that "[t]he base limit is not $5,200."  JA 303, 301. But the *McCutcheon* Court based its holding on the belief that, in fact, the base limit *is* $5,200. In describing the facts of the *McCutcheon* challenge the Court noted "[f]or the 2013-2014 election cycle, *the base limits in the Federal Election Campaign Act of 1971 (FECA)*, as amended by the Bipartisan Campaign Reform Act of 2002 (BCRA), permit an individual to contribute up to $2,600 per election to a candidate *($5,200 total for the primary and general elections)*." *Id*. at 1442 (emphasis added).

Thus, the *McCutcheon* Court was plainly aware of the per-election bifurcation. Nevertheless, it determined that the amount authorized for primary and general election contributions was *the* relevant fact for the purposes of finding whether FECA was properly tailored to the government's anti-corruption interest.

As the *McCutcheon* Court reasoned,

> "[i]f there is no corruption concern in giving nine candidates up to $5,200 each, it is difficult to understand how a tenth candidate can be regarded as corruptible if given $1,801, and all others corruptible if given a dime. And if there is no risk that additional candidates will be corrupted by donations of up to $5,200, then the Government must defend the aggregate limits by demonstrating that they prevent circumvention of the base limits."

*Id*. at 1452. That is, the Court held that the state had no interest in further regulating the aggregation of contributions independent of the base limit of $5,200.

*Id*. at 1448 ("The individual may give *up to $5,200* each to nine candidates, but the aggregate limits constitute an outright ban on further contributions to any other candidate") (emphasis added). The existence of the combined primary and general election limits was at the core, not the periphery, of the Court's holding. The Chief Justice's reading of the statute, therefore, was not dicta.[13] Indeed, the *McCutcheon* dissenters also based their argument on a base limit of $5200. *See* 134 S.Ct. at 1473 (Breyer, dissenting) (the majority "significantly understates the problem. That is because federal election law also allows a single contributor to give $5,200 to each party candidate over a 2-year election cycle (assuming the candidate is running in both a primary and a general election). §[ 30116](a)(1)(A); 78 Fed. Reg. 8532. There are 435 party candidates for House seats and 33 party candidates for

---

[13] Even assuming the *McCutcheon* passages are "dicta," however, the district court was still bound by the Supreme Court's reasoning. *See*, *e.g.*, *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) ("'carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative'") (quoting *Doughty v. Underwriters at Lloyd's, London*, 6 F.3d 856, 861 n.3 (1st Cir. 1993)). That is because even if a statement is dicta "it does not necessarily follow that [it was] wrong, and certainly dicta of the United States Supreme Court should be very persuasive." *Gabbs Exploration Co. v. Udall*, 315 F.2d 37, 39 (D.C. Cir. 1963) (internal citations omitted); *also IFC Interconsult, AG v. Safeguard Intl Partners*, 438 F.3d 298, 311 (3d Cir. 2006) ("we pay due homage to the Supreme Court's well-considered dicta as pharoi that guide our rulings"). This is particularly true when the case at issue is of recent vintage. As the Tenth Circuit recognized, lower courts "are bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, *particularly when the dicta is recent* and not enfeebled by later statements." *Peterson v. Martinez*, 707 F.3d 1197, 1210 (10th Cir. 2013) (quotation marks and citation omitted) (emphasis added).

Senate seats in any given election year. That makes an additional $2.4 million in allowable contributions. Thus, without an aggregate limit, the law will permit a wealthy individual to write a check, over a 2-year election cycle, for $3.6 million—all to benefit his political party and its candidates.") *See also id.* ("no … candidate receives more than it could have received from Rich Donor directly--…$5,200); *id.* at 1474 ("Campaign finance law prohibits an individual from contributing (1) more than $5,200 to any candidate in a federal election cycle").

The district court claims that *Buckley* forecloses any consideration of the structure of Congress's base contribution limits. JA 301-302. But whether the bifurcation of that limit fights corruption is an open question, and one unlikely to be answered in the affirmative, especially after *McCutcheon*. We know, as the *McCutcheon* Court knew, that Congress has authorized the giving of $5,200 to a candidate for office for most of the election cycle, and that such contributions do not implicate the anti-corruption interest. The per-election division is an artificial means of dividing that amount. From an anticorruption perspective, it is no different from permitting $2,600 for the primary election, $1,300 from the primary until October 1, and a final $1,300 from October 1 to Election Day. However convenient a particular administrative approach may be for the FEC, these divisions do nothing to prevent corruption, and that is the only governmental interest that justifies a contribution limit.

40

The district court dismissed *McCutcheon* entirely. It stated that "[t]he Supreme Court's reference to $5,200 was a product of the facts in that case, where appellant made the maximum permissible base level contributions to his preferred candidates for their primary and general elections…." JA 304, n.12. But this is true for only some, but not all, of Mr. McCutcheon's contributions. He also wished to give $1,776 to an additional 12 candidates, among other activities. *See*, *e.g.*, *McCutcheon*, 134 S.Ct. at 1443 ("[h]e alleges that he wished to contribute $1,776 to each of 12 additional candidates but was prevented from doing so by the aggregate limit on contributions to candidates"). That is, *McCutcheon* stands generally for the unconstitutionality of "*prophylaxis-upon-prophylaxis*," of contribution limits that simply pile additional restrictions upon the base limit on how much may be contributed to a candidate. *Id*. at 1458 (quoting and applying *Wisconsin Right to Life*, 551 U.S., at 479 (Roberts, C.J. controlling opinion)). Merely pointing to a plaintiff's preferred contribution structure cannot change the fact that the Court looked to $5,200 as the threshold at which contributions risk becoming "corrupting," and that this understanding of the base limit was central both to its holding, *Id*. at 1442; *id*. at 1452, and to the dissenters' arguments as well *id.* at 1476 ("total allowable contributions to Smith [are] $5,200 per election cycle.").

41

Consequently, the district court was incorrect in determining that "the base limit—the maximum contribution to a candidate for his general election campaign—is $2,600, and *Buckley* mandates deference to that limit." JA 301. Rather, Appellants "claim is unsettled…because *Buckley* did not address *when* a contributor could give $5,200 during the election cycle." *Id*. (emphasis in original). It is undisputed that FECA and the FEC permit individuals to give $5,200 to the same candidate for the same office during the same election cycle—as the *McCutcheon* Court properly noted. And it is further undisputed that no Supreme Court case has determined whether the artificial division of the $5,200 into two giving periods during a contest for office featuring a primary and a general election is properly designed to serve the government's anti-corruption interest. Consequently, the district court erred in not recertifying Appellants' First Amendment question to the en banc Court of Appeals.

### c. Neither the Supreme Court nor any other court has considered Appellants' specific Fifth Amendment challenge.

Appellants' challenge is based upon the asymmetry posed when a candidate who faces a primary challenge competes in the general election against a candidate who ran unopposed or virtually unopposed during the primary.[14] During the 2014

---

[14] While defining the exact situations in which a candidate is "virtually unopposed" would require the Commission to issue a regulation, there is nothing in the record to indicate that the Commission could not do so, nor that the specific elections at

election, the only difference between Appellants and contributors to their preferred candidates' general election opponents was that a contributor to Congressman Loebsack or Congressman Peters could give $5,200 solely toward general election use, while Appellants were denied that same ability.

Appellants challenge this result under the Fifth Amendment's guarantee of the equal protection of the laws. The district court, however, found Appellants' Fifth Amendment claim unworthy of certification, stating that "FECA treats all individual contributors equally by imposing uniform per-candidate, per-election contribution limits", and accordingly, because *"Buckley*'s reasoning applies…here" Appellants' "Fifth Amendment claim is based on settled law." JA 306, 308. This was incorrect, and merits reversal.

### i. The facial opinion in *Buckley* did not reach the Fifth Amendment question.

Given that the per-election division of the base limit was not considered in *Buckley*'s First Amendment analysis, it is unsurprising that the Court did not address the equal protection implications of that regime. 424 U.S. at 35 ("In view of these considerations, we conclude that the impact of the Act's $1,000

---

issue here are anywhere near the line. JA 264 (noting the Commission's ability to implement "as-applied challenges leading to sweeping relief and regulatory adjustment", and citing the FEC's regulatory changes after *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. at 457 at 72 Fed. Reg. 72899 (Dec. 26, 2007) and *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 241 (1986) at 60 Fed. Reg. 35292, 35293 (July 6, 1995)).

contribution limitation on major-party challengers and on minor-party candidates does not render the provision unconstitutional *on its face*") (emphasis added). Indeed, the district court itself observed that that the *Buckley* opinion's facial review of the limits "does not mean that the statute could not be unconstitutional in an as-applied challenge" under the Fifth Amendment. JA 306 (quoting *Buckley*, 424 U.S. at 31 n.33 as expressing no "opinion with regard to the alleged invidious discrimination resulting from the full sweep of the legislation as enacted").

No court has considered the issue that Appellants bring,[15] although the *McCutcheon* Court, by treating the primary and general election limits as one overall limit, did suggest that the transfer of $5,200 from an individual contributor to a particular candidate posed no corruption concerns. Nevertheless, the district court determined that Appellants claim was "foreclosed by *Buckley*." JA 308, n.15.

### ii. Appellants bring a novel, justiciable, equal protection claim.

Unable to foreclose certification on the ground that this case has been reviewed by the Supreme Court, the district court justified denial by reaching the merits and quoting extensively from the its rejection of Appellants' earlier motion

---

[15] As discussed *infra*, a Fifth Amendment claim against other federal contribution limits was raised in *Davis v. FEC*, 554 U.S. 724 (2008) (declaring unconstitutional the "millionaire's amendment" changing contribution limits for opponents of self-financed candidates), but the Supreme Court ruled on other grounds. *Id*. at 738. Nonetheless, the Court has certainly not *foreclosed* Fifth Amendment challenges to contribution limits generally—let alone Fifth Amendment challenges to the per-election division in particular.

for a preliminary injunction. JA 306-07. Because the district court's authority to reject certification is, as discussed *supra*, limited, the district court essentially stated that Appellants had not presented a claim capable of judicial redress. JA 307; *but see Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) (equal protection doctrine's "broad and benign provisions" render invalid any law which may "itself be fair on its face and impartial in appearance, yet…[be] applied…so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights").

The Constitution's guarantee of equal protection is designed to prevent "governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citation omitted). The "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment," *Buckley*, 424 U.S. at 93 (citation omitted), and "[t]he Equal Protection Clause of the Fourteenth Amendment…proscribe[s]" against "state action of *every kind* that operates to deny *any* citizen the equal protection of the laws." *Gilmore v. Montgomery*, 417 U.S. 556, 565 (1974) (internal quotation marks and citation omitted) (emphasis added).

Here, the government has implicitly classified contributors based upon whether or not their preferred candidate faces a primary challenger. For example,

Adam wishes to support Party A's candidate in the general election. Since Party A has an uncontested primary, Adam can contribute $5200 before the primary date, knowing that it will all be used to support the election of Party A's nominee in the general election. Briana wishes to support Party B's candidate in the general election. But since Party B has a contested primary, she cannot confidently contribute $5200 to her party's nominee in the general election. FECA thus classifies contributors based upon the moment during an election period—before or after a primary election—that a contributor seeks to financially associate with a candidate's campaign. Worse, it does so in the context of a fundamental right that "lies at the foundation of a free society", and is accordingly "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Buckley*, 424 U.S. at 25; *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960).

Indeed, the *Buckley* Court anticipated that circumstances such as Appellants' might arise. *Buckley* merely considered a facial challenge to FECA's contribution limits, and did not consider the effects of separate limits for primary elections. 424 U.S. at 35 ("the impact of the Act's $1,000 contribution limitation on major-party challengers and on minor-party candidates does not render the provision unconstitutional on its face"). The *Buckley* Court left the door open for subsequent challenges where those limits work "invidious discrimination." *Id*. at 31, n.33. This

46

was particularly important because FECA was necessarily designed by incumbents, and so it was possible that "the Act, [might] on its face appear[] to be evenhanded" but this appearance "may not reflect political reality." *Id*.; *see McCutcheon*, 134 S. Ct. at 1441-42 ("[T]hose who govern should be the *last* people to help decide who *should* govern") (emphasis in original).

While the Court has yet to address the specific question presented here— hence the need for the unusual review process of 52 U.S.C. § 30110—it *has* determined that where contribution limits work asymmetrical effects, they threaten fundamental freedoms and may be unconstitutional.

In 2008, *Davis v. FEC* considered a BCRA provision, commonly called the "millionaire's amendment," which permitted candidates facing a self-financed opponent to raise money in increments triple the normal base limit. 554 U.S. at 729; *id*. at 738. Before BCRA's enactment, observers noted that the provision's inevitable effect would be asymmetric treatment in favor of a specific class of candidate—in that case, incumbents. STATEMENT OF SENATOR CHRIS DODD, 147 CONG. REC. S. 2536, 2542 (2001) ("this is what I could call incumbency protection").

The *Davis* plaintiff, a self-financed Congressional candidate, raised both First and Fifth Amendment objections. 554 U.S. at 744, n.9. Ultimately, Davis prevailed—though the Court did not reach his Fifth Amendment claim—on the

47

ground that such an asymmetric outcome offends the Constitution. *Id*. at 738 ("We have never upheld the constitutionality of a law that imposes different contributions for candidates who are competing against each other, and we agree with Davis that this scheme impermissibly burdens his First Amendment right to spend his own money for campaign speech").

Similarly, in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, the Supreme Court struck down an Arizona public financing regime under the First Amendment based, in part, upon its asymmetric effect. 564 U.S. ___, ___,131 S. Ct. 2806, 2819 (2011). Arizona's system allowed "a publicly financed candidate" to "receive[] roughly one dollar for every dollar spent by an opposing privately financed candidate" or independent group supporting such a candidate. *Id*. at 2813. Relying on "[t]he logic of *Davis*" the Court rejected this approach. *Id*. at 2818. In its opinion, the Court also pointed to a further asymmetry: some Arizona districts, including its state House districts, elected more than one candidate. Consequently, "each dollar spent by the privately funded candidate would result in an additional dollar of campaign funding to *each* of that candidate's publicly financed opponents." *Id*. at 2819 (emphasis added). The Court stated that, in such circumstances, candidates would be required "to fight a political hydra of sorts." *Id.*

48

This was equally (if not especially) true for independent groups which, in speaking about candidates, would trigger direct cash payments to those candidates' opponents. *Id.* ("spending one dollar can result in the flow of dollars to multiple candidates the group disapproves of"). These passages can only be read to express the Court's concern—explicitly raised in both *Buckley* and *Davis*—that governments might impermissibly burden political association and expression by advantaging some over others. This violates the First Amendment, as explained above. It also falls far short of the Fifth Amendment's equal protection guarantee.

In fact, the Tenth Circuit has struck down asymmetric contribution limits under the equal protection doctrine. While that case, *Riddle v. Hickenlooper*, 742 F.3d 922 (10th Cir. 2014), contemplated a slightly different factual posture, it addressed a parallel constitutional claim, where a contribution limit that operated asymmetrically violated the guarantee of equal protection.

The case involved a Colorado law permitting uncontested major party candidates to receive contributions for the primary and general elections—just as federal law permits now. *Id*. at 924 (Contributions for both elections allowed "even when there is only one candidate seeking the nomination" of a major party). These primary and general election contributions could—as in the federal system—all be spent in the general election. *Compare id*. at 926 *with* JA 273-74, ¶ 11; JA 277, ¶ 26; *see also* Congressional Candidates and Committees, FEDERAL ELECTION

49

COMMISSION at JA 94 ("Nevertheless, the campaign of a candidate running in the general election may spend unused primary contributions for general election expenses"). But candidates seeking the nomination of other, non-major parties, could receive primary contributions "only when multiple candidates vie for the nomination." *Id.* at 924. Other candidates who did not run in a primary—such as independent or write-in candidates—were also barred from accepting primary election money. *Id.* at 927.

The *Riddle* plaintiffs, like Ms. Holmes and Mr. Jost, sought to contribute the full primary and general election amounts to a general election candidate (in *Riddle*, a write-in candidate). The Tenth Circuit found no cognizable anti-corruption interest in "creat[ing] a basic favoritism between candidates vying for the same office," and determined that Colorado's asymmetric scheme violated the U.S. Constitution's requirement that citizens be treated equally under the law. *Id.* at 929-30. Specifically, the Tenth Circuit determined that because "[a]fter the primary, a supporter of [the write-in candidate] could give" half as much money for the general election as other candidates, "the statute treated contributors differently based on the political affiliation of the candidate being supported. And by treating the contributors differently, the statute impinged on the right to political expression." *Id.* at 927.

50

Despite these relevant precedents and persuasive analysis, and the lack of any ruling on the direct question presented here, the district court declined to certify Appellants' equal protection question. In doing so, the district court suggested that Appellants are "only restricted *to the exact same extent* as any other individuals wishing to contribute more than $2,600 per election." JA 306-307 (citation and quotation marks omitted, emphasis in original). As discussed *supra*, the law does not actually work this way—there are circumstances in which $5,200 may be given to candidates for general election purposes. And, in any event, only the *en banc* Court of Appeals has jurisdiction to render that judgment.

### iii.   *Wagner v. FEC* is not to the contrary.

The en banc Court of Appeals recently rejected a Fifth Amendment claim in the context of a § 30110 challenge to FECA. *Wagner v. FEC*, No. 13-5162, 2015 U.S. App. LEXIS 11625 (D.C. Cir. July 7, 2015).

*Wagner* did speak to one aspect of Appellants' challenge: whether strict scrutiny would apply to a Fifth Amendment claim brought against FECA. The *Riddle* decision, in the Tenth Circuit, specifically declined to resolve that issue, finding instead that the Colorado contribution limit failed closely drawn scrutiny. 742 F.3d at 928. *Wagner* did reach that question, holding that strict scrutiny is inappropriate for equal protection challenges to individual contribution limits. *Wagner*, 2015 U.S. App. LEXIS 11625 at *81-82.

51

While the *Wagner* Court rejected Appellants' claims that certain categories of givers could be prohibited from financially associating with candidates of their choice, *Wagner* involved Congressional limits on government contractors. *Id*. at *2-3. The en banc Court differentiated limits on government officials from restrictions on giving by the general public, given the state's interest in "allowing governmental entities to perform their functions." *Id.* at *15 (citing *Citizens United*, 558 U.S. at 341). This interest is not implicated here, as Appellants are private citizens and "the Supreme Court has identified no congressional objective beyond protection against quid pro quo corruption and its appearance that warrants imposing campaign finance restrictions on the citizenry at large." *Id*.

Furthermore, the *Wagner* plaintiffs' challenge was rejected, in part, because "plaintiffs acknowledge that they know of no case in *any* court in which an equal-protection challenge to contribution limits succeeded where a First Amendment one did not." *Id*. at *81 (quotation marks and citation omitted) (emphasis in original). But the *Riddle* case provides ample evidence that Fifth Amendment remedies are available when contribution limits violate the equal protection of the laws. This fact, in itself, is sufficient to justify § 30110 review by the en banc Court of Appeals.

Thus, Appellants seek relief which can be granted under the Fifth Amendment. Their claim is novel and has never been reviewed by the Supreme

52

Court. Accordingly, Appellants' claim ought to be heard en banc pursuant to 52 U.S.C. § 30110.

**Conclusion**

For the foregoing reasons the judgment of the district court should be reversed and the merits of Appellants' constitutional claims certified to this Court, en banc, pursuant to 52 U.S.C. § 30110.

Respectfully Submitted,

s/ Allen Dickerson

Allen Dickerson (D.C. Cir. No. 54137)
Tyler Martinez (D.C. Cir. No. 54964)

Center for Competitive Politics
124 S. West Street, Suite 201
Alexandria, Virginia 22314
Telephone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org
tmartinez@campaignfreedom.org

*Counsel for Plaintiffs-Appellants*

Dated: August 17, 2015.

**Certificate of Compliance**

I hereby certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,315 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Dated: August 17, 2015                         s/ Allen Dickerson
                                               Allen Dickerson

**ADDENDUM**

## Addendum Table of Contents

52 U.S.C. § 30101(1) ...................................................................................... ADD 1

52 U.S.C. § 30110 ........................................................................................... ADD 2

52 U.S.C. § 30116(a)(1)(A) ........................................................................... ADD 3

11 C.F.R. § 100.2 ............................................................................................ ADD 4

11 C.F.R. § 102.9 ............................................................................................ ADD 7

11 C.F.R. § 110.1(b) ...................................................................................... ADD 12

11 C.F.R. § 110.3(c)(3) .................................................................................. ADD 22

## 52 U.S.C. § 30101(1)

When used in this Act:

(1) The term "election" means--

    (A) a general, special, primary, or runoff election;

    (B) a convention or caucus of a political party which has authority to nominate a candidate;

    (C) a primary election held for the selection of delegates to a national nominating convention of a political party; and

    (D) a primary election held for the expression of a preference for the nomination of individuals for election to the office of President.

## 52 U.S.C. § 30110

The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

## 52 U.S.C. § 30116(a)(1)(A)

(a) Dollar limits on contributions.

(1) Except as provided in subsection (i) and section 315A [52 USCS § 30117],

no person shall make contributions--

(A) to any candidate and his authorized political committees with respect to

any election for Federal office which, in the aggregate, exceed $ 2,000…

## 11 C.F.R. § 100.2

(a) Election means the process by which individuals, whether opposed or unopposed, seek nomination for election, or election, to Federal office. The specific types of elections, as set forth at 11 CFR 100.2(b), (c), (d), (e) and (f) are included in this definition.

(b) General election. A general election is an election which meets either of the following conditions:

(1) An election held in even numbered years on the Tuesday following the first Monday in November is a general election.

(2) An election which is held to fill a vacancy in a Federal office (i.e., a special election) and which is intended to result in the final selection of a single individual to the office at stake is a general election. See 11 CFR 100.2(f).

(c) Primary election. A primary election is an election which meets one of the following conditions:

(1) An election which is held prior to a general election, as a direct result of which candidates are nominated, in accordance with applicable State law, for election to Federal office in a subsequent election is a primary election.

(2) An election which is held for the expression of a preference for the nomination of persons for election to the office of President of the United States is a primary election.

(3) An election which is held to elect delegates to a national nominating convention is a primary election.

(4) With respect to individuals seeking federal office as independent candidates, or without nomination by a major party (as defined in 26 U.S.C. 9002(6)), the primary election is considered to occur on one of the following dates, at the choice of the candidate:

(i) The day prescribed by applicable State law as the last day to qualify for a position on the general election ballot may be designated as the primary election for such candidate.

(ii) The date of the last major party primary election, caucus, or convention in that State may be designated as the primary election for such candidate.

(iii) In the case of non-major parties, the date of the nomination by that party may be designated as the primary election for such candidate.

(5) With respect to any major party candidate (as defined at 26 U.S.C. 9002(6) who is unopposed for nomination within his or her own party, and who is certified to appear as that party's nominee in the general election for the office sought, the primary election is considered to have occurred on the date on which the primary election was held by the candidate's party in that State.

(d) Runoff election. Runoff election means the election which meets either of the following conditions:

(1) The election held after a primary election, and prescribed by applicable State law as the means for deciding which candidate(s) should be certified as a nominee for the Federal office sought, is a runoff election.

(2) The election held after a general election and prescribed by applicable State law as the means for deciding which candidate should be certified as an officeholder elect, is a runoff election.

(e) Caucus or Convention. A caucus or convention of a political party is an election if the caucus or convention has the authority to select a nominee for federal office on behalf of that party.

(f) Special election. Special election means an election which is held to fill a vacancy in a Federal office. A special election may be a primary, general, or runoff election, as defined at 11 CFR 100.2(b), (c) and (d).

ADD 6

## 11 C.F.R. § 102.9

The treasurer of a political committee or an agent authorized by the treasurer to receive contributions and make expenditures shall fulfill all recordkeeping duties as set forth at 11 CFR 102.9(a) through (f):

(a) An account shall be kept by any reasonable accounting procedure of all contributions received by or on behalf of the political committee.

(1) For contributions in excess of $ 50, such account shall include the name and address of the contributor and the date of receipt and amount of such contribution.

(2) For contributions from any person whose contributions aggregate more than $ 200 during a calendar year, such account shall include the identification of the person, and the date of receipt and amount of such contribution.

(3) For contributions from a political committee, such account shall include the identification of the political committee and the date of receipt and amount of such contribution.

(4) In addition to the account to be kept under paragraph (a)(1) of this section, for contributions in excess of $ 50, the treasurer of a political committee or an agent authorized by the treasurer shall maintain:

(i) A full-size photocopy of each check or written instrument; or

ADD 7

(ii) A digital image of each check or written instrument. The political committee or other person shall provide the computer equipment and software needed to retrieve and read the digital images, if necessary, at no cost to the Commission.

(b)

(1) An account shall be kept of all disbursements made by or on behalf of the political committee. Such account shall consist of a record of:

(i) the name and address of every person to whom any disbursement is made;

(ii) the date, amount, and purpose of the disbursement; and

(iii) if the disbursement is made for a candidate, the name and office (including State and congressional district, if any) sought by that candidate.

(iv) For purposes of 11 CFR 102.9(b)(1), purpose has the same meaning given the term at 11 CFR 104.3(b)(3)(i)(A).

(2) In addition to the account to be kept under 11 CFR 102.9(b)(1), a receipt or invoice from the payee or a cancelled check to the payee shall be obtained and kept for each disbursement in excess of $ 200 by or on behalf of, the committee, except that credit card transactions, shall be documented in accordance with 11 CFR 102.9(b)(2)(ii) and disbursements by share draft or

check drawn on a credit union account shall be documented in accordance with 11 CFR 102.9(b)(2)(iii).

(i)

(A) For purposes of 11 CFR 102.9(b)(2), payee means the person who provides the goods or services to the committee or agent thereof in return for payment, except for an advance of $ 500 or less for travel and subsistence to an individual who will be the recipient of the goods or services.

(B) For any advance of $ 500 or less to an individual for travel and subsistence, the expense voucher or other expense account documentation and a cancelled check to the recipient of the advance shall be obtained and kept.

(ii) For any credit card transaction, documentation shall include a monthly billing statement or customer receipt for each transaction and the cancelled check used to pay the credit card account.

(iii) For purposes of 11 CFR 102.9(b)(2), a carbon copy of a share draft or check drawn on a credit union account may be used as a duplicate record of such draft or check provided that the monthly account statement showing that the share draft or check was paid by the credit union is also retained.

(c) The treasurer shall preserve all records and accounts required to be kept under 11 CFR 102.9 for 3 years after the report to which such records and accounts relate is filed.

(d) In performing recordkeeping duties, the treasurer or his or her authorized agent shall use his or her best efforts to obtain, maintain and submit the required information and shall keep a complete record of such efforts. If there is a showing that best efforts have been made, any records of a committee shall be deemed to be in compliance with this Act. With regard to the requirements of 11 CFR 102.9(b)(2) concerning receipts, invoices and cancelled checks, the treasurer will not be deemed to have exercised best efforts to obtain, maintain and submit the records unless he or she has made at least one written effort per transaction to obtain a duplicate copy of the invoice, receipt, or cancelled check.

(e)

(1) If the candidate, or his or her authorized committee(s), receives contributions that are designated for use in connection with the general election pursuant to 11 CFR 110.1(b) prior to the date of the primary election, such candidate or such committee(s) shall use an acceptable accounting method to distinguish between contributions received for the primary election and contributions received for the general election. Acceptable accounting methods include, but are not limited to:

ADD 10

(i) The designation of separate accounts for each election, caucus or convention; or

(ii) The establishment of separate books and records for each election.

(2) Regardless of the method used under paragraph (e)(1) of this section, an authorized committee's records must demonstrate that, prior to the primary election, recorded cash on hand was at all times equal to or in excess of the sum of general election contributions received less the sum of general election disbursements made.

(3) If a candidate is not a candidate in the general election, any contributions made for the general election shall be refunded to the contributors, redesignated in accordance with 11 CFR 110.1(b)(5) or 110.2(b)(5), or reattributed in accordance with 11 CFR 110.1(k)(3), as appropriate.

(f) The treasurer shall maintain the documentation required by 11 CFR 110.1(l), concerning designations, redesignations, reattributions and the dates of contributions. If the treasurer does not maintain this documentation, 11 CFR 110.1(l)(5) shall apply.

## 11 C.F.R. § 110.1(b)

(b) Contributions to candidates; designations; and redesignations.

   (1) No person shall make contributions to any candidate, his or her authorized political committees or agents with respect to any election for Federal office that, in the aggregate, exceed $ 2,000.

      (i) The contribution limitation in the introductory text of paragraph (b)(1) of this section shall be increased by the percent difference in the price index in accordance with 11 CFR 110.17.

      (ii) The increased contribution limitation shall be in effect for the 2-year period beginning on the first day following the date of the last general election in the year preceding the year in which the contribution limitation is increased and ending on the date of the next general election. For example, an increase in the contribution limitation made in January 2005 is effective from November 3, 2004 to November 7, 2006.

      (iii) In every odd numbered year, the Commission will publish in the FEDERAL REGISTER the amount of the contribution limitation in effect and place such information on the Commission's Web site.

   (2) For purposes of this section, with respect to any election means --

      (i) In the case of a contribution designated in writing by the contributor for a particular election, the election so designated. Contributors to candidates

ADD 12

are encouraged to designate their contributions in writing for particular elections. See 11 CFR 110.1(b)(4).

(ii) In the case of a contribution not designated in writing by the contributor for a particular election, the next election for that Federal office after the contribution is made.

(3)

(i) A contribution designated in writing for a particular election, but made after that election, shall be made only to the extent that the contribution does not exceed net debts outstanding from such election. To the extent that such contribution exceeds net debts outstanding, the candidate or the candidate's authorized political committee shall return or deposit the contribution within ten days from the date of the treasurer's receipt of the contribution as provided by 11 CFR 103.3(a), and if deposited, then within sixty days from the date of the treasurer's receipt the treasurer shall take the following action, as appropriate:

(A) Refund the contribution using a committee check or draft; or

(B) Obtain a written redesignation by the contributor for another election in accordance with 11 CFR 110.1(b)(5); or

(C) Obtain a written reattribution to another contributor in accordance with 11 CFR 110.1(k)(3).

If the candidate is not a candidate in the general election, all contributions made for the general election shall be either returned or refunded to the contributors or redesignated in accordance with 11 CFR 110.1(b)(5), or reattributed in accordance with 11 CFR 110.1(k)(3), as appropriate.

(ii) In order to determine whether there are net debts outstanding from a particular election, the treasurer of the candidate's authorized political committee shall calculate net debts outstanding as of the date of the election. For purposes of this section, net debts outstanding means the total amount of unpaid debts and obligations incurred with respect to an election, including the estimated cost of raising funds to liquidate debts incurred with respect to the election and, if the candidate's authorized committee terminates or if the candidate will not be a candidate for the next election, estimated necessary costs associated with termination of political activity, such as the costs of complying with the post-election requirements of the Act and other necessary administrative costs associated with winding down the campaign, including office space rental, staff salaries and office supplies, less the sum of:

   (A) The total cash on hand available to pay those debts and obligations, including: currency; balances on deposit in banks, savings and loan institutions, and other depository institutions; traveler's checks;

certificates of deposit; treasury bills; and any other committee investments valued at fair market value;

(B) The total amounts owed to the candidate or political committee in the form of credits, refunds of deposits, returns, or receivables, or a commercially reasonable amount based on the collectibility of those credits, refunds, returns, or receivables; and

(C) The amount of personal loans, as defined in 11 CFR 116.11(b), that in the aggregate exceed $ 250,000 per election.

(iii) The amount of the net debts outstanding shall be adjusted as additional funds are received and expenditures are made. The candidate and his or her authorized political committee(s) may accept contributions made after the date of the election if:

(A) Such contributions are designated in writing by the contributor for that election;

(B) Such contributions do not exceed the adjusted amount of net debts outstanding on the date the contribution is received; and

(C) Such contributions do not exceed the contribution limitations in effect on the date of such election.

(iv) This paragraph shall not be construed to prevent a candidate who is a candidate in the general election or his or her authorized political

committee(s) from paying primary election debts and obligations with funds which represent contributions made with respect to the general election.

(4) For purposes of this section, a contribution shall be considered to be designated in writing for a particular election if --

(i) The contribution is made by check, money order, or other negotiable instrument which clearly indicates the particular election with respect to which the contribution is made;

(ii) The contribution is accompanied by a writing, signed by the contributor, which clearly indicates the particular election with respect to which the contribution is made; or

(iii) The contribution is redesignated in accordance with 11 CFR 110.1(b)(5).

(5)

(i) The treasurer of an authorized political committee may request a written redesignation of a contribution by the contributor for a different election if --

(A) The contribution was designated in writing for a particular election, and the contribution, either on its face or when aggregated with other

contributions from the same contributor for the same election, exceeds the limitation on contributions set forth in 11 CFR 110.1(b)(1);

(B) The contribution was designated in writing for a particular election and the contribution was made after that election and the contribution cannot be accepted under the net debts outstanding provisions of 11 CFR 110.1(b)(3);

(C) The contribution was not designated in writing for a particular election, and the contribution exceeds the limitation on contributions set forth in 11 CFR 110.1(b)(1); or

(D) The contribution was not designated in writing for a particular election, and the contribution was received after the date of an election for which there are net debts outstanding on the date the contribution is received.

(ii)

(A) A contribution shall be considered to be redesignated for another election if --

(1) The treasurer of the recipient authorized political committee requests that the contributor provide a written redesignation of the contribution and informs the contributor that the contributor may

request the refund of the contribution as an alternative to providing a written redesignation; and

(2) Within sixty days from the date of the treasurer's receipt of the contribution, the contributor provides the treasurer with a written redesignation of the contribution for another election, which is signed by the contributor.

(B) Notwithstanding paragraph (b)(5)(ii)(A) of this section or any other provision of this section, the treasurer of the recipient authorized political committee may treat all or part of the amount of the contribution that exceeds the contribution limits in paragraph (b)(1) of this section as made with respect to the general election, provided that:

(1) The contribution was made before the primary election;

(2) The contribution was not designated for a particular election;

(3) The contribution would exceed the limitation on contributions set forth in paragraph (b)(1) of this section if it were treated as a contribution made for the primary election;

(4) Such redesignation would not cause the contributor to exceed any of the limitations on contributions set forth in paragraph (b)(1) of this section;

(5) The treasurer of the recipient authorized political committee notifies the contributor of the amount of the contribution that was redesignated and that the contributor may request a refund of the contribution; and

(6) Within sixty days from the date of the treasurer's receipt of the contribution, the treasurer shall provide notification required in paragraph (b)(5)(ii)(B)(5) of this section to the contributor by any written method including electronic mail.

(C) Notwithstanding paragraph (b)(5)(ii)(A) of this section or any other provision of this section, the treasurer of the recipient authorized political committee may treat all or part of the amount of the contribution that exceeds the contribution limits in paragraph (b)(1) of this section as made with respect to the primary election, provided that:

(1) The contribution was made after the primary election but before the general election;

(2) The contribution was not designated for a particular election;

(3) The contribution would exceed the limitation on contributions set forth in paragraph (b)(1) of this section if it were treated as a contribution made for the general election;

(4) Such redesignation would not cause the contributor to exceed any of the limitations on contributions set forth in paragraph (b)(1) of this section;

(5) The contribution does not exceed the committee's net debts outstanding for the primary election;

(6) The treasurer of the recipient authorized political committee notifies the contributor of how the contribution was redesignated and that the contributor may request a refund of the contribution; and

(7) Within sixty days from the date of the treasurer's receipt of the contribution, the treasurer shall provide notification required in paragraph (b)(5)(ii)(C)(6) of this section to the contributor by any written method, including electronic mail.

(iii) A contribution redesignated for another election shall not exceed the limitations on contributions made with respect to that election. A contribution redesignated for a previous election shall be subject to the requirements of 11 CFR 110.1(b)(3) regarding net debts outstanding.

(6) For the purposes of this section, a contribution shall be considered to be made when the contributor relinquishes control over the contribution. A contributor shall be considered to relinquish control over the contribution when

it is delivered by the contributor to the candidate, to the political committee, or to an agent of the political committee. A contribution that is mailed to the candidate, or to the political committee or to an agent of the political committee, shall be considered to be made on the date of the postmark. See 11 CFR 110.1(1)(4). An in-kind contribution shall be considered to be made on the date that the goods or services are provided by the contributor.

## 11 C.F.R. § 110.3(c)(3)

(c) Permissible transfers. The contribution limitations of 11 CFR 110.1 and 110.2 shall not limit the transfers set forth below in 11 CFR 110.3(c) (1) through (6) –

[…]

(3) Transfers of funds between the primary campaign and general election campaign of a candidate of funds unused for the primary;

## Certificate of Service

I hereby certify that I electronically filed the foregoing Opening Brief for Plaintiffs-Appellants and Joint Appendix using the court's CM/ECF system which will automatically generate and send by email a Notice of Docket Activity to all registered attorneys currently participating in this case, constituting service on those attorneys. D.C. Cir. R. 25(d).


Steve Nicholas Hajjar                    shajjar@fec.gov

Charles P. Kitcher                       ckitcher@fec.gov

Erin Rebecca Chlopak                     echlopak@fec.gov

Kevin Andrew Deeley                      kdeeley@fec.gov



Dated: August 17, 2015              s/ Allen Dickerson
                                    Allen Dickerson