ORAL ARGUMENT NOT YET SCHEDULED

No. 15-5120

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

LAURA HOLMES AND PAUL JOST,

*Plaintiffs-Appellants*,

*v.*

FEDERAL ELECTION COMMISSION,

*Defendant-Appellee.*

On appeal from the United States District Court
for the District of Columbia, No. 1:14-cv-1243 (RMC)

**Joint Appendix**

Lisa J. Stevenson
Kevin Deeley
Erin Chlopak
Steve N. Hajjar
Charles Kitcher
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
Telephone: 202.694.1650

*Counsel for Defendant-Appellee.*

Allen Dickerson
Tyler Martinez
CENTER FOR COMPETITIVE POLITICS
124 S. West Street, Suite 201
Alexandria, Virginia 22314
Telephone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org
tmartinez@campaignfreedom.org

*Counsel for Plaintiffs-Appellants*

August 17, 2015

# TABLE OF CONTENTS

Docket, District Court for the District of Columbia ............................................. JA 1

Complaint for Declaratory Relief,
    July 21, 2014 (Dkt. 1) .................................................................... JA 8

Defendant Federal Election Commission's Answer,
    Sept. 29, 2014 (Dkt. 14) .......................................................... JA 26

Memorandum Opinion Denying Preliminary Injunction,
    Oct. 20, 2014 (Dkt. 15) ........................................................... JA 37

Certification of Questions of Constitutionality of FECA,
    Nov. 17, 2014 (Dkt. 19) .......................................................... JA 52

D.C. Circuit Order Granting Defendant's Motion for Remand,
    Jan. 30, 2015 (Dkt. 22) ........................................................... JA 59

Plaintiffs' Proposed Facts for Certification,
    March 13, 2015 (Dkt. 26) ........................................................ JA 60

Declaration of Jayci A. Sadio and Exhibits 1-27,
    March 13, 2015 (Dkt. 27-1) .................................................... JA 69

Transcript of Oral Argument,
    March 31, 2015 (Dkt. 37) ..................................................... JA 201

Notice Correcting Statement Made At Oral Argument,
    April 1, 2015 (Dkt. 32) ......................................................... JA 263

Opinion,
    April 20, 2015 (Dkt. 33) ....................................................... JA 266

Order,
    April 20, 2015 (Dkt. 34) ....................................................... JA 310

Notice of Appeal,
    April 24, 2015 (Dkt. 35) ....................................................... JA 311

USCA Case #15-5120      Document #1568250      Filed: 08/17/2015    Page 3 of 313
APPEAL,CLOSED,TYPE-L

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:14-cv-01243-RMC

HOLMES et al v. FEDERAL ELECTION COMMISSION

Assigned to: Judge Rosemary M. Collyer

Case in other court:  USCA, 15-05120

Cause: 02:437 Federal Election Commission

Date Filed: 07/21/2014

Date Terminated: 11/14/2014

Jury Demand: None

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**LAURA HOLMES**                      represented by   **Allen Joseph Dickerson**
                                                       CENTER FOR COMPETITIVE
                                                       POLITICS
                                                       124 S. West Street
                                                       Suite 201
                                                       Alexandria, VA 22314
                                                       (703) 894-6800
                                                       Email:
                                                       adickerson@campaignfreedom.org
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**PAUL JOST**                         represented by   **Allen Joseph Dickerson**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**FEDERAL ELECTION**                  represented by   **Charles Kitcher**
**COMMISSION**                                         FEDERAL ELECTION COMMISSION
                                                       999 E Street, NW
                                                       Washington, DC 20463
                                                       (202) 694-1650
                                                       Email: ckitcher@fec.gov
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Erin R Chlopak**
                                                       FEDERAL ELECTION COMMISSION
                                                       Office of General Counsel
                                                       999 E Street, NW
                                                       Washington, DC 20463
                                                       (202) 694-1650

JA 1

Fax: (202) 219-0260
Email: echlopak@fec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steve Nicholas Hajjar**
FEDERAL ELECTION COMMISSION
999 E Street, NW
Washington, DC 20463
(202) 694-1546
Fax: (202) 219-3923
Email: shajjar@fec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin A. Streeter , III**
FEDERAL ELECTION COMMISSION
999 E Street, NW
Washington, DC 20463-0002
(202) 694-1650
Fax: (202) 219-0260
Email: bstreeter@fec.gov
*ATTORNEY TO BE NOTICED*

**Kevin Deeley**
FEDERAL ELECTION COMMISSION
999 E Street, NW
Washington, DC 20463
(202) 694-1650
Fax: (202) 219-0260
Email: kdeeley@fec.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/21/2014 | 1 | COMPLAINT against FEDERAL ELECTION COMMISSION ( Filing fee $ 400 receipt number 0090-3784931) filed by LAURA HOLMES, PAUL JOST. (Attachments: # 1 Summons, # 2 Civil Cover Sheet)(Dickerson, Allen) (Entered: 07/21/2014) |
| 07/21/2014 | | Case Assigned to Judge Rosemary M. Collyer. (kb) (Entered: 07/22/2014) |
| 07/22/2014 | 2 | SUMMONS (1) Issued Electronically as to FEDERAL ELECTION COMMISSION. (Attachments: # 1 Consent Form, # 2 Notice of Consent)(kb) (Entered: 07/22/2014) |
| 07/23/2014 | | MINUTE ORDER directing Plaintiffs to file proof of proper service pursuant to Federal Rule of Civil Procedure 4(i)(1). Signed by Judge Rosemary M. Collyer on July 23, 2014.(lcrmc3) (Entered: 07/23/2014) |
| 07/28/2014 | 3 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. |

JA 2

| | | |
|---|---|---|
| | | FEDERAL ELECTION COMMISSION served on 7/28/2014 (Dickerson, Allen) (Entered: 07/28/2014) |
| 07/28/2014 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 07/28/2014. (Dickerson, Allen) (Entered: 07/28/2014) |
| 07/28/2014 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 7/28/2014. Answer due for ALL FEDERAL DEFENDANTS by 9/26/2014. (Dickerson, Allen) (Entered: 07/28/2014) |
| 08/20/2014 | 6 | MOTION for Preliminary Injunction by LAURA HOLMES, PAUL JOST (Attachments: # 1 Memorandum in Support, # 2 Declaration of Laura Holmes, # 3 Declaration of Paul Jost, # 4 Text of Proposed Order, # 5 Certificate of Service) (Dickerson, Allen) (Entered: 08/20/2014) |
| 08/22/2014 | 7 | NOTICE of Appearance by Kevin Deeley on behalf of FEDERAL ELECTION COMMISSION (Deeley, Kevin) (Entered: 08/22/2014) |
| 08/22/2014 | 8 | Unopposed MOTION for Briefing Schedule *for Plaintiffs' Motion for Preliminary Injunction* by FEDERAL ELECTION COMMISSION (Attachments: # 1 Text of Proposed Order)(Deeley, Kevin) (Entered: 08/22/2014) |
| 08/22/2014 | | MINUTE ORDER granting 8 Unopposed Motion for Briefing Schedule. Defendant shall file its response to 6 Plaintiffs' Motion for Preliminary Injunction no later than September 8, 2014. Signed by Judge Rosemary M. Collyer on August 22, 2014. (lcrmc3) (Entered: 08/22/2014) |
| 08/22/2014 | | Set/Reset Deadlines/Hearings: Response to 6 due by 9/8/2014. (cdw) (Entered: 08/26/2014) |
| 09/04/2014 | 9 | NOTICE of Appearance by Steve Nicholas Hajjar on behalf of FEDERAL ELECTION COMMISSION (Hajjar, Steve) Modified on 9/4/2014 (rdj). (Entered: 09/04/2014) |
| 09/04/2014 | 10 | NOTICE of Appearance by Erin R Chlopak on behalf of FEDERAL ELECTION COMMISSION (Chlopak, Erin) ( Modified on 9/4/2014 (rdj). (Entered: 09/04/2014) |
| 09/04/2014 | 11 | NOTICE of Appearance by Benjamin A. Streeter, III on behalf of FEDERAL ELECTION COMMISSION (Streeter, Benjamin) Modified on 9/4/2014 (rdj). (Entered: 09/04/2014) |
| 09/08/2014 | 12 | Memorandum in opposition to re 6 MOTION for Preliminary Injunction filed by FEDERAL ELECTION COMMISSION. (Attachments: # 1 Text of Proposed Order)(Hajjar, Steve) (Entered: 09/08/2014) |
| 09/15/2014 | 13 | REPLY to opposition to motion re 6 MOTION for Preliminary Injunction filed by LAURA HOLMES, PAUL JOST. (Dickerson, Allen) (Entered: 09/15/2014) |
| 09/29/2014 | 14 | ANSWER to Complaint by FEDERAL ELECTION COMMISSION.(Chlopak, Erin) (Entered: 09/29/2014) |
| 10/20/2014 | 15 | MEMORANDUM AND OPINION. Signed by Judge Rosemary M. Collyer on October 20, 2014. (lcrmc3) (Entered: 10/20/2014) |

JA 3

| | | |
|---|---|---|
| 10/20/2014 | 16 | VACATED PURSUANT TO THE COURT'S ORDER OF 11/12/2014..........ORDER denying 6 Motion for Preliminary Injunction. It is further ordered that Plaintiffs shall show cause, no later than November 3, 2014, as to why the Court should not convert this Order denying Plaintiffs' Motion for a Preliminary Injunction into a final appealable Order denying Plaintiffs' request to certify the constitutional issues to the United States Court of Appeals for the District of Columbia Circuit for en banc consideration. Signed by Judge Rosemary M. Collyer on October 20, 2014. (lcrmc3) Modified on 11/14/2014 (cdw). (Entered: 10/20/2014) |
| 11/03/2014 | 17 | RESPONSE TO ORDER TO SHOW CAUSE by LAURA HOLMES, PAUL JOST re 16 Order on Motion for Preliminary Injunction,, . (Dickerson, Allen) (Entered: 11/03/2014) |
| 11/12/2014 | 18 | ENTERED IN ERROR.....MEMORANDUM AND FINDINGS. The Court hereby certifies the constitutional questions to the U.S. Court of Appeals for the District of Columbia Circuit for en banc consideration. Signed by Judge Rosemary M. Collyer on November 12, 2014. (lcrmc3) Modified on 11/17/2014 (rdj). Modified on 11/17/2014 (rdj). (Entered: 11/12/2014) |
| 11/12/2014 | | MINUTE ORDER. Pursuant to the Court's 18 Memorandum and Findings, the October 20, 2014 Order to Show Cause in the 6 Order Denying Plaintiffs' Motion for a Preliminary Injunction is hereby VACATED. Signed by Judge Rosemary M. Collyer on November 12, 2014. (lcrmc3) (Entered: 11/12/2014) |
| 11/17/2014 | | NOTICE OF CORRECTED DOCKET ENTRY: re 18 Memorandum & Opinion, was entered in error at the request of Chambers. (rdj) (Entered: 11/17/2014) |
| 11/17/2014 | 19 | MEMORANDUM AND FINDINGS. The Court hereby certifies two constitutional questions to the United States Court of Appeals for the District of Columbia Circuit for en banc consideration. Signed by Judge Rosemary M. Collyer on November 17, 2014. (lcrmc3) (Entered: 11/17/2014) |
| 11/17/2014 | 20 | Transmission of 19 MEMORANDUM AND FINDINGS Signed by Judge Rosemary M. Collyer on November 17, 2014. The Court hereby certifies two constitutional questions to the United States Court of Appeals for the District of Columbia Circuit for en banc consideration.(rdj) (Entered: 11/17/2014) |
| 01/30/2015 | 22 | ORDER of USCA (certified copy) as to 20 Certified Question of Law with Memorandum of Facts submitted to the U.S.C.A. by Judge Rosemary M. Collyer; upon consideration of the motion of the Federal Election Commission for remand, ordered that the motion is granted and this case is remanded to the district court; the district court shall complete the functions mandated by § 30110 and described in Wagner v. FEC, 717 F.3d at 1009, including the development of a record for appellate review, by 4/24/15; the district court is to certify any constitutional question(s) by that date as well. USCA Case Number 14-5281. (mlp) (Entered: 02/05/2015) |
| 02/02/2015 | 21 | ORDER of USCA (certified copy); ORDERED, on the the court's own motion, that this case be removed from March 30, 2015 oral argument calendar. FURTHER ORDERED that the motion be granted and this case is hereby remanded to the district court. FURTHER ORDERED that the district court shall complete the functions mandated by 30110 and described in Wagner v. FEC, 717 F.3d at 1009, |

USCA Case #15-5130      Document #1568250      Filed: 08/17/2015      Page 7 of 313

| | | |
|---|---|---|
| | | including the development of a record for appellate review, by April 24, 2015. (md, ) (Entered: 02/02/2015) |
| 02/02/2015 | | MINUTE ORDER. In light of the January 30, 2015 Order of the D.C. Circuit remanding this case to the district court, the parties shall meet and confer and file a joint proposal no later than February 9, 2015, that specifies all the steps they believe necessary, and a schedule therefore, to ensure that this matter is fully ripe for adjudication by the district court no later than March 20, 2015. Signed by Judge Rosemary M. Collyer on February 2, 2015. (lcrmc3) (Entered: 02/02/2015) |
| 02/02/2015 | | Set/Reset Deadlines/Hearings: Joint proposal due by 2/9/2015. (cdw) (Entered: 02/03/2015) |
| 02/09/2015 | 23 | MEET AND CONFER STATEMENT. (Hajjar, Steve) (Entered: 02/09/2015) |
| 02/10/2015 | 24 | JOINT PROPOSAL AND ORDER TO GOVERN PROCEEDINGS. Signed by Judge Rosemary M. Collyer on February 9, 2015. (cdw) (Entered: 02/11/2015) |
| 02/11/2015 | | MINUTE ORDER. In connection with 24 the Joint Proposal and Order to Govern Proceedings, the Court further directs that counsel are expected to conduct themselves in a civil, polite, and professional manner at all times, particularly during discovery. Counsel are referred to LCvR 26.2 and expected to conform fully with its directives. Moreover, counsel are required, under both Fed. R. Civ. P. 26(f) and LCvR 7.1(m), to confer in good faith in an effort to resolve any discovery dispute before bringing it to the Courts attention. In the event that counsel are unable to resolve a dispute, counsel shall contact chambers to arrange for a telephone conference with the Court. Counsel shall not file discovery motions without a prior telephone conference with the Court and opposing counsel. Signed by Judge Rosemary M. Collyer on February 11, 2015. (lcrmc3) (Entered: 02/11/2015) |
| 02/18/2015 | | MINUTE ORDER scheduling hearing on factual findings and certification question on March 31, 2015, at 9:30 a.m. in Courtroom 8. Signed by Judge Rosemary M. Collyer on February 18, 2015. (lcrmc3) (Entered: 02/18/2015) |
| 02/18/2015 | | Set/Reset Deadlines/Hearings: Hearing on factual findings and certification question set for 3/31/2015 at 9:30 AM in Courtroom 8 before Judge Rosemary M. Collyer. (cdw) (Entered: 02/19/2015) |
| 03/13/2015 | 25 | MOTION for Order *Regarding Certification* by LAURA HOLMES, PAUL JOST (Dickerson, Allen) (Entered: 03/13/2015) |
| 03/13/2015 | 26 | Proposed Findings of Fact by LAURA HOLMES, PAUL JOST. (Dickerson, Allen) (Entered: 03/13/2015) |
| 03/13/2015 | 27 | Memorandum in opposition to re 25 MOTION for Order *Regarding Certification* filed by FEDERAL ELECTION COMMISSION. (Attachments: # 1 Declaration Sadio Declaration, # 2 Declaration Leamon Declaration)(Hajjar, Steve) (Entered: 03/13/2015) |
| 03/20/2015 | 28 | REPLY to opposition to motion re 25 MOTION for Order *Regarding Certification* filed by LAURA HOLMES, PAUL JOST. (Attachments: # 1 Affidavit of Paul Jost, # 2 Affidavit of Laura Holmes, # 3 Responses and Objections to FEC's Proposed Facts)(Dickerson, Allen) (Entered: 03/20/2015) |

USCA Case #15-5120    Document #1588850    Filed: 08/17/2015    Page 8 of 313

| | | |
|---|---|---|
| 03/20/2015 | 29 | RESPONSE *re* 25 *MOTION for Order Regarding Certification* filed by FEDERAL ELECTION COMMISSION. (Attachments: # 1 Exhibit Slip Opinion)(Chlopak, Erin) (Entered: 03/20/2015) |
| 03/20/2015 | 30 | RESPONSE *to Plaintiffs' Proposed Facts for Certification* filed by FEDERAL ELECTION COMMISSION. (Chlopak, Erin) (Entered: 03/20/2015) |
| 03/23/2015 | 31 | NOTICE of Appearance by Charles Kitcher on behalf of FEDERAL ELECTION COMMISSION (Kitcher, Charles) (Entered: 03/23/2015) |
| 03/31/2015 | | Minute Entry for proceedings held before Judge Rosemary M. Collyer: Motion Hearing held on 3/31/2015 re 25 Motion for Order Regarding Certification. Motion heard and taken under advisement. (Court Reporter: Crystal Pilgrim) (cdw) (Entered: 04/01/2015) |
| 04/01/2015 | 32 | NOTICE *CORRECTING STATEMENT MADE AT ORAL ARGUMENT* by LAURA HOLMES, PAUL JOST (Dickerson, Allen) (Entered: 04/01/2015) |
| 04/20/2015 | 33 | MEMORANDUM AND OPINION. Signed by Judge Rosemary M. Collyer on April 20, 2015. (lcrmc3) (Entered: 04/20/2015) |
| 04/20/2015 | 34 | ORDER denying 25 Plaintiffs' Motion for Order Regarding Certification and GRANTING 27 Defendant's Motion for Summary Judgment. Judgment is entered in favor of Defendant. This is a final appealable order. This case is closed. Signed by Judge Rosemary M. Collyer on April 20, 2015. (lcrmc3) (Entered: 04/20/2015) |
| 04/24/2015 | 35 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 34 Order on Motion for Order, by LAURA HOLMES, PAUL JOST. Filing fee $ 505, receipt number 0090-4069406. Fee Status: Fee Paid. Parties have been notified. (Attachments: # 1 Certificate of Service)(Dickerson, Allen) (Entered: 04/24/2015) |
| 04/27/2015 | 36 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 35 Notice of Appeal to DC Circuit Court. (rdj) (Entered: 04/27/2015) |
| 04/29/2015 | | USCA Case Number 15-5120 for 35 Notice of Appeal to DC Circuit Court, filed by PAUL JOST, LAURA HOLMES. (md, ) (Entered: 04/29/2015) |
| 06/26/2015 | 37 | TRANSCRIPT OF PROCEEDINGS before Judge Rosemary M. Collyer held on 03/31/15; Page Numbers: 1-62. Date of Issuance:06/26/15. Court Reporter/Transcriber Crystal M. Pilgrim, Telephone number 202.354.3127, Court Reporter Email Address : crystalpilgrim@aol.com.<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located |

JA 6

USCA Case #15-5120     Document #1568250         Filed: 08/17/2015       Page 9 of 313

on our website at www.dcd.uscourts.gov.

Redaction Request due 7/17/2015. Redacted Transcript Deadline set for 7/27/2015. Release of Transcript Restriction set for 9/24/2015.(Pilgrim, Crystal) (Entered: 06/26/2015)

JA 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LAURA HOLMES,** | ) | |
| 1500 Ocean Drive, Unit 1105, | ) | |
| Miami, Florida 33139, | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **PAUL JOST,** | ) | |
| 1500 Ocean Drive, Unit 1105, | ) | |
| Miami, Florida 33139 | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil No.** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **Federal Election Commission,** | ) | |
| 999 E Street, N.W. | ) | |
| Washington, D.C. 20436 | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT FOR DECLARATORY RELIEF

### I.      NATURE OF ACTION

1.      Plaintiffs Laura Holmes and Paul Jost challenge the bifurcated contribution

limits under the Federal Election Campaign Act ("FECA") and its amendments.

FECA distinguishes contributions given for primary elections from contributions

given for general elections, and provides independent caps on contributions per election type. 2 U.S.C. § 441a(a)(1)(A) ("no person shall make contributions…to any candidate and his authorized political committees *with respect to any election for Federal office*….") (emphasis supplied); *see also* 2 U.S.C. § 441a(a)(6) (separating primary and general elections for purposes of contribution limits).

2.      Plaintiffs' case arises under the First Amendment's protection of the freedom to associate. U.S. CONST. amend. I.

3.      Plaintiffs' case also arises under the Fifth Amendment's Due Process Clause, in the context of equal protection of the law. U.S. CONST. amend. V; *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), for the proposition that the Fifth Amendment's Due Process Clause applies to the federal government in the same way the Fourteenth Amendment's Equal Protection Clause applies to the states).

## II.      JURISDICTION AND VENUE

4.      This Court has jurisdiction because this action arises under the First and Fifth Amendments to the United States Constitution and a federal statute. 28 U.S.C. § 1331.

5.      Under, 2 U.S.C. § 437h, this court has jurisdiction under FECA and its amendments to make necessary findings of fact and then to certify the

constitutional issues in the case immediately to the United States Court of Appeals for the District of Columbia Circuit for *en banc* consideration.

6.    This Court has jurisdiction under the Declaratory Judgment Act. 28 U.S.C. §§ 2201, 2202.

7.    Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2) and (e).

### III.   PARTIES

8.    Plaintiffs Laura Holmes and Paul Jost are married to one another. Plaintiff Laura Holmes sometimes uses the name "Laura Holmes-Jost" when contributing to candidates. Plaintiffs are residents of Florida and citizens of the United States. They reside at 1500 Ocean Drive, Unit 1105, Miami, Florida 33139. Each plaintiff wishes to associate with a candidate in the amount up to the overall candidate contribution limit allowed for primary and general elections combined. Each wishes to donate to the victor of a primary election in the full amount that has already been donated by many contributors to that victor's incumbent opponent, who was unopposed in the primary by a member of his own party and whose contributors have effectively given money solely for the general election.

9.    Defendant Federal Election Commission ("FEC") is the federal government agency charged with administering and enforcing FECA and its amendments. 2 U.S.C. § 437c(b)(1).

3

JA 10

## IV.   FACTS

10.    FECA splits the candidate contribution limits "to any candidate and his authorized political committees with respect to *any election* for Federal office…" 2 U.S.C. § 441a(a)(1)(A) (emphasis added).

11.    "Election" is defined to include general, special, primary, or runoff contests. 2 U.S.C. § 431(1)(A); *see also* 11 C.F.R. § 100.2.

12.    The primary and general elections are considered separate elections for the purposes of individual candidate contribution limits. 2 U.S.C. § 441a(a)(6) ("the limitations on contributions to a candidate imposed by paragraphs (1) and (2) of this subsection shall apply separately with respect to each election…").

13.    Pursuant to §§ 441a(a)(1)(A) and 441a(a)(6), the FEC has promulgated rules for determining whether a contribution is considered to have been given for the primary or general election. *See* 11 C.F.R. § 110.1(b).

14.    A contributor may earmark which election his contribution is intended to benefit. 11 C.F.R. § 110.1(b)(2)(i). Otherwise, contributions are presumed to be for the "next election." 11 C.F.R. § 110.1(b)(2)(ii).

15.    Earmarked contributions made *after* the designated election may only be used to retire outstanding debts; all other such contributions must be returned. 11

C.F.R. § 110.1(b)(3)(i)(A). Detailed FEC rules define what obligations constitute outstanding debts in this context. 11 C.F.R. § 110.1(b)(3)(iii).

16.    Thus, even if a contributor has not reached the contribution limit with respect to a given candidate and his primary election, the debt of that candidate's committee delineates the extent to which the contributor may associate with the candidate *after* the primary election.

17.    Alternatively, the candidate's committee may seek to have the contribution redesignated to the next election (i.e., the general election). 11 C.F.R. § 110.1 § 110.1(b)(3)(i)(B); *see also* 11 C.F.R. § 110.1(b)(5) (detailing redesignation process).

18.    Plaintiffs Laura Holmes and Paul Jost wish to contribute to individual candidates after their primaries. They wish to do so up to the full amount allowed under FECA and its amendments without regard to the artificial distinction between primary and general elections found in 2 U.S.C §§ 441a(a)(1)(A) and 441a(a)(6).

19.    Plaintiff Laura Holmes supports Carl DeMaio, a candidate to represent California Congressional District 52 ("CA-52"), Federal Election Commission Candidate ID H4CA52051. Mr. DeMaio came in second during the primary

election on June 3, 2014, ensuring him a place on the ballot in the general election on November 4, 2014.

20.    On November 4, 2014, under California's "top two" primary system, Carl DeMaio will face incumbent and first-place primary finisher Scott Peters in the contest to represent CA-52. Congressman Peters was the only member of the Democratic Party on the ballot to represent CA-52 during the June 3, 2014 primary, and thus, did not face any significant primary challengers.

21.    Ms. Holmes contributed $2,600 to Mr. DeMaio after the California primary. She wishes to contribute an additional $2,600 at this time, for a total of $5,200, because she did not contribute to Mr. DeMaio during the primary.

22.    Plaintiff Paul Jost supports Mariannette Miller-Meeks, a candidate to represent Iowa's Second Congressional District ("IA-02"), Federal Election Commission Candidate ID H8IA02043. Dr. Miller-Meeks won her primary election on June 3, 2014.

23.    On November 4, 2014, Dr. Miller-Meeks will face incumbent David Loebsack in the contest to represent IA-02. Congressman Loebsack was the only candidate to represent IA-02 listed on the ballot in the 2014 Democratic primary, and thus, did not face any significant primary challengers.

24.    Mr. Jost has already contributed $2,600 to Dr. Miller-Meeks for the general election. He wishes to contribute an additional $2,600 at this time, for a total of $5,200. He did not contribute to Dr. Miller-Meeks during the primary.

25.    Plaintiffs do not wish to exceed the base candidate contribution limit over the combined primary and general election periods. 2 U.S.C. § 441a(a)(1)(A) (currently $5,200-$2600 for the primary, and $2600 for the general—as indexed for inflation per 11 C.F.R. § 110.5(b)(3)-(4) at Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, Federal Election Commission, 78 Fed. Reg. 8530, 8532 (Feb. 16, 2013)).

26.    Instead, Plaintiffs Laura Holmes and Paul Jost each wish to give the full $5,200 they are allowed to contribute to a candidate with whom they wish to associate, but do so entirely for the general election. Mr. Jost and Ms. Holmes wish to fully associate with candidates, unencumbered by the artificial distinction between primary and general elections, and the arbitrary and discriminatory rules defining primary election debt.

## V.    CAUSES OF ACTION

### Count 1
**Declaratory judgment that 2 U.S.C. §§ 441a(a)(1)(A) and 441a(a)(6) are unconstitutional as applied to Plaintiffs because they violate their First Amendment freedom of political association.**

27.     Plaintiff realleges and incorporates by reference paragraphs 1-26.

28.     Contribution limits implicate fundamental First Amendment interests. *Buckley v. Valeo*, 424 U.S. 1, 24-25 (1976).

29.     In *Buckley*, the Supreme Court identified campaign contributions as a component of the "right to associate" and therefore determined that limits on such contributions are subject "to the closest scrutiny." 424 U.S. at 25 (citing *NAACP v. Ala. ex rel Patterson*, 357 U.S. 449, 460-61 (1958)).

30.     While the right to associate and participate in politics "is not absolute," the government must "demonstrate[] a sufficiently important interest and employ[] means closely drawn to avoid unnecessary abridgement of associational freedoms." *Buckley*, 424 U.S. at 25 (internal quotations and citations omitted).

31.     Prevention of *quid-pro-quo* corruption, or the appearance of such corruption, is the only constitutionally sufficient justification for contribution limits. *McCutcheon v. FEC*, 572 U.S. ___, 134 S. Ct. 1434, 1450 (2014); *Buckley*, 424 U.S. at 25, *see also*, *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 388 (2000).

32.     The Supreme Court in *McCutcheon* was clear: "[c]ampaign finance restrictions that pursue other objects [not aimed at preventing *quid-pro-quo* corruption]…impermissibly inject the Government into the debate over who

8

should govern. And those who govern should be the *last* people to help decide who *should* govern." *McCutcheon*, 134 S. Ct. at 1441-1442. (emphasis in original).

33. The government may not merely assert a "corruption" interest to justify a burden on the fundamental right to associate via contribution limits. *Shrink Mo. Gov't PAC*, 528 U.S. at 392 (citing and discussing *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 616 (1996) (opinion of Breyer, J.)).

34. In other words, a contribution limit must be properly tailored to vindicate the government's interest, otherwise it is unconstitutional. *McCutcheon*, 134 S. Ct. at 1444; *see also Randall v. Sorrell*, 548 U.S. 230, 248 (2006).

35. The novelty and plausibility of the asserted harm to be avoided will determine how much empirical evidence is required to justify the government's regulation. *Shrink Mo. Gov't PAC*, 528 U.S. at 391.

36. *McCutcheon* discussed the FECA framework that bifurcates contribution limits between primary and general elections. *McCutcheon*, 134 S. Ct. at 1442. Together, the Court referred to these as "base limits." *Id*.

37. In discussing the base limits in the corruption context, the Court considered the *total* limit, without respect to the artificial distinction between primary and general elections. *See*, *e.g.*, *id*. at 1448 ("if all contributions fall within the base limits Congress views as adequate to protect against corruption. The individual

may give up to $5,200 each to nine candidates…"); at 1451 ("under the dissent's view, it is perfectly fine to contribute $5,200 to nine candidates but somehow corrupt to give the same amount to a tenth.")

38.    The Court considered the *total* $5,200 as the "base limit" at or below which there is no threat of actual or apparent corruption. *Id*. at 1452 ("[b]ut Congress's selection of a $5,200 base limit indicates its belief that contributions of that amount or less do not create a cognizable risk of corruption").

39.    The bifurcated candidate contribution limit prevents contributors from giving the full, non-corrupting contribution amount, at the time they feel is most critical in the electoral cycle. That is, the law allows a contributor to associate with an individual candidate up to $5,200 per election cycle. Ms. Holmes and Mr. Jost will abide by that limit. They do not wish, however, to split their contributions between the primary and general elections in order to fully exercise their associational rights. Instead, they wish to give to candidates challenging incumbents who did not face significant opposition from within their own political party.

40.    Artificially bifurcating the $5,200 between general and primary elections does not further any anticorruption interest. This is particularly so where, as in both CA-52 and IA-02, the incumbent faced no substantial primary challenger.

41.     Because the government lacks a cognizable interest in artificially bifurcating the $5,200 individual candidate contribution limit, 2 U.S.C. § 441a(a)(1)(A) is unconstitutional as applied to Plaintiffs' planned contributions.

### Count 2
**Declaratory judgment that 2 U.S.C. §§ 441a(a)(1)(A) and 441a(a)(6) are unconstitutional as applied to Plaintiffs because they violate their Fifth Amendment rights to equal protection of the law.**

42.     Plaintiff realleges and incorporates by reference paragraphs 1-41.

43.     The Fifth Amendment's Due Process Clause guarantees equal protection of the law, and the analysis thereof is the same as under the Fourteenth Amendment. *Buckley*, 424 U.S. at 93; *Bolling*, 347 U.S. at 499.

44.     The Supreme Court has not addressed the issue of bifurcated individual candidate contribution limits. *McCutcheon* struck down the *aggregate* limits while emphasizing that the $5,200 base limit was not corrupting. *McCutcheon*, 134 S. Ct. at 1462, 1451.

45.     *Buckley* only upheld FECA's contribution limits on their face. 424 U.S. at 35 ("[i]n view of these considerations, we conclude that the impact of the Act's $1,000 contribution limitation on major-party challengers and on minor-party candidates does not render the provision unconstitutional on its face").

11

46.    The Court specifically allowed for the possibility of a subsequent challenge due to "invidious discriminat[ion]." *Buckley*, 424 U.S. at 31 n. 33. ("[s]ince an incumbent is subject to these limitations to the same degree as his opponent, the Act, on its face, appears to be evenhanded. The appearance of fairness, however, may not reflect political reality").

47.    *Buckley*'s facial decision focused on the candidates—both challengers and incumbents—in the record before it. It did not squarely address the issue of the rights of *contributors*. *Id*. at 33.

48.    In 2002, Congress passed the Bipartisan Campaign Reform Act. Pub. L. 107-155, 116 Stat. 81 (2002) ("BCRA"). BCRA increased the contribution limits and indexed them for inflation. BCRA § 307, 116 Stat. at 102 (codified at 2 U.S.C. § 441a(a)(1)). It did not modify the distinction between primary and general elections found at 2 U.S.C. § 441a(a)(6).

49.    After BCRA's enactment, it faced an omnibus challenge in *McConnell v. FEC*, 540 U.S. 93 (2003).

50.    *McConnell* did not address the issue of bifurcated contribution limits. Some of the plaintiffs challenged the *increase* in contribution limits, but the Court declined to reach the issue on jurisdictional and standing grounds. *Id*. at 227-29.

51.     In 2008, the Supreme Court considered asymmetrical contribution limits, again in the context of a candidate's challenge. *Davis v. FEC*, 554 U.S. 724, 744 (2008).

52.     *Davis* involved some of BCRA's substantive changes to the law, including the "millionaire's amendment." *Id*. at 729 (discussing BCRA § 319(a), 116 Stat. at 108 (codified at 2 U.S.C. § 441a-1(a))). BCRA § 319(a) permitted candidates who faced a self-financed opponent to raise money at three times the base contribution limit. BCRA § 319(a); *Davis*, 554 U.S. at 738.

53.     The justification asserted in support of the asymmetrical contribution limit in *Davis* was to level the playing field by artificially inflating the resources of non-wealthy candidates. *Id.* at 741.

54.     The Court explained that "[w]e have never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other." *Id.* at 738.

55.     The Court found this asymmetry in the contribution limits to be a *First Amendment* harm. *Id.* at 739; *cf SpeechNow.org v. FEC*, 599 F.3d 686, 697 (D.C. Cir. 2010) (noting that *Davis* found "asymmetrical contribution limits were unconstitutional").

56.    Because the Court resolved *Davis* under the First Amendment, it did not reach the Fifth Amendment claims. 554 U.S. at 744 n. 9.

57.    Just this year, the Court reiterated this reasoning in *McCutcheon*. Considering the associational rights of contributors, the Court held that any government interest in "reduc[ing] the amount of money in politics" or "restrict[ing] the political participation of some in order to enhance the relative influence of others" is insufficient to justify contribution limits. *McCutcheon*, 134 S. Ct. at 1441.

58.    Just before the Court released its *McCutcheon* opinion, the Tenth Circuit faced a similar problem of bifurcated limits in construing a state statute. In *Riddle v. Hickenlooper*, contributors to a campaign challenged Colorado's preferential treatment of candidates of "major parties" over minor party candidates, independent candidates, and write-in candidates. *Riddle v. Hickenlooper*, 742 F.3d 922, 924 (10th Cir. 2014).

59.    The law at issue in *Riddle*

> effectively removed any potential time limitations on when a candidate committee could accept contributions when a primary is involved. For money ostensibly given for the primary, the candidate committee could accept the contribution and spend it during the general election; and, for money ostensibly given for the general election, the committee could accept the contribution and spend it even before the primary.

*Id*.

60.     However, this applied *only* to "major party" candidates—minor party, independent, and write-in candidates did not receive such a benefit. *Id*. at 924-25.

61.     The case came before the Tenth Circuit on appeal from cross motions for summary judgment based upon equal protection claims. *Id*. at 925-926.

62.     In determining the "threshold issue" of "whether the 'disfavored parties' [] are similarly situated to the 'favored parties," the Tenth Circuit held that the focus is on the *contributors*, not the candidates in the race. *Id*. at 926.

63.     The Colorado law at issue did "not set contribution limits based on who has a primary and who doesn't. Instead, the statute blurs the distinction by allowing Republican and Democratic candidates to collect and spend the entire [contribution] after the primary." *Id*.

64.     In short, the Colorado statute "create[d] a basic favoritism between candidates vying for the same office." *Id* at 929.

65.     However, the Tenth Circuit did note

> We do not suggest that the constitution would forbid any contribution limits based on an election cycle. But here the State of Colorado has created different contribution limits for candidates running against each other, and these differences have little to do with fighting corruption.

*Id*. at 930.

USCA Case #15-5120      Document #1568250      Filed: 08/17/2015      Page 25 of 313

66.     Functionally, the federal system is the same as Colorado's in *Riddle*—if one of the federal candidates does not face a substantial primary opponent. Such a candidate can use the "primary" contributions to run advertisements promoting his campaign or attacking candidates of the opposing party. Yet opposing party candidates—if locked in a primary contest—enjoy no such luxury.

67.     Ms. Holmes and Mr. Jost wish to support the victor of the primary against the incumbent. As a result, they can give only half the money as many contributors who have already supported the opposing party candidate. The result is asymmetrical contribution limits based upon factors entirely out of the contributor's (or even the candidate's) control. Thus, 2 U.S.C. § 441a(a)(1)(A) artificially favors some contributors (and candidates) over others. This artificial distinction is made worse by the fact that incumbents may begin raising money for the 2014 election immediately after the November 2012 election—or, in the case of a senate race, immediately after the November 2008 election—well before the time the vast majority of challengers have declared their candidacy for the 2014 election. Thus, contributors to some challengers are permitted to associate over a longer period of time and to a greater extent than others, denying equal protection of the campaign finance laws.

68.     Further, the dates for primaries are not uniform across the United States. Public Disclosure Division, "2014 Congressional Primary Dates and Candidate Filing Deadlines for Ballot Access," FEDERAL ELECTION COMMISSION (2014) *available at* http://www.fec.gov/pubrec/fe2014/2014pdates.pdf.

69.     Thus, the contributions may need to stretch further or be compressed as compared to other races in other states. The effectiveness of the association created by the contribution changes based upon individual state primary dates. This may be alleviated by allowing Plaintiffs to contribute the full $5,200 in a single contribution to the candidate of his choice regardless of the date of the primary.

70.     As in *Riddle*, the government has no corruption interest in deciding, artificially, how money is contributed so long as it is under the limits found by Congress to be non-corrupting.

71.     Congress may set contribution limits, but it must make these limits the same for everyone. Allowing for "extra" contributions by contributors supporting a candidate running unopposed in the primary is functionally the same as the differing contribution limits reviewed in *Davis* and *Riddle*. Such asymmetry denies Plaintiffs' equal protection rights under the Fifth Amendment.

## VI.    PRAYERS FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.    A declaratory judgment that 2 U.S.C. §§ 441a(a)(1)(A) and 441a(a)(6) are

unconstitutional as-applied to Plaintiffs because they violate Plaintiffs' freedom of

political association guaranteed under the First Amendment.

B.    A declaratory judgment that §§ 441a(a)(1)(A) and 441a(a)(6) are

unconstitutional as-applied to Plaintiffs because they violate the equal protection of

the law guaranteed by the Fifth Amendment.

C.    An injunction barring enforcement of §§ 441a(a)(1)(A) and 441a(a)(6)'s

artificial bifurcation of individual candidate contributions.

D.    Reasonable costs and attorneys' fees.

E.    Such equitable or other relief as this Court may consider just and

appropriate.


Respectfully submitted this the 21st day of July, 2014.

/s/ Allen Dickerson
Allen Dickerson
Center for Competitive Politics
124 S. West Street
Suite 201
Alexandria, Virginia 22314
Phone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HOLMES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 14-1243 (RMC) |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | ANSWER |
| | ) | |
| Defendant. | ) | |

## DEFENDANT FEDERAL ELECTION COMMISSION'S ANSWER

Defendant Federal Election Commission ("FEC" or "Commission") submits this answer to the Complaint for Declaratory Relief filed by plaintiffs Laura Holmes and Paul Jost.  Any allegation not specifically responded to below is DENIED.  The Commission answers as follows:

1.     This first sentence of this paragraph summarizes plaintiffs' complaint, the allegations of which speak for themselves, and requires no response.  The remainder of this paragraph purports to paraphrase and characterize specific provisions of the Federal Election Campaign Act ("FECA"), which speak for themselves, and does not require a response.

2.     ADMIT that plaintiffs purport to challenge certain provisions of FECA under the First Amendment to the United States Constitution.

3.     ADMIT that plaintiffs purport to challenge certain provisions of FECA under the Fifth Amendment's Due Process Clause.  This paragraph also includes citations to, and characterizations of, certain judicial decisions, which speak for themselves, and require no response.

4.     DENY.

5.      ADMIT that 2 U.S.C. § 437h (recently recodified at 52 U.S.C. § 30110), provides the Court with jurisdiction to make necessary findings of fact and to screen to determine whether any substantial constitutional questions should be certified to the United States Court of Appeals for the District of Columbia *en banc*, but DENY that this case presents any substantial constitutional questions that warrant certification under that provision.

6.      DENY.  *See Wagner v. FEC*, 717 F.3d 1007 (D.C. Cir. 2013) (per curiam).

7.      ADMIT.

8.      The Commission lacks knowledge or information sufficient to admit or deny the allegations contained in this paragraph.

9.      ADMIT this paragraph to the extent that it alleges that the Commission has exclusive civil jurisdiction with respect to administration and civil enforcement of the FECA.  52 U.S.C. § 30106(b)(1) (formerly 2 U.S.C. § 437c(b)(1)).

10.      This paragraph purports to quote and characterize a specific provision of FECA, which speaks for itself, and does not require a response.  To the extent a response is required, DENY that "FECA splits the candidate contribution limits."

11.      ADMIT that the cited statutory and regulatory provisions set forth and explain the definition of "election," which includes general, special, primary, and runoff contests.  DENY that this paragraph sets forth the complete statutory or regulatory definition of "election."

12.      ADMIT that the limits on contributions to candidates set forth in 2 U.S.C. § 441a(a)(6) (recently recodified at 52 U.S.C. § 30116(a)(6) apply separately with respect to each election; DENY this paragraph to the extent it alleges that FECA only defines "election" in terms of "primary and general elections."

13.     ADMIT that the Commission  has promulgated regulations pursuant to its authority under FECA, including 11 C.F.R. § 110.1(b), and ADMIT that 11 C.F.R. § 110.1(b) provides, *inter alia*, the rules for determining for which election a particular contribution is made, and otherwise DENY the remainder of this paragraph.

14.     ADMIT that Commission regulations provide for a contributor to designate a contribution for a particular election and that absent a proper designation, a contribution is deemed to have been made for the next election for federal office.  To the extent this paragraph purports to paraphrase specific Commission regulations, those provisions speak for themselves and require no response.

15.     ADMIT that Commission regulations define the circumstances in which a contribution designated for an election that has already occurred may be used, ADMIT that Commission regulations define what constitutes net debts outstanding from a particular election, and otherwise DENY the remainder of this paragraph.

16.     DENY.

17.     ADMIT that Commission regulations permit a contribution to be redesignated for another election; otherwise DENY that this paragraph accurately or completely describes the redesignation process.

18.     The Commission lacks knowledge or information sufficient to admit or deny the allegations contained in this paragraph regarding the wishes of the plaintiffs; DENY that FECA or its amendments contain any "artificial distinction between primary and general elections."

19.     The Commission lacks knowledge or information sufficient to admit or deny the allegations contained in the first sentence of this paragraph, regarding Plaintiff Holmes's desire to support a certain candidate.  The Commission ADMITS that candidate Carl DeMaio finished

3

second in the Congressional primary election for the 52nd District in California, and that this

ensures his placement on the ballot for the November 4, 2014 general election.

20.     ADMIT that Carl DeMaio and incumbent Scott Peters will compete in the

November 4, 2014 general election to represent California's 52nd District and ADMIT that

Congressman Peters was the only member of the Democratic Party on the June 3, 2014 primary

ballot, and that this paragraph correctly identifies his FEC candidate ID number.  The

Commission lacks knowledge or information sufficient to admit or deny the allegations

contained in the second sentence of this paragraph to the extent they depend on plaintiffs'

subjective meaning of "significant primary challengers," but DENY this sentence to the extent it

alleges that Congressman Peters's status as the only member of the Democratic Party deprived

him of primary challengers under California's "top two" primary system.

21.     ADMIT that plaintiff Holmes contributed $2,600 to DeMaio after the California

primary election.  The Commission lacks knowledge or information sufficient to admit or deny

the allegations in the second sentence of this paragraph.

22.     The FEC lacks knowledge or information sufficient to admit or deny the

allegation in this paragraph regarding plaintiff Jost's support of a particular candidate.  ADMIT

that Mariannette Miller-Meeks is a candidate to represent Iowa's second Congressional District,

that this paragraph correctly identifies her FEC candidate ID number, and that Miller-Meeks won

the Republican primary election for that seat on June 3, 2014.

23.     ADMIT the allegations contained in this paragraph regarding the candidates who

will participate in the November 4, 2014 general election for Iowa's Second Congressional

District and ADMIT that Congressman Loebsack was the only candidate listed on the ballot in

the Democratic primary for that seat.  The Commission lacks knowledge or information

sufficient to admit or deny the allegations contained in the second sentence of this paragraph to

the extent they depend on plaintiffs' subjective meaning of "significant primary challengers," but

ADMIT that Congressman Loebsack was not challenged in the primary by another candidate

listed on the Democratic primary ballot.

24.     ADMIT that plaintiff Jost did not make a contribution to candidate Miller-Meeks

during her primary election campaign and that he has contributed $2,600 to Miller-Meeks for the

general election.  The Commission lacks knowledge or information sufficient to admit or deny

the allegation regarding plaintiff Jost's wishes to make additional contributions.

25.     The FEC lacks knowledge or information sufficient to admit or deny plaintiffs'

allegations regarding their wish to exceed FECA's contribution limits.  DENY that FECA

imposes a "base candidate contribution limit" for "the combined primary and general election

periods."  To the extent this paragraph purports to paraphrase specific statutory or regulatory

provisions or a Federal Register notice, such documents speak for themselves and require no

response.

26.     The Commission lacks knowledge or information sufficient to admit or deny the

allegations in this paragraph concerning plaintiffs' wishes; otherwise DENY this paragraph.

27.     The Commission incorporates by reference its responses to paragraphs 1 – 26.

28.     ADMIT that the Supreme Court's opinion in *Buckley v. Valeo,* 424 U.S. 1 (1976),

describes the extent to which contribution limits implicate the First Amendment.

29.     This paragraph purports to characterize and paraphrase part of the Supreme

Court's opinion in *Buckley,* which speaks for itself, and requires no response.

30.     ADMIT that the Supreme Court's opinion in *Buckley* includes the quoted

language, without plaintiffs' alterations.

31.     This paragraph purports to paraphrase a legal conclusion in one or more Supreme Court opinions, each of which speaks for itself, and requires no response.

32.     This paragraph purports to characterize part of the Supreme Court's opinion in *McCutcheon v. FEC,*134 S. Ct. 1434 (2014)*,* which speaks for itself, and requires no response; DENY that the language in quotation marks accurately or completely quotes that opinion.

33.     This paragraph purports to characterize and paraphrase part of the Supreme Court's opinion in *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377 (2000), which speaks for itself, and purports to state a legal conclusion, neither of which requires a response.

34.     This paragraph purports to characterize part of the Supreme Court's opinion in *McCutcheon,* which speaks for itself, and purports to state legal conclusions, neither of which requires a response.

35.     This paragraph purports to paraphrase part of the Supreme Court's opinion in *Nixon v. Shrink Missouri Government,* which speaks for itself, and purports to state legal conclusions, neither of which requires a response.

36.     ADMIT that Supreme Court's opinion in *McCutcheon* uses the term "base limits"; DENY the remainder of this paragraph.

37.     DENY the first sentence of this paragraph; ADMIT that the Supreme Court's opinion in *McCutcheon* includes the language that appears in quotation marks, but not the ellipses.

38.     DENY the first sentence of this paragraph; ADMIT that the Supreme Court's opinion in *McCutcheon* includes the language that appears in quotation marks, but not plaintiffs' modification.

39.     The Commission lacks knowledge or information sufficient to admit or deny plaintiffs' allegations regarding their wishes; DENY the characterization that FECA's contribution limits are "bifurcated."

40.     DENY that FECA's contribution limits are "[a]rtificially bifurcat[ed]" and otherwise DENY this paragraph.

41.     The Commission lacks knowledge or information sufficient to admit or deny plaintiffs' allegations regarding their "planned contributions."  DENY that FECA's contribution limits are "[a]rtificially bifurcate[ed]" and otherwise DENY the remainder of this paragraph.

42.     The Commission incorporates by references its responses to paragraphs 1 – 41.

43.     ADMIT that the Fifth Amendment's Due Process Clause includes an equal protection guarantee like that guaranteed by the Fourteenth Amendment.  To the extent this paragraph purports to summarize the Supreme Court's opinions in *Buckley* or *Bolling v. Sharpe,* 347 U.S. 497 (1954), those opinions speak for themselves and require no response.

44.     ADMIT that the Supreme Court in *McCutcheon* struck down FECA's aggregate limits on candidate contributions; otherwise DENY this paragraph including the implication that FECA contains "bifurcated individual candidate contribution limits."  To the extent the second sentence of this paragraph purports to characterize or paraphrase part of the Supreme Court's opinion in *McCutcheon,* that opinion speaks for itself and requires no response.

45.     ADMIT that the Supreme Court in *Buckley* upheld FECA's contribution limits on their face and that the opinion includes the language in quotation marks but not plaintiffs' alteration; DENY the first sentence of this paragraph to the extent that it alleges the *Buckley* opinion was limited to that holding.

46.     ADMIT that the Supreme Court's opinion in *Buckley* includes the quoted language, but not plaintiffs' alterations.  To the extent this paragraph purports to characterize or summarize part of the Supreme Court's opinion in *Buckley,* that opinion speaks for itself and requires no response.

47.     DENY.

48.     ADMIT.

49.     ADMIT.

50.     DENY that FECA's contribution limits are "bifurcated" and ADMIT that some plaintiffs in *McConnell v. FEC,* 540 U.S. 93 (2003), challenged BCRA's amendment to the amount of FECA's contribution limits and that the Court declined to address that challenge.

51.     ADMIT that *Davis v. FEC*, 554 U.S. 724 (2008) concerned a candidate's challenge to asymmetrical contribution limits.

52.     ADMIT that *Davis* concerned a provision of BCRA known as the "millionaire's amendment" that would permit certain candidates opposing a self-financing opponent to raise amounts up to a higher contribution limit under certain circumstances.  The Commission lacks knowledge or information regarding other unspecified "substantive changes to law" plaintiffs intend to reference in this paragraph sufficient to admit or deny such vague allegations.

53.     DENY.

54.     ADMIT that the Supreme Court's opinion in *Davis* contains the language in quotation marks but not plaintiffs' alteration.

55.     ADMIT that the Court in *Davis* found the asymmetrical contribution limits established by the millionaire's amendment to be unconstitutional under the First Amendment.

56.     ADMIT.

57.     The Commission lacks knowledge or information regarding what plaintiffs mean by "this reasoning" sufficient to admit or deny the allegations in the first sentence of this paragraph.  ADMIT the second sentence of this paragraph.

58.     DENY that *McCutcheon* and *Riddle v. Hickenlooper* address "a similar problem" and DENY that *Riddle v. Hickenlooper* purports to address any "problem of bifurcated limits." The second sentence of this paragraph purports to characterize the Colorado statute at issue in *Riddle v. Hickenlooper,* 742 F.3d 922, 924 (10th Cir. 2014), which speaks for itself and requires no response.

59.     ADMIT that the language in this paragraph is a quote from the cited part of the Tenth Circuit Court of Appeals' opinion in *Riddle*.

60.     DENY that this paragraph accurately describes the nature and scope of law at issue in *Riddle*.

61.     DENY that this paragraph accurately describes the scope of the case before the Tenth Circuit in *Riddle*.

62.     ADMIT that the language in quotation marks, but not plaintiffs' alterations, appears in *Riddle* and that the Court of Appeals focused on whether two groups of contributors were "similarly situated."

63.     ADMIT that the language in quotation marks, but not plaintiffs' alterations, appears in *Riddle*.

64.     ADMIT that the language in quotation marks, but not plaintiffs' alterations, appears in *Riddle*.

65.     ADMIT that the language in this paragraph is a quote from the cited part of the Tenth Circuit Court of Appeals' opinion in *Riddle*.

66.     DENY the first and third sentences of this paragraph.   DENY the second

sentence of this paragraph to the extent it alleges that under "the federal system," only certain

candidates that participate in a primary election "can use the 'primary' contributions to run

advertisements promoting his campaign or attacking candidates of the opposing party."

67.   The Commission lacks knowledge or information sufficient to admit or deny the

allegations contained in the first sentence of this paragraph.  DENY the remainder of this

paragraph.

68.     ADMIT.

69.     DENY.

70.     DENY that this case is similar to *Riddle*, that the government makes any

"artificial" decisions regarding "how money is contributed," and otherwise DENY the

allegations in this paragraph.

71.     The first sentence of this paragraph is vague and purports to state a generalized

legal conclusion that requires no response; DENY that FECA "allow[s] for 'extra' contributions"

by anyone, DENY that the challenged contribution limits impose any "asymmetry," and

otherwise DENY the remainder of this paragraph.


**PRAYERS FOR RELIEF**

The Court should deny plaintiffs' requested relief.


10

JA 35

## AFFIRMATIVE DEFENSE

The Complaint fails to state a cause of action on which relief can be granted.

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)
Deputy General Counsel

Kevin Deeley
Acting Associate General Counsel

/s/ Erin Chlopak
Erin Chlopak (D.C. Bar No. 496370)
Acting Assistant General Counsel

Steve Hajjar
Benjamin A. Streeter III
Attorneys

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
September 29, 2014                    (202) 694-1650

11

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **LAURA HOLMES,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 14-1243 (RMC)** |
| | ) | |
| **FEDERAL ELECTION COMMISSION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION DENYING PRELIMINARY INJUNCTION

The Federal Election Campaign Act limits donor contributions to $2,600 per candidate, per election (primary, run-off (if any), and general elections). Plaintiffs want to combine their primary and general election contributions so as to increase their contributions to $5,200 for the candidate in the general election, without "wasting" money on the primary. Plaintiffs do not seek to make unlimited financial contributions. Instead, they allege that the FECA per-election limit on their contributions violates their constitutional rights under the First and Fifth Amendments; they seek a preliminary injunction to prevent enforcement of the law by the Federal Election Commission. Plaintiffs challenge the analysis and conclusion of the Supreme Court in *Buckley v. Valeo* and its progeny. This Court does not have that luxury. Plaintiffs thus fail to demonstrate likelihood of success on the merits or irreparable harm and the public interest in the integrity of the election process outweighs their private interest in giving money in a more focused way. Accordingly, their motion for a preliminary injunction will be denied.

# I.  FACTS

## A.  Background

Defendant Federal Election Commission (FEC) is a federal government agency charged with administering, interpreting, and enforcing the Federal Election Campaign Act (FECA), 2 U.S.C. §§ 431-57.[1]  Under FECA and its subsequent amendments, donors may contribute $2,600 per election to individual federal candidates, per election.  *See* 2 U.S.C. § 441a(a); FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold*, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013) (limit on contributions made to federal candidates during the 2013-2014 election cycle is $2,600 per candidate, per election).  An "election" is defined as "a general, special, primary, or runoff election."  2 U.S.C. § 431(1)(A).  The total amount that one may contribute to a particular candidate during a full election cycle depends on the number of elections in which that candidate runs.  For example, if the candidate runs in both a primary and a general election, an individual may contribute a total of $5,200—$2,600 for the primary and $2,600 for the general election.  If the candidate must also participate in a runoff election, an individual may contribute an additional $2,600 for that election, for a total of $7,800.

FEC has implemented various regulations on how contributions are to be allocated among these elections.  Contributors "are encouraged to designate their contributions in writing for particular elections."  11 C.F.R. § 110.1(b)(2)(i).  If a contribution is not designated, it is presumed to be for "the next election for that Federal office after the contribution is made."  *Id.* § 110.1(b)(2)(ii).  If a contribution is designated for an election that has already occurred, it

---

[1] Effective September 1, 2014, the provisions of FECA codified at 2 U.S.C. §§ 431-57 were recodified and transferred to 52 U.S.C. §§ 30101-30146.  Plaintiffs cite to Title 2 in their briefs and thus the Court will also do so herein for purposes of clarity.

can only be used to satisfy outstanding net debts from that election; to the extent a contribution exceeds net debts, it must be refunded, redesignated to another election, or reattributed as from another contributor. *Id.* at § 110.1(b)(3)(i). If a candidate fails to qualify for the general election, contributions for that election must also be refunded, redesignated, or reattributed. *Id.* "Redesignation" means that a candidate running in a general election "may spend unused primary contributions for general election expenses;" however, those contributions "continue to apply toward the contributors' limits for the primary" and do not prevent the same contributor from giving more money for the general election. FEC Campaign Guide, *Congressional Candidates and Committees June 2014*, at 21, available at http://www.fec.gov/pdf/candgui.pdf (citing 11 C.F.R. § 110.3(c)(3)) (last visited Oct. 20, 2014). As a result, if a party candidate has no opposition in the primary election, one may contribute $2,600 to the primary and $2,600 to the general election and the candidate can use both amounts ($5,200) in the general election alone.

Plaintiffs Laura Holmes and Paul Jost are a married couple, residing in Miami, Florida. Compl. ¶ 8. Ms. Holmes supports Carl DeMaio, a general election candidate for California's 52nd Congressional District. *Id.* ¶ 19. Mr. DeMaio finished second in the primary election behind incumbent Scott Peters, who was the only member of the Democratic Party on the ballot to represent CA-52.[2] *Id.* ¶ 20. Ms. Holmes did not make any contributions to Mr. DeMaio before the primary, but contributed $2,600 after the primary. *Id.* ¶ 21. Mr. Jost supports Marionette Miller-Meeks, a general election candidate for Iowa's Second Congressional District. *Id.* ¶ 22. He contributed $2,600 to Dr. Miller-Meeks after she won her primary, but made no

---

[2] Under California's "Top Two" primary system, all candidates for United States congressional offices are listed on the same primary ballot and the two candidates that receive the most votes, regardless of party preference, proceed to compete in the general election.

contributions before the primary.  *Id.* ¶ 24.  During the general election Dr. Miller-Meeks will face incumbent David Loebsack, who was the only candidate on the ballot in the Democratic Party primary.  *Id.* ¶ 23.  Both Plaintiffs wish to contribute an additional $2,600 to their preferred candidates but cannot because of the limits on contributions for a general election.

### B.  Plaintiffs' Complaint and Motion for Declaratory Relief

Plaintiffs allege that FECA's contribution limit of $2,600 per election is unconstitutional as applied, where Plaintiffs want to contribute an additional $2,600 to general election candidates who (1) won contested primaries and (2) face opponents in the general election who did not have significant opposition in their primaries.  Plaintiffs first argue that the per-election contribution rule impermissibly burdens their First Amendment right to associate by creating an artificial distinction between primary and general elections without furthering any anticorruption interest.  Because they cannot contribute the entire $5,200 after the primary, Plaintiffs assert, they are foreclosed from fully supporting the successful party candidate. Plaintiffs further argue a violation of equal protection, contending that they are treated differently than contributors to candidates who ran in uncontested primaries.  Specifically, they assert that while contributors to candidates facing no significant primary opposition can effectively give $5,200 for the general election (because those candidates can use the $2,600 contributed before the primary towards the general election, as well as the $2,600 contributed after the primary), In contrast, Plaintiffs, who wish only to support candidates in the general election, are limited to a single contribution of $2,600.  On these grounds, Plaintiffs have moved for a preliminary injunction to enjoin enforcement of the rule.[3]

---

[3] As correctly noted by FEC, the Court's jurisdiction over the Complaint is based on 2 U.S.C. § 437h, which provides that the district court shall certify all questions of FECA's constitutionality to the Court of Appeals for *en banc* review.  According to the D.C. Circuit, it remains an open question whether "section 437h deprives the district court of authority to grant

## II.  LEGAL STANDARD

### A.  Preliminary Injunction

A district court may grant a preliminary injunction "to preserve the relative

positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451

U.S. 390, 395 (1981).  A plaintiff seeking a preliminary injunction must establish that:

> (a) he is likely to succeed on the merits;
> (b) he is likely to suffer irreparable harm in the absence of preliminary relief;
> (c) the balance of equities tips in his favor; and
> (d) an injunction is in the public interest.

*Winter v. NRDC, Inc.*, 555 U.S. 7, 7 (2008).  The D.C. Circuit has further instructed that "the

movant has the burden to show that all four factors . . . weigh in favor of the injunction."  *Davis

v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).[4]  Further, a preliminary

injunction is "an extraordinary remedy that should be granted only when the party seeking the

relief, by a clear showing, carries the burden of persuasion."  *Cobell v. Norton*, 391 F.3d 251,

258 (D.C. Cir. 2004); *see also Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) ("A

---

[preliminary injunctive] relief based on a constitutional challenge to FECA."  *Wagner v. FEC*,
717 F.3d 1007, 1017 n.9 (D.C. Cir. 2013).  The Court does not address this issue given its denial
of Plaintiffs' motion for a preliminary injunction.  *See Rufer v. FEC*, No. 14-0837, 2014 U.S.
Dist. LEXIS 114762, at *20, *23 (D.D.C. Aug. 19, 2014) (denying injunctive relief where
plaintiffs raised constitutional questions that had to be certified to the Circuit under FECA).

[4] Traditionally, courts balanced the four factors on a "sliding scale," *i.e.*, a lesser showing on one
factor could be surmounted by a greater showing on another factor.  *See CSX Transp., Inc. v.
Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005).  However, more recently the D.C. Circuit has
suggested that a positive showing on all four preliminary injunction factors may be required.
*See Davis*, 571 F.3d at 1292; *see also Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011)
("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an
independent, free-standing requirement for a preliminary injunction.") (internal quotations
omitted).  Still, the Court undertakes a balancing approach below given that "the Circuit has had
no occasion to decide this question because it has not yet encountered a post-*Winter* case where a
preliminary injunction motion survived the less rigorous sliding-scale analysis."  *Converdyn v.
Moniz*, No. 14-1012, 2014 U.S. Dist. LEXIS 127838, at *24 n.2 (D.D.C. Sept. 12, 2014).

preliminary injunction is an extraordinary remedy that may only be awarded upon a clear

showing that the plaintiff is entitled to such relief.") (internal citations omitted).

## III.  LEGAL ANALYSIS

### A.  Likelihood of Success on the Merits

#### 1.  First Amendment

The Supreme Court has long held that "[t]he right to participate in democracy

through political contributions is protected by the First Amendment, but that right is not

absolute." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1441 (2014).  Although both are protected as

First Amendment speech, the Court distinguishes between *expenditures by candidates*, which are

essentially unlimited, and *limits on contributions* to a particular candidate.  *See, e.g., id*. at 1444;

*Buckley v. Valeo*, 424 U.S. 1, 19-21 (1976).  Expenditures are a core form of political expression

and any restriction is subject to "exacting scrutiny;" a candidate's expenditures may only be

restricted "if such regulation promotes a compelling interest and is the least restrictive means to

further the articulated interest."  *McCutcheon*, 134 S. Ct. at 1444 (citing *Sable Communications*

*of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)).

By contrast, "a limitation upon the amount that any one person or group may

contribute to a candidate or political committee entails only a marginal restriction upon the

contributor's ability to engage in free communication."  *Buckley*, 424 U.S. at 20-21.  Thus, in

evaluating contribution restrictions, "[e]ven a significant interference with protected rights of

political association may be sustained if the State demonstrates a sufficiently important interest

and employs means closely drawn to avoid unnecessary abridgement of associational freedoms."

*Id.* at 25 (internal citations omitted).  Limits on contributions will be upheld as "sufficiently

important" if they are appropriately designed to reduce *quid pro quo* corruption or the

appearance of corruption.  *See id.* at 26-27; *McCutcheon*, 134 S. Ct. at 1450 ("This Court has

identified only one legitimate governmental interest for restricting campaign finances: preventing

corruption or the appearance of corruption.").  If a court "is satisfied that some limit on

contributions is necessary," then it "has no scalpel to probe" the specific level at which the limit

is set.  *Buckley*, 424 U.S. at 30; *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (Breyer, J.,

plurality) ("We cannot determine with any degree of exactitude the precise restriction necessary

to carry out the statute's legitimate objectives. In practice, the legislature is better equipped to

make such empirical judgments, as legislators have particular expertise in matters related to the

costs and nature of running for office.  Thus ordinarily we have deferred to the legislature's

determination of such matters.") (internal quotations omitted).  The First Amendment does not

compare a contributor's rights with the rights of other contributors, but rather focuses on whether

the burden imposed by the contribution limit is closely drawn to match a sufficiently important

state interest.  *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387-88 (2000).

       Plaintiffs are not likely to succeed on the merits of their First Amendment claim

because FEC's contribution limit of $2,600 per election per candidate only marginally restricts

Plaintiffs' freedom of association and is properly designed to reduce corruption or the

appearance of corruption.  To start, Plaintiffs have *not* been prevented from supporting their

preferred candidates with the full $5,200 contribution authorized by law.  They could have

contributed $2,600 to any candidate before the primaries, but *chose* not to do so because of their

belief that the money would be "wasted in an intraparty squabble" as opposed to being used to

fight the incumbent in the general election.  Pl. Mem. at 1.  That Plaintiffs elected not to exercise

their right of free expression before the primary election does not render the law unconstitutional

as applied.

Plaintiffs contend that their rights were infringed because they should not have to associate with a candidate during the primary election campaign; rather, they argue, they should be able to contribute only to the primary winner for the general election because "[b]y drawing the line at $5,200, Congress implicitly found that contributions of that size, at least, pose no cognizable risk of corruption." *Id.* at 14 (citing *McCutcheon*. 134 S. Ct. at 1452). However, contrary to Plaintiffs' suggestion, neither Congress nor *McCutcheon* approved contributions of $5,200 for a single election. The base limit of $5,200 imposed by Congress and upheld by the Court is the total allowable contribution limit for both primary and general elections, *i.e.*, $2,600 each. *McCutcheon*, 134 S. Ct. at 1442, 1451. The per-election limit was designed to restrict financial contributions while allowing expression of First Amendment associational rights in every election in which a candidate runs. This is a quintessential political decision made by politicians who understand the process far better than the courts and is deserving of deference. *See Buckley*, 424 U.S. at 29-30.[5]

Plaintiffs also maintain that FEC has not set forth a valid anti-corruption rationale for the rule limiting contributions on a per-election basis. However, the Supreme Court has long ago concluded that restrictions on the amount of money one can contribute per election prevent corruption and the appearance of corruption by allowing candidates to compete fairly in each stage of the political process. *See Buckley*, 424 U.S. at 26-27 (upholding contribution limits because "the integrity of our system of representative democracy is undermined" when "large

---

[5] Plaintiffs claim that such deference is inapplicable here because they are challenging the structure of the contribution limit scheme, not the limit itself. Pl. Reply at 4. However, Plaintiffs' attempt to reframe the issue falls short. The limit is not $5,200, as Plaintiffs would have it. The limit is $2,600 *per election* which might, if a run-off occurs, result in an authorized contribution of $7,800. Plaintiffs wish to contribute $5,200 to the general election alone, as opposed to the $2,600 deemed appropriate by Congress. Thus, despite their claims to the contrary, Plaintiffs are indeed objecting to the specific base limit on how much an individual may contribute per election.

contributions are given to secure political *quid pro quo*'s from current and potential office

holders" and because of the dangerous impact "of the appearance of corruption stemming from

public awareness of the opportunities for abuse inherent in a regime of large individual financial

contributions"). Moreover, given that "the danger of corruption and the appearance of

corruption apply with equal force to challengers and to incumbents," there is "ample justification

for imposing the same fundraising constraints upon both." *Id.* at 33.

    Furthermore, primaries are a necessary part of the election process. Voters have a

First Amendment right to associate with and financially support primary candidates. And, of

course, voters are also free to engage in independent political expression by volunteering their

services. Intimately aware of the financial demands of a modern election campaign, Congress

has nonetheless maintained a per-person, per-election contribution limitation. Plaintiffs are not

wrong that a candidate who participates in an uncontested primary may go into a general election

with more money than a candidate who ran in a contested primary. But there is certainly no rule

requiring that all candidates have equal funding. To the contrary, inequity in campaign finances

is an inherent part of elections. *See Davis v. FEC*, 554 U.S. 724, 742 (2008) ("Different

candidates have different strengths. Some are wealthy; others have wealthy supporters who are

willing to make large contributions. . . . [T]here is no legal right to have the same resources to

influence the electoral process.") (citations omitted). FECA simply makes uniform the amount a

person can contribute to a candidate on a per-election basis. This restriction, therefore, is closely

drawn to match a sufficiently important state interest and does not overly burden Plaintiffs'

freedom to associate. *See Buckley*, 424 U.S. at 21 ("The quantity of communication by the

contributor does not increase perceptibly with the size of his contribution, since the expression

rests solely on the undifferentiated, symbolic act of contributing.").

### 2.  **Fifth Amendment Equal Protection**

Plaintiffs also contend that the bifurcated contribution limit violates their right to equal protection under the law.  The Fourteenth Amendment specifies that that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. 14, § 1.  Equal protection applies equally to the federal government through the Fifth Amendment Due Process Clause.  U.S. Const. Amend. 5("No person . . . shall be deprived of life, liberty or property, without due process of law.").  *See, e.g., Buckley*, 424 U.S. at 93 ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."); *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 804 (D.C. Cir. 1988) ("Although the Equal Protection Clause appears only in the 14th Amendment, which applies only to the states, the Supreme Court has found its essential mandate inherent in the Due Process Clause of the Fifth Amendment and therefore applicable to the federal government.").

The Supreme Court has held that the First Amendment requires "closely drawn" scrutiny for limits on political contributions, *Davis v. FEC*, 554 U.S. at 737, but has not addressed the scrutiny applicable to a challenge to restrictions on political contributions under an equal protection rubric.  Recent courts to have considered the issue have applied the same "closely drawn" scrutiny to equal protection challenges.  *See Riddle v. Hickenlooper*, 742 F.3d 922, 928 (10th Cir. Colo. 2014) ("For the sake of argument, we can assume that this form of intermediate scrutiny applies when contributors challenge contribution limits based on the Fourteenth Amendment's Equal Protection Clause rather than the First Amendment."); *Woodhouse v. Me. Comm'n on Governmental Ethics & Election Practices*, No. 14-266, 2014 U.S. Dist. LEXIS 117926, at *18 (D. Me. Aug. 22, 2014) ("Neither the Supreme Court nor the First Circuit has announced any different standard for dealing with First Amendment

discrimination challenges, and I therefore apply it in this equal protection context."); *Wagner v. FEC*, 901 F. Supp. 2d 101, 112-13 (D.D.C. 2012), *vacated on other grounds*, 717 F.3d 1007 (D.C. Cir. 2013). Since both the First and Fifth Amendments are crucial protectors of individual rights, this Court agrees and will apply intermediate scrutiny to determine whether FECA's per-election contribution limit is closely drawn to match a sufficiently important state interest or differentiates unfairly between similarly situated contributors.[6]

       As discussed above, the Court finds that the contribution limit, which applies equally to every contributor, advances the legitimate state interest of preventing corruption or the appearance of corruption.[7] Furthermore, the means are closely drawn and do not unfairly differentiate among contributors. Indeed, Plaintiffs have not been treated differently than any other contributor because the statute here "applies the same limitations on contributions to all candidates regardless of their present occupations, ideological views, or party affiliations." *Buckley*, 424 U.S. at 31. Plaintiffs consistently describe the law as asymmetrical, citing cases in which the Supreme Court struck down state laws imposing varying contribution limits on different groups of contributors. Pl. Mem. at 20-22 (citing *Davis*, 554 U.S. 724; *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011)). These cases are inapposite. While Plaintiffs may be prevented from contributing $5,200 to their chosen candidates after their primary elections, Plaintiffs were only restricted *to the exact same extent* as any other individuals wishing to contribute more than $2,600 per election.

---

[6] Plaintiffs argue for an intermediate level of scrutiny, not strict scrutiny, when analyzing their Fifth Amendment claims. FEC argues for application of rational basis scrutiny, but also asserts that Plaintffs' equal protection claim would similarly fail under intermediate scrutiny.

[7] Plaintiffs do not argue that *Citizens United v. FEC*, 558 U.S. 310 (2010), has impacted the analysis in this case.

Plaintiffs argue that FECA differentiates unfairly because contributors cannot give $5,200 for the general election to a candidate who faced significant opposition in the primary, but can effectively give $5,200 for the general election to a candidate who faced no such opposition.  However, Plaintiffs misapprehend the statutory contribution limits.  No individual has the power to give $5,200 solely for use in the general election.  It may be that a contributor to an unopposed incumbent will contribute $2,600 before the primary election in anticipation that it will all be used in the general election.  How the funds are actually spent, of course, is wholly out of the contributor's control.  An unopposed candidate may well decide to campaign before the primary in order to get a head start on the general election campaign—or not, depending on the candidate's calculus of her reelection chances.  In either case, contributors have not been treated differently.  Plaintiffs' argument that the law works asymmetric and discriminatory effects by favoring one category of candidates over another is therefore misplaced.  It is the candidate who faces no primary challenger—whether an incumbent or a first-time candidate—who might be advantaged by saving campaign costs for the primary.  Accordingly, even if a candidate in a primary must spend money to advertise and win, it does not follow that the rights of his contributors have been treated unequally.[8]

Plaintiffs rely heavily on *Riddle v. Hickenlooper*, 742 F.3d 922 (10th Cir. 2014), a case involving a Colorado statute that allowed individuals to contribute $400 to Republican and Democratic candidates at any time, but limited contributions to write-in candidates to $200.  In theory, the contribution limit was higher for Party candidates because they had to compete in primaries, while write-in candidates did not.  *Id.* at 926.  However, the state law did not require

---

[8] It may be that Plaintiffs object to FEC regulations allowing "[t]ransfers of funds between the primary campaign and general election campaign of a candidate of funds unused for the primary," 11 C.F.R. § 110.3(c)(3), but Plaintiffs have not brought that challenge here.

contributions to be made before a primary; contributors could give $400 to Party candidates

before *or* after a primary election, but contributors to write-in candidates were limited to one

$200 contribution.  The Tenth Circuit found the statute unconstitutional as applied because it

violated the equal protection rights of contributors to write-in candidates.  Specifically, the law

"treated contributors differently based on the political affiliation of the candidate being

supported" and thereby "impinged on the right to political expression for those who support[ed]"

write-in candidates.  *Id.* at 927.  Furthermore, the reviewing court found no link between the

differing contribution limits and the state's anticorruption interest, nor did state officials rely on

the cost of a primary as a separate governmental interest.  *Id.* at 928.

   In contrast to the Colorado statute, FECA does not "create[ ] different

contribution limits for individuals running against one another."  *Id.* at 929 (citing *Davis*, 554

U.S. at 738).  To the contrary, it creates *identical* contribution limits for all candidates based

solely the number of elections in which they run for federal office.  The fact that a candidate may

be fortunate enough not to face "significant opposition" in her primary does not render the

statute's treatment of her contributors unconstitutional.  These are not different limits "on

candidates vying for the same seat," *Davis v. FEC*, 554 U.S. at 743-44, but *uniform* limits on

contributors.  Any variance in the levels of funding is a natural result of the political process, not

a result of the per-election contribution limit.

   The Court finds that Plaintiffs' perceived inequality in contribution limits is not

imposed by FECA or its regulations, but by the vagaries of the election process.  Plaintiffs' Fifth

Amendment claim of an equal protection violation is without merit.

### B.  Remaining Preliminary Injunction Factors

None of the other factors affecting the grant of a preliminary injunction weighs in favor of Plaintiffs' motion.  First, Plaintiffs are not likely to suffer irreparable harm; rather, "they will simply be required to adhere to the regulatory regime that has governed campaign finance for decades."  *Rufer*, 2014 U.S. Dist. LEXIS 114762, at *7-8 (finding that "alleged harm to Plaintiffs caused by delaying receipt of unlimited contributions does not overcome the weighty considerations against preliminary relief").  Second, the balance of equities does not support a preliminary injunction.  The regulatory scheme for contributions under the FECA has been in place for decades and approved by the Supreme Court.  Plaintiffs' attempt to locate a problem of constitutional proportions in the per-election contribution limit would upset settled expectations immediately before the vote itself.  *See Veasey v. Perry*, No. 14-41127, 2014 WL 5313516, at *4 (5th Cir. Tex. Oct. 14, 2014) ("The Supreme Court has instructed that we should carefully guard against judicially altering the status quo on the eve of an election."), *cert. denied*, Nos. 14A393, 14A402 and 14A404, 2014 WL 5311490 (Oct. 18, 2014); *see also Rufer*, 2014 U.S. Dist. LEXIS 114762, at *23. ("Granting preliminary relief would upset the entire federal campaign finance framework [immediately] prior to the next federal election based on an as yet untested legal theory.  Permitting that to happen would be imprudent, to say the least, and certainly not in the public interest.").

Moreover, "'[t]he presumption of constitutionality which attaches to every Act of Congress is . . . an equity to be considered in favor of [the government] in balancing hardships.'" *Stop This Insanity v. FEC*, 902 F. Supp. 2d 23, 50 (D.D.C. 2012) (quoting *Bowen v. Kendrick*, 483 U.S. 1304, 1304 (1987)) (alterations in original).  This Circuit has "set a high standard for irreparable injury," and Plaintiffs have not met their burden of showing a clear entitlement to the

"extraordinary remedy" of a preliminary injunction.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## IV.  CONCLUSION

For the reasons set forth above, the Court finds that Plaintiffs are not likely to succeed on the merits of their two constitutional claims; they have shown no irreparable harm; the equities do not favor Plaintiffs; and a preliminary injunction is not in the public interest. Their motion for a preliminary injunction will be denied.  A memorializing Order accompanies this Memorandum Opinion.

Date: October 20, 2014

                            _____/s/_____
                            ROSEMARY M. COLLYER
                            United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **LAURA HOLMES,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 14-1243 (RMC)** |
| | ) | |
| **FEDERAL ELECTION COMMISSION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## CERTIFICATION OF QUESTIONS OF CONSTITUTIONALITY OF
## FEDERAL ELECTION CAMPAIGN ACT

The Federal Election Campaign Act (FECA) limits donor contributions to $2,600 per person/per candidate/per election, *i.e.*, general, special, primary, or runoff election.  Plaintiffs Laura Holmes and Paul Jost wanted to combine their primary and general election contributions so that each Plaintiff could contribute $5,200 to their preferred candidates in the general 2014 congressional election, without wasting money on the primary.  Plaintiffs do not argue that, under *Citizens United v. Federal Election Comm'n,* 558 U.S. 310 (2010), they should be allowed to make unlimited financial contributions.  Instead, they allege that the FECA per-election limit on their contributions violates their constitutional rights under the First and Fifth Amendments. This Court denied their motion for a preliminary injunction and Plaintiffs now seek certification of two questions of constitutionality to the United States Court of Appeals for the District of Columbia Circuit.

The Court previously held that Plaintiffs were unlikely to succeed on the merits of their constitutional challenge to FECA.  Nonetheless, the law requires that "[t]he district court shall immediately certify all questions of constitutionality of [the] Act to the United States court

of appeals for the circuit involved, which shall hear the matter sitting en banc."  2 U.S.C.

§ 437(h) (now 52 U.S.C. § 30110).[1]  One district court has found that its prerogative under

§ 437(h) was "not to answer any constitutional questions, or to render a judgment of any kind,"

but rather to only "make findings of fact that will allow the Court of Appeals to answer the

[certified] constitutional questions."  *Speechnow.org v. Federal Election Com'n*, Civ. No. 08-

0248 (JR), 2009 WL 3101036, at *1 (D.D.C. Sept. 28, 2009).  Another has held that § 437(h)

requires certification unless the Court finds the questions presented are "'frivolous' or 'settled

principles of law.'"  *Libertarian Nat'l Comm., Inc. v. FEC*, 930 F. Supp. 2d 154, 165 (D.D.C.

2013) (quoting *Khachaturian v. FEC*, 980 F.2d 330, 331 (5th Cir. 1992)).  In an abundance of

caution, the Court will so certify and makes the necessary findings of fact below.

## A.  FINDINGS OF FACT

### 1.  Defendant FEC

- The Federal Election Commission (FEC) is a federal government agency charged
  with administering, interpreting, and enforcing the Federal Election Campaign
  Act (FECA), 2 U.S.C. §§ 431-57.

- Under FECA as amended, individual persons may contribute no more than $2,600
  per candidate, per federal election.  *See* 2 U.S.C. § 441a(a); FEC, *Price Index
  Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling
  Disclosure Threshold*, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013) (FEC Price Index
  Adjustments) (limit on individual contributions to federal candidates in the 2013-
  2014 election cycle is $2,600 per candidate, per election).

---

[1]  Effective September 1, 2014, the provisions of FECA codified in Title 2 were transferred to
52 U.S.C. §§ 30101-30146.  Because this suit was filed before September 1, Plaintiffs' briefs cite
to Title 2 and all parties have continued that convention for clarity.

- An election is defined as "a general, special, primary, or runoff election."

  2 U.S.C. § 431(1)(A).

- The total amount that an individual may contribute to a particular candidate

  during a full election cycle depends on the number of elections in which that

  candidate runs.  For example, if the candidate runs in both a primary and a general

  election, an individual may contribute a total of $5,200—$2,600 for the primary

  campaign and $2,600 for the general election campaign.  If the candidate must

  also participate in a runoff election, an individual may contribute an additional

  $2,600 for that election campaign, for a total possible contribute of $7,800.  *See* 2

  U.S.C. § 441a(a); FEC Price Index Adjustments.

- FEC has adopted regulations on how contributions are to be allocated among

  these elections.  Contributors "are encouraged to designate their contributions in

  writing for particular elections."  11 C.F.R. § 110.1(b)(2)(i).

- If a contribution is not so designated, it is presumed to be for "the next election

  for that Federal office after the contribution is made."  *Id.* § 110.1(b)(2)(ii).  If a

  contribution is designated for an election that has already occurred, it can be used

  to satisfy outstanding net debts from that election.  To the extent that a

  contribution to a past election exceeds that amount, it must be refunded,

  redesignated to a future election, or reattributed as from another contributor.  *Id.*

- "Redesignation" means that a candidate running in a general election "may spend

  unused primary contributions for general election expenses;" however, those

  contributions "continue to apply toward the contributors' limits for the primary"

  and do not prevent the same contributor from giving $2,600 for the general

election campaign.  FEC Campaign Guide, *Congressional Candidates and Committees June 2014*, at 21, available at <u>http://www.fec.gov/pdf/candgui.pdf</u> (citing 11 C.F.R. § 110.3(c)(3)) (last visited Oct. 20, 2014) (retained in Court file).

- As a result of the rules on redesignation, if a party candidate has no opposition in the primary election, an individual can contribute $2,600 for the primary campaign and $2,600 for the general election campaign and the candidate can use both amounts ($5,200) in the general election campaign alone.

- It is on the basis of the rules allowing redesignation that Plaintiffs complain that some individuals can contribute $5,200 to candidates in a general election whereas they, who chose not to contribute to candidates facing opposition in their primary campaigns, could not.

2. **Plaintiffs Holmes and Jost**

- Plaintiffs Laura Holmes and Paul Jost are a married couple, residing in Miami, Florida.

- Ms. Holmes supported Carl DeMaio, a general election candidate for California's 52nd Congressional District (CA-52).  Mr. DeMaio finished second in the primary election behind incumbent Scott Peters, who was the only member of the Democratic Party on the primary ballot to represent CA-52.

- Under California's "Two Two" primary system, all candidates for the United States Congress are listed on the same primary ballot and the two candidates who receive the most votes, regardless of party affiliation, compete in the general election.  *See*

No Party Preference Information, California Secretary of State,

http://www.sos.ca.gov/elections/no-party-preference.htm (last visited Nov. 7, 2014).

- Ms. Holmes did not make any contributions to Mr. DeMaio before the primary election but contributed $2,600 to his general election campaign.

- Mr. Jost supported Marionette Miller-Meeks, a general election candidate for Iowa's Second Congressional District.

- Mr. Jost contributed $2,600 to Dr. Miller-Meeks only after she won the primary election; he made no contribution to any candidate in the Iowa primary.

- During the general election campaign, Dr. Miller-Meeks faced incumbent David Loebsack, who was the only candidate on the ballot in the Democratic Party primary for Iowa's Second Congressional District.

- Ms. Holmes wanted to contribute an additional $2,600 to Mr. DeMaio and Mr. Jost wanted to contribute an additional $2,600 to Dr. Miller-Meeks during the general election campaigns but they were prevented from doing so by FECA and FEC regulations.

- Plaintiffs did not want to exceed the contribution limit of $5,200 for the combined primary and general election periods, but each wanted to give $5,200 solely for use in the general election.

**3.   Procedural Background**

- Plaintiffs filed suit on July 21, 2014, alleging that FECA's contribution limit of $2,600 per individual/per candidate/per election is unconstitutional as applied to them, where Plaintiffs wanted to contribute no money to any primary candidate and contribute a full $5,200 to general election candidates.  *See* Compl. [Dkt. 1].

- Plaintiffs sought a declaratory judgment and injunction barring enforcement against them of the per-election provisions of FECA and the FEC regulations in the 2014 federal elections. *Id.*

- On August 28, 2014, Plaintiffs filed a motion for a preliminary injunction [Dkt. 6].

- After full briefing, this Court denied the motion for a preliminary injunction on October 20, 2014 [Dkt 15].

- In response to the Court's Order to Show Cause, Plaintiffs sought certification of two constitutional questions to the D.C. Circuit [Dkt. 17].

- Plaintiffs' complaint is not mooted by the November 4, 2014 election inasmuch as the same limitations would apply to their contributions in the next federal election in which they wish to contribute to a candidate.

**B. CONSTITUTIONAL QUESTIONS**

As requested by Plaintiffs, the Court **CERTIFIES** the following two constitutional questions to the United States Court of Appeals for the District of Columbia Circuit for en banc consideration pursuant to 2 U.S.C. § 437(h) (now 52 U.S.C. § 30110):

1. When federal law limits individual contributors to giving $2,600 to a candidate for use in the primary election and $2,600 to a candidate for use in the general election and denies Plaintiffs the ability to give $5,200 to a candidate solely for use in the general election, does it violate Plaintiffs' rights of freedom to associate guaranteed by the First Amendment, U.S. Const. amend, I?

2. When federal law limits individual contributors to giving $2,600 to a candidate for use in the primary election and $2,600 to a candidate for use in the general election and denies Plaintiffs the ability to give $5,200 to a candidate solely for use in the general election, does it violate Plaintiffs' rights to Due Process, in the context of equal protection of the law, guaranteed by the Fifth Amendment, U.S. Const. amend. V?

**SO ORDERED.**

Date: November 17, 2014                    _____/s/_____
                                            ROSEMARY M. COLLYER
                                            United States District Judge

7

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 14-5281                                    September Term, 2014

1:14-cv-01243-RMC

**Filed On:** January 30, 2015

Laura Holmes and Paul Jost,

Appellants

v.

Federal Election Commission,

Appellee

**BEFORE:**   Garland, Chief Judge, and Henderson, Rogers, Tatel, Brown,
Griffith, Kavanaugh, Srinivasan, Millett, Pillard, and Wilkins,
Circuit Judges

# O R D E R

Upon consideration of the motion of the Federal Election Commission for remand, the opposition thereto, and the reply, it is

**ORDERED**, on the court's own motion, that this case be removed from the March 30, 2015 oral argument calendar.  It is

**FURTHER ORDERED** that the motion be granted and this case is hereby remanded to the district court.  The court grants the motion to remand this 52 U.S.C. § 30110 (formerly 2 U.S.C. § 437h) case in order to provide the parties an opportunity to develop, by expedited discovery or otherwise, the factual record necessary for en banc review of the plaintiffs' constitutional challenge.  *See Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 192 n.14 (1981); *Wagner v. FEC*, 717 F.3d 1007, 1009 (D.C. Cir. 2013).  It is

**FURTHER ORDERED** that the district court shall complete the functions mandated by § 30110 and described in *Wagner v. FEC*, 717 F.3d at 1009, including the development of a record for appellate review, by April 24, 2015.  The district court is to certify any constitutional question(s) by that date as well.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published.  The Clerk is directed to transmit to the district court a copy of this order in lieu of formal mandate.

**Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:   /s/
Michael C. McGrail
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA HOLMES, *et al.*      )
      )
    Plaintiffs,      )
      )
  v.      )
      )
FEDERAL ELECTION      ) Civil Action No. 1:14-cv-01243 (RMC)
COMMISSION,      )
      )
    Defendant.      )
      )
      )
      )

---

## PLAINTIFFS' PROPOSED FACTS FOR CERTIFICATION

In accordance with this Court's February 9, 2015 Order to Govern Proceedings, (Dkt. 24), Plaintiffs submit the following proposed facts for certification. In doing so, Plaintiffs reiterate that "Congress's objective when it enacted [§ 30110]… was, and is, speed." *Wagner v. FEC,* 717 F.3d 1007, 1013 n.6 (D.C. Cir. 2013) (per curiam). Moreover, § 30110 "results in a less-focused record than ordinary litigation." *Id.* at 1015; *see also id.* at 1017 (district court need only "make appropriate findings of facts, *as necessary*, and to certify those facts…") (emphasis supplied).

Plaintiffs submit that, with very few additions, the facts already certified by this Court are sufficient to resolve their constitutional claims. Thus, these proposed

1

facts come largely from this Court's Certification Order, which is cited herein.

Plaintiffs' suggested additions are denoted by italics.

## <u>Defendant FEC</u>

1.   The Federal Election Commission (FEC) is a federal government agency charged with administering, interpreting, and enforcing the Federal Election Campaign Act (FECA), 2 U.S.C. §§ 431-57.  Cert. Order at 2.

2.   Effective September 1, 2014 the provisions of FECA codified in Title 2 were recodified at 52 U.S.C. § 30101-30146. Cert. Order at 2.

3.   Under FECA as amended, *in 2014*, individual persons *could* contribute no more than $2,600 per candidate, per federal election. *See* 52 U.S.C. § 30116(a); FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold*, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013) (FEC Price Index Adjustments) (limit on individual contributions to federal candidates in the 2013-2014 election cycle is $2,600 per candidate, per election). Cert. Order at 2 (proposed changes to Certification Order here reflect the price index adjustments to the contribution limits as of February 3, 2015. 80 Fed. Reg. 5750, 5752, available at http://fec.gov/law/cfr/ej_compilation/2015/notice2015-01.pdf).

4.   An election is defined as "a general, special, primary, or runoff election."

52 U.S.C. § 30101(1)(A). Cert. Order at 3.

5.    *Under the text of FECA as amended, the individual contribution limits apply separately with respect to each election.* 52 U.S.C. §§ 30116(a)(1)(A); 30116(a)(6).

6.    The total amount that an individual may contribute to a particular candidate during a full election cycle depends on the number of elections in which that candidate runs. For example, if the candidate runs in both a primary and a general election, an individual may contribute a total of $5,200—$2,600 for the primary campaign and $2,600 for the general election campaign. If the candidate must also participate in a runoff election, an individual may contribute an additional $2,600 for that election campaign, for a total possible contribute of $7,800. *See* 52 U.S.C. § 30116(a); FEC Price Index Adjustments, 78 Fed. Reg. at 8532. Cert. Order at 3.

7.    FEC has adopted regulations on how contributions are to be allocated among these elections. Contributors "are encouraged to designate their contributions in writing for particular elections." 11 C.F.R. § 110.1(b)(2)(i). Cert. Order at 3.

8.    If a contribution is not so designated, it is presumed to be for "the next election for that Federal office after the contribution is made." *Id.* §

3

110.1(b)(2)(ii). If a contribution is designated for an election that has already occurred, it can be used to satisfy outstanding net debts from that election. To the extent that a contribution to a past election exceeds that amount, it must be refunded, redesignated to a future election, or reattributed as from another contributor. 11 C.F.R. § 110.1(b)(2)(i). Cert. Order at 3.

9.     "Redesignation" means that a candidate running in a general election "may spend unused primary contributions for general election expenses;" however, those contributions "continue to apply toward the contributors' limits for the primary" and do not prevent the same contributor from giving $2,600 for the general election campaign. FEC, CAMPAIGN GUIDE: CONGRESSIONAL CANDIDATES AND COMMITTEES June 2014 at 21, available at http://www.fec.gov/pdf/candgui.pdf (citing 11 C.F.R. § 110.3(c)(3)) (last visited Oct. 20, 2014) (retained in Court file). Cert. Order at 3-4.

10.    As a result of the rules on redesignation, if a party candidate has no opposition in the primary election, an individual can contribute $2,600 for the primary campaign and $2,600 for the general election campaign and the candidate can use both amounts ($5,200) in the general election campaign alone. Cert. Order at 4.

11.  It is on the basis of the rules allowing redesignation that Plaintiffs complain that some individuals can contribute $5,200 to candidates general election whereas they, who chose not to contribute to candidates facing opposition in their primary campaigns, could not. Cert. Order at 4.

### Plaintiffs Holmes and Jost

12.  Plaintiffs Laura Holmes and Paul Jost are a married couple, residing in Miami, Florida. Cert. Order at 4.

13.  *Plaintiffs are citizens of the United States, and reside at 1500 Ocean Drive, Unit 1105, Miami Beach, Florida 33139*. Compl. ¶ 8; Holmes Decl. ¶ 3 (ECF 6-2); Jost Decl ¶ 3 (ECF 6-3).

14.  *Plaintiffs were eligible to vote in the 2012 presidential election*. Compl. ¶ 8; Holmes Decl. ¶ 5 (ECF 6-2); Jost Decl ¶ 5 (ECF 6-3).

15.  *Plaintiff Laura Holmes sometimes uses the name "Laura Holmes-Jost" when contributing to candidates*. Compl. ¶ 8.

16.  Ms. Holmes supported Carl DeMaio, a general election candidate for California's 52nd Congressional District (CA-52). Cert. Order at 4.

17.  *During the 2014 primary election on June 3, 2014, there were four candidates on the ballot to represent California Congressional District 52 ("CA-52"): Scott Peters, a Democrat and the incumbent; Carl*

*DeMaio, a Republican; Kirk Jorgensen, a Republican; and Fred J. Simon, Jr., a Republican.* California Secretary of State, Statement of Vote, June 3, 2014, Statewide Direct Primary Election at 24, available at http://elections.cdn.sos.ca.gov/sov/2014-primary/pdf/2014-complete-sov.pdf.

18.  *Peters finished first in the June 3, 2014 primary election, receiving 53,926 votes (approximately 42.3%). DeMaio finished second, receiving 44,954 votes (approximately 35.5%). Jorgensen finished third recieving 23,588 votes (approximately 18.5%), and Simon, Jr. finished fourth, receiving 5,040 votes (approximately 4%).* California Secretary of State, Statement of Vote, June 3, 2014, Statewide Direct Primary Election at 24,  available  at  http://elections.cdn.sos.ca.gov/sov/2014-primary/pdf/2014-complete-sov.pdf. *See also* Cert. Order at 4.

19.  Under California's "Two Two" primary system, all candidates for the United States Congress are listed on the same primary ballot and the two candidates who receive the most votes, regardless of party affiliation, compete in the general election. *See* No Party Preference Information, California Secretary of State, https://www.sos.ca.gov/elections/no-party-preference.htm (last visited Nov. 7, 2014). Cert. Order at 4-5.

20.  *DeMaio and Peters were the only candidates to represent CA-52 on the*

6

*ballot on November 4, 2014.*

21.  Ms. Holmes did not make any contributions to Mr. DeMaio before the primary election but contributed $2,600 to his general election campaign. Cert. Order at 5.

22.  Mr. Jost supported Marionette Miller-Meeks, a general election candidate for Iowa's Second Congressional District. Cert. Order at 5.

23.  *During the 2014 primary election, Dr. Miller-Meeks was on the ballot with two other candidates from the Republican Party, Mark S. Lofgren and Matthew C. Waldren. Miller-Meeks received 15,043 votes, Lofgren received 11,634 votes, and Waldren received 3,746 votes, out of a total of approximately 33,662 votes cast.* Iowa Secretary of State, 2014 Primary Election Results, Official Canvass by County at 10, available at https://sos.iowa.gov/elections/pdf/2014/primary/canvsummary.pdf.

24.  Mr. Jost contributed $2,600 to Dr. Miller-Meeks only after she won the primary election; he made no contribution to any candidate in the Iowa primary. Cert. Order at 5.

25.  During the general election campaign, Dr. Miller-Meeks faced incumbent David Loebsack, who was the only candidate on the ballot in the Democratic Party primary for Iowa's Second Congressional District. Cert. Order at 5.

7

26. Ms. Holmes wanted to contribute an additional $2,600 to Mr. DeMaio and Mr. Jost wanted to contribute an additional $2,600 to Dr. Miller-Meeks during the general election campaigns but they were prevented from doing so by FECA and FEC regulations. Cert. Order at 5.

27. Plaintiffs did not want to exceed the contribution limit of $5,200 for the combined primary and general election periods, but each wanted to give $5,200 solely for use in the general election. Cert. Order at 5.

### Procedural Background

28. Plaintiffs filed suit on July 21, 2014, alleging that FECA's contribution limit of $2,600 per individual/per candidate/per election is unconstitutional as applied to them, where Plaintiffs wanted to contribute no money to any primary candidate and contribute a full $5,200 to general election candidates. *See* Compl. [Dkt. 1]. Cert. Order at 5.

29. Plaintiffs sought a declaratory judgment and injunction barring enforcement against them of the per-election provisions of FECA and the FEC regulations in the 2014 federal elections. *Id.* Cert. Order at 6.

30. On August 28, 2014, Plaintiffs filed a motion for a preliminary injunction [Dkt. 6]. Cert. Order at 6.

31. After full briefing, this Court denied the motion for a preliminary injunction on October 20, 2014 [Dkt 15]. Cert. Order at 6.

32.   In response to the Court's Order to Show Cause, Plaintiffs sought certification of two constitutional questions to the D.C. Circuit [Dkt. 17]. Cert. Order at 6.

33.   Plaintiffs' complaint is not mooted by the November 4, 2014 election inasmuch as the same limitations would apply to their contributions in the next federal election in which they wish to contribute to a candidate. Cert. Order at 6.

34.   *On January 30, 2015, the United States Court of Appeals for the District of Columbia Circuit granted the FEC's Motion to Remand this case "in order to provide the parties an opportunity to develop, by expedited discovery or otherwise, the factual record necessary for en banc review of the plaintiffs' constitutional challenge."* Order Granting Motion for Remand, Dkt. 22 (citing *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 192 n.14 (1981); *Wagner v. FEC*, 717 F.3d 1007, 1009 (D.C. Cir. 2013)).

Respectfully submitted this 13th day of March, 2015.

/s/ Allen Dickerson
Allen Dickerson, DC Bar No. 1003781
Center for Competitive Politics
124 S. West Street, Suite 201
Alexandria, VA 22314
Phone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org

*Counsel for Plaintiffs*

9

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

HOLMES, *et al.*,                              )
                                               )
                                               )
            Plaintiffs,                        )
                                               )        Civ. No. 14-1243 (RMC)
            v.                                 )
                                               )
FEDERAL ELECTION COMMISSION,                   )        DECLARATION OF
                                               )        JAYCI A. SADIO
            Defendant.                         )
_____                )


# DECLARATION OF JAYCI A. SADIO


Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.      My name is Jayci A. Sadio.  I am a resident of Upper Marlboro, Maryland.  I am over 21 years of age.

2.      I am employed as a Paralegal Specialist in the Office of the General Counsel of the Federal Election Commission ("FEC or "Commission"), located at 999 E Street, NW, Washington, DC 20463.  I have been employed in this capacity since January 2006.

3.      I make this declaration based on my personal knowledge and in support of the Commission's (1) Brief Opposing Certification and in Support of Summary Judgment in Favor of the Commission and (2) Proposed Findings of Fact / Statement of Material Facts and Constitutional Questions in the above-captioned matter.

4.      As part of my duties at the Commission, I maintain records of litigation filings and materials.  Attached as **Exhibit 1** is a true and correct copy of:  Plaintiff Laura Holmes's

1

Responses to Defendant's Corrected First Set of Discovery Requests, dated March 5, 2015,

which the Commission received by email on the same date.

5.      Attached as **Exhibit 2** is a true and correct copy of:  Plaintiff Paul Jost's

Responses to Defendant's Corrected First Set of Discovery Requests, dated March 5, 2015,

which the Commission received by email on the same date.  Not included in this attachment is an

exhibit to the discovery responses containing a credit card statement.

6.      As part of my duties at the Commission, I am familiar with the Commission's

publication of Campaign Guides, which provide information and explanations about federal

campaign finance rules and requirements.  I am also familiar with the Commission's publication

of electronic versions of such Campaign Guides, including the June 2014 Campaign Guide for

Congressional Candidates and Committees, on the FEC website.  Attached as **Exhibit 3** is a true

and correct copy of excerpts of:  FEC, *Congressional Candidates and Committees* (June 2014).

The attached excerpts were retrieved on March 10, 2015 from the FEC website:

http://www.fec.gov/pdf/candgui.pdf.

7.      As part of my duties at the Commission, I am also familiar with the

Commission's publication on the FEC website of information regarding Congressional Primary

Election Dates and Candidate Filing Deadlines for Ballot Access.  In particular, I am familiar

with the Commission's publication of the 2014 Congressional Primary Election Dates and

Candidate Filing Deadlines for Ballot Access (based on data as of 7/28/2014), on the FEC

website.  Attached as **Exhibit 4** is a true and correct copy of:  FEC, *2014 Congressional Primary*

*Election Dates and Candidate Filing Deadlines for Ballot Access*.  The attached was retrieved on

March 10, 2015 from the FEC website:  http://www.fec.gov/pubrec/fe2014/2014pdates.pdf.

2

8.      As part of my duties at the Commission, I am also familiar with the

Commission's publication on the FEC website of Advisory Opinions, which are official

Commission responses to questions regarding the application of federal campaign finance law to

specific factual situations.  Attached as **Exhibit 5** is a true and correct copy of:  FEC Advisory

Opinion 1986-17 (Green) (June 27, 1986).  The attached was retrieved on March 10, 2015 from

the FEC website by entering Advisory Opinion number 1986-17 into the Commission's advisory

opinion database:  http://saos.nictusa.com/saos/searchao.  It is publicly available on the FEC

website:  http://saos.fec.gov/saos/aonum.jsp?AONUM=1986-17.

9.      Attached as **Exhibit 6** is a true and correct copy of:  FEC Advisory Opinion 2009-

15 (Bill White for Texas) (July 29, 2009).  The attached was retrieved on March 10, 2015 from

the FEC website by entering Advisory Opinion number 2009-15 into the Commission's advisory

opinion database:  http://saos.nictusa.com/saos/searchao.  It is publicly available on the FEC

website:  http://saos.fec.gov/saos/aonum.jsp?AONUM=2009-15.

10.      As part of my duties at the Commission, I am also familiar with the

Commission's publication on the FEC website of completed administrative enforcement cases

including the public documents from such administrative matters.  Attached as **Exhibit 7** is a

true and correct copy of:  *In the Matter of Jim Treffinger for Senate, Inc.*, MUR 5388,

Conciliation Agreement (Apr. 24, 2006).  The attached was retrieved on March 10, 2015 from

the FEC website:  http://eqs.fec.gov/eqsdocsMUR/000051D0.pdf

11.      Attached as **Exhibit 8** is a true and correct copy of:  *In the matter of Wynn for

Congress*, MUR 6230, Conciliation Agreement (June 10, 2010).  The attached was retrieved on

March 10, 2015 from the FEC website:  http://eqs.fec.gov/eqsdocsMUR/10044272923.pdf.

3

12.     As part of my duties at the Commission, I conduct research using various data sources, including Westlaw, online news publications, and other internet sources.

13.     Attached as **Exhibit 9** is a true and correct copy of excerpts of:  California Secretary of State, *No Party Preference Information*.  The attached excerpts were retrieved on March 10, 2015 from the following website:  https://www.sos.ca.gov/elections/no-party-preference.htm.

14.     Attached as **Exhibit 10** is a true and correct copy of excerpts of:  California Secretary of State, *Statement of Vote, June 3, 2014, Statewide Direct Primary Election*.  The attached excerpts were retrieved on March 10, 2015 from the following website:  http://elections.cdn.sos.ca.gov/sov/2014-primary/pdf/2014-complete-sov.pdf.

15.     Attached as **Exhibit 11** is a true and correct copy of excerpts of:  California Secretary of State, *Statement of Vote, November 4, 2014, General Election*.  The attached excerpts were retrieved on March 10, 2015 from the following website:  http://elections.cdn.sos.ca.gov/sov/2014-general/pdf/2014-complete-sov.pdf.

16.     Attached as **Exhibit 12** is a true and correct copy of:  South Carolina State Election Commission, *RUNOFF – U.S. House of Representatives District 1 Primary*, April 5, 2013.  The attached was retrieved on March 10, 2015 from the following website:  http://www.enr-scvotes.org/SC/46107/116099/en/summary.html.

17.     Attached as **Exhibit 13** is a true and correct copy of:  South Carolina State Election Commission, *Special Election – U.S. House of Representatives District 1*, May 10,

4

2013.  The attached was retrieved on March 10, 2015 from the following website:

http://www.enr-scvotes.org/SC/46180/116910/en/summary.html.

18.     Attached as **Exhibit 14** is a true and correct copy of an excerpt of:  South

Carolina State Election Commission, *2014 Statewide General Election*, December 15, 2014.  The

attached excerpt was retrieved on March 10, 2015 from the following website:  http://www.enr-

scvotes.org/SC/53424/149816/en/summary.html#.

19.     Attached as **Exhibit 15** is a true and correct copy of:  National Conference of

State Legislatures, *State Primary Election Types*, June 24, 2014.  The attached was retrieved on

March 10, 2015 from the following website:  http://www.ncsl.org/research/elections-and-

campaigns/primary-types.aspx.

20.     Attached as **Exhibit 16** is a true and correct copy of:  Burt Helm, *The Ins and

Outs of Write-Ins*, Bloomberg Business, Nov. 1, 2004.  The attached was retrieved on March 12,

2015 from the following website:  http://www.bloomberg.com/bw/stories/2004-11-01/the-ins-

and-outs-of-write-ins.

21.     Attached as **Exhibit 17** is a true and correct copy of:  Washington Secretary of

State, *Elections & Voting, Top 2 Primary*.   The attached was retrieved on March 10, 2015 from

the following website:  https://wei.sos.wa.gov/agency/osos/en/voters/Pages/top_2_primary.aspx.

22.     Attached as **Exhibit 18** is a true and correct copy of:  Louisiana Secretary of

State, *Official Election Results, Results for Election Date:  11/4/2014*.   The attached was

retrieved on March 10, 2015 from the following website:

http://staticresults.sos.la.gov/11042014/11042014_Congressional.html.

23.     Attached as **Exhibit 19** is a true and correct copy of:  Louisiana Secretary of State, *Official Election Results, Results for Election Date:  12/6/2014*.   The attached was retrieved on March 10, 2015 from the following website:

http://staticresults.sos.la.gov/12062014/12062014_Congressional.html.

24.     Attached as **Exhibit 20** is a true and correct copy of an excerpt of:  State of Iowa Winner List, *2014 General Election*.  The attached excerpt was retrieved on March 10, 2015 from the following website:  http://sos.iowa.gov/elections/pdf/2014/general/Winnerlist.pdf.

25.     Attached as **Exhibit 21** is a true and correct copy of an excerpt of:  State of Iowa Winner List, *2014 Primary Election*.  The attached excerpt was retrieved on March 10, 2015 from the following website:  http://sos.iowa.gov/elections/pdf/2014/primary/Winnerlist.pdf.

26.     Attached as **Exhibit 22** is a true and correct copy of:  William Petroski, *David Young Wins 3rd District GOP Nomination in Stunning Upset*, Des Moines Register (June 21, 2014, 8:21 PM CDT).  The attached was retrieved on March 10, 2015 from the following website:  http://www.desmoinesregister.com/story/news/politics/2014/06/21/iowa-young-david-congress/11216169/.

27.     Attached as **Exhibit 23** is a true and correct copy of:  Kim Severson, *Looking Past Sex Scandal, South Carolina Returns Ex-Governor to Congress*, N.Y. Times, May 7, 2013. The attached was retrieved on March 10, 2015 from the following website:  http://www.nytimes.com/2013/05/08/us/south-carolina-election-a-referendum-on-sanford.html.

28.     Attached as **Exhibit 24** is a true and correct copy of:  Alexander Burns, *Thad Cochran, Chris McDaniel Barrel Toward Runoff*, Politico (last updated June 4, 2014, 4:57 p.m.).

The attached was retrieved on March 10, 2015 from the following website:

http://www.politico.com/story/2014/06/primary-elections-2014-mississippi-california-new-jersey-iowa-107388.html.

29.     Attached as **Exhibit 25** is a true and correct copy of:  Aaron Blake, *Thad Cochran Faces Very Tough Odds in the Runoff.  Here's Why.*, Washington Post (June 4, 2014).  The attached was retrieved on March 10, 2015 from the following website:

http://www.washingtonpost.com/blogs/the-fix/wp/2014/06/04/thad-cochran-faces-very-tough-odds-in-the-runoff-heres-why/.

30.     Attached as **Exhibit 26** is a true and correct copy of:  State of Alaska Division of Elections, *Official General Election Results, December 28, 2010*.  The attached was retrieved on March 12, 2015 from the following website:

http://www.elections.alaska.gov/results/10GENR/data/results.pdf.

31.     Attached as **Exhibit 27** is a true and correct copy of:  Sandhya Somashekhar, *In Alaska's Senate Race, Murkowski's Write-In Bid Bears Fruit*, Wash. Post, Nov. 4, 2010.  The attached was retrieved on March 12, 2015 from the following website:

http://www.washingtonpost.com/wp-dyn/content/article/2010/11/03/AR2010110308817.html.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true

and correct.  Executed on March /2, 2015.

Jayci A. Sadio
Paralegal Specialist
Federal Election Commission

8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOLMES, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |

Civ. No. 14-1243 (RMC)

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA HOLMES, *et al.*          )
                                )
    Plaintiffs,              )
                                )
  v.                          )
                                )
FEDERAL ELECTION               )     C.A. No. 1:14-cv-01243-RMC
COMMISSION,                    )
                                )
    Defendant.               )
                                )
                                )
                                )

### PLAINTIFF LAURA HOLMES'S RESPONSES TO DEFENDANT'S
### CORRECTED FIRST SET OF DISCOVERY REQUESTS

TO:   Lisa J. Stevenson
      Deputy General Counsel – Law

      Kevin Deeley
      Acting Associate General Counsel

      Erin Chlopak
      Acting Assistant General Counsel

      Benjamin R. Streeter, III
      Attorney

      Steve Hajjar
      Attorney

      FEDERAL ELECTION COMMISSION
      999 E Street, NW
      Washington, DC 20463
      (202) 694-1650

In accordance with this Court's Order of February 10, 2015 (Dkt. No. 24),
FED. R. CIV. P. 33 and 36, and D.C. R. CIV. P. 26.2(d) and 30.4, Plaintiff Laura
Holmes, by and through undersigned counsel, responds and answers the requests for
admission and interrogatories served on February 19, 2015.

## **REQUESTS FOR ADMISSION**

1. On or around July 21, 2014, YOU CONTRIBUTED $2,600 to CARL
   DEMAIO. Compl. ¶ 21.

*Response*: ADMIT.

2. YOU chose not to CONTRIBUTE to CARL DEMAIO during the 2014
   primary election race in which he ran (ending on June 3, 2014). Compl. ¶ 21.

*Response*: ADMIT.

3. In California's "top two" primary system (Compl. ¶ 20), CARL DEMAIO and
   SCOTT PETERS were opponents during the 2014 primary election race.

*Response*: DENY insofar as this suggests that DeMaio and Peters were the *only* two
candidates at the primary stage. ADMIT insofar as both DeMaio and Peters were
candidates during the 2014 primary election.

4. YOUR challenge "is not based on an incumbent/challenger distinction, but
   rather the asymmetry posed whenever a candidate who faces a primary
   challenge competes in the general election against a candidate who ran
   virtually unopposed during the primary." (Opp. to Mot. to Remand at 9 (D.C.

Cir. Doc. #1531459 (quoting Pls.' Reply Mem. on Mot. for Prelim. Injunction

(Docket No. 13) at 11(same)).)

*Response*: ADMIT.

## **INTERROGATORIES**

1. State the factual basis for YOUR claim that individuals who made
   CONTRIBUTIONS to SCOTT PETERS for his 2014 primary election race
   were "effectively" giving "money solely for the general election." Compl. ¶
   8.

*Response*: Scott Peters was the only member of the Democratic Party seeking

election to serve as the United States Representative for the 52nd Congressional

district of California during the 2014 election cycle. Monies collected and expended

by Mr. Peters's campaign thus effectively furthered only his prospects of securing

victory in the general election.

2. Define the phrase "substantial primary opponent." Compl. ¶ 66.

*Response*: A candidate for office who is a member of the same political party as his

or her opponent, must compete in the same primary election, and is sufficiently likely

to succeed that his or her candidacy would materially alter the competitive position

of a candidate similarly situated to Scott Peters during the 2014 primary.

3. State when the determination of whether there is a "substantial primary
   opponent" (Compl. ¶ 66) is made.

*Response*: If Plaintiffs prevail, Defendant will bear the burden of answering this question. Defendant is tasked with promulgating rules and regulations to implement federal campaign finance laws—including adopting decisions of the judiciary vindicating as-applied challenges to those laws. For example, Defendant implemented the Supreme Court's as-applied ruling in *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007). 72 Fed. Reg. 72899 ("The Federal Election Commission is revising its rules governing electioneering communications. These revisions implement the Supreme Court's decision in *FEC* v. *Wisconsin Right to Life, Inc.,* which held that the prohibition on the use of corporate and labor organization funds for electioneering communications is unconstitutional as applied to certain types of electioneering communications").

  4.  State who determines whether there is a "substantial primary opponent."

      Compl. ¶ 66.

*Response*: If Plaintiffs prevail, Defendant will bear the burden of answering this question. Defendant is tasked with promulgating rules and regulations to implement federal campaign finance laws—including adopting decisions of the judiciary vindicating as-applied challenges to those laws. For example, Defendant implemented the Supreme Court's as-applied ruling in *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007). 72 Fed. Reg. 72899 ("The Federal Election Commission is revising its rules governing electioneering communications. These

revisions implement the Supreme Court's decision in *FEC* v. *Wisconsin Right to Life, Inc.,* which held that the prohibition on the use of corporate and labor organization funds for electioneering communications is unconstitutional as applied to certain types of electioneering communications").

5.  State the amounts YOU CONTRIBUTED to MARSHALL SANFORD between January 1, 2013 and December 31, 2014, and identify the election associated with each CONTRIBUTION.

*Response*: Plaintiff notes that the responsive information is within the Defendant's custody, and plainly stated in Representative Sanford's filings with the Commission. *See, e.g.,* FED. R. CIV. P. 26(b)(2)(C)(i). In good faith, however, Plaintiff responds.

$2,600 on March 21, 2013 for the 2013 runoff election

$2,600 on April 5, 2013 for the 2013 special general election

$2,600 on November 22, 2013 for the 2014 primary election

$150 on May 7, 2014 for the 2014 general election

$1,300 on December 26, 2014 for the 2016 primary election

6.  Define the class of persons that is permitted to make "'extra' contributions" to CANDIDATES. Compl. ¶ 71.

*Response*: Those able to contribute up to the primary and general election contribution limits to candidates running under competitive circumstances substantially similar to those Scott Peters faced during the 2014 election cycle.

7. For each request for admission not admitted, state the reason or reasons the

   request was not admitted.

*Response*: Not applicable.

8. Verify the statements about YOU in paragraph 8 of the complaint.

*Response*: The statements in paragraph 8 of my complaint are true and correct.

   By: Laura Holmes
   c/o Allen Dickerson, Attorney

Served via email this 5th day of March, 2015,

                              /s/ Allen Dickerson
                              Allen Dickerson
                              CENTER FOR COMPETITIVE POLITICS
                              124 S. West Street, Suite 201
                              Alexandria, VA 22314
                              Tel: (703) 894-6800
                              Fax: (703) 894-6811

                              *Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|   |   |
|---|---|
| HOLMES, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |

Civ. No. 14-1243 (RMC)

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA HOLMES, *et al.*                    )
                                          )
      Plaintiffs,                   )
                                          )
  v.                                      )
                                          )
FEDERAL ELECTION                          )    C.A. No. 1:14-cv-01243-RMC
COMMISSION,                               )
                                          )
      Defendant.                    )
                                          )
                                          )
                                          )

## PLAINTIFF PAUL JOST'S RESPONSES TO DEFENDANT'S
## CORRECTED FIRST SET OF DISCOVERY REQUESTS

TO:   Lisa J. Stevenson
      Deputy General Counsel – Law

      Kevin Deeley
      Acting Associate General Counsel

      Erin Chlopak
      Acting Assistant General Counsel

      Benjamin R. Streeter, III
      Attorney

      Steve Hajjar
      Attorney

      FEDERAL ELECTION COMMISSION
      999 E Street, NW
      Washington, DC 20463
      (202) 694-1650

In accordance with this Court's Order of February 10, 2015 (Dkt. No. 24), FED. R. CIV. P. 33, 34 and 36, and D.C. R. CIV. P. 26.2(d) and 30.4, Plaintiff Paul Jost, by and through undersigned counsel, responds and answers the document requests, requests for admission, and interrogatories served on February 19, 2015.

## DOCUMENT REQUESTS

1. Documents sufficient to show that, as of July 21, 2014, YOU had "already" CONTRIBUTED $2,600 to MARIANNETTE MILLER-MEEKS "for the general election." Compl. ¶ 24.

*Response*: Such documents are attached to these Responses as Exhibit A.

## REQUESTS FOR ADMISSION

1. YOU chose not to CONTRIBUTE to MARIANNETTE MILLER-MEEKS during the 2014 primary election race in which she ran (ending on June 3, 2014). Compl. ¶ 24.

*Response*: ADMIT.

2. YOU made no CONTRIBUTIONS, in 2014 OR at any other time, to MARIANNETTE MILLER-MEEKS.

*Response*: DENY.

3. YOUR challenge "is not based on an incumbent/challenger distinction, but rather the asymmetry posed whenever a candidate who faces a primary challenge competes in the general election against a candidate who ran

virtually unopposed during the primary." (Opp. to Mot. to Remand at 9 (D.C. Cir. Doc. #1531459 (quoting Pls.' Reply Mem. on Mot. for Prelim. Injunction (Docket No. 13) at 11(same)).)

*Response*: ADMIT.

## <u>INTERROGATORIES</u>

1. State the factual basis for YOUR claim that individuals who made CONTRIBUTIONS to DAVID LOEBSACK for his 2014 primary election race were "effectively" giving "money solely for the general election." Compl. ¶ 8.

*Response*: David Loebsack was the only member of the Democratic Party seeking election as the United States Representative for the 2nd Congressional district of Iowa. Thus, he was unopposed in the primary election, and was the only Democratic candidate on the ballot during both the primary and general elections in 2014. Monies collected and expended by Mr. Loebsack's campaign thus effectively furthered only his prospects of securing victory in the general election.

2. Define the phrase "substantial primary opponent." Compl. ¶ 66.

*Response*: A candidate for office who is a member of the same political party as his or her opponent, must compete in the same primary election, and is sufficiently likely to succeed that his or her candidacy would materially alter the competitive position of a candidate similarly situated to David Loebsack during the 2014 primary.

3. State when the determination of whether there is a "substantial primary opponent" (Compl. ¶ 66) is made.

*Response*: If Plaintiffs prevail, Defendant will bear the burden of answering this question. Defendant is tasked with promulgating rules and regulations to implement federal campaign finance laws—including adopting decisions of the judiciary vindicating as-applied challenges to those laws. For example, Defendant implemented the Supreme Court's as-applied ruling in *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007). 72 Fed. Reg. 72899 ("The Federal Election Commission is revising its rules governing electioneering communications. These revisions implement the Supreme Court's decision in *FEC* v. *Wisconsin Right to Life, Inc.,* which held that the prohibition on the use of corporate and labor organization funds for electioneering communications is unconstitutional as applied to certain types of electioneering communications").

4. State who determines whether there is a "substantial primary opponent." Compl. ¶ 66.

*Response*: If Plaintiffs prevail, Defendant will bear the burden of answering this question. Defendant is tasked with promulgating rules and regulations to implement federal campaign finance laws—including adopting decisions of the judiciary vindicating as-applied challenges to those laws. For example, Defendant implemented the Supreme Court's as-applied ruling in *FEC v. Wisconsin Right to*

*Life, Inc.*, 551 U.S. 449 (2007). 72 Fed. Reg. 72899 ("The Federal Election Commission is revising its rules governing electioneering communications. These revisions implement the Supreme Court's decision in *FEC* v. *Wisconsin Right to Life, Inc.,* which held that the prohibition on the use of corporate and labor organization funds for electioneering communications is unconstitutional as applied to certain types of electioneering communications").

    5.  State the amounts YOU CONTRIBUTED to MARSHALL SANFORD between January 1, 2013 and December 31, 2014, and identify the election associated with each CONTRIBUTION.

*Response*: Plaintiff notes that the responsive information is within the Defendant's custody, and plainly stated in Representative Sanford's filings with the Commission. *See, e.g,*. FED. R. CIV. P.  26(b)(2)(C)(i). In good faith, however, Plaintiff responds.

    $2,600 on March 21, 2013 for the 2013 runoff election

    $2,600 on April 5, 2013 for the 2013 special general election

    $2,600 on November 22, 2013 for the 2014 primary election

    $1,300 on December 26, 2014 for the 2016 primary election

    6.  Define the class of persons that is permitted to make "'extra' contributions" to CANDIDATES. Compl. ¶ 71.

*Response*: Those able to contribute up to the primary and general election

contribution limits to candidates running under competitive circumstances

substantially similar to those David Loebsack faced during the 2014 election cycle.

7. For each request for admission not admitted, state the reason or reasons the

   request was not admitted.

*Response*: The documents attached as Exhibit A are sufficient to demonstrate that I

contributed to Dr. Miller-Meeks during the year 2014.

8. Verify the statements about YOU in paragraph 8 of the complaint.

*Response*: The statements in paragraph 8 of my complaint are true and correct.

By: Paul Jost
c/o Allen Dickerson, Attorney

Respectfully submitted this 5th day of March, 2015,

/s/ Allen Dickerson
Allen Dickerson
CENTER FOR COMPETITIVE POLITICS
124 S. West Street, Suite 201
Alexandria, VA 22314
Tel: (703) 894-6800
Fax: (703) 894-6811

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HOLMES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. No. 14-1243 (RMC) |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 3



Federal Election Commission Campaign Guide

# Congressional Candidates and Committees

June 2014

## Corporate/Labor/Membership Organization PACs

All separate segregated funds (also called political action committees or PACs) established, financed, maintained or controlled by the same corporation or labor organization are affiliated. For example:

- PACs established by a parent corporation and its subsidiaries are affiliated.
- PACs established by a national or international union and its local unions are affiliated.
- PACs established by a federation of national or international unions and the federation's state and local central bodies are affiliated.
- PACs established by an incorporated membership organization and its related state and local entities are affiliated.

100.5(g)(2) and (3); 110.3(a)(1)(ii) and (2).

When committees are not automatically affiliated under the conditions described above, the Commission may nevertheless conclude that two or more committees are affiliated based on factors listed in the regulations. 100.5(g)(4)(ii)(A)-(J) and 110.3(a)(3)(ii)(A)-(J). The Commission makes these decisions, through advisory opinions, on a case-by-case basis. For examples, see AOs 2009-18, 2006-12, 2005-03, 2004-32, 2002-11 and 2001-07 (plus opinions cited within those AOs).

## Authorized Committees

An authorized committee, however, can be affiliated only with another authorized committee of the same candidate. 100.5(g)(5) and 110.3(a)(1)(i). Note that, by definition, an unauthorized committee sponsored by an officeholder (i.e., a "leadership PAC") is not considered to be affiliated with any authorized committees sponsored by the same individual. 100.5(e)(6) and (g)(5).

## 2. HOW LIMITS WORK

The limits on contributions to candidates apply separately to each federal election in which the candidate participates. A primary election, general election, runoff election and special election are each considered a separate election with a separate limit.[3] 100.2. (A special election may itself involve separate primary, general and/or runoff elections, each with a separate contribution limit.)[4] In some cases, a party caucus or convention is considered a primary election, as explained below.

## Party Caucus or Convention

A party caucus or convention constitutes an election only if it has the authority under relevant state law to select a nominee for federal office. (Notable examples of these types of conventions are those held in Connecticut, Utah and Virginia.) Otherwise, there is no separate limit for a caucus or convention; it is considered part of the primary process. When the caucus or convention does constitute a primary election, reports must be filed for the convention as they would for the primary. 100.2(c)(1) and (e). See also, for example, AOs 1992-25, 1986-21 and 1986-17. See Chapter 12 for information on filing reports.

## Candidates Who Lose in the Primary

A candidate is entitled to an election limit only if he or she seeks office in that election. Thus, a candidate who loses the primary (or otherwise does not participate in the general election) does not have a separate limit for the general. If a candidate accepts contributions for the general election before the primary is held and loses the primary (or does not otherwise participate in the general election), the candidate's principal campaign committee must refund, redesignate or reattribute the general election contributions within 60 days of the primary or the date that the candidate publicly withdraws from the primary race.[5] 110.1(b)(3) and 110.2(b)(5). See also in this chapter, Section 4, "Designated and Undesignated Contributions" and Section 8, "Contributions to Retire Debts."

---

3  Presidential campaigns should note that all Presidential primary elections held during a calendar year are considered one election for the purposes of the contribution limits. 110.1(j)(1).

4  In AO 2009-15, the Commission ruled that an authorized committee may accept contributions that may be used in a special or emergency election or runoff, even though an election has not been scheduled and may not occur.

5  In AO 2008-04, the Commission ruled that the authorized committee of a Presidential candidate receiving primary matching funds may issue refunds or obtain redesignations to his or her Senate campaign for contributions made in connection with the general election.

# Independent and Non-Major Party Candidates

Even when independent and non-major party candidates are not involved in an actual primary, they are entitled to a primary limit. They may choose one of the following dates to be their "primary" date, and, until that date, they may collect contributions that count towards the contributor's primary limits.

- The last day on which, under state law, a candidate may qualify for a position on the general election ballot; or
- The date of the last major primary election, caucus or convention in that state.

Non-major party candidates may also choose the date of the nomination by their party as their primary date. 100.2(c)(4).

# Primary vs. General Election

Campaigns must adopt an accounting system to distinguish between contributions made for the primary election and those made for the general election, as discussed in Chapter 10, Section 1, "Fundraising." 102.9(e). [6] Nevertheless, the campaign of a candidate running in the general election may spend unused primary contributions for general election expenses. The contributions would continue to apply toward the contributors' limits for the primary. 110.3(c)(3). The campaign of a candidate running in the general election may use general election contributions for primary election debts; the contributions would still count against the contributor's general election limits. 110.1(b)(3)(iv). As noted above, should the candidate lose the primary, contributions accepted for the general must be refunded, redesignated or reattributed within 60 days and may not be used to repay primary election debt. AO 1986-17. Therefore, candidates should ensure they have enough cash on hand to make those refunds if needed.

# Unopposed Candidates; Elections Not Held

A candidate is entitled to a separate contribution limit even if:

- The candidate is unopposed in an election;
- A primary or general election is not held because the candidate is unopposed;[7] or
- The general election is not held because the candidate received a majority of votes in the previous election.

The date on which the election would have been held is considered the date of the election. 110.1(j)(2) and (3). The campaign must file pre-election reports and, in the case of a general election, a post-election report. AO 1986-21. See also Chapter 12, Section 3, "When to Report."

# Recounts

A federal campaign may establish a recount fund either as a separate bank account of the candidate's authorized committee or as a separate entity. Although they are not considered contributions under the *Act*, any funds solicited, received, directed, transferred or spent in connection with a recount are subject to the amount limitations, source prohibitions and reporting requirements of the *Act*. See 52 U.S.C. §30125(e). This means that the normal contribution limits, reporting requirements and source restrictions apply. The Commission has addressed the use of funds raised for recount purposes in AO 2010-14 (permitting the use of such funds before an election for certain recount-related purposes) and AO 2010-18 (permitting the redesignation of excess recount funds to a state party committee's federal account). Committees must disclose funds received for a recount as "Other Receipts" and funds spent as "Other Disbursements." For more information and reporting instructions, see AO 2006-24 and Chapter 13, "Completing FEC Reports."

---

6  In AO 2007-03, the Commission ruled that a Presidential candidate could solicit and receive private contributions for the 2008 Presidential general election without losing eligibility to receive public funding if the candidate received his party's nomination for President, provided that the campaign (1) deposited and maintained all private contributions designated for the general election in a separate account; (2) refrained from using these contributions for any purpose; and (3) refunded the private contributions in full if the candidate ultimately decided to receive public funds.

---

7  A primary election that is not held because the candidate was nominated by a caucus or convention with authority to nominate is not a separate election with a separate contribution limit. 110.1(j)(4).

## 3. CONTRIBUTIONS TO UNAUTHORIZED COMMITTEES

If a contributor makes a contribution to a committee not authorized by any candidate and knows that a substantial portion of the contribution will be contributed to or spent on behalf of a particular candidate, the contribution counts against the contributor's per-election limit with respect to that candidate. 110.1(h).

## 4. DESIGNATED AND UNDESIGNATED CONTRIBUTIONS

The Commission strongly recommends that campaigns encourage contributors to designate their contributions for specific elections. Designated contributions ensure that the contributor's intent is conveyed to the candidate's campaign. In the case of contributions from political committees, written designations also promote consistency in reporting and thereby avoid the possible appearance of excessive contributions on reports.

### Effect of Designating vs. Not Designating

Designated contributions count against the donor's contribution limits for the election that is named. Undesignated contributions count against the donor's contribution limits for the candidate's next election. 110.1(b)(2).

For example:

- An undesignated contribution made[8] after the candidate has won the primary, but before the general election, applies toward the contribution limit for the general election.
- In the case of the candidate who has lost the primary, an undesignated contribution made after the primary automatically applies toward the limit for the next election in which the candidate runs for federal office.

- If the candidate does not plan to run for federal office in the future, the committee may:
  - Presumptively redesignate the contribution to retire any primary debts they may have. 110.1(b)(5)(ii)(C); see "Remedying Excessive Contributions" below for proper procedure; or
  - Request written redesignation from the contributor to retire debts from a previous election cycle.[9]

Otherwise, the committee must return or refund the contribution.

For additional information on presumptive redesignation, see Section 7 of this chapter, "Remedying an Excessive Contribution."

### How Contributions are Designated

Contributors designate contributions by indicating in writing the specific election to which they intend a contribution to apply. 110.1(b)(2)(i). Contributors may make this written designation on the check (or other signed written instrument) or in a signed statement accompanying the contribution. 110.1(b)(4). A designation also occurs when the contributor signs a form supplied by the candidate. 110.1(b)(4); see also AO 1990-30.

### Campaign Must Retain Designations

The campaign must retain copies of contribution designations for three years. If the designation appears on the check (or other written instrument), the campaign must retain a full-size photocopy. 102.9(c) and (f); 110.1(l)(1).

## 5. DATE CONTRIBUTION IS MADE vs. DATE OF RECEIPT

The date a contribution is made by the contributor and the date the contribution is received by the campaign are significant for purposes of the contribution limits. It is important to understand the distinction.

---

8 See Section 5 for an explanation of when a contribution is "made."

9 Note that if a contribution designated to retire the debt of a previous campaign exceeds the amount of the debt, the contribution must be returned, refunded, redesignated or reattributed. Contributions can be designated for debt retirement only if debt exists and if the contributor has not already met the contribution limit for that election. 110.1(b)(3)(i).

# Date Contribution is Made

The date a contribution is made is the date the contributor relinquishes control over it. 110.1(b)(6). For example:

- A hand-delivered contribution is considered made on the date it is delivered by the contributor to the campaign. 110.1(b)(6).
- A mailed contribution is made on the date of the postmark. 110.1(b)(6). Note that if a campaign wishes to rely on a postmark as evidence of the date a contribution was made, it must retain the envelope or a copy of it. 110.1(l)(4).
- An in-kind contribution is made on the date that the goods or services are provided by the contributor. See AOs 2004-36 and 1996-29.
- A contribution made via the Internet is considered made on the date the contributor electronically confirms making the transaction. AO 1995-09.
- An earmarked contribution is considered made during the election cycle in which the contribution is actually made, regardless of the year in which the election is held. See AOs 2008-08 and 2006-30 (footnote 5). (Note that the conduit must forward this information to the campaign.) See Appendix A for more information.

# Date Contribution is Received

The date of receipt is the date the campaign (or a person acting on the campaign's behalf) actually receives the contribution. 102.8(a). This is the date used by the campaign for reporting purposes, but it also affects the application of the net debts outstanding rule (discussed in Section 8 of this chapter).

## Contributions Charged on Credit Cards

When the committee receives contributions through credit card charges, the date of receipt is the date on which the committee receives the contributor's signed authorization to charge the contribution. The treasurer should retain a copy of the authorization form in the committee's records. See AOs 1995-09 and 1990-04.

## In-Kind Contributions

The date of receipt for an in-kind contribution is the date the goods or services are provided to the committee, even if the contributor pays the bill for the goods or services after they are provided. See 110.1(b)(6).

# Effect of Dates on Undesignated Contributions

The date an undesignated contribution is made determines which election limit it counts against. The date of receipt, however, does not affect the application of the contribution limits. An undesignated contribution made on or before Election Day counts against the donor's limit for that election, even if the date of receipt is after Election Day and even if the campaign has no net debts outstanding. On the other hand, an undesignated contribution made after an election counts against the donor's limit for the candidate's next election. 110.1(b)(2)(ii).

# Effect of Dates on Designated Contributions

Both the date a contribution is made and the date of receipt affect the application of the net debts outstanding rule to a designated contribution. The date the contribution is made determines whether the rule will apply, while the date of receipt governs whether the contribution is acceptable under the rule. For example, a contribution designated for the primary and made before that election will not be subject to the net debts outstanding rule, even if the campaign receives the contribution after the primary. By contrast, a contribution designated for—but made after—the primary is acceptable only to the extent the campaign has net debts outstanding for the primary on the date of receipt. 110.1(b)(3)(i) and (iii). See Section 8 of this chapter.

# Date of Deposit

While all contributions must be deposited within 10 days, the date of deposit is not used for reporting or contribution limit purposes.

## 6.   JOINT CONTRIBUTIONS

A joint contribution is a contribution that is made by more than one person using a single check or other written instrument. Although each individual has a separate contribution limit, joint contributors may combine their contribution limits by contributing a joint contribution (for example, a check for $5,200 for a candidate's primary election) as long as both sign the check (or an attached statement), as explained below. 110.1(k).

## Each Contributor Must Sign the Check

When making a joint contribution, each contributor must sign the check (or other written instrument) or a statement that accompanies the contribution. 110.1(k)(1). Note that if the check or an accompanying statement of attribution is not signed by each contributor, the entire contribution will be attributed only to the party who signed the check. 104.8(c). However, under certain circumstances the committee may presumptively reattribute the excessive portion of a contribution. See "Reattribution" below.

### Exception: Partnerships and LLCs

Contributions from partnerships and certain LLCs are not considered joint contributions, but do trigger special attribution requirements; see Appendix B.

### Attribution

If the check or statement does not indicate how much should be attributed to each donor, the recipient committee must attribute the contribution in equal portions. 110.1(k)(1) and (2). For example, if a committee receives a $1,000 joint contribution signed by two individuals but with no written attribution, the committee must attribute a $500 contribution to each donor.

A campaign may request that a contribution be reattributed, as explained below.

## 7.   REMEDYING AN EXCESSIVE CONTRIBUTION

When a committee receives an excessive contribution—one which exceeds the contributor's limit or

the campaign's net debts outstanding for an election—the committee may remedy the violation by refunding the excessive amount or by seeking a redesignation or reattribution of it within 60 days. Step-by-step procedures for obtaining a reattribution or redesignation are explained below.

## Redesignation

### By Contributor

With a redesignation, the contributor instructs the committee to use the excessive portion of a contribution for an election other than the one for which the funds were originally given. For example, the contributor may redesignate the excessive portion of a contribution made for the primary election so that it counts against his or her limit with respect to the general election (provided the contributor has not already contributed the maximum for the general election).

When requesting a redesignation, the committee must inform the contributor that he or she may, alternatively, request a refund of the excessive amount. 110.1(b)(5).

### Presumptive Redesignation by Committee

Under certain circumstances, the committee may make a presumptive redesignation of an excessive contribution. When an individual or a non-multicandidate committee makes an excessive contribution to a candidate's authorized committee, the campaign may presumptively redesignate the excessive portion to the general election if the contribution:

- Is made before that candidate's primary election;
- Is not designated in writing for a particular election;
- Would be excessive if treated as a primary election contribution; and
- As redesignated, does not cause the contributor to exceed any other contribution limit. 110.1(b)(5)(ii)(B)(1)-(4).

Also, the excessive portion of an undesignated contribution made after the primary, but before the general election, may be automatically applied to the primary if the campaign's net debts outstanding from the primary equal or exceed the amount redesignated. 110.1(b)(5)(ii)(C). See Section 8 in this chapter.

The committee is required to notify the contributor in writing of the presumptive redesignation within 60 days of the treasurer's receipt of the contribution, and must offer the contributor the option to receive a refund instead. 110.1(b)(5)(ii)(C).

It is important to note that presumptive redesignations may be made only within the same election cycle. Also, presumptive redesignation is not an option when the contributor is a multicandidate committee.

## Reattribution

### By Contributor

With a reattribution, the contributor instructs the committee in writing to attribute the excessive portion of a joint contribution to another individual. For example, if the committee receives an excessive contribution drawn on a joint checking account, but signed by only one account holder, the committee may seek a reattribution signed by each contributor of the excessive amount to the other account holder. 110.1(k)(3). (A joint contribution may also be reattributed so that a different amount is attributed to each contributor.[10]) Note that a joint contribution must represent the personal funds of each contributor because contributions made in the name of another are prohibited. See 110.4(b).

When requesting reattributions, the committee must also inform contributors that they may, alternatively, ask for a refund of the excessive portions of their contributions. 110.1(k)(3).

## Presumptive Reattribution by Committee

When a committee receives an excessive contribution made via a written instrument with more than one individual's name imprinted on it, but only one signature, the committee may attribute the permissible portion to the signer. The committee may make a presumptive reattribution of the excessive portion to the other individual whose name is imprinted on the written instrument, without obtaining a second signature, so long as the reattribution does not cause the contributor to exceed any other contribution limit. 110.1(k)(3)(ii)(B)(1).

The committee is required to notify the contributors in writing of the presumptive reattribution within 60 days of the treasurer's receipt of the contribution, and must offer the contributors the option to receive a refund if it was not intended to be a joint contribution. 110.1(k)(3)(ii)(B)(2)-(3).

## When to Request Redesignations and Reattributions

In many circumstances, the committee will be able to presumptively redesignate or reattribute contributions. For all other circumstances, contributions can be redesignated or reattributed only by the individual contributor.

A committee may ask a contributor to redesignate and/or reattribute a contribution (within 60 days of the treasurer's receipt), for example, when the committee receives:

- A designated or undesignated contribution that exceeds the donor's limit. 110.1(b)(5)(i) (A) and (C).
- A designated or undesignated contribution for an election in which the candidate is not running. For example, a contribution that was designated for the general but was received before the primary may be redesignated for a future primary if the candidate loses the primary or otherwise does not run in the general election. See 102.9(e); see also AOs 1996-29, 1992-15 and 1986-17.
- A contribution that is designated for, but made after, an election and that exceeds the campaign's net debts outstanding for that election. 110.1(b)(3)(i) and (5)(i)(B).
- An undesignated contribution (which normally applies to the candidate's upcoming election) that the committee wants to use to retire debts of a previous election. Note that, if it is redesignated, the contribution then counts against the donor's contribution limits for that previous election. 110.1(b)(5)(i)(D).

---

10  See the Explanation and Justification published with the final rule, 52 Fed. Reg. 760, 765-766 (January 9, 1987), available online at http://go.usa.gov/8hR5.

# Procedures for Obtaining Redesignations and Reattributions from Contributors

The committee treasurer is the person ultimately responsible for complying with the procedures outlined below. 103.3(a) and (b).

## Step 1: Deposit Contribution

A committee must deposit contributions within 10 days of the treasurer's receipt. (If a contribution is not deposited, it must be returned to the contributor within 10 days of receipt.) 103.3(a).

## Step 2: Determine Whether Excessive

The committee must determine whether a contribution exceeds the donor's limit or the campaign's net debts outstanding. The Commission encourages committees to make this determination within 30 days of receiving the contribution. This allows a committee sufficient time to request and receive a redesignation and/or reattribution within the 60-day limit, as explained below.

## Step 3: Be Prepared to Make Refund

When a committee deposits contributions that may exceed the limits or net debts outstanding for an election, the committee must not spend the funds because they may have to be refunded. To ensure that the committee will be able to refund the contribution in full, the committee may either maintain sufficient funds in its regular campaign depository or establish a separate account used solely for the deposit of possibly illegal contributions. 103.3(b)(4). Furthermore, the committee must keep a written record noting the reason a contribution may be excessive and must include this information when reporting the receipt of the contribution. 103.3(b)(5).

## Step 4: Request Redesignation and/or Reattribution

When requesting a redesignation, the committee asks the contributor to provide a written, signed redesignation of the contribution for another election. The request must also state that the donor may receive a refund of the excessive portion of the contribution if he or she does not wish to redesignate it. 110.1(b)(5)(ii)(A).[11]

When requesting a reattribution, the committee asks the contributor whether the contribution was intended to be a joint contribution from more than one person. Alternatively, if the original contribution was a joint contribution, the committee requests that contributors adjust the amount attributable to each.[12] In either case, the committee should inform contributors that they must each sign the reattribution. The request must notify each contributor that, instead of reattributing the contribution, he or she may seek a refund of the portion of the contribution that exceeds the limits or the campaign's net debts outstanding. 110.1(k)(3)(ii)(A).

## Step 5: Redesignation/Reattribution Made or Make Refund within 60 Days

Within 60 days after the date of the committee's receipt of the contribution either:
- The contributor must provide the committee with a redesignation or reattribution; or
- The committee must refund the excessive portion of the contribution.

103.3(b)(3).

A contribution is properly redesignated if, within the 60-day period, the contributor provides the committee with a written, signed statement redesignating the contribution for a different election. 110.1(b)(5)(ii)(B).

A contribution is properly reattributed if, within the 60-day period, the contributors provide the committee with a written statement reattributing the contribution. The statement must be signed by all contributors and must indicate the amount attributable to each donor. (If the contributors do not specify how to divide the contribution, the committee must attribute the contribution equally among the contributors.) 110.1(k)(2) and (3)(ii)(B).

---

11  Redesignations may be made electronically provided that the method offers a sufficient degree of assurance of the contributor's identity and intent to redesignate, and the committee retains a record of the redesignation in a manner consistent with the recordkeeping requirements in 110.1(l). For more information, see the FEC's Interpretive Rule on Electronic Redesignations (76 FR 16233 (March 23, 2011)) at http://go.usa.gov/8hRH.

12  See the Explanation and Justification published with the final rule, 52 Fed. Reg. 760, 766 (January 9, 1987), available online at http://go.usa.gov/8hn4.

### Step 6: Keep Records and Report

The committee must keep documentation for each reattribution and redesignation to verify that it was received within the 60-day time limit. Documentation for a reattribution or a redesignation must include one of the following:

- A copy of the postmarked envelope bearing the contributor's name, return address or other identifying code;
- A copy of the signed statement reattributing or redesignating the contribution with a date stamp showing the date of the committee's receipt; or
- A copy of the written redesignation or reattribution dated by the contributor.

110.1(l)(6).

The documentation relating to a reattribution or redesignation must be retained for three years. 102.9(c).

## 8.  CONTRIBUTIONS TO RETIRE DEBTS

If a committee has net debts outstanding after an election is over, a campaign may accept contributions after the election to retire the debts provided that:

- The contribution is designated for that election (since an undesignated contribution made after an election counts toward the limit for the candidate's upcoming election, unless the campaign requests its redesignation);
- The contribution does not exceed the contributor's limit for the designated election; and
- The campaign has net debts outstanding for the designated election on the day it receives the contribution.

110.1(b)(3)(i) and (iii).

## How to Calculate Net Debts Outstanding

A campaign's net debts outstanding consist of unpaid debts incurred with respect to the particular election minus cash on hand plus the total amounts owed to the campaign in the form of credits,

refunds of deposits, returns and receivables or a commercially reasonable estimate of the collectible amount, and loans exceeding $250,000 from the candidate's personal funds.[13] 110.1(b)(3)(ii).

### Unpaid Debts

Unpaid debts include the following:

- All outstanding debts and obligations;
- The estimated cost of raising funds to liquidate the debts; and
- If the campaign is terminating, estimated winding down costs (for example, office rental, staff salaries and office supplies).

110.1(b)(3)(ii).

### Cash on Hand

Cash on hand consists of the resources available to pay the campaign's total debts, including currency, deposited funds, traveler's checks, certificates of deposit, treasury bills and any other investments valued at fair market value. 110.1(b)(3)(ii)(A).

For the purpose of calculating net debts outstanding for the primary, cash on hand need not include contributions designated for the general. 110.1(b)(3)(iv).

## Adjustment to Net Debts Total

A campaign first calculates its net debts outstanding as of the day of the election. Thereafter, the campaign continually recalculates its total net debts outstanding as additional funds are received for, or spent on, the election for which the debt remains. 110.1(b)(3)(ii) and (iii).

## Contributions Exceeding Net Debts

If, on the same day, a campaign receives several contributions that, together, exceed the amount needed to retire its debts, the campaign may:

- Accept a proportionate amount of each contribution and either refund the remaining amount or ask contributors to redesignate the excessive portions for another election; or

---

13  For an illustration of how the net debts outstanding calculation is performed, see the Explanation and Justification published with the final rule, 52 Fed. Reg. 762 (January 9, 1987), available online at http://go.usa.gov/8hnk.

• Accept some contributions in full and either return or refund the others or seek redesignations or reattributions for them. (See "Redesignations" and "Reattributions" in Section 7 above.) 110.1(b)(3).

## 9. CONTRIBUTIONS FROM PARTNERSHIPS

Partnerships are permitted to make contributions according to special rules. 110.1(e) and (k)(1). For further details, see Appendix B.

## 10. CONTRIBUTIONS FROM LIMITED LIABILITY COMPANIES

### Corporation v. Partnership

For purposes of contribution limitations and prohibitions, a limited liability company (LLC) is treated as either a corporation or a partnership.
An LLC is treated as a corporation if:
• It has chosen to file, under Internal Revenue Service (IRS) rules, as a corporation; or
• It has publicly traded shares. 110.1(g)(3).
An LLC is treated as a partnership if:
• It has chosen to file, under IRS rules, as a partnership; or
• It has made no choice, under IRS rules, as to whether it is a corporation or a partnership. 110.1(g)(2).
If an LLC is treated as a corporation, it is prohibited from making contributions to candidate committees, but it can establish an SSF (see Chapter 5 for general information on the corporate prohibition). It may also give money to IEOPCs. If it is considered a partnership, it is subject to the contribution limits for partnerships outlined in Appendix B. 110.1(g).

### Single Member LLC

If a single member LLC has not chosen corporate tax treatment, it may make contributions; the contributions will be attributed to the single member, not the LLC. 110.1(g)(4).

### Notifying Recipient Committee

An LLC must, at the time it makes a contribution, notify the recipient committee:
• That it is eligible to make the contribution; and
• How the contribution is to be attributed among members.
This requirement will prevent the recipient committee from inadvertently accepting an illegal contribution. 110.1(g)(5).

## 11. CONTRIBUTIONS FROM MINORS

An individual who is under 18 years old may make contributions to candidates and political committees, subject to the limit of $2,600 per election, if:
• The decision to contribute is made knowingly and voluntarily by the minor;
• The funds, goods or services contributed are owned or controlled by the minor, proceeds from a trust for which he or she is a beneficiary or funds withdrawn by the minor from a financial account opened and maintained in his or her name; and
• The contribution is not made using funds given to the minor as a gift for the purpose of making the contribution, and is not in any way controlled by another individual. 110.19.

## 12. CANDIDATE'S PERSONAL FUNDS

When candidates use their personal funds for campaign purposes, they are making contributions to their campaigns. Unlike other contributions, these candidate contributions are not subject to any limits. 110.10; AOs 1991-09, 1990-09, 1985-33 and 1984-60. They must, however, be reported (as discussed below).

Contributions from members of the candidate's family are subject to the same limits that apply to any other individual. For example, a candidate's parent or spouse may not contribute more than $2,600, per election, to the candidate.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOLMES, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Civ. No. 14-1243 (RMC)

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 4

**2014 CONGRESSIONAL PRIMARY ELECTION DATES
AND CANDIDATE FILING DEADLINES FOR BALLOT ACCESS**
(Data as of 7/28/2014)
Note: Dates Subject to Change / **S** Indicates Senate Election / General Election Date 11/04/2014

| STATE | | CONGRESSIONAL PRIMARY DATE | CONGRESSIONAL RUNOFF DATE | FILING DEADLINE FOR PRIMARY BALLOT ACCESS | INDEPENDENT [1] FILING DEADLINE FOR GENERAL ELECTION |
|---|---|---|---|---|---|
| Alabama | S | 6/3 | 7/15 | 2/7 | 6/3 |
| Alaska | S | 8/19 | | 6/2 | 8/19 (Independent) |
| American Samoa | | n/a | | n/a | 9/2 |
| Arizona | | 8/26 | | 5/28 5pm | 5/28 5pm |
| Arkansas | S | 5/20 | 6/10 | 3/3 Noon | 3/3 Noon |
| California | | 6/3 | | 3/7 | n/a |
| Colorado | S | 6/24 | | 3/31 | 7/10 (Independent) 3/31 (Third/Minor) |
| Connecticut | | 8/12 [2] | | 6/10 4pm | 8/6 4pm (Independent) 9/3 (Third/Minor_ |
| Delaware | S | 9/9 [3] | | 7/8 Noon | 7/15 (Independent) |
| D.C. | | 4/1 | | 1/2 | 8/6 |
| Florida | | 8/26 | | 5/2 | 3/31 |
| Georgia | S | 5/20 | 7/22 | 3/7 | 6/27 |
| Guam | | 8/30 | | 7/1 | 7/1 |
| Hawaii | S | 8/9 [4] | | 6/3 | 6/3 |
| Idaho | S | 5/20 | | 3/14 | 3/14 |
| Illinois | S | 3/18 | | 12/2 | 6/23 |
| Indiana | | 5/6 [5] | | 2/7 Noon | 7/15 Noon |
| Iowa | S | 6/3 [6] | | 3/14 | 8/15 |
| Kansas | S | 8/5 [7] | | 6/2 Noon | 8/4 Noon |
| Kentucky | S | 5/20 | | 1/28 4pm | 8/12 4pm |
| Louisiana | S | n/a [8] | | 8/22 [6] | 8/22 |
| Maine | S | 6/10 | | 3/17 | 6/2 (Independent) |
| Maryland | | 6/24 [9] | | 2/25 9pm | 8/4 5pm |
| Massachusetts | S | 9/9 | | 5/6 | 7/29 |
| Michigan | S | 8/5 [10] | | 4/22 | 7/17 |
| Minnesota | S | 8/12 | | 6/3 | 6/3 |
| Mississippi | S | 6/3 | 6/24 | 3/1 | 3/1 |
| Missouri | | 8/5 | | 3/25 | 7/28 |
| Montana | S | 6/3 | | 3/10 | 5/27 |
| Nebraska | S | 5/13 | | 2/18 (Incumbents) 3/3 (All Others) | 9/2 |
| Nevada | | 6/10 | | 3/14 | 2/6 (Independent) 4/11 (Third/Minor) |
| New Hampshire | S | 9/9 | | 6/13 | 8/6 |
| New Jersey | S | 6/3 | | 3/31 | 6/3 |
| New Mexico | S | 6/3 | | 3/11 | 6/24 |
| New York | | 6/24 | | 4/10 | 8/5 |
| North Carolina | S | 5/6 | 7/15 | 2/28 Noon | 6/27 Noon (Independent) |
| North Dakota | | 6/10 | | 4/7 4pm | 9/2 4pm |
| Northern Mariana Islands | | n/a | | n/a | 8/4 |

-1-

**2014 CONGRESSIONAL PRIMARY ELECTION DATES
AND CANDIDATE FILING DEADLINES FOR BALLOT ACCESS**
(Data as of 7/28/2014)
Note: Dates Subject to Change / **S** Indicates Senate Election / General Election Date 11/04/2014

| STATE | | CONGRESSIONAL PRIMARY DATE | CONGRESSIONAL RUNOFF DATE | FILING DEADLINE FOR PRIMARY BALLOT ACCESS | INDEPENDENT[1] FILING DEADLINE FOR GENERAL ELECTION |
|---|---|---|---|---|---|
| Ohio | | 5/6 | | 2/5 4pm | 5/5 4pm (Independent) |
| Oklahoma | S | 6/24 | 8/26 | 4/11 | 4/11 |
| Oregon | S | 5/20 [11] | | 3/11 | 8/26 |
| Pennsylvania | | 5/20 | | 3/11 | 8/1 |
| Puerto Rico | | n/a[12] | | | |
| Rhode Island | S | 9/9 | | 6/25 | 7/11 4pm |
| South Carolina | S | 6/10 [13] | 6/24 | 3/30 | 7/15 (Independent) |
| South Dakota | S | 6/3 | 8/12 | 3/25 | 3/25 (Third/Minor) 4/29 (Independent) |
| Tennessee | S | 8/7 | | 4/3 Noon | 4/3 Noon |
| Texas | S | 3/4 [14] | 5/27 | 12/9 | 12/9 (Third/Minor) 6/26 (Independent) |
| Utah | | 6/24 [15] | | 3/20 | 3/20 |
| Vermont | | 8/26 | | 6/12 | 6/12 |
| Virginia | S | 6/10 [16] | | 3/27 5pm | 6/10 |
| Virgin Islands | | 8/2 | | 5/13 | 10/5 |
| Washington | | 8/5 | | 5/16 | n/a |
| West Virginia | S | 5/13 [17] | | 1/25 | 8/1 |
| Wisconsin | | 8/12 | | 6/2 | 6/2 |
| Wyoming | S | 8/19 | | 5/30 | 8/25 (Independent) |

**Notes:**

1. The column Independent Filing Deadline shows the date for the filing of petitions by independent or third/minor party candidates. This is a general reference date for use by the public and voters. Candidates and others seeking specific information should contact the states for other deadlines that may need to be met. For example, the petitions may have to be checked by officials prior to this date. A declaration of candidacy may be due before the petitions are due. New parties may have different deadlines.

2. In Connecticut, conventions are held by the Democratic and Republican Parties prior to the primary. For U.S. Congress, the Democratic Party convention date is 5/14/14, and the Republican Party convention date is 5/16/14.

3. In Delaware, the Libertarian Party convention date is 3/8/14 and the Independent Party of Delaware convention date is 7/26/14.

4. In Hawaii, the U.S. Senate election is for an Unexpired Term.

5. In Indiana, the Libertarian Party convention date is 4/26/14.

6. In Iowa's 3rd Congressional District, a runoff convention was held by the Republican Party on 6/21/14.

7. In Kansas, the Libertarian Party convention date is 4/26/14.

8. In Louisiana, a Congressional primary election is not held. The election for candidates seeking Federal office is the General Election scheduled for 11/4/14. If necessary, a Runoff Election will be held on 12/06/14. The filing deadline for ballot access is 8/22/14.

9. In Maryland, the Libertarian Party convention date is 4/05/14 and the Green Party's party-organized primary date is 5/31/14.

10. In Michigan, the Libertarian Party convention date is 5/17/14, the Green Party convention date is 6/8/14, the U.S. Taxpayers Party convention date is 6/28/14 and the Natural Law Party convention date is 7/30/14.

11. In Oregon, the Constitution Party convention date is 5/24/14 and the Pacific Green Party convention date is 6/7/14. The Libertarian Party's party-organized primary date is 6/6/14 and the Independent Party's party-organized primary date is 7/19/14. The Working Families Party nominating caucus dates are 7/9/14 (Congressional District 2), 7/10/14 (Congressional District 5), 7/14/14 (Congressional District 4) and 7/22/14 (Congressional Districts 1 and 3).

12. In Puerto Rico, the general election for Resident Commissioner to the U.S. House of Representatives is held every four years, coinciding with the U.S. Presidential election.

13. In South Carolina, the American Party convention date is 5/10/14, the Green Party convention date is 5/3/14, the Labor Party convention date is 8/2/14, and the Libertarian Party convention date is 5/10/14. Also, South Carolina has two U.S. Senate seats on the ballot in 2014. One is for an Unexpired Term.

14. In Texas, the Green and Libertarian Parties may nominate by convention. The convention dates are 3/15/14 for single county U.S. House Districts 2, 3, 7, 16, 18, 20, 29 and 30; 3/22/14 for multi-county U.S. House Districts 1, 4-6, 8-15, 17, 19, 21-28, 31-36. State conventions for U.S. Senate nominations: 4/12/14.

15. In Utah, conventions are held by the Democratic, Republican, Constitution and Libertarian Parties prior to the primary. The Democratic, Republican and Libertarian Party conventions are scheduled for 4/26/14. The Constitution Party convention date is 5/3/14.

16. In Virginia, political parties may choose to nominate by convention rather than by primary election. The Democratic Party has scheduled conventions on 6/7/14 (District 1), 5/31/14 (District 5), 5/17/14 (District 6), 5/10/14 (District 9) and caucuses on 5/29/2014 (District 4) and 6/10/14 (District 10). The Republican Party has scheduled a convention on 6/7/2014 to select its U.S. Senate nominee. For U.S. House Districts, Republican conventions will be held on 5/3/14 (District 3), 4/26/14 (District 8) and 5/10/14 (District 11). A Republican Party canvass will be held on 4/26/14 for District 10.

17. In West Virginia, the Libertarian Party convention date is 3/8/14 and the Mountain Party convention date is 7/19/14.

**2014 CONGRESSIONAL PRIMARY ELECTION DATES
IN CHRONOLOGICAL ORDER**
(Data as of 7/28/2014)
Note: Dates Subject to Change / **S** Indicates Senate Election / General Election Date 11/04/2014

| | STATE | CONGRESSIONAL PRIMARY DATE | CONGRESSIONAL RUNOFF DATE |
|---|---|---|---|
| **S** | Texas | 3/4 [1] | 5/27 |
| **S** | Illinois | 3/18 | |
| | D.C. | 4/1 | |
| | Indiana | 5/6 [1] | |
| **S** | North Carolina | 5/6 | 7/15 |
| | Ohio | 5/6 | |
| **S** | Nebraska | 5/13 | |
| **S** | West Virginia | 5/13 | |
| **S** | Arkansas | 5/20 | 6/10 |
| **S** | Georgia | 5/20 | 7/22 |
| **S** | Idaho | 5/20 | |
| **S** | Kentucky | 5/20 | |
| **S** | Oregon | 5/20 [1] | |
| | Pennsylvania | 5/20 | |
| **S** | Alabama | 6/3 | 7/15 |
| | California | 6/3 | |
| **S** | Iowa | 6/3 | |
| **S** | Mississippi | 6/3 | 6/24 |
| **S** | Montana | 6/3 | |
| **S** | New Jersey | 6/3 | |
| **S** | New Mexico | 6/3 | |
| **S** | South Dakota | 6/3 | 8/12 |
| **S** | Maine | 6/10 | |
| | Nevada | 6/10 | |
| | North Dakota | 6/10 | |
| **S** | South Carolina | 6/10 [1] | 6/24 |
| **S** | Virginia | 6/10 [1] | |
| **S** | Colorado | 6/24 | |
| | Maryland | 6/24 [1] | |
| | New York | 6/24 | |
| **S** | Oklahoma | 6/24 | 8/26 |
| | Utah | 6/24 [1] | |
| | Virgin Islands | 8/2 | |
| **S** | Kansas | 8/5 [1] | |
| **S** | Michigan | 8/5 [1] | |
| | Missouri | 8/5 | |
| | Washington | 8/5 | |
| **S** | Tennessee | 8/7 | |
| **S** | Hawaii | 8/9 | |
| | Connecticut | 8/12 [1] | |
| **S** | Minnesota | 8/12 | |
| | Wisconsin | 8/12 | |

**2014 CONGRESSIONAL PRIMARY ELECTION DATES**
**IN CHRONOLOGICAL ORDER**
(Data as of 7/28/2014)
Note: Dates Subject to Change / **S** Indicates Senate Election / General Election Date 11/04/2014

| | STATE | CONGRESSIONAL PRIMARY DATE | CONGRESSIONAL RUNOFF DATE |
|---|---|---|---|
| S | Alaska | 8/19 | |
| S | Wyoming | 8/19 | |
| | Arizona | 8/26 | |
| | Florida | 8/26 | |
| | Vermont | 8/26 | |
| | Guam | 8/30 | |
| S | Delaware | 9/9 | |
| S | Massachusetts | 9/9 | |
| S | New Hampshire | 9/9 | |
| S | Rhode Island | 9/9 | |
| | | | |

**Notes:**

1. In Connecticut and Utah, conventions are held by the political parties prior to the primary.  In Virginia, political parties may choose to nominate by convention rather than by primary election.  In other states, such as Delaware, Indiana, Kansas, Maryland, Michigan, Oregon, South Carolina, Texas and West Virginia, minor parties may hold conventions to nominate candidates.

**Sources:**  State Election Offices, Statutes and State Parties

**Compiled by:**  Public Disclosure Division, Office of Communications, Federal Election Commission
800/424-9530 (option 2), or 202/694-1120

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| _____ ) | |
| HOLMES, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civ. No. 14-1243 (RMC) |
| v. ) | |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 5



FEDERAL ELECTION COMMISSION
Washington, DC  20463

June 27, 1986

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

ADVISORY OPINION 1986-17

Stephen Gillers
New York University School of Law
40 Washington Square South
New York, NY 10012

Dear Mr. Gillers:

This responds to your letter dated May 15, 1986, on behalf of Mark Green, requesting an advisory opinion concerning application of the Federal Election Campaign Act of 1971, as amended ("the Act"), and Commission regulations to (1) the party designation of a candidate for nomination and (2) the expenditure of general election contributions.

Mark Green has filed with the Commission a Statement of Candidacy as a candidate for the Democratic Party's nomination for the United States Senate from New York in 1986. He has also filed with the Commission a Statement of Organization for his principal campaign committee, "Friends of Mark Green." In its reports through the first quarter of 1986 the Committee has itemized all contributions it has received and has reported them as primary election contributions.

I.    <u>Party Designation</u>

The New York primary election will be held on Tuesday, September 9, 1986. New York election law provides that between the fourteenth and fifteenth Tuesday preceding the primary election, the state committee of a political party shall meet and designate "a candidate for nomination" for any office to be filled by the voters of the entire state. New York Elec. Law 6-104(1). The person receiving the majority vote of the state committee, under a weighted voting system, becomes the party's designated candidate for nomination. All other persons who receive at least 25 percent of the vote on any ballot at this meeting may make a written demand that their names also appear on the ballot as candidates for nomination. Id. at 6-104(2) and (4). The state committee files with the state board of elections the names of all persons designated by the state

committee as candidates for nomination and all persons receiving at least 25 percent of the vote on any ballot and the office for which they receive such votes. Id. at §6-104(7).

Under New York law enrolled members of a political party may also file petitions that designate other candidates for nomination. Id. at §6-104(5) and 6-118. State law also permits enrolled members of a political party to petition for an opportunity to write in a candidate for nomination. Id. at §6-164. Where the nomination of a party for an office is contested, the person receiving the most votes in the primary election for that office becomes the party's nominee. Id. at §6-160(1). Where a party's nomination for an office is uncontested, the person designated for nomination will be deemed nominated without balloting. Id. at §6-160(2). In such case the primary election ballot will not contain a space for voting for such office unless a petition for an opportunity to write in a candidate has been filed. Id. at §7-102 and 7-114(1)(d).

You ask whether the designation of a candidate for nomination by the state committee of a political party under New York law is an "election" under the Act to which separate contribution limitations will apply.[1]

The Act places limitations on the aggregate amount of contributions that any person or any multicandidate political committee may make to a candidate with respect to any election for Federal office. 2 U.S.C. 441a(a)(1) and (2). These limitations apply separately with respect to each election. 2 U.S.C. 441a(a)(6); 11 CFR 110.1(j) and 110.2(d). The Act and regulations define "election" to include a general election, a primary election, and "a convention or caucus of a political party which has authority to nominate a candidate." 2 U.S.C. 431(1); 11 CFR 100.2. The Commission has previously stated that the question whether a particular event is an election, or a convention or caucus which has authority to nominate a candidate, is determined by state law. See generally Advisory Opinion 1984-16.

The provisions of New York's election law paraphrased above demonstrate that the state committee does not have authority to nominate a candidate but only to designate a candidate "for nomination." In this respect, the state committee's designation is an alternative means by which a person becomes a candidate for nomination with respect to the primary election and is, thus, a part of the primary election process. Where an office is uncontested and no petition for an opportunity to ballot has been filed, the primary election ballot will not list that office. Instead, the person designated as a candidate for nomination will be deemed nominated without balloting. Nevertheless, the certificate of nomination will issue after the date of the primary election. See 50 NY Jur.2d Elections 370 (1985). Thus, under New York election law, the state committee's designation of a candidate for nomination does not qualify as a "convention or caucus of a

---

[1] In your request you invoked the provisions of 2 U.S.C. 437f(a)(2) and 11 CFR 112.4(b), which direct the Commission to render an advisory opinion within 20 days if it receives a request on behalf of a candidate within 60 days of a Federal election and if the request presents a specific transaction or activity with respect to that election. In your case, however, the substantive question you ask poses the same issue that is presented by your request for the 20-day procedure: whether the state committee's designation of a candidate for nomination is an "election" under the Act. Since the Commission concludes that the designation by the state committee is not an "election" under the Act, your request does not qualify for the 20-day procedure.

political party which has authority to nominate a candidate." Accordingly, it is not an "election" under the Act to which separate contribution limitations will apply. This result is also indicated in Advisory Opinion 1982-47.

II.   General Election Contributions

According to your request, Mr. Green[2] contemplates receiving contributions for the general election prior to the date of the primary election. You further state that such contributions will be separately accounted for pursuant to 11 CFR 102.9(e) and that these contributions will be refunded if Mr. Green does not become a candidate with respect to the general election. The Commission infers from your request that the contributors of these designated general election contributions will have already made their aggregate allowable contribution with respect to the primary election.

You ask whether Mr. Green may make expenditures of such general election contributions before he becomes a candidate with respect to the general election.[3]

As outlined above, the Act's limitations on contributions made to a candidate with respect to any election for Federal office apply separately with respect to each election. 2 U.S.C. 441a(a)(1), (2), and (6). Under Commission regulations, contributions made to Mr. Green or his principal or authorized campaign committees prior to the September 9, 1986, primary election will be considered made with respect to the general election on November 4, 1986, only if they are designated in writing by the contributor for such general election. See 11 CFR 110.1(a)(2). Commission regulations also provide that a candidate or his committee must separately account for contributions received prior to the primary election that are designated for the general election. See 11 CFR 102.9(e). In past advisory opinions, the Commission has further explained that contributions designated for a particular election such as a runoff or general election, may be accepted but become refundable to the contributors if the candidate does not participate in that election. See Advisory Opinions 1986-12, 1983-39, 1982-49, and 1980-122.[4] The Commission has also recognized that a contributor may in certain circumstances redesignate in writing a contribution (previously designated for a particular election) to another election provided that in doing so the contributor does not exceed his or her aggregate contribution limitation with respect to the election for which the contribution is redesignated. See Advisory Opinions 1986-12, 1984-32, and 1983-39.

In Advisory Opinion 1980-122, a candidate who lost the primary election had received contributions designated for the general election from contributors who had made their aggregate allowable contribution to the candidate with respect to the primary election. The Commission

---

[2]  In this opinion, your references to Mr. Green also encompass Mr. Green's principal campaign committee, since Mr. Green is deemed to be an agent of his committee for the purposes of receiving contributions and making disbursements. 2 U.S.C. 432(e)(2); 11 CFR 101.2.

[3]  In a telephone communication with an attorney in the Office of General Counsel, you indicated that the Committee plans to use these general election contributions for activities to influence the primary election as well as for activities related to a potential general election candidacy.

[4]  Commission regulations permit unlimited transfers of funds between the primary and general election campaigns of a candidate of funds unused for the primary election. 11 CFR 110.3(a)(2)(iii). This regulation, however, applies only in the case where an individual participates as a candidate in both the primary and general elections.

stated that the candidate could not use these general election contributions to pay outstanding primary election debts because doing so would result in a violation of the Act's contribution limitations. Instead, the Commission concluded that these general election contributions must be refunded because a separate contribution limitation was not available to these contributors since the candidate did not participate in the general election. The Commission has followed this position in several advisory opinions. See, e.g., Advisory opinions 1986-12 and 1983-39.

In Advisory Opinion 1982-49, the campaign committee of a candidate who received the nomination of the party convention (which qualified under the Act as an election) contracted with a firm for services with respect to a possible primary election. The contract called for the firm to contact independent voters in Connecticut to encourage them to register as Republicans in order to participate in the Republican Party's primary election. Thus, these services were related solely to the possible primary election and would not have influenced the convention. The committee made payments to the firm, including nonrefundable payments, prior to and after the convention from its convention account. The committee had also received, and separately accounted for, contributions designated for the possible primary election from contributors who had made their aggregate allowable contribution with respect to both the convention and the general election.

The Commission concluded that the committee could not use these primary election contributions to defray the expenses it had incurred and paid with respect to the possible primary election. It stated that since there was a determination under state law not to hold the primary election, there was no separate contribution limitation available to these contributors with respect to that election. Instead, the Commission said that these primary election contributions must be refunded to the contributors to the extent that the contributors had made their aggregate allowable contribution with respect to the convention and general election.

Nevertheless, the Commission concludes that the Act does not prohibit your committee from using contributions designated for the general election to make expenditures, prior to the primary election, exclusively for the purpose of influencing the prospective general election in those limited circumstances where it is necessary to make advance payments or deposits to vendors for services that will be rendered, or goods that will be provided, to your committee after you have established your candidacy with respect to the general election. This limited, permissible use of such general election contributions does not include the expenditure of such contributions for activities that influence the primary election or nominating process or expenditure allocations for goods or services to be used in both the primary and general elections. See 2 U.S.C. 441a(f); Advisory Opinion 1980-122.

Furthermore, the Commission concludes that if you do not establish your candidacy with respect to the general election, your committee must refund within a reasonable time contributions designated for the general election, whether or not your committee has made any expenditure from these contributions, since a separate contribution limitation will not be available to these contributors with respect to the general election. See 11 CFR 103.3(b); Advisory Opinion 1986-12. Your committee should make a full refund to those contributors who have made their aggregate allowable contribution to you with respect to the primary election.

Finally, the Commission notes that portions of Advisory Opinion 1982-49 may suggest that contributions designated for a particular election may not be expended until it is established that the candidate will participate in that election. To the extent that Advisory Opinion 1982-49 may be so interpreted as to preclude expenditures of general election contributions in the limited circumstances permitted in this opinion, Advisory Opinion 1982-49 is superseded.

This response constitutes an advisory opinion concerning application of the Act, or regulations prescribed by the Commission, to the specific transaction or activity set forth in your request. See 2 U.S.C. 437f.

Sincerely yours,

(signed)

Joan D. Aikens
Chairman for the
Federal Election Commission

Enclosures (AOs 1986-12, 1984-32, 1984-16, 1983-39, 1982-49, 1982-47, and 1980-122)

Commissioner Harris voted against approval of this opinion and will file a dissenting opinion at a later date.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HOLMES, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civ. No. 14-1243 (RMC) |
| ) | |
| v. ) | |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant. ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 6

FEDERAL ELECTION COMMISSION
Washington, DC  20463

July 29, 2009

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

ADVISORY OPINION 2009-15

Barry Hunsaker, Treasurer
Bill White for Texas
P.O. Box 131197
Houston, TX  77219 - 1197

Dear Mr. Hunsaker:

We are responding to your advisory opinion request, on behalf of Bill White for Texas (the "White Committee"), concerning the application of the Federal Election Campaign Act of 1971, as amended (the "Act"), and Commission regulations to the raising and acceptance of contributions for a special election that may not occur.  The Commission concludes that the White Committee may accept contributions for the Senatorial primary and general elections to be held in 2012 in Texas, and may currently accept contributions for a special or emergency election or runoff in 2009 or 2010 that has not been scheduled and may not occur.

### *Background*

The facts presented in this advisory opinion are based on your letter received on June 12, 2009, and on reports filed with the Commission.

Bill White is currently the mayor of Houston, Texas.  The White Committee is Mayor White's principal campaign committee for election to the United States Senate from Texas.  The White Committee registered with the Commission on December 12, 2008.  On December 15, 2008, Mayor White filed a Statement of Candidacy with respect to the 2012 Senate race.  If a special or emergency election is called before 2012 to fill a vacancy in the Senate seat, Mayor White intends to be a candidate in that election.

Currently, Senator Kay Bailey Hutchison holds the Senate seat that will be contested in the 2012 primary and general elections.  However, Senator Hutchison has

AO 2009-15
Page 2

stated publicly that she will not be a candidate for re-election in 2012,[1] and she has formed a committee under Texas law to raise funds to run for Governor of Texas in the 2010 March primary and November general elections. Senator Hutchison has discussed the possibility of resigning from the Senate during the course of her gubernatorial campaign.[2]

Under the Texas Election Code (the "Election Code"), if Senator Hutchison resigns from the Senate before her term expires, a "special election" to fill that seat may be scheduled for November 3, 2009, May 8, 2010, or November 2, 2010, depending on the timing of the resignation. Election Code §§210.023 and 3.003. It is also possible that the Governor may schedule an "emergency election" on another date to fill the vacancy if the Governor determines that an emergency exists. Election Code §41.0011. The Governor has considerable discretion in deciding whether to call such an election, and it is not currently possible to predict whether he would do so.[3]

A special election to fill a U.S. Senate seat would not be conducted as a party primary, but as an election in which candidates from all parties appear on the same ballot, with party affiliation indicated. Election Code §203.003. If no candidate receives a majority, that election is followed by a runoff election between the two candidates receiving the most votes in the first election.

Regularly scheduled party primary and general elections for the Senate seat will be held in 2012. If no candidate receives a majority in the party primary, a runoff will be held. It is thus conceivable that Mayor White could be a candidate in up to five elections for the same U.S. Senate seat between now and November 2012: a special election in 2009 or 2010, a runoff for that election, the 2012 Democratic party primary, a primary runoff, and a general election in November 2012.

### *Questions Presented[4]*

1.      *If a contributor makes an undesignated contribution to the White Committee of $2,400 or less, and a special Senate election is subsequently scheduled after that contribution is made but before the March 2012 Senate primary election, would that undesignated contribution be available to the White Committee to use for the special Senate election?*

2.      *May the White Committee accept a contribution of up to $4,800 from an individual before a special Senate election is scheduled if the contributor (i) designates up to $2,400 for a special Senate election if one is held, or for the 2012 primary election*

---

[1] Gamboa, Suzanne, "Texas senator won't run for re-election," *USA Today*, October 16, 2007.
[2] *Id.*
[3] The term "special election" is used throughout the remainder of this advisory opinion to refer to either a special or emergency election.
[4] These questions use the $2,400 per person per election contribution limit in place for the 2009-2010 election cycle. That amount may be adjusted for inflation in the 2011-2012 election cycle. *See generally*, 2 U.S.C. 441a(b).

AO 2009-15
Page 3

*if there is no special Senate election; and (ii) designates up to $2,400 for either a runoff election following the special Senate election if a runoff is held, or to the 2012 general election if there is no such runoff?*

*3.      With respect to a contribution that exceeds $2,400 and that is made before any special election is scheduled:*

> *(a) Is the contribution properly designated if the contributor uses a form stating that "Federal Election Law allows individuals to donate up to $4,800; $2,400 for the first election and $2,400 for any subsequent election" and there is no other designation language provided?*

> *(b) Is the contribution designated to the 2012 primary and/or 2012 general election pursuant to a form described in question 3(a) properly redesignated to the special and/or runoff election if the White Committee provides the contributor a form letter, such as the one attached as Appendix D in the Request, stating that the White Committee is designating $2,400 for "the first election" and the remaining amount for "the second election in which Mayor White participates"?*

> *(c) If the notice of redesignation described in question 3(b) relating to a special election and possible runoff election is not effective as to a special election and possible runoff election, will the notice of redesignation nevertheless be effective as to the primary and general elections of 2012?*

> *(d)  If the notice of redesignation is effective as to the 2012 primary and general elections, may the White Committee use the contribution for a special election and, if one is required, a runoff election if special election is called before the 2012 primary election occurs?*

*4.      If the White Committee raises money for a special election, and for a runoff following a special election, and the special election or runoff does not occur, what may the Committee do with the money?*

*5.      How should the White Committee report designated contributions if the answer to Question 2 is yes, and redesignated contributions if the answer to Question 3 is yes?*

### *Legal Analysis and Conclusions*

*1.      If a contributor makes an undesignated contribution to the White Committee of $2,400 or less, and a special Senate election is subsequently scheduled after that contribution is made but before the March 2012 Senate primary election, would that undesignated contribution be available to the White Committee to use for the special Senate election?*

AO 2009-15
Page 4

        Yes, an undesignated contribution of up to $2,400 would be available to the
White Committee to use for the Senate special election that is called after the contribution
is made.

        Contributions by a person other than a multicandidate committee to a Federal
candidate's authorized committees are limited to $2,400 "with respect to any election."
11 CFR 110.1(b); 2 U.S.C. 441a(a)(1)(A) and 441a(c).  Commission regulations state that
"with respect to any election" means: (1) in the case of a contribution designated in
writing by the contributor for a particular election, the election so designated; and (2) in
the case of a contribution not designated in writing by the contributor, the next election
for the Federal office after the contribution is made.  11 CFR 110.1(b)(2).  Under the
circumstances described, a special election that has been called would be the next Federal
election after the undesignated contribution is made.  Therefore, the undesignated
contribution may be used for that election (but is subject to the reporting requirements set
forth in the answer to question 5).

*2.      May the White Committee accept a contribution of up to $4,800 from an
individual before a special Senate election is scheduled if the contributor (i) designates
up to $2,400 for a special Senate election if one is held, or for the 2012 primary election
if there is no special Senate election; and (ii) designates up to $2,400 for either a runoff
election following the special Senate election if a runoff is held, or to the 2012 general
election if there is no such runoff?*

        Yes, contributions may be designated in the alternative, under the circumstances
as set forth in question 2.  The White Committee may accept up to $2,400 from an
individual contributor for the 2012 primary or, in the alternative, a special election that
has not yet been scheduled.  The White Committee may also accept up to $2,400 from
that same individual contributor for the general election in 2012 or, in the alternative, for
a runoff for a not-yet-declared special election.

        Commission regulations provide for the designation of a contribution for "a
particular election."  *See* 11 CFR 110.1(b)(2), (3), and (4).  Such a designated
contribution must not cause the contributor to exceed the contribution limits at 2 U.S.C.
441a(a)(1) with respect to the particular election, and contributions designated for an
election that has already occurred may only be accepted to the extent such contributions
do not exceed the committee's net debts outstanding.  *See* 11 CFR 110.1(b)(1) and (3)(i).
Thus, for an authorized committee to accept a designated contribution of $4,800, which is
$2,400 in excess of the per election limit, the contributor must clearly state in writing that
$2,400 is designated for one particular election and $2,400 is designated for another
particular election, either on the check (or other negotiable instrument) or in a writing
accompanying the contribution.

        The Commission concludes that designations for the special election and for the
runoff would qualify as references to "a particular election."  Although the designations
present these particular elections in the alternative (*i.e.*, (1) the special election if held
before 2012 and, if not so held,  the 2012 primary; or (2) the special election runoff if

AO 2009-15

Page 5

held before 2012 and, if not so held, the 2012 general election), the specific use of the contribution will be clear to both the Committee and the contributor based on circumstances that will be a matter of public record: that the Governor would have to call a special election following the resignation of Senator Hutchinson.

Moreover, the likelihood of the occurrence of a special election is sufficiently real in this situation.  Based on statements from Senator Hutchison and her agents, Mayor White is presented with a strong possibility that Senator Hutchison will resign before the gubernatorial primary or gubernatorial general election as well as a certainty that she will resign by the end of 2010 if she is elected Governor.[5]

Thus, the White Committee may use the described designations to accept up to $2,400 for the special election and up to $2,400 for the runoff to that election.  The White Committee must use an acceptable accounting method to distinguish between the contributions received for each of the two elections, *e.g.*, by designating separate bank accounts for each election or maintaining separate books and records for each election. 11 CFR 102.9(e)(1).[6]

The designations described in question 2 would be treated as designations for the special election or the runoff to that election at the point that Senator Hutchinson announces her resignation and Mayor White becomes a candidate in a special election called by the Governor.  At that point, the contributions can no longer be considered to be designated for the 2012 regularly scheduled elections.  After the end of any pre-2012 elections (special or runoff) in which Mayor White actually participates as a candidate, the White Committee may use unused surplus funds (as determined by use of a reasonable accounting method under 11 CFR 110.3(c)(4)) for the 2012 primary election.

3.      *With respect to a contribution that exceeds $2,400 and that is made before any special election is scheduled:*

*(a) Is the contribution properly designated if the contributor uses a form stating that "Federal Election Law allows individuals to donate up to $4,800; $2,400 for the first election and $2,400 for any subsequent election" and there is no other designation language provided?*

Yes, any such contribution is properly designated.  If at the time the contribution is made Senator Hutchison has not resigned, no special or runoff election has been called, and the possibility of a special or runoff election is not even mentioned in the forms, current contributors who use the form described in question 3(a) must conclude that the "first election" referenced in the forms means the 2012 primary, and the "second

---

[5]  *See* Advisory Opinion 2006-22 (Wallace) (where the Commission concluded that an individual raising and spending funds for his candidacy was considered a Federal candidate even at a time when the question of whether the relevant special nominating process would be held was subject to court rulings that had not yet been made).
[6]  The Committee must not spend funds designated for the runoff election unless Mayor White participates in the runoff as a candidate.  *See* 11 CFR 102.9(e)(3).

AO 2009-15
Page 6

election" means the 2012 general election.  Accordingly, barring any further instruction
from a contributor, the first $2,400 contributed would be designated for the 2012 primary
election.  Any remaining amount up to $2,400 would likewise be considered designated
for the 2012 general election.  *See* 11 CFR 110.1(b)(2) and (4).

> *(b) Is the contribution designated to the 2012 primary and/or 2012 general*
> *election pursuant to a form described in question 3(a) properly redesignated to*
> *the special and/or runoff election  if the White Committee provides the contributor*
> *a form letter, such as the one attached as Appendix D in the Request, stating that*
> *the White Committee is designating $2,400 for "the first election" and the*
> *remaining amount for "the second election in which [Mayor White]*
> *participates"?*

No, any contributions designated for the 2012 primary and/or general election are
not properly redesignated to the special and/or runoff election by the form letter
described in question 3(b).  Once a contribution is designated to a particular election, it
cannot be presumptively redesignated to another election, which is what the form letter
attached as Appendix D in the Request purports to do.  *See* 11 CFR 110.1(b)(5)(ii)(B)(*2*)
and (C)(*2*).  Thus,  in order to use funds received in response to the wording of the form
described in question 3(a) for a 2009 or 2010 special election or runoff, the White
Committee must first obtain written redesignations from the contributors for the special
election or runoff in accordance with 11 CFR 110.1(b)(5)(ii)(A)(*1*) and (*2*).[7]

> *(c) If the notice of redesignation described in question 3(b) relating to a special*
> *election and possible runoff election is not effective, will the notice of*
> *redesignation nevertheless be effective as to the primary and general elections of*
> *2012?*

Given that the Commission has already concluded in answering question 3(a)
above that the language in the forms would result in the proper designation of the
contributions for the 2012 primary and general elections, this question is moot.  The
White Committee would not need to redesignate contributions that already are properly
designated.  If the Request is asking whether the White Committee may use the notice of
redesignation described in question 3(b), such as the one attached as Appendix D in the
Request, to redesignate contributions that already are designated, the answer remains the
same as the answer to question 3(b).  Contributions that already are designated must be
redesignated by obtaining a writing from the contributor; simply issuing a notice to the
contributor, such as the one attached as Appendix D, will not suffice.  *See* 11 CFR
110.1(b)(5)(ii)(A)(*1*) and (*2*).

---

[7] Although Commission regulations only specifically address redesignation of excessive contributions,
nothing in the Commission's regulations is intended to suggest that political committees may not seek
redesignation of contributions that are *within* the contribution limitations and restrictions.  *See* 11 CFR
110.1(b)(5)(i)(A)-(D).

AO 2009-15
Page 7

If, on the other hand, the Request is asking whether undesignated contributions that exceed the per-election contribution limit may be presumptively redesignated between the 2012 primary and general elections, then the answer is contingent on whether a special and/or runoff election are called, since the redesignation language contained in the notice attached as Appendix D of the Request is contingent on that fact. In the event the special and runoff elections are not called, the form letter would constitute an effective presumptive redesignation pursuant to 11 CFR 110.1(b)(5)(ii)(B) and (C), since the letter states that the White Committee is designating a certain amount to the primary election (in the event a special election is not called) and a certain amount to the general election (in the event a runoff election does not occur).

> *(d) If the notice of redesignation is effective as to the 2012 primary and general elections, may the White Committee use the contribution for a special election and, if one is required, a runoff election if special election is called before the 2012 primary election occurs?*

If the White Committee wishes to use contributions that have been designated for the 2012 primary and general elections for a 2009 or 2010 special election or runoff once the special election is called, the White Committee must first obtain written contributor redesignations for the special election or runoff in accordance with 11 CFR 110.1(b)(5)(ii)(A)(*1*) and (*2*).

*4.     If the White Committee raises money for a special election, and for a runoff following a special election, and the special election or runoff does not occur, what may the Committee do with the money?*

If the White Committee raises money for a special election, and the special election does not occur, contributions designated for the special election must be refunded to the contributor within sixty days of the last date that a special election may be scheduled under Texas law, unless the White Committee receives a written redesignation or combined redesignation and reattribution. 11 CFR 110.1(b)(3)(i)(C); *see* Advisory Opinion 1992-15 (Russo) (concluding that the 60-day period begins to run on the date that the committee "has actual notice of the need to obtain redesignations . . . or refund the contribution[s]").

Similarly, although the Committee may accept contributions designated for the runoff once it is apparent that a special election will occur, it may not use those contributions unless Mayor White participates in the runoff as a candidate. *See* Advisory Opinion 1982-49 (Weicker) (recognizing that accepting contributions for an election at a time before the necessity of such an election is determined is analogous to accepting general election contributions before the primary election). Contributions designated for an election that does not occur, or in which a person is not a candidate (for example, where a candidate has lost the primary and is hence not running in the general election), must be refunded, redesignated for another election in which the candidate has participated or is participating in accordance with 11 CFR 110.1(b)(5), or redesignated and reattributed to another contributor in accordance with 11 CFR 110.1(k)(3). *See*

AO 2009-15
Page 8

11 CFR 102.9(e)(3), 110.1(b)(3)(i), and 103.3(b)(3), and Advisory Opinions 1992-25
(Owens), 1986-17 (Green), and 1982-49 (Weicker).  Thus, if Mayor White loses the
special election, or if any candidate receives a majority in the special election (and
therefore there is no special runoff election), contributions designated for the special
election runoff must be refunded to the contributor within sixty days of the special
election unless the White Committee receives a written redesignation or combined
redesignation and reattribution.  11 CFR 110.1(b)(3)(i)(C).

     *5.     How should the White Committee report designated contributions if the
answer to Question 2 is yes, and redesignated contributions if the answer to Question 3 is
yes?*
     In reporting contributions accompanied by the written statements described in
question 2 that are received before a special election is scheduled, the White Committee
must check a box on Schedule A indicating either a "Primary" contribution or a
"General" contribution for the 2012 elections and include a memo text stating either
(1) "Designated for special or emergency election if scheduled before 2012" or
(2) "Designated for special or emergency election runoff if scheduled before 2012."
Such reporting reflects the use of the contributions as they are intended by the contributor
at the time the contribution is made.  If Senator Hutchison announces her resignation, and
Mayor White becomes a candidate in a special election called by the Governor, the White
Committee must inform the Commission that the contributions are considered to be
designated for the special election or the runoff election.  Normally, when the designation
of a contribution has been changed, the political committee must disclose the
redesignation on the report covering the period in which it received the redesignation,
including a memo entry for each contribution that indicates when the Committee received
a new designation from the contributor.  *See* 11 CFR 104.8(d); *see also Instructions for
FEC Form 3 and Related Schedules*, p. 9.  Under the circumstances presented, where the
White Committee is attempting to deal with uncertainty as to the proper way to designate
contributions in an unusual electoral situation, the Commission considers it to be
sufficient for the White Committee to file amended reports, simply indicating the proper
designations of the contributions.  The Commission recommends that to avoid any
confusion, the White Committee include memo text specifically referencing this advisory
opinion.

     Further, the Commission must also be informed of any changes to the potential
use of undesignated contributions received pursuant to question 1.  The White Committee
should similarly file amended reports for these contributions once a special election is
called.

     Contributions received using the forms described in question 3 must be reported
as contributions designated for the 2012 primary election or 2012 general election.

     This response constitutes an advisory opinion concerning the application of the
Act and Commission regulations to the specific transaction or activity set forth in your
request.  *See* 2 U.S.C. 437f.  The Commission emphasizes that, if there is a change in any
of the facts or assumptions presented, and such facts or assumptions are material to a

AO 2009-15
Page 9

conclusion presented in this advisory opinion, then the requester may not rely on that
conclusion as support for its proposed activity.  Any person involved in any specific
transaction or activity which is indistinguishable in all its material aspects from the
transaction or activity with respect to which this advisory opinion is rendered may rely on
this advisory opinion.  *See* 2 U.S.C. 437f(c)(1)(B).  Please note that the analysis or
conclusions in this advisory opinion may be affected by subsequent developments in the
law including, but not limited to, statutes, regulations, advisory opinions and case law.
All cited advisory opinions are available on the Commission's website at
http://saos.nictusa.com/saos/searchao.

On behalf of the Commission,


(signed)
Steven T. Walther
Chairman

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                                              |     |                         |
| -------------------------------------------- | --- | ----------------------- |
|                                              | )   |                         |
| HOLMES, *et al.*,                            | )   |                         |
|                                              | )   |                         |
| Plaintiffs,                                  | )   |                         |
|                                              | )   | Civ. No. 14-1243 (RMC)  |
| v.                                           | )   |                         |
|                                              | )   |                         |
| FEDERAL ELECTION COMMISSION,                 | )   |                         |
|                                              | )   |                         |
| Defendant.                                   | )   |                         |
|                                              | )   |                         |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 7

MAR-22-2006  14:05      OGC                                      202 219 3923    P.02

BEFORE THE FEDERAL ELECTION COMMISSION

| | |
|---|---|
| In the Matter of | ) |
| | )      **MUR 5388** |
| Jim Treffinger for Senate, Inc. | ) |
| Robert A. Mathers, as treasurer | ) |

**CONCILIATION AGREEMENT**

This matter was initiated by the Federal Election Commission ("the Commission"),

pursuant to information ascertained in the normal course of carrying out its supervisory

responsibilities and by a Complaint filed with the Commission by Jay Hochberg.  The

Commission found reason to believe that Jim Treffinger for Senate, Inc. and Robert A. Mathers,

as treasurer ("Respondents"), knowingly and willfully violated 2 U.S.C. § 441a(f).

NOW, THEREFORE, the Commission and the Respondents, having participated in

informal methods of conciliation, prior to a finding of probable cause to believe, do hereby agree

as follows:

I.    The Commission has jurisdiction over the Respondents and the subject matter of

this proceeding, and this agreement has the effect of an agreement entered pursuant to 2 U.S.C.

§ 437g(a)(4)(A)(i) and 11 C.F.R. § 111.18(d).

II.    Respondents have had a reasonable opportunity to demonstrate that no action

should be taken in this matter.

III.    Respondents enter voluntarily into this agreement with the Commission.

TOTAL P.02

MUR 5388  2
Jim Treffinger for Senate, Inc.
  and Robert A. Mathers, as treasurer
Conciliation Agreement

1    IV.    The pertinent facts in this matter are as follows:

2           1.  James Treffinger was a candidate for the U.S. Senate in New Jersey in the

3    June 6, 2000 Republican primary election.  Jim Treffinger for Senate, Inc. ("the Committee") is a

4    political committee within the meaning of 2 U.S.C. § 431(4) and is the authorized principal

5    campaign committee for Mr. Treffinger's 2000 and 2002 Senatorial campaigns.

6           2.  Robert A. Mathers became the treasurer of the Committee in March 2002.

7           3.  The Federal Election Campaign Act of 1971, as amended ("the Act"),

8    provides that no person may make a contribution to a candidate for federal office, or his

9    authorized political committees, in excess of $1,000 per election.[1]  2 U.S.C. § 441a(a)(1)(A).

10   The Act also makes it unlawful for candidates and political committees to knowingly accept any

11   contribution in violation of section 441a.  See 2 U.S.C. § 441a(f).

12          4.  The treasurer of a political committee has the responsibility for determining

13   the legality of any contributions received by the committee.  11 C.F.R. §§ 103.3(b)(3),

14   110.1(b)(3), 110.2(b)(3).  In the case of excessive contributions, the treasurer has sixty days from

15   the date of receipt to reattribute, redesignate, or refund the contribution to cure the illegality.

16   11 C.F.R. § 102.9(e); AO 1992-15; AO 1988-41.

17          5.  In an election cycle, the Act treats primary and general elections as two

18   separate elections.  2 U.S.C. § 431(1)(A); 11 C.F.R. § 110.1(b)(2).

19

20

---

[1]  The activity in this matter is governed by the Federal Election Campaign Act of 1971, as amended ("the Act"),
and the regulations in effect during the pertinent time period, which precedes the amendments made by the
Bipartisan Campaign Reform Act of 2002 ("BCRA").  All references to the Act and regulations in this Conciliation
Agreement exclude the changes made by or subsequent to BCRA.

MUR 5388                                                    3
Jim Treffinger for Senate, Inc.
  and Robert A. Mathers, as treasurer
Conciliation Agreement

1          6.   While it is permissible to accept contributions for the general election prior to

2    the primary election, the Committee must employ an acceptable accounting method to

3    distinguish between primary and general election contributions.  2 U.S.C. § 441a(a)(6); 11 C.F.R.

4    § 102.9(e); AO 1992-15; AO 1980-122; AO 1988-41.

5          7.   Prior to the 2000 Republican primary election for the U.S. Senate in New

6    Jersey, Respondents received $227,080 in contributions designated for the 2000 general election.

7    On June 6, 2000, Mr. Treffinger lost the primary election.

8          8.   Respondents failed to use acceptable accounting methods as required by

9    11 C.F.R. § 102.9(e) and used $50,000 of the money designated for the 2000 general election for

10   activities associated with the primary election, making the contributions excessive and in

11   violation of 2 U.S.C. § 441a(a).

12         9.   Additionally, since Mr. Treffinger did not participate in the 2000 general

13   election, the general election contributions became excessive and Respondents were required to

14   obtain reattribution of the contributions to another contributor in accordance with 11 C.F.R.

15   § 110.1(k)(3), to obtain redesignation of the contributions to another election in accordance with

16   11 C.F.R. §§ 110.1(b)(5) or 110.2(b)(5), or to refund the contributions within sixty days of the

17   June 6, 2000 primary election. 2 U.S.C. § 441a(f); 11 C.F.R. § 102.9(e); AO 1992-15; AO 1988-

18   41; see also 11 C.F.R. §§ 110.1(b)(3)(i), 110.2(b)(3), 103.3(b)(3).

19         10.  Respondents, however, failed to disclose any refunds, reattributions, or

20   redesignations of these excessive contributions in any report filed within sixty days after the

21   primary date.  To date, Respondents have refunded only nine of these excessive contributions

22   totaling $6,400.

26044134693

MUR 5388
Jim Treffinger for Senate, Inc.
  and Robert A. Mathers, as treasurer
Conciliation Agreement

4

1      11. Respondents also received $10,550 in excessive 2000 primary election

2   contributions. The contributions originated from thirteen individuals who had already met their

3   $1,000 contribution limits for the 2000 primary election. Respondents had sixty days from the

4   date of receipt to reattribute, redesignate, or refund the excessive primary election contributions.

5      12. Respondents, however, failed to disclose any refunds, reattributions, or

6   redesignations of these excessive contributions in any report filed within sixty days of receipt of

7   the contributions. To date, Respondents have refunded only $1,250 of these excessive

8   contributions.

9      13. Twice during 2002, the Commission's Reports Analysis Division ("RAD")

10  provided Respondents with detailed information on the excessive 2000 contributions. RAD

11  notified Respondents of their obligation to refund the outstanding contributions.

12      14. Respondents failed to refund the remaining excessive 2000 contributions.

13      15. On July 25, 2003, the Commission issued Advisory Opinion 2003-17 ("the

14  AO"). In the AO the Commission noted that the Committee had accepted contributions for both

15  the 2000 and 2002 general elections, and warned that to the extent funds were needed for the

16  purpose of refunding those contributions, no funds could be used to pay legal expenses related to

17  Mr. Treffinger's criminal defense.

18      16. At the time the AO was issued, Respondents' refund obligation already

19  exceeded the Committee's cash on hand. Nevertheless, beginning in August 2003, Respondents

20  made six payments to law firms that represented Mr. Treffinger in his May 2003 court

21  appearance and October 2003 criminal sentencing. Thus, contrary to the explicit language of the

2604413695

MUR 5388                                          5
Jim Treffinger for Senate, Inc.
  and Robert A. Mathers, as treasurer
Conciliation Agreement

1    AO, Respondents used the funds needed to meet the refund obligation to pay Mr. Treffinger's

2    legal fees.

3         V.    Respondents violated 2 U.S.C. § 441a(f) by accepting $237,630 in excessive

4    contributions. Respondents will cease and desist from violating 2 U.S.C. § 441a(f).

5         VI.    Respondents will pay a civil penalty to the Federal Election Commission in the

6    amount of Fifty-Seven Thousand Dollars ($57,000), pursuant to 2 U.S.C. § 437g(a)(5)(A).

7         VII.    Respondents shall report as debt on Schedule D of their periodic disclosure

8    reports filed with the Commission pursuant to 2 U.S.C. § 434 each unrefunded excessive

9    contribution at issue in this matter. None of the respondent Committee's future receipts, if any,

10   may be disbursed for any purpose other than refunding the excessive contributions until the entire

11   amount of excessive contributions has been refunded.

12        VIII.    The Commission, on request of anyone filing a complaint under 2 U.S.C.

13   § 437g(a)(1) concerning the matters at issue herein or on its own motion, may review compliance

14   with this agreement. If the Commission believes that this agreement or any requirement thereof

15   has been violated, it may institute a civil action for relief in the United States District Court for

16   the District of Columbia.

17        IX.    This agreement shall become effective as of the date that all parties hereto have

18   executed same and the Commission has approved the entire agreement.

19        X.    Respondents shall have no more than 30 days from the date this agreement

20   becomes effective to comply with and implement the requirements contained in this agreement

21   and to so notify the Commission.

MUR 5388                                          6
Jim Treffinger for Senate, Inc.
  and Robert A. Mathers, as treasurer
Conciliation Agreement

1        XI.      This Conciliation Agreement constitutes the entire agreement between the parties

2    on the matters raised herein, and no other statement, promise, or agreement, either written or

3    oral, made by either party or by agents of either party that is not contained in this written

4    agreement shall be enforceable.

5
6
7    FOR THE COMMISSION:

8    Lawrence H. Norton
9    General Counsel

10
11
12
13   BY: _____  _____
14        Rhonda J. Vosdingh          Date  4/24/06
15        Associate General Counsel
16          for Enforcement
17
18
19   FOR THE RESPONDENTS:
20
21
22   _____  _____
23   Robert A. Mathers                Date  3/22/06
24   Treasurer
25

JA 129

USCA Case #15-5120      Document #1568250         Filed: 08/17/2015      Page 132 of 313

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOLMES, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |

Civ. No. 14-1243 (RMC)

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 8



**FEDERAL ELECTION COMMISSION**
WASHINGTON, D C 20463

JUN **1 4** 2010

Scott E. Thomas
Dickstein Shapiro LLP
1825 Eye Street NW
Washington, DC 20006-5403

RE:   MUR 6230
      Wynn for Congress and
      Curt Clifton, in his official capacity
      as treasurer

Dear Mr. Thomas:

On May 25, 2010, the Federal Election Commission accepted the signed conciliation agreement submitted on your clients' behalf in settlement of a violation of U.S.C. § 441a(f), a provision of the Federal Election Campaign Act of 1971, as amended ("the Act"), and 11 C.F.R. §§ 102.9(e)(3), 110.1(b)(3)(i), and 110.2(b)(3)(i) of the Commission's regulations. Accordingly, the file has been closed in this matter.

Documents related to the case will be placed on the public record within 30 days. *See* Statement of Policy Regarding Disclosure of Closed Enforcement and Related Files, 68 Fed. Reg. 70,426 (Dec. 18, 2003). Information derived in connection with any conciliation attempt will not become public without the written consent of the respondent and the Commission. See 2 U.S.C. § 437g(a)(4)(B).

Enclosed you will find a copy of the fully executed conciliation agreement for your files. Please note that the initial payment of $5,000 (Five Thousand Dollars) of the civil penalty is due within 24 hours of final execution of the conciliation agreement. The remainder will be paid in six (6) installments of $500 (Five Hundred Dollars) each, starting on the last business day of the month following the month this agreement is executed and continuing on the last business day of the six (6) succeeding months. If you have any questions, please contact me at (202) 694-1624.

Sincerely,

Joshua B. Smith
Attorney

Enclosure:
  Conciliation Agreement

10044272924

RECEIVED
FEDERAL ELECTION
BEFORE THE FEDERAL ELECTION COMMISSION

2018 MAR 12  PM 5: 39

In the Matter of                                    )OFFICE OF GENERAL
                                                     )     COUNSEL MUR 6230
                                                     )
Wynn for Congress and                                )
Curt Clifton, in his official capacity as treasurer  )

### CONCILIATION AGREEMENT

This matter was initiated by the Federal Election Commission, ("Commission") pursuant

to information ascertained in the normal course of carrying out its supervisory responsibilities.

The Commission found reason to believe that Wynn for Congress and Curt Clifton, in his official

capacity as treasurer, ("Respondents") violated 2 U.S.C. § 441a(f) of the Federal Election

Campaign Act of 1971, as amended ("the Act") and 11 C.F.R. §§ 102.9(e)(3), 110.1(b)(3)(i), and

110.2(b)(3)(i) of the Commission's regulations.

NOW, THEREFORE, the Commission and the Respondents, having participated in

informal methods of conciliation, prior to a finding of probable cause to believe, do hereby agree

as follows:

I.   The Commission has jurisdiction over the Respondents and the subject matter of

this proceeding, and this agreement has the effect of an agreement entered pursuant to 2 U.S.C.

§ 437g(a)(4)(A)(i).

II.   Respondents have had a reasonable opportunity to demonstrate that no action

should be taken in this matter.

III.   Respondents enter voluntarily into this agreement with the Commission.

IV.   The pertinent facts in this matter are as follows:

MUR 6230
Conciliation Agreement
Page 2 of 6

1.  Wynn for Congress is the principal campaign committee for Albert Wynn's 2008 Congressional race.  Wynn for Congress is a political committee within the meaning of 2 U.S.C. § 431(4).

2.  Curt Clifton has been the treasurer of Wynn for Congress since October 15, 2008.  During the relevant period of the 2008 campaign, Gregory Holloway was the treasurer.

3.  Albert Wynn lost the primary election on February 12, 2008.

4.  At the time this activity occurred, the Act prohibited persons from making contributions to any candidate and his authorized political committee with respect to any election for federal office which, in the aggregate, exceed $2,300.  2 U.S.C. § 441a(a)(1)(A).

5.  The Act prohibits any multicandidate political committee from making contributions to any candidate and his authorized political committee with respect to any election for federal office which, in the aggregate, exceed $5,000.  2 U.S.C. § 441a(a)(2)(A).

6.  The Act prohibits any candidate or political committee from knowingly accepting any contributions that exceed the limits established by 2 U.S.C. § 441a.  2 U.S.C. § 441a(f).

7.  A committee may accept contributions that are designated for use in connection with the general election prior to the date of the primary election if the committee employs an acceptable accounting method to distinguish between contributions received for the primary election and contributions received for the general election.  11 C.F.R. § 102.9(c)(1).

8.  An authorized committee's records must demonstrate that, prior to the primary election, recorded cash on hand was at all times equal to or in excess of the sum of general election contributions received less the sum of general election disbursements made.  11 C.F.R. § 102.9(c)(2).

MUR 6230
Conciliation Agreement
Page 3 of 6

      9. If a candidate is not a candidate in the general election, a committee shall return, refund to the contributors, redesignate in accordance with 11 C.F.R. § 110.1(b)(5), or reattribute in accordance with 11 C.F.R. § 110.1(k)(3), any contributions designated for the general election within 60 days of the primary election. 11 C.F.R. §§ 102.9(e)(3), 110.1(b)(3)(i), and 110.2(b)(3)(i), AO 1992-15.

      10. If a candidate fails to qualify for the general election, any contributions designated for the general election that have been received from contributors who have already reached their contribution limit for the primary election would exceed FECA's contribution limits. AO 2007-03.

      11. Respondent's Amended 2008 campaign reports disclosed to the Commission that it accepted $115,100 in contributions designated for the 2008 general election, before the primary election on February 12, 2008, consisting of $41,600 from twenty-two individuals and $73,500 from twenty-four PACs.

      12. Respondents did not employ an accounting method to distinguish between contributions received for the primary election and contributions received for the general election, and they used general election funds to pay for primary election costs.

      13. Respondents could not redesignate the general election contributions to the 2008 primary election because all of the general election contributors had already contributed the maximum amount allowable for the primary election.

      14. Respondents could not reattribute the general election contributions because reattribution would not remedy the Respondents' acceptance of contributions designated for an election in which Wynn was not participating.

      15. Respondents did not refund the general election contributions within 60 days of the primary election, and have not done so to date.

10044272927

MUR 6230
Conciliation Agreement
Page 4 of 6

V.    Respondents committed the following violations:

1.    Respondents violated 2 U.S.C. § 441a(f) by accepting $115,100 in general election contributions from individuals and multicandidate committees that had already contributed the maximum amount allowable for the 2008 primary election, which became excessive as of the date the candidate lost the primary.

2.    Respondents violated 11 C.F.R. §§ 102.9(e)(3), 110.1(b)(3)(i), and 110.2(b)(3)(i) by failing to refund or return $115,100 in excessive contributions.

VI.    Respondents will take the following actions:

1.    In ordinary circumstances, the Commission would seek a substantially higher civil penalty based on the violations outlined in this agreement. However, the Commission is taking into account the fact that the Committee is defunct, has no cash on hand according to the evidence available, and has a limited ability to raise any additional funds. Respondents will pay a civil penalty to the Federal Election Commission in the amount of Eight Thousand Dollars ($8,000), pursuant to 2 U.S.C. § 437g(a)(5)(A), divided as follows:

(a)    An initial payment of $5,000 within 24 hours of final execution of this agreement;

(b)    The remainder will be paid in six (6) installments of Five Hundred Dollars each, starting on the last business day of the month following the month this agreement is executed and continuing on the last business day of the six (6) succeeding months.

2.    Respondents will convey a copy of the agreement to former Congressman Wynn, who has verified to Respondents that, in the event he ever decides to run for federal office again, he will cause his authorized committee to set aside an additional $12,000 in campaign proceeds and pay that amount as an additional civil penalty relating to the matter herein, as well

MUR 6230
Conciliation Agreement
Page 5 of 6

as refund to the contributors, or in the alternative, disgorge to the U.S. Treasury, the $115,100 in

excessive contributions identified herein as received in violation of 2 U.S.C. § 441a(a).

   3. Respondents will cease and desist from violating 2 U.S.C. § 441a(f),

11 C.F.R. §§ 102.9(c)(3), 110.1(h)(3)(i), and 110.2(b)(3)(i).

  VII. The Commission, on request of anyone filing a complaint under 2 U.S.C.

§ 437g(a)(1) concerning the matters at issue herein or on its own motion, may review compliance

with this agreement. If the Commission believes that this agreement or any requirement thereof

has been violated, it may institute a civil action for relief in the United States District Court for

the District of Columbia.

  VIII. This agreement shall become effective as of the date that all parties hereto have

executed same and the Commission has approved the entire agreement.

  IX. Except as otherwise provided, Respondents shall have no more than 30 days from

the date this agreement becomes effective to comply with and implement the requirements

contained in this agreement and to so notify the Commission.

  X. This Conciliation Agreement constitutes the entire agreement between the parties

on the matters raised herein, and no other statement, promise, or agreement, either written or

oral, made by either party or by agents of either party, that is not contained in this written

agreement shall be enforceable.

FOR THE COMMISSION:

Thomasenia P. Duncan
General Counsel

BY: _____     6/10/10
 Ann Marie Terzaken        Date
 Associate General Counsel

MUR 6230
Conciliation Agreement
Page 6 of 6

For Enforcement

FOR THE RESPONDENTS:

_____
Carl Clifton, Current Treasurer
Wynn for Congress

03/12/2010
_____
Date

10044272930

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HOLMES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. No. 14-1243 (RMC) |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 9

# No Party Preference Information

## Voting in Presidential Primary Elections

Each political party has the option of allowing people who register to vote without stating a political party preference ("no party preference" voters - formerly known as "decline-to-state" voters) to vote in their presidential primary election. A political party must notify the Secretary of State's office whether or not they will allow no party preference voters to vote in their presidential primary election 135 days before the election.

If a no party preference voter wishes to vote in the presidential primary election of a political party who has notified the Secretary of State that they will allow no party preference voters to vote in their party's primary, a no party preference voter would simply ask their **county elections office** or ask a poll worker at their polling place for a ballot for that political party. A voter may not request more than one party's ballot.

If a no party preference voter does not request such a ballot, they will be given a nonpartisan ballot, containing only the names of candidates for voter-nominated offices and local nonpartisan offices and measures to be voted upon at that presidential primary election.

## History Behind California's Primary Election System

### Closed Primary System

A "closed" primary system governed California's primary elections until 1996. In a closed primary, only persons who are registered members of a political party may vote the ballot of that political party.

### Open Primary System

The provisions of the "closed" primary system were amended by the adoption of Proposition 198, an initiative statute approved by the voters at the March 26, 1996, Primary Election. Proposition 198 changed the closed primary system to what is known as a "blanket" or "open" primary, in which all registered voters may vote for any candidate, regardless of political affiliation and without a declaration of political faith or allegiance. On June 26, 2000, the United States Supreme Court issued a decision in *California Democratic Party, et. al. v. Jones*, stating that California's "open" primary system, established by Proposition 198, was unconstitutional because it violated a political party's First Amendment right of association. Therefore, the Supreme Court overturned Proposition 198.

### Modified Closed Primary System for Presidential Elections

California's current "modified" closed primary system for Presidential elections was chaptered on September 29, 2000 and took effect on January 1, 2001. Senate Bill 28 (Ch. 898, Stats. 2000) implemented a "modified" closed primary system that permitted voters who had declined to provide a political party preference (formerly known as

3/9/2015                                          Voter Information Guide Voter-Nominated and Nonpartisan Offices Separate pages

Case 1:14-cv-01248-RMC Document 27-1 Filed 03/13/15 Page 72 of 132
USCA Case #15-5120      Document #1568250       Filed: 08/17/2015     Page 142 of 313

"decline to state" voters) to participate in a primary election if authorized by an individual party's rules and duly noticed by the Secretary of State.

## Top Two Candidates Open Primary Act and Voter-Nominated Offices

The Top Two Candidates Open Primary Act, which took effect January 1, 2011, requires that all candidates for a voter-nominated office be listed on the same ballot. Previously known as partisan offices, voter-nominated offices are state legislative offices, U.S. congressional offices, and state constitutional offices. Only the two candidates receiving the most votes—regardless of party preference—move on to the general election regardless of vote totals.

Write-in candidates for voter-nominated offices can only run in the primary election. However, a write-in candidate can only move on to the general election if the candidate is one of the top two vote-getters in the primary election.

Additionally, there is no independent nomination process for a general election. California's new open primary system does not apply to candidates running for U.S. President, county central committee, or local offices.

### Party-Nominated/Partisan Offices

Under the California Constitution, political parties may formally nominate candidates for party-nominated/partisan offices at the primary election. A candidate so nominated will then represent that party as its official candidate for the office in question at the ensuing general election and the ballot will reflect an official designation to that effect. The top votegetter for each party at the primary election is entitled to participate in the general election. Parties also elect officers of official party committees at a partisan primary.

No voter may vote in the primary election of any political party other than the party he or she has disclosed a preference for upon registering to vote. However, a political party may authorize a person who has declined to disclose a party preference to vote in that party's primary election.

### Voter-Nominated Offices

Under the California constitution, political parties are not entitled to formally nominate candidates for voter-nominated offices at the primary election. A candidate nominated for a voter-nominated office at the primary election is the nominee of the people and not the official nominee of any party at the following general election. A candidate for nomination or election to a voter-nominated office shall have his or her party preference, or lack of party preference, reflected on the primary and general election ballot, but the party preference designation is selected solely by the candidate and is shown for the information of the voters only. It does not constitute or imply an endorsement of the candidate by the party designated, or affiliation between the party and candidate, and no candidate nominated by the qualified voters for any voter-nominated office shall be deemed to be the officially nominated candidate of any political party. The parties may list the candidates for voter-nominated offices who have received the official endorsement of the party in the sample ballot.

All voters may vote for any candidate for a voter-nominated office, provided they meet the other qualifications required to vote for that office. The top two votegetters at the primary election advance to the general election for

the voter-nominated office, even if both candidates have specified the same party preference designation. No party is entitled to have a candidate with its party preference designation participate in the general election unless such candidate is one of the two highest votegetters at the primary election.

Nonpartisan Offices

Under the California Constitution, political parties are not entitled to nominate candidates for nonpartisan offices at the primary election, and a candidate nominated for a nonpartisan office at the primary election is not the official nominee of any party for the office in question at the ensuing general election. A candidate for nomination or election to a nonpartisan office may not designate his or her party preference, or lack of party preference, on the primary and general election ballot. The top two votegetters at the primary election advance to the general election for the nonpartisan office.

**History of Political Parties That Have Adopted Party Rules Regarding No Party Preference Voters**

Copyright © 2015    California Secretary of State

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOLMES, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civ. No. 14-1243 (RMC) |
| ) | |
| v. ) | |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant. ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 10

# Statement of Vote

## June 3, 2014, Statewide Direct Primary Election



 **California Secretary of State Debra Bowen**

# Table of Contents

ABOUT THIS STATEMENT OF VOTE ............................................................................ 1

REGISTRATION AND PARTICIPATION

    Voter Registration Statistics by County .................................................................. 2
    Voter Participation Statistics by County .................................................................. 3
    Historical Voter Registration and Participation in Statewide Primary Elections 1914 - 2014 ........ 4

SPECIAL ELECTION RESULTS

    State Senator, 4th District, General Election ........................................................... 6
    State Senator, 32nd District, Primary Election ....................................................... 7
    State Senator, 32nd District, General Election ....................................................... 8
    State Senator, 40th District, Primary Election ........................................................ 9
    State Senator, 16th District, Primary Election ...................................................... 10
    State Senator, 16th District, General Election ...................................................... 11
    State Assemblymember, 80th District, Primary Election ........................................ 12
    State Assemblymember, 52nd District, Primary Election ...................................... 13
    State Assemblymember, 52nd District, General Election ...................................... 14
    State Senator, 26th District, Primary Election ...................................................... 15
    State Assemblymember, 45th District, Primary Election ...................................... 16
    State Assemblymember, 45th District, General Election ...................................... 17
    State Assemblymember, 54th District, Primary Election ...................................... 18
    State Senator, 23rd District, Primary Election ..................................................... 19

VOTE SUMMARIES

    Statement of Vote Summary Pages ....................................................................... 20

VOTING SYSTEMS USED BY COUNTIES ................................................................. 30

THE STATEMENT OF VOTE

    Explanatory Note .................................................................................................... 31
    Certificate of the Secretary of State ....................................................................... 32
    Governor by County ............................................................................................... 33
    Lieutenant Governor by County ............................................................................. 42
    Secretary of State by County ................................................................................. 45
    Controller by County .............................................................................................. 48
    Treasurer by County .............................................................................................. 51
    Attorney General by County ................................................................................... 54
    Insurance Commissioner by County ...................................................................... 57
    Board of Equalization Member by County .............................................................. 60
    United States Representative in Congress by District............................................ 63
    State Senator by District (even-numbered districts only) ...................................... 78
    State Assemblymember by District ........................................................................ 84
    Superintendent of Public Instruction by County.................................................... 104
    State Ballot Measures (Propositions 41 and 42) by County.................................. 107

# ABOUT THIS STATEMENT OF VOTE

The Statement of Vote reports the county-by-county votes cast for each candidate and measure on the ballot. In a statewide contest such as Governor, the vote is reported by all 58 counties and listed in alphabetical order with the statewide total at the bottom.  Candidates are listed in order by party, with the two major parties first (i.e., Democratic, Republican, American Independent, Green, Libertarian, and Peace and Freedom).  Write-in candidates are listed last.  For example:

| | Akinyemi Agbede DEM | Edmund G. "Jerry" Brown DEM | Glenn Champ REP | Tim Donnelly REP | Richard William Aguirre REP | Andrew Blount REP | Neel Kashkari REP |
|---|---|---|---|---|---|---|---|
| **Alameda** | 1,537 | 153,638 | 2,040 | 14,475 | 784 | 3,891 | 11,881 |
| Percent | 0.8% | 76.0% | 1.0% | 7.2% | 0.4% | 1.9% | 5.9% |
| **State Totals** | 37,024 | 2,354,769 | 79,066 | 643,236 | 35,125 | 89,749 | 839,767 |
| Percent | 0.9% | 54.3% | 1.8% | 14.8% | 0.8% | 2.1% | 19.4% |

Legislative and congressional district contests are similarly reported, indicating the counties that comprise the district.  For example:

### 6th Congressional District

| | Doris Matsui* DEM | Joseph McCray Sr. REP |
|---|---|---|
| **Sacramento** | 58,826 | 20,567 |
| **Yolo** | 3,814 | 1,898 |
| **District Totals** | 62,640 | 22,465 |
| Percent | 73.6% | 26.4% |

Ballot measures are reported by county in alphabetical order.  For example:

| | Proposition 41 Veterans Housing & Homeless Bond Act of 2014 | | Proposition 42 Public Records. Open Meetings. Reimbursements. | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| **Alameda** | 140,879 | 57,406 | 126,343 | 63,544 |
| Percent | 71.0% | 29.0% | 66.5% | 33.5% |
| **Alpine** | 301 | 180 | 202 | 192 |
| Percent | 62.6% | 37.4% | 51.3% | 48.7% |
| **State Totals** | 2,708,933 | 1,434,060 | 2,467,357 | 1,522,406 |
| Percent | 65.4% | 34.6% | 61.8% | 38.2% |

1

**United States Representative**

### 49th Congressional District

|  | Noboru Isagawa DEM | Dave Peiser DEM | Darrell Issa* REP | Johnny Moore DEM (W/I) |
|---|---|---|---|---|
| **Orange** | 1,858 | 4,649 | 15,162 | 0 |
| **San Diego** | 7,029 | 21,297 | 41,396 | 16 |
| **District Totals** | 8,887 | 25,946 | 56,558 | 16 |
| Percent | 9.7% | 28.4% | 61.9% | 0.0% |

### 50th Congressional District

|  | James H. Kimber DEM | Duncan Hunter* REP | Michael Benoit LIB |
|---|---|---|---|
| **Riverside** | 1,684 | 4,612 | 322 |
| **San Diego** | 19,868 | 57,759 | 4,312 |
| **District Totals** | 21,552 | 62,371 | 4,634 |
| Percent | 24.3% | 70.4% | 5.2% |

### 51st Congressional District

|  | Juan Vargas* DEM | Stephen Meade REP | Ernest Griffes REP (W/I) |
|---|---|---|---|
| **Imperial** | 10,833 | 5,323 | 109 |
| **San Diego** | 24,979 | 11,080 | 75 |
| **District Totals** | 35,812 | 16,403 | 184 |
| Percent | 68.3% | 31.3% | 0.4% |

### 52nd Congressional District

|  | Scott Peters* DEM | Carl DeMaio REP | Kirk Jorgensen REP | Fred J. Simon Jr. REP |
|---|---|---|---|---|
| **San Diego** | 53,926 | 44,954 | 23,588 | 5,040 |
| **District Totals** | 53,926 | 44,954 | 23,588 | 5,040 |
| Percent | 42.3% | 35.3% | 18.5% | 4.0% |

* Incumbent

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOLMES, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civ. No. 14-1243 (RMC) |
| ) | |
| v. ) | |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant. ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 11

# Statement of Vote

## November 4, 2014, General Election





## California Secretary of State Debra Bowen

# Table of Contents

ABOUT THIS STATEMENT OF VOTE ........................................................................................ 1

REGISTRATION AND PARTICIPATION

    Voter Registration Statistics by County ................................................................... 2
    Voter Participation Statistics by County................................................................... 3
    Historical Voter Registration and Participation in Statewide General Elections 1910 - 2014 .. 4

VOTE SUMMARIES

    Statement of Vote Summary Pages ........................................................................ 6

VOTING SYSTEMS USED BY COUNTIES ............................................................................. 16

THE STATEMENT OF VOTE

    Explanatory Note........................................................................................................ 17
    Certificate of the Secretary of State........................................................................ 18
    Governor by County .................................................................................................. 19
    Lieutenant Governor by County............................................................................... 22
    Secretary of State by County ................................................................................... 25
    Controller by County ................................................................................................. 28
    Treasurer by County ................................................................................................. 31
    Attorney General by County..................................................................................... 34
    Insurance Commissioner by County ........................................................................ 37
    Board of Equalization Member by County ............................................................... 40
    United States Representative in Congress by District............................................. 43
    State Senator by District (even-numbered districts only) ....................................... 58
    State Assemblymember by District .......................................................................... 64
    Superintendent of Public Instruction by County...................................................... 85
    State Ballot Measures (Propositions 1, 2, 45 - 48) by County................................ 88

**ABOUT THIS STATEMENT OF VOTE**

The Statement of Vote reports the county-by-county votes cast for each candidate and measure on the ballot. In a statewide contest such as Governor, the vote is reported by all 58 counties and listed in alphabetical order with the statewide total at the bottom.  Candidates are listed in alphabetical order by party, with the two major parties first (i.e., Democratic, Republican, American Independent, Americans Elect, Green, Libertarian, and Peace and Freedom). For example:



|  | Edmund G. "Jerry" Brown* DEM | Neel Kashkari REP |
|---|---|---|
| Alameda | 293,081 | 63,593 |
| Percent | 82.2% | 17.8% |
| State Totals | 4,388,368 | 2,929,213 |
| Percent | 60.0% | 40.0% |

Legislative and congressional district contests are similarly reported, indicating the counties that comprise the district. For example:

### 6th Congressional District

|  | Doris Matsui* DEM | Joseph McCray Sr. REP |
|---|---|---|
| Sacramento | 90,992 | 33,294 |
| Yolo | 6,016 | 3,154 |
| District Totals | 97,008 | 36,448 |
| Percent | 72.7% | 27.3% |

State ballot measures are reported by county in alphabetical order. For example:

|  | Proposition 1 Funding Water Quality, Supply, Treatment, Storage | | Proposition 2 State Budget Stabilization Account | | Proposition 45 Healthcare Insurance Rate Changes | | Proposition 46 Doctor Drug Testing, Medical Negligence | |
|---|---|---|---|---|---|---|---|---|
|  | Yes | No | Yes | No | Yes | No | Yes | No |
| Alameda | 244,683 | 98,700 | 243,511 | 94,073 | 184,451 | 160,153 | 125,880 | 221,153 |
| Percent | 71.3% | 28.7% | 72.1% | 27.9% | 53.5% | 46.5% | 36.3% | 63.7% |
| State Totals | 4,771,350 | 2,336,676 | 4,831,045 | 2,158,004 | 2,917,882 | 4,184,416 | 2,376,817 | 4,774,364 |
| Percent | 67.1% | 32.9% | 69.1% | 30.9% | 41.1% | 58.9% | 33.2% | 66.8% |

1

## STATEMENT OF VOTE SUMMARY PAGES

| United States Representative District 41 | Votes | Percent | State Senate District 2 | Votes | Percent |
|---|---|---|---|---|---|
| Mark Takano*, DEM | 46,948 | 56.6% | Mike McGuire, DEM | 188,142 | 70% |
| Steve Adams, REP | 35,936 | 43.4% | Lawrence R. Wiesner, REP | 80,778 | 30% |

| United States Representative District 42 | Votes | Percent | State Senate District 4 | Votes | Percent |
|---|---|---|---|---|---|
| Tim Sheridan, DEM | 38,850 | 34.3% | CJ Jawahar, DEM | 79,457 | 36.3% |
| Ken Calvert*, REP | 74,540 | 65.7% | Jim Nielsen*, REP | 139,199 | 63.7% |

| United States Representative District 43 | Votes | Percent | State Senate District 6 | Votes | Percent |
|---|---|---|---|---|---|
| Maxine Waters*, DEM | 69,681 | 71% | Roger Dickinson, DEM | 82,938 | 46.2% |
| John Wood, Jr., REP | 28,521 | 29% | Richard Pan, DEM | 96,688 | 53.8% |

| United States Representative District 44 | Votes | Percent | State Senate District 8 | Votes | Percent |
|---|---|---|---|---|---|
| Janice Hahn*, DEM | 59,670 | 86.7% | Paulina Miranda, DEM | 73,417 | 33.5% |
| Adam Shbeita, PF | 9,192 | 13.3% | Tom Berryhill*, REP | 145,587 | 66.5% |

| United States Representative District 45 | Votes | Percent | State Senate District 10 | Votes | Percent |
|---|---|---|---|---|---|
| Drew E. Leavens, DEM | 56,819 | 34.9% | Bob Wieckowski, DEM | 111,162 | 68% |
| Mimi Walters, REP | 106,083 | 65.1% | Peter Kuo, REP | 52,302 | 32% |

| United States Representative District 46 | Votes | Percent | State Senate District 12 | Votes | Percent |
|---|---|---|---|---|---|
| Loretta Sanchez*, DEM | 49,738 | 59.7% | Shawn K. Bagley, DEM | 49,039 | 39.5% |
| Adam Nick, REP | 33,577 | 40.3% | Anthony Cannella*, REP | 74,988 | 60.5% |

| United States Representative District 47 | Votes | Percent | State Senate District 14 | Votes | Percent |
|---|---|---|---|---|---|
| Alan Lowenthal*, DEM | 69,091 | 56% | Luis Chavez, DEM | 46,035 | 45.9% |
| Andy Whallon, REP | 54,309 | 44% | Andy Vidak*, REP | 54,251 | 54.1% |

| United States Representative District 48 | Votes | Percent | State Senate District 16 | Votes | Percent |
|---|---|---|---|---|---|
| Suzanne Joyce Savary, DEM | 62,713 | 35.9% | Ruth Musser-Lopez, DEM | 45,812 | 27.2% |
| Dana Rohrabacher*, REP | 112,082 | 64.1% | Jean Fuller*, REP | 122,700 | 72.8% |

| United States Representative District 49 | Votes | Percent | State Senate District 18 | Votes | Percent |
|---|---|---|---|---|---|
| Dave Peiser, DEM | 64,981 | 39.8% | Bob Hertzberg, DEM | 79,495 | 70.2% |
| Darrell Issa*, REP | 98,161 | 60.2% | Ricardo Antonio Benitez, REP | 33,794 | 29.8% |

| United States Representative District 50 | Votes | Percent | State Senate District 20 | Votes | Percent |
|---|---|---|---|---|---|
| James H. Kimber, DEM | 45,302 | 28.8% | Connie M. Leyva, DEM | 56,943 | 62.4% |
| Duncan Hunter*, REP | 111,997 | 71.2% | Matthew Munson, REP | 34,256 | 37.6% |

| United States Representative District 51 | Votes | Percent | State Senate District 22 | Votes | Percent |
|---|---|---|---|---|---|
| Juan Vargas*, DEM | 56,373 | 68.8% | Ed Hernandez*, DEM | 63,570 | 64.8% |
| Stephen Meade, REP | 25,577 | 31.2% | Marc Rodriguez, REP | 34,468 | 35.2% |

| United States Representative District 52 | Votes | Percent | State Senate District 24 | Votes | Percent |
|---|---|---|---|---|---|
| Scott Peters*, DEM | 98,826 | 51.6% | Peter Choi, DEM | 29,848 | 34.2% |
| Carl DeMaio, REP | 92,746 | 48.4% | Kevin De Leon*, DEM | 57,412 | 65.8% |

| United States Representative District 53 | Votes | Percent | State Senate District 26 | Votes | Percent |
|---|---|---|---|---|---|
| Susan A. Davis*, DEM | 87,104 | 58.8% | Ben Allen, DEM | 122,901 | 60.3% |
| Larry A. Wilske, REP | 60,940 | 41.2% | Sandra Fluke, DEM | 80,781 | 39.7% |

*Incumbent

8

JA 151

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HOLMES, *et al.*,            )
                             )
            Plaintiffs,      )
                             )        Civ. No. 14-1243 (RMC)
            v.               )
                             )
FEDERAL ELECTION COMMISSION, )
                             )
            Defendant.       )
_____)

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 12

Statewide Results

**RUNOFF - U.S. House of Representatives District 1 Primary** RSS

Last updated 4/5/2013 10:16:57 AM EDT

Results by County

| | | | |
|---|---|---|---|
| Registered Voters: | 453,632 | Counties Completely Reported: | 5 of 5 |
| Ballots Cast: | 46,387 | | |
| Voter Turnout: | 10.23 % | | |

## OFFICIAL RESULTS

# Precinct-level results by county and contest are located under the "Results by County" tab above.

Search Contests
(1 of 1)

Go To Page   [1 ▾]   Contest Per Page   [5 ▾]



**U.S. House of Representatives, District 1 - REP (Vote For 1)**

5 of 5 Counties Reporting

| | | Percent | Votes |
|---|---|---|---|
| Curtis Bostic (REP) | | 43.41% | 20,044 |
| Mark Sanford (REP) | | 56.59% | 26,127 |
| {2} | | | |
| | | | 46,171 |

Powered by - **SOE Software**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HOLMES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. No. 14-1243 (RMC) |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 13

Statewide Results
**Special Election - U.S. House of Representatives District 1** RSS

Last updated 5/10/2013 2:06:08 PM EDT

Results by County

| | | | |
|---|---|---|---|
| Registered Voters: | 455,702 | Counties Completely Reported: | 5 of 5 |
| Ballots Cast: | 144,053 | | |
| Voter Turnout: | 31.61 % | | |

## OFFICIAL RESULTS

# Precinct-level results by county and contest are located under the "Results by County" tab above.

Search Contests
(1 of 1)

| | | |
|---|---|---|
| Go To Page | 1 ▾ | Contest Per Page   5 ▾ |

---

**U.S. House of Representatives, District 1 (Vote For 1)**

5 of 5 Counties Reporting

| | | Percent | Votes |
|---|---|---|---|
| Mark Sanford (REP) | | 54.03% | 77,600 |
| | {2} | | |
| Elizabeth Colbert Busch (DEM) | | 41.87% | 60,146 |
| Elizabeth Colbert Busch (WFM) | | 3.35% | 4,815 |
| Eugene Platt (GRN) | | 0.48% | 690 |
| Write-In (NON) | | 0.27% | 384 |
| | | | 143,635 |

Powered by - **SOE Software**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HOLMES, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | )   Civ. No. 14-1243 (RMC) |
| v. | ) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 14

**Statewide Results**

**2014 Statewide General Election RSS**

Last updated 12/15/2014 2:48:22 PM EST

**Results by County**

| | |
|---|---|
| Registered Voters: | 2,881,052 |
| Ballots Cast: | 1,261,611 |
| Voter Turnout: | 43.79 % |

Counties Partially Reported:  0 of 46
Counties Completely Reported: 46 of 46

## OFFICIAL RESULTS

# Precinct-level results by county and contest are located under the "Results by County" tab above.

Search Contests
(172 of 172)

<< Previous | Next >>

Go To Page  **3** ▼  Contest Per Page  **5** ▼

---

### U.S. Senate (Unexpired Term) (Vote For 1)

46 of 46 Counties Reporting

| | Percent | Votes |
|---|---|---|
| Joyce Dickerson (DEM) | 37.09% | 459,583 |
| Tim Scott (REP) | 61.12% | 757,215 |
| Jill Bossi (AMR) | 1.75% | 21,652 |
| Write-In (NON) | 0.04% | 532 |
| | | 1,238,982 |

{2}

---

### U.S. House of Representatives, District 1 (Vote For 1)

5 of 5 Counties Reporting

| | Percent | Votes |
|---|---|---|
| Mark Sanford (REP) | 93.41% | 119,392 |
| Write-In (NON) | 6.59% | 8,423 |
| | | 127,815 |

{2}

---

### U.S. House of Representatives, District 2 (Vote For 1)

5 of 5 Counties Reporting

| | Percent | Votes |
|---|---|---|
| Phil Black (DEM) | 35.28% | 68,719 |
| Harold Geddings III (LAB) | 2.13% | 4,158 |
| Joe Wilson (REP) | 62.45% | 121,649 |
| Write-In (NON) | 0.14% | 282 |
| | | 194,808 |

{2}

---

### U.S. House of Representatives, District 3 (Vote For 1)

11 of 11 Counties Reporting

| | Percent | Votes |
|---|---|---|

USCA Case #15-5120     Document #1568250     Filed: 08/17/2015     Page 160 of 313

| | | Percent | Votes |
|---|---|---|---|
| Barbara Jo Mullis (DEM) | | 28.77% | 47,181 |
| Jeff Duncan (REP) | | 71.18% | 116,741 |
| Write-In (NON) | | 0.05% | 87 |
| | | | 164,009 |

{2}

**U.S. House of Representatives, District 4 (Vote For 1)**

2 of 2 Counties Reporting

| | | Percent | Votes |
|---|---|---|---|
| Curtis E McLaughlin Jr (LIB) | | 14.74% | 21,969 |
| Trey Gowdy (REP) | | 84.84% | 126,452 |
| WRITE-IN (NON) | | 0.42% | 628 |
| | | | 149,049 |

{2}

<< Previous | Next >>

Powered by - SOE Software

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOLMES, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civ. No. 14-1243 (RMC) |
| ) | |
| v. ) | |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant. ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 15

ABOUT US    LEGISLATORS & STAFF    RESEARCH    MEETINGS & TRAINING    NCSL IN D.C.    BOOKSTORE    BLOG

## STATE PRIMARY ELECTION TYPES

#### 6/24/2014

The manner in which party primary elections are conducted varies widely from state to state. Most primaries can be categorized as either open, closed or top-two. In other states, the primary type does not fall neatly into a category, but may represent a hybrid of these types.

### Open Primaries

Eleven states operate open primaries, which permit any registered voter to cast a vote in a primary, regardless of his or her political affiliation. This means that a Democrat could "cross over" and cast a vote in the Republican primary, or vice versa, and an unaffiliated voter can choose either major party's primary.

Proponents say that this system gives voters maximum flexibility because they can cross party lines. Opponents counter that this system dilutes a political party's ability to nominate its own candidate without interference from non-members.

TABLE OF CONTENTS

Open Primaries

Closed Primaries

Top-Two Primaries

Hybrid Primaries

Recent Changes

Additional Resources

**CONTACT**

NCSL Elections Team, 303-384-7700

NAVIGATE

Home

About State Legislatures

Agriculture and Rural Development

Civil and Criminal Justice

Education

Elections and Campaigns
- Campaign Finance
- Election Administration
- Initiative and Referendum
- StateVote Election Results and Analysis

Energy

Environment and Natural Resources

Ethics

Financial Services and Commerce

Fiscal Policy

Health

Human Services

Immigration

International

Labor and Employment

Military and Veterans Affairs

Redistricting

State-Tribal Institute

Telecommunications and Information Technology

Transportation

#### OPEN PRIMARY STATES

| States | | |
|---|---|---|
| Alabama | Michigan | North Dakota |
| Arkansas | Minnesota | Vermont |
| Georgia | Missouri | Wisconsin |
| Hawaii | Montana | |

### Closed Primaries

Eleven states operate closed primary elections or caucuses. In either case, only voters who are registered as members of a political party prior to the primary date may participate in the nomination process for its candidates.

Proponents say that closed systems contribute to a strong party organization. Opponents note that Independent or unaffiliated voters are excluded from the process.

#### CLOSED PRIMARY STATES

| States | | |
|---|---|---|
| Delaware | Maine | New York |
| Florida | Nevada | Pennsylvania |
| Kansas | New Jersey | Wyoming |
| Kentucky | New Mexico | |

### Top-Two Primaries

In top-two primaries all candidates, regardless of party affiliation, are listed on one ballot. Voters choose their favorite candidate, and the top two vote-getters become the candidates in the general election. The top-two model is not used for presidential primaries in any state. In Nebraska, it is used only for the state's nonpartisan legislature and for some statewide races. In California, Louisiana and Washington, the top-two primary is used for state and Congressional races.

Proponents say that top-two primaries give Independent voters an equal voice and may help elect more moderate candidates from the major parties. Opponents argue that it can reduce ballot access for third party candidates and lessen voter choice in that two Democrats or two Republicans could be the only candidates in the general election.

#### TOP-TWO PRIMARY STATES

**States**

Share this:

We are the nation's most respected bipartisan organization providing states support, ideas, connections and a strong voice on Capitol Hill.

| California | Nebraska (for nonpartisan legislative races only) |
|------------|---------------------------------------------------|
| Louisiana | Washington |

## Hybrid

Many states use primary election systems that fall somewhere in between "open" and "closed." Procedures are unique from state to state, and how to categorize these primaries is a judgment call. Some states allow voters to cross party lines to vote. Depending on the state, choosing a ballot may actually be a form of registration in the party. States in this category also vary according to how they treat unaffiliated voters. They may or may not be permitted to vote in party primaries. In some states, such as Alaska, political parties may decide for themselves whether to permit voters who are unaffiliated or are members of another party to participate in their primary. The parties may not necessarily all choose the same approach in a given state. For instance, in 2008 and 2010, the Alaska Democratic party allowed any registered voter, regardless of party affiliation, to participate in its primary, while the Republican party limited participation in its primary to its own members.

### HYBRID PRIMARY STATES

**States**

| Alaska | Maryland | Rhode Island |
|--------|----------|--------------|
| Arizona | Massachusetts | South Carolina |
| Colorado | Mississippi | South Dakota |
| Connecticut | New Hampshire | Tennessee |
| Idaho | North Carolina | Texas |
| Illinois | Ohio | Utah |
| Indiana | Oklahoma | Virginia |
| Iowa | Oregon | West Virginia |

## Recent Changes

In 2011, Idaho did away with its open primary. Before 2011, Idaho did not have party registration, and each voter could choose which party's primary to vote in. In 2012, voters will be required to declare a party affiliation in order to receive that party's ballot in the primary election. Voters who choose to remain unaffiliated will be offered a primary ballot with only non-partisan races. Parties may choose whether to allow unaffiliated voters and members of other parties to participate in future primary elections, and a voter's choice to do so will affiliate the voter with that party.

## Additional Resources

Article from NCSL's elections newsletter, *The Canvass: A Primer on Primaries*

NCSL Member Toolbox

Members Resources

Get Involved With NCSL
Jobs Clearinghouse
Legislative Careers
NCSL Staff Directories
Staff Directories
StateConnect Directory

Policy & Research Resources

Bill Information Service
Legislative Websites
NCSL Bookstore
State Legislatures Magazine

Meeting Resources

Calendar
Online Registration

Press Room

Media Contact
NCSL in the News
Press Releases

Denver

7700 East First Place
Denver, CO 80230
Tel: 303-364-7700 | Fax: 303-364-7800

Washington

444 North Capitol Street, N.W., Suite 515
Washington, D.C. 20001
Tel: 202-624-5400 | Fax: 202-737-1069



Copyright 2015 by National Conference of State Legislatures    Website Feedback    Go 20112 [Go]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOLMES, *et al.*,                    ) | |
|            ) | |
|        Plaintiffs,      ) | Civ. No. 14-1243 (RMC) |
|        ) | |
|        v.                        ) | |
|        ) | |
| FEDERAL ELECTION COMMISSION,  ) | |
|        ) | |
|        Defendant.    ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 16

LIVE

**News**    **Markets**    **Insights**

**Video**

Sign in with Facebook Or use your Businessweek account

Email

Password   Forgot password?        ☐ Remember me   Sign In

Already a Bloomberg.com user?

Sign in with the same account.

Don't have an account? Sign up.

Help! I can't access my account.

# The Ins and Outs of Write-Ins

November 01, 2004

By Burt Helm Couldn't make up your mind for John Kerry or George Bush? Ralph Nader not your bag? Then the only way you can pick the candidate you want is to write him or her in. Many states make such an effort for Presidential races difficult -- and six states ban White House write-in votes altogether.

Regardless of which state you live in, voting for a write-in contender is much more complicated than scribbling whatever name you please on the dotted line at the bottom of the ballot. Thirty-five states require that a write-in candidate must submit some form of affidavit and, sometimes, a filing fee at least one month before the election. In North Carolina, these candidates must circulate a petition. Then their names are posted on a list at the polling place, though not on the official ballot. All other write-in votes are tossed.

DESIGN TROUBLE. For third-party candidates who want to demonstrate that their platform has won some support, the widely varying registration rules create problems. And nobody has had a tougher time than Nader. The Presidential hopeful, who initially planned to be on the ballot in all 50 states, has ended up on only 35 and has relied on write-in

Nader ran into trouble with the write-in regulations in Ohio, where he was kicked off the official ballot after the write-in submission deadline. That means any Ohio votes for him will be thrown away. "They basically screwed us," says Kevin Zeese, a Nader spokesperson.

Once an office-seeker is registered as a write-in, their voters will run into more trouble. States with punch-style "chad" ballots, usually don't provide a space for such candidate, but instead require that votes be written inside the secrecy envelope. The punch-style Illinois absentee ballot comes folded over a Styrofoam block, and the write-in space is on the foam side, hidden from view. That can confuse voters, third-party advocates argue.

CONSTANT CANDIDATE. Some write-in contenders just don't care. Deborah Elaine Allen of Houston is a registered write-in candidate in Texas, where registration is free and requires only the signatures of people willing to represent her in the electoral college. What's her platform? "There's no policy. I just walked right around the neighborhood and got 34 [signatures]," she says. Allen says she has run for office since 1981 and has been a write-in candidate for city councillor, county commissioner, and judge.

In most states, registered write-in candidates like Nader and Allen at least get the joy of seeing their piddling results the next day. But in Oregon, the computerized tabulation system won't calculate any specific write-in results unless it appears the contender has enough support to win.

And five states -- Hawaii, Nevada, South Dakota, Oklahoma, and South Carolina -- don't allow any Presidential write-ins, and never have. Louisiana, the sixth no-write-in state, got rid of them in 1975 after it adopted a system in which anyone could get on the regular ballot, regardless of party affiliation. "The Supreme Court upheld Louisiana's ban on write-ins in 1992" says Richard Winger, of Ballot Access News, a San Francisco-based group that works to make ballots nonpartisan.

However, despite the legal precedent, "we've actually expanded write-ins in many states," Winger says. More states than ever allow write-ins for federal elections, and as voting becomes fully electronic, "the write-in voter has the fun of using a computer keyboard, making it look official" and easy to tabulate.

THURMOND'S OPENING. But don't write off the write-in as simply the domain of fringe and hobbyist politicians or jokesters who vote for cartoon characters and sports stars. According to Winger, write-in votes serve an important purpose when a shock late in the election occurs -- like the death or indictment of a candidate. Then parties will scramble to field someone else.

In the last 100 years, write-in contenders have won at least seven U.S. congressional races. The most famous one is probably Strom Thurmond, who won by write-in in 1954 after the well-entrenched incumbent suddenly passed away.

In a tense Presidential election, write-in votes get in the way more than anything. Polling places are prepared, though. In states where voters fill in bubbles or complete arrows with a pencil, optical scanning machines are preprogrammed to automatically "kick out" write-ins from the computer's running tabulation, says Joe Kanefield, Arizona's election director. The machine then literally spits the write-in ballots into a pile on the floor. County representatives sort through the pile later.

NO JOKE. Unregistered write-ins have to be thrown out manually. "My friends used to write me in for county attorney, and I used to think it was funny," says Kanefield, letting his chuckle stop short. "[That was] until I got into the election administration. It takes time to process those."

The person who has to sort your vote for Boston Red Sox center fielder Johnny Damon from the pile will undoubtedly find it less amusing than you do. Helm is a reporter for BusinessWeek Online in New York

Video: Anglo Sees $3.9B of Commodity-Driven Write Downs
Video: Write Off A-Rod and Greece: Gamco's Ward

## From The Web

Sponsored Links by Taboola



**San Antonio Transformation Is Ahead of Schedule**
San Antonio Visitors Bureau



**Guess Who's About To Go Bankrupt in America**
The Crux for Stansberry Research



**Ex-Microsoft exec is disrupting the traditional broker...**
Yahoo! Finance | Motif Investing



**7 Credit Cards You Should Not Ignore If You Have Excellen...**
NextAdvisor



**Software Is Eating Personal Investing**
TechCrunch | Wealthfront



**Why the 30 Year Mortgage Is a Flat Out "Scam"...**
Bills.com



**3 Forms Of ADHD: Does Your Child Struggle From One?**
WebMD



**Why You Should Color Your Gray at Home**
eSalon

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HOLMES, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |

Civ. No. 14-1243 (RMC)

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 17

# Top 2 Primary

Washington is the first state in the country to establish a Top 2 Primary election system, rather than a party nominating system. A Top 2 Primary narrows the number of candidates to two. The two candidates who receive the most votes in the Primary advance to the General Election, regardless of their party preference.

## Candidates

Each candidate for partisan office may state a political party that he or she prefers. A candidate's party preference does not imply that the candidate is nominated or endorsed by the party, or that the party approves of or associates with that candidate.

## Voters

In each race, you may vote for any candidate listed on the ballot. The two candidates who receive the most votes in the Primary advance to the General Election, regardless of their party preference.  Washington voters do not declare party affiliation as part of voter registration.

## Political parties

Political parties do not have a guaranteed spot on the General Election ballot. The two candidates who advance to the General Election may prefer the same party, different parties, or not state a party preference. Parties are free to conduct their nominating procedures according to their own rules, at their own conventions, caucuses or meetings. This frees parties to develop their own criteria for nominations, endorsements, and other public declarations of support.

For more information see History of Washington State Primary Systems and Top 2 Litigation.

JA 167

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HOLMES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 14-1243 (RMC) |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 18

# Louisiana Secretary of State

## Official Election Results
## Results for Election Date: 11/4/2014

| U. S. Senator | | |
|---|---|---|
| **All 4018 precincts reporting** | | |
| [Click here for Results by Parish](#) | | |
| Wayne Ables (D) | 0.77% | 11323 |
| "Bill" Cassidy (R) | 40.97% | 603048 |
| Thomas Clements (R) | 0.96% | 14173 |
| Mary L. Landrieu (D) | 42.08% | 619402 |
| "Rob" Maness (R) | 13.76% | 202556 |
| Brannon Lee McMorris (L) | 0.89% | 13034 |
| Vallian Senegal (D) | 0.26% | 3835 |
| William P. Waymire, Jr. (D) | 0.32% | 4673 |

| U. S. Representative -- 1st Congressional District | | |
|---|---|---|
| **All 552 precincts reporting** | | |
| [Click here for Results by Parish](#) | | |
| Lee A. Dugas (D) | 8.72% | 21286 |
| M. V. "Vinny" Mendoza (D) | 10.15% | 24761 |
| Jeffry "Jeff" Sanford (L) | 3.57% | 8707 |
| Steve Scalise (R) | 77.56% | 189250 |

| U. S. Representative -- 2nd Congressional District | | |
|---|---|---|
| **All 682 precincts reporting** | | |
| [Click here for Results by Parish](#) | | |
| David Brooks (N) | 7.37% | 16327 |
| Samuel Davenport (L) | 6.88% | 15237 |
| Gary Landrieu (D) | 17.06% | 37805 |
| Cedric Richmond (D) | 68.69% | 152201 |

| U. S. Representative -- 3rd Congressional District | | |
|---|---|---|
| **All 597 precincts reporting** | | |
| [Click here for Results by Parish](#) | | |
| Bryan Barrilleaux (R) | 9.34% | 22059 |
| Charles W. Boustany, Jr. (R) | 78.67% | 185867 |
| Russell Richard (N) | 12.00% | 28342 |

| U. S. Representative -- 4th Congressional District |
|---|

Click here for Results by Parish

| John Fleming (R) | 73.43% | 152683 |
|---|---|---|
| Randall Lord (L) | 26.57% | 55236 |

# U. S. Representative -- 5th Congressional District

**All 845 precincts reporting**

Click here for Results by Parish

| Ralph Lee Abraham (R) | 23.16% | 55489 |
|---|---|---|
| Eliot S. Barron (G) | 0.69% | 1655 |
| Harris Brown (R) | 4.13% | 9890 |
| "Zach" Dasher (R) | 22.39% | 53628 |
| Clyde C. Holloway (R) | 7.46% | 17877 |
| "Jamie" Mayo (D) | 28.22% | 67611 |
| Vance M. McAllister (R) | 11.11% | 26606 |
| Charles Saucier (L) | 0.92% | 2201 |
| "Ed" Tarpley (R) | 1.92% | 4594 |

# U. S. Representative -- 6th Congressional District

**All 575 precincts reporting**

Click here for Results by Parish

| Robert Lamar "Bob" Bell (R) | 2.00% | 5182 |
|---|---|---|
| "Dan" Claitor (R) | 10.26% | 26524 |
| Norman "Norm" Clark (R) | 0.71% | 1848 |
| Rufus Holt Craig, Jr. (L) | 1.38% | 3561 |
| Paul Dietzel II (R) | 13.55% | 35024 |
| Edwin Edwards (D) | 30.12% | 77866 |
| Garret Graves (R) | 27.36% | 70715 |
| Richard Lieberman (D) | 2.83% | 7309 |
| Craig McCulloch (R) | 2.25% | 5815 |
| "Trey" Thomas (R) | 0.56% | 1447 |
| Lenar Whitney (R) | 7.41% | 19151 |
| Peter Williams (D) | 1.56% | 4037 |

Back to Election Date Selection Page | Back to 11/4/2014 Main Page

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOLMES, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civ. No. 14-1243 (RMC) |
| ) | |
| v. ) | |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant. ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 19

USCA Case #15-5120        Document #1568250        Filed: 08/17/2015        Page 174 of 313

# Louisiana Secretary of State

## Official Election Results
## Results for Election Date: 12/6/2014

| U. S. Senator | | |
|---|---|---|
| **All 4018 precincts reporting** | | |
| Click here for Results by Parish | | |
| "Bill" Cassidy (R) | 55.93% | 712379 |
| Mary L. Landrieu (D) | 44.07% | 561210 |

| U. S. Representative -- 5th Congressional District | | |
|---|---|---|
| **All 845 precincts reporting** | | |
| Click here for Results by Parish | | |
| Ralph Lee Abraham (R) | 64.22% | 134616 |
| "Jamie" Mayo (D) | 35.78% | 75006 |

| U. S. Representative -- 6th Congressional District | | |
|---|---|---|
| **All 575 precincts reporting** | | |
| Click here for Results by Parish | | |
| Edwin Edwards (D) | 37.57% | 83781 |
| Garret Graves (R) | 62.43% | 139209 |

Back to Election Date Selection Page | Back to 12/6/2014 Main Page

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOLMES, *et al.*, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>FEDERAL ELECTION COMMISSION, )<br>)<br>Defendant. )<br>) | Civ. No. 14-1243 (RMC) |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 20

**State of Iowa Winner List**
**2014 General Election**

| Race | Winner | Race | Winner |
|------|--------|------|--------|
| U.S. Senator | Joni Ernst, Republican Party | State Senator Dist. 23 | Herman C. Quirmbach, Democratic Party |
| U.S. Rep. Dist. 1 | Rod Blum, Republican Party | State Senator Dist. 25 | Bill Dix, Republican Party |
| U.S. Rep. Dist. 2 | Dave Loebsack, Democratic Party | State Senator Dist. 27 | Amanda Ragan, Democratic Party |
| U.S. Rep. Dist. 3 | David Young, Republican Party | State Senator Dist. 29 | Tod R. Bowman, Democratic Party |
| U.S. Rep. Dist. 4 | Steve King, Republican Party | State Senator Dist. 31 | Bill Dotzler, Democratic Party |
| Governor/ Lt. Governor | Terry E. Branstad/ Kim Reynolds, Republican Party | State Senator Dist. 33 | Robert M. Hogg, Democratic Party |
| Secretary of State | Paul D. Pate, Republican Party | State Senator Dist. 35 | Wally E. Horn, Democratic Party |
| Auditor of State | Mary Mosiman, Republican Party | State Senator Dist. 37 | Robert E. Dvorsky, Democratic Party |
| Treasurer of State | Michael L. Fitzgerald, Democratic Party | State Senator Dist. 39 | Kevin Kinney, Democratic Party |
| Secretary of Agriculture | Bill Northey, Republican Party | State Senator Dist. 41 | Mark Chelgren, Republican Party |
| Attorney General | Tom Miller, Democratic Party | State Senator Dist. 43 | Joe Bolkcom, Democratic Party |
| State Senator Dist. 1 | David Johnson, Republican Party | State Senator Dist. 45 | Joe M. Seng, Democratic Party |
| State Senator Dist. 3 | Bill Anderson, Republican Party | State Senator Dist. 47 | Roby Smith, Republican Party |
| State Senator Dist. 5 | Tim Kraayenbrink, Republican Party | State Senator Dist. 49 | Rita Hart, Democratic Party |
| State Senator Dist. 7 | Rick Bertrand, Republican Party | State Rep. Dist. 1 | John H. Wills, Republican Party |
| State Senator Dist. 9 | Jason Schultz, Republican Party | State Rep. Dist. 2 | Megan Hess, Republican Party |
| State Senator Dist. 11 | Tom Shipley, Republican Party | State Rep. Dist. 3 | Dan Huseman, Republican Party |
| State Senator Dist. 13 | Julian B. Garrett, Republican Party | State Rep. Dist. 4 | Dwayne Alons, Republican Party |
| State Senator Dist. 15 | Chaz Allen, Democratic Party | State Rep. Dist. 5 | Chuck Soderberg, Republican Party |
| State Senator Dist. 17 | Tony Bisignano, Democratic Party | State Rep. Dist. 6 | Ron Jorgensen, Republican Party |
| State Senator Dist. 19 | Jack Whitver, Republican Party | State Rep. Dist. 7 | Tedd Gassman, Republican Party |
| State Senator Dist. 21 | Matt McCoy, Democratic Party | State Rep. Dist. 8 | Terry Baxter, Republican Party |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ———————————————— )<br>HOLMES, *et al.*,                              )<br>                                                   )<br>               Plaintiffs,                    )<br>                                                   )<br>          v.                                        )<br>                                                   )<br>FEDERAL ELECTION COMMISSION,   )<br>                                                   )<br>               Defendant.                     )<br>———————————————— ) | Civ. No. 14-1243 (RMC) |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 21

State of Iowa Winner List
2014 Primary Election

| Race | Winner |
|------|--------|
| U.S. Senator - Rep | Joni Ernst |
| U.S. Senator - Dem | Bruce Braley |
| U.S. Rep. Dist. 1 - Rep | Rod Blum |
| U.S. Rep. Dist. 1 - Dem | Pat Murphy |
| U.S. Rep. Dist. 2 - Rep | Mariannette Miller-Meeks |
| U.S. Rep. Dist. 2 - Dem | Dave Loebsack |
| U.S. Rep. Dist. 3 - Dem | Staci Appel |
| U.S. Rep. Dist. 4 - Rep | Steve King |
| U.S. Rep. Dist. 4 - Dem | Jim Mowrer |
| Governor - Rep | Terry E. Branstad |
| Governor - Dem | Jack Hatch |
| Secretary of State - Rep | Paul D. Pate |
| Secretary of State - Dem | Brad Anderson |
| Auditor of State - Rep | Mary Mosiman |
| Auditor of State - Dem | Jonathan Neiderbach |
| Treasurer of State - Dem | Michael L. Fitzgerald |
| Secretary of Agriculture - Rep | Bill Northey |
| Secretary of Agriculture - Dem | Sherrie Taha |
| Attorney General - Dem | Tom Miller |
| State Senator Dist. 1 - Rep | David Johnson |
| State Senator Dist. 3 - Rep | Bill Anderson |
| State Senator Dist. 5 - Rep | Tim Kraayenbrink |
| State Senator Dist. 5 - Dem | Daryl Beall |
| State Senator Dist. 7 - Rep | Rick Bertrand |
| State Senator Dist. 7 - Dem | Jim France |
| State Senator Dist. 9 - Rep | Jason Schultz |
| State Senator Dist. 11 - Rep | Tom Shipley |
| State Senator Dist. 13 - Rep | Julian B. Garrett |
| State Senator Dist. 13 - Dem | Pam Deichmann |
| State Senator Dist. 15 - Rep | Crystal Bruntz |
| State Senator Dist. 15 - Dem | Chaz Allen |
| State Senator Dist. 17 - Dem | Tony Bisignano |
| State Senator Dist. 19 - Rep | Jack Whitver |
| State Senator Dist. 21 - Dem | Matt McCoy |
| State Senator Dist. 23 - Rep | Jeremy Davis |
| State Senator Dist. 23 - Dem | Herman C. Quirmbach |
| State Senator Dist. 25 - Rep | Bill Dix |
| State Senator Dist. 27 - Rep | Shawn Dietz |
| State Senator Dist. 27 - Dem | Amanda Ragan |
| State Senator Dist. 29 - Rep | James R. Budde |
| State Senator Dist. 29 - Dem | Tod R. Bowman |
| State Senator Dist. 31 - Dem | Bill Dotzler |

JA 176

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOLMES, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civ. No. 14-1243 (RMC) |
| ) | |
| v. ) | |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant. ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 22

# David Young wins 3rd District GOP nomination in stunning upset

David Young addresses Republican delegates who nominated him to face Staci Appel in the contest for Iowa's 3rd Congressional District seat.

 **William Petroski**, bpetrosk@dmreg.com   *8:21 p.m. CDT June 21, 2014*



*(Photo: Special to the Register)*

David Young, a former chief of staff to U.S. Sen. Chuck Grassley, won a stunning upset victory Saturday to capture the Iowa Republican Party's nomination in what is expected to be a nationally watched race to succeed U.S. Rep. Tom Latham.

Young's win came on the fifth ballot at a convention of 3rd Congressional District delegates at Des Moines Christian School in Urbandale. The day had begun with six candidates vying for the nomination, but the final ballot came down to a decision between Young and state Sen. Brad Zaun of Urbandale.

Zaun had led on the first four ballots and had been in first place in a June 3 primary among six candidates, but he couldn't get enough votes from rural county delegates to secure the nomination. As the balloting proceeded and other candidates dropped out, Young's candidacy gained in strength.

"I am trusted, tried and true in my conservative thought," Young said. "I am asking for your vote."

The final ballot had Young with 276 delegate votes, or 55.5 percent, to Zaun's 221 votes, or 45.5 percent

Young will be opposed on the November general election ballot by former state Sen. Staci Appel of Ackworth, the Democratic party's nominee

Saturday's decision marks the end of a lengthy battle among the six Republican candidates, who had been vying for the party's nomination since Latham stunned fellow Republicans by announcing in December he wouldn't seek reelection and would leave after 20 years in Congress.

The convention was required under Iowa law after no candidate managed to win 35 percent of the vote in a district-wide primary on June 3.

Joe Grandanette , a physical education teacher from Des Moines was the first of six candidates dropped from the ballot because of a low vote count, while Robert Cramer, a bridge construction executive from Grimes, pulled out after the second ballot after it became clear he couldn't win.

USCA Case #15-5120      Document #1568250          Filed: 08/17/2015      Page 181 of 313

Secretary of State Matt Schultze of Turo was dropped after the third ballot and threw his support to Young, and Monte Shaw, a renewable fuels executive from West Des Moines, was dropped after the fourth ballot.

The race is a priority for their national parties as Republicans seek to maintain their majority in the U.S. House of Representatives and as Democrats try to regain control. The 3rd District is considered a swing district with Republicans representing 34 percent of registered voters, Democrats representing 33 percent, and 33 percent citing no party.

The Rothenberg Political Report and the Cook Political Report – which monitor congressional races nationwide - both rate the Iowa 3rd District contest as a toss-up.

Democrats contend they have an advantage – at least financially – as the head-to-head matchup begins in earnest.

In reports filed on June 1 with the Federal Election Commission, none of the six Republicans who sought their party's nomination had more than $63,000 in cash , while Appel in mid-May reported $466,000 in cash and no debts.

Democrats will contend the Republican nominee has been pushed too far to the right to win the support of GOP activists. All of the Republican candidates have taken stances in support of gun rights, opposing legalized abortion and same-sex marriage, and for cutting taxes and federal spending.

Meanwhile, Republicans are already calling Appel , a supporter of abortion rights and same-sex marriage, an "ultra-liberal" who loves to spend taxpayer money and raise taxes.

Latham's announcement last December that he planned to leave Congress at the end of his term touched off a scramble within the Iowa GOP to succeed him that has left some analysts wondering if the party will be able to heal its divisions by the fall campaign. However, Republican leaders say they are optimistic about their chances up and down their ticket this fall and believe party unity will be maintained.

Meanwhile, Appel, who was defeated in 2010 after one term in the Iowa Senate, has been running for Congress since last July after initially wavering back and forth on the idea. Several other Democrats were mentioned as possible candidates– including state Sen. Matt McCoy of Des Moines and former Iowa First Lady Christie Vilsack - but none decided to enter the race. Her campaign has been endorsed by Emily's List, which works to get pro-choice Democratic women elected to office. Her supporters note that no woman has ever been elected to Congress from Iowa.

Outgoing Congressman Latham had remained neutral during the GOP's nominating contest. Latham had moved from Ames to Clive for the 2012 election, defeating Democratic Rep. Leonard Boswell after Iowa's delegation in the U.S. House shrunk from five to four members following redistricting forced by the 2010 census.

The last time Iowa Republicans had a nominating convention to select a candidate for Congress was in 2002, when Steve King, a Republican from northwest Iowa, won his party's nomination. He has since been elected to Congress six times and is currently representing Iowa's 4th District.

Read or Share this story: http://dmreg.co/1iviRza

**MORE STORIES**

**RAGBRAI full route: City to village to countryside (/story/life/living-**



(/story/life/living-
well/ragbrai/2015/03/07/ragbrai-
full-route-
preview-pass-
towns/24436119/)
**well/ragbrai/2015/03/07/ragbrai-full-route-
preview-pass-towns/24436119/)**
March 7, 2015, 10:15 p.m.



**100 photos: Register photo
booth at Kidsfest, Friday
(/picture-**

(/picture-
gallery/news/local/2015/03/10/100-
photos-register-
photo-booth-at-
kidsfest-
friday/24554275/)
**gallery/news/local/2015/03/10/100-photos-
register-photo-booth-at-kidsfest-
friday/24554275/)**
March 10, 2015, 2:01 p.m.

**Demand for meat threatens
Iowa's wild turtles
(/story/life/2015/03/09/iowa-
turtles-overharvest/24672843/)**
March 9, 2015, 7:07 a.m.

(/story/life/2015/03/09/iowa-
turtles-
overharvest/24672843/)

## Mytheresa - Luxury Online

mytheresa.com/Designer_Fashion

New Feminine & Sophisticate Styles. Top Designers - Shop S/S 2015!

JA 180

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HOLMES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. No. 14-1243 (RMC) |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 23



## The New York Times

http://nyti.ms/16SGWbT

U.S.

# Looking Past Sex Scandal, South Carolina Returns Ex-Governor to Congress

By **KIM SEVERSON**    MAY 7, 2013

MOUNT PLEASANT, S.C. — As political rehabilitations go, few can match what happened to Mark Sanford on Tuesday night.

Mr. Sanford, the former South Carolina governor once so tarnished by a spectacular lie about an affair that few expected him to recover, is now headed to Congress.

About 55 percent of voters in South Carolina's First Congressional District forgave the man who turned "hiking the Appalachian Trail" into a euphemism for infidelity, giving him a nearly 10-percentage-point win over his Democratic opponent, Elizabeth Colbert Busch.

In his victory speech, Mr. Sanford promised to be a "messenger to Washington, D.C." Then, after introducing one of his sons and his fiancée, Mariá Belén Chapur, who had just flown in from Argentina, he spoke of the redemption he had found on the campaign trail.

"I am an imperfect man saved by God's grace," he said.

For voters, his hawkish views on federal spending, his experience and his promise to fight President Obama outweighed any personal transgressions.

"He took a couple of years to reflect, and now he just wants to get back to work," said Tom Lewis, 47, a Sanford voter who considers himself a libertarian. "They've just got to reel it in in Washington."

Still, even until the last moments of voting, it appeared that Ms. Colbert Busch, a political neophyte, stood a solid chance of becoming the first Democrat this conservative coastal district would send to the House in more

than 30 years.

Not only did she have nearly $1 million in financing from the national Democratic Party and fund-raisers hosted by her famous brother, the comedian Stephen Colbert, but she also had the support of women who might have otherwise voted Republican.

"I'm still not sure I know exactly what she believes in, but integrity matters more than anything to me," said Suzanne McCord, 53, a conservative who had never before voted for a Democrat but found Mr. Sanford's behavior too distasteful to forgive with her vote.

In the end, however, government spending beat out a messy personal life.

"I've got a lot of problems with Sanford, believe me," said Jennifer Kavanagh, 42, a real estate agent. "I'd have preferred to have another Republican, but I just don't agree with the way Democrats are spending."

The race, soaked in personal drama that many have found similar to — and even more engaging than — reality television, received enormous media attention.

In 2009, Mr. Sanford had appeared to commit professional suicide by covering up a trip to Argentina to pursue the woman he would later call his soul mate with a story about hiking the Appalachian Trail.

His wife, Jenny Sanford, divorced him, and he faced impeachment before limping through the end of his term in 2011.

Mr. Sanford's political comeback could have been crafted only by a veteran, as Mr. Sanford is. He has never lost an election, and from 1995 to 2001, he held the House seat he just won, back then riding a wave of Republican power led by Newt Gingrich and articulated by the party's Contract With America.

The seat opened up in December when Gov. Nikki R. Haley appointed Representative Tim Scott, a favorite of the Tea Party, to replace Jim DeMint in the Senate. Mr. DeMint had stepped down to run the Heritage Foundation.

Mr. Sanford, who will have to run again in 2014 to keep the seat, easily

USCA Case #15-5120      Document #1568250      Filed: 08/17/2015      Page 186 of 313

won in a crowded primary field in March. Still, it was never clear that he could overcome his transgressions, even though the district is populated with country club Republicans and more conservative Tea Party voters.

And then there was his opponent, a sympathetic woman roughly the age of Jenny Sanford with a famous brother, a compelling personal story as a single mother and a long track record as an executive in the maritime industry.

She was popular among the more centrist residents of Charleston County, which had supported President Obama twice but handed the victory to Mr. Sanford by less than two percentage points.

"We gave it a heck of a fight," she said in her concession speech.

Throughout the campaign, she tried to invoke the word "trust" with regularity, but remained vague on issues and scant on public appearances that were not heavily orchestrated.

In April, leaked court documents revealed that Mr. Sanford's ex-wife claimed that he had been in her house watching the Super Bowl with one of their sons in violation of the divorce agreement. (The two will head back to court on Thursday to resolve the issue.)

The National Republican Congressional Committee pulled its support of Mr. Sanford while national Democratic organizations poured money into Ms. Colbert Busch's campaign.

On Sunday, Ms. Colbert Busch received a key endorsement from The Post and Courier of Charleston, the largest newspaper in the area. Several Republican women stepped firmly into her camp, including members of Congress.

But Mr. Sanford turned the race into a battle against Washington Democratic power brokers, especially the former House speaker Nancy Pelosi.

Tuesday's vote proved that his approach worked.

Mr. Sanford received support from local Republicans, including Governor Haley, although some of it was tepid. Senator Lindsey Graham, a fellow Republican, had been more vocal, portraying the race as a statement

against President Obama.

Mr. Sanford received, but declined, an endorsement and the offer of financial support from Larry Flynt, the pornography advocate, who called Mr. Sanford "America's great sex pioneer."

But in the end, people here cared less about sex and more about government spending.

"We are not trying to elect the 'how is your conscience' candidate," said Charm Altman, president of the South Carolina Federation of Republican Women. "We are trying to elect someone who can govern."

Brad Mallett, 45, a local coffee roaster who was at Mr. Sanford's packed victory party, put it more simply: "Everyone deserves a second chance."

A version of this article appears in print on May 8, 2013, on page A14 of the New York edition with the headline: Looking Past Sex Scandal, South Carolina Returns Ex-Governor to Congress.

© 2015 The New York Times Company

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HOLMES, *et al.*,              ) | |
|               ) | |
|      Plaintiffs,      ) | Civ. No. 14-1243 (RMC) |
|               ) | |
|      v.            ) | |
|               ) | |
| FEDERAL ELECTION COMMISSION,  ) | |
|               ) | |
|      Defendant.     ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 24

USCA Case #15-5120   Document #1568250   Filed: 08/17/2015   Page 189 of 313



Promoted Links by Taboola








**GOP dissenters: Iran letter could backfire** | **The Outsider** | **Excited for Jeb and Hillary? Just Wait for** | **Clinton to address email controversy** | **Fostering a bold culture** | **10 Things No One Ever Told You That Happened**

# Thad Cochran, Chris McDaniel barrel toward runoff




By **ALEXANDER BURNS** | 6/3/14 6:00 PM EDT Updated: 6/4/14 4:57 PM EDT

Mississippi Sen. Thad Cochran appeared to fall short of claiming the GOP nomination for a seventh term Tuesday, sending the longtime incumbent and his tea party challenger stumbling into a costly runoff election and scrambling the general election landscape in one of the nation's most conservative states.

Already a savagely personal race, the duel between Cochran and activist state Sen. Chris McDaniel could now drag on until the next vote on June 24 and present national Republicans with a dilemma: Whether to continue supporting the senator and tearing down McDaniel at the potential cost of damaging the party's eventual nominee.

Outside groups have already spent more than $8 million in the Republican Senate primary, an extraordinary sum in a small state that rarely hosts competitive federal elections. Cochran and his allies have assailed McDaniel as a bumbling snake-oil salesman and finger-in-the wind opportunist who's out of touch with Mississippi's priorities. McDaniel and his campaign have attacked Cochran's record of voting for federal spending, accused him of being soft on President Barack Obama and raised not-so-veiled questions about the senator's age.

(**Full 2014 election results (http://www.politico.com/2014-election/results/map/senate/)** )

All that may continue for weeks to come, with no easy way out for a national GOP that worked strenuously to bolster Cochran against his sharp-elbowed challenger.

With 98 percent of precincts reporting, McDaniel held less than a 1-percentage-point lead over Cochran, the second-longest serving Republican in the U.S. Senate. Neither candidate has won the simple majority needed to avert a second round of voting: At midnight, McDaniel had 49.6 percent of the vote to Cochran's 48.8 percent, a difference of about 2,500 votes out of more than 300,000 cast.

An obscure third candidate, Thomas Carey, had 1.6 percent — probably just enough to prolong the political plight of Republicans in the state and nationally by three more weeks.

The primary was balanced on a knife's edge in the run-up to June 3, as outside groups continued to plow hundreds of thousands of dollars into ads supporting both candidates. The Republican National Senatorial Committee rushed additional field staff to the state to fill gaps in Cochran's turnout operation.

And Cochran appeared to benefit from a wave of sympathy after a group of pro-McDaniel activists was arrested and charged with a lurid conspiracy to break into a nursing home and take photographs of the senator's wife, Rose Cochran, who suffers from progressive dementia.

All that was not enough to propel Cochran across the finish line. It is now unclear which national groups would continue to spend millions on the runoff, or whether Cochran will continue to enjoy the foursquare support of Mississippi's Republican establishment.

Cochran did not give a speech on election night. His campaign tweeted that the race was a "dead heat," writing: "New campaign starts tomorrow. Three weeks to victory!" In his own election night remarks, McDaniel expressed confidence that he would emerge as the nominee, "whether it's tomorrow or three weeks from tonight."

(**Also on POLITICO: Primary day: The 7 key questions (http://www.politico.com/story/2014/06/primary-night-the-7-key-questions-107343.html)**) )

"This is a historic moment in this state's history. And because of your hard work, because of your dedication, we sit here tonight leading a 42-year incumbent," McDaniel said.

Cochran backers acknowledged ahead of Tuesday's vote that a runoff would be an alarming prospect, one that would likely force the senator to compete with an even smaller group of voters that skews still further to the right.

Democrats have watched the race as intently as Republicans: Despite Mississippi's strongly conservative tilt, Democrats hope to mount a competitive general-election campaign against McDaniel, a slash-and-burn ideological activist who fashions himself after Texas Sen. Ted Cruz and has a hefty record of incendiary statements and personal associations.

Within the past two weeks, private Democratic polling has shown that the party's nominee, former Rep. Travis Childers, would start a general election statistically tied with McDaniel. A race against Cochran, who is well-liked by independents and many Democrats, would be difficult to the point of futility.

Even if he was unable to capture his party's nomination outright Tuesday, McDaniel's upset showing is an agonizing blow to entrenched GOP leaders in Jackson and Washington D.C. — and a banner triumph for the national conservative groups that plowed millions into his campaign.

In a season of defeats for the activist wing of the Republican Party, McDaniel represents a powerful corrective to forecasts of the tea party's demise. Though McDaniel reported raising only $1.3 million for his own campaign, Club for Growth put $2.5 million into boosting him; Senate Conservatives Fund spent more than $1 million as other spenders, including Tea Party Patriots and Citizens United, piled on.

Cochran enjoyed heavy-duty outside backing for his campaign, as well, including a $1.7 million effort by the Mississippi Conservatives super PAC, a group led by Republican National Committee member Henry Barbour and promoted by Haley Barbour, the former Mississippi governor. Business groups including the U.S. Chamber of Commerce and the National Association of Realtors added hundreds of thousands of dollars more to Cochran's air support.

Now, all that spending may wind on for the better part of a month, costing millions of dollars more and likely intensifying already-bitter divisions the race has opened within the GOP.

Even with that looming risk, some influential GOP strategists would still favor an all-out war on McDaniel, whose record of controversial statements about Mississippi-centric issues, such as hurricane relief, and past incendiary

remarks about immigration and homosexuality may make him a tough sell for middle-of-the road Republicans and the party's major donors.

**Author:** Alexander Burns (@aburnspolitico)

**Short URL:** http://politi.co/U9Nrnv

AROUND THE WEB                                                      Sponsored Links by Taboola

**3 Easy Tricks for Beating Brain Drain**
American Express OPEN

**The 7 Most Amazing Credit Cards If You Have Excellent Credit**
NextAdvisor

**How to Tell If Your Breathing Problem Is Asthma, COPD, or Pneumonia**
HealthCentral.com

**The Cast of Spaceballs – Where Are They Now?**
Rant Movies

**How Software Is Eating The Personal Investing World**
TechCrunch | Wealthfront

**10 Cars You Don't Want To See a Woman Get Out Of**
Rant Cars

RELATED BOOKS ON THE POLITICO BOOKSHELF

      

See other **New & Noteworthy books »**

Sponsored Links

**Hot New Stock - ASCC**
ASCC Targets Top Spirit Market With New Product Launch
investors.aristocratgroupcorp.com

**New Rule in District Of Columbia**
If you drive in District Of Columbia, this hidden rule can save you $347/yr..
www.SmartWaysToLive.com

**Want to save big?**
Safe drivers can save 45% or more with Allstate. Click to quote now.
Allstate.com

Buy a link here

Close

USCA Case #15-5120      Document #1568250        Filed: 08/17/2015      Page 192 of 313

# Send to a friendThad Cochran, Chris McDaniel barrel toward runoff

Your E-mail

Friends E-mail(s) Separate emails with a comma. Maximum of 5 emails allowed.

Message

Submit

Cancel

© 2014 POLITICO LLC

Terms of Service  Privacy Policy

JA 190

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HOLMES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. No. 14-1243 (RMC) |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 25

*The Washington Post*

**The Fix**

# Thad Cochran faces very tough odds in the runoff. Here's why.

**By Aaron Blake** June 4, 2014

It's not official, but Sen. Thad Cochran (R-Miss.) is very likely headed to a three-week runoff with state Sen. Chris McDaniel (R).

And while the race is close enough that anything can happen -- it's currently McDaniel 49.5 percent to Cochran 48.9 percent -- history suggests Cochran faces a tough path.

That's because runoffs are very unkind to incumbents.

We looked at seven times since 2000 in which an incumbent has faced a primary runoff, and then compared the primary vote totals to the runoff totals in each race. In all but two cases, the challenger took at least 75 percent off the votes that were "up for grabs" in the runoff, and in two of those cases, the incumbent actually *lost* votes in the runoff.

(We're including six congressional races and also added Texas Lt. Gov. David Dewhurst's runoff loss this year -- because examples of incumbents facing runoffs is so rare and we wanted more data.)

Here's how that looks, chartified:

One of the exceptions to the rule was Rep. William Jefferson (D-La.), who actually lapped his opponent in his 2008 primary runoff. That was a highly unusual set of circumstances, of course, as Jefferson was under federal indictment. He also happened to be running in a primary runoff on the same day as President Obama's historic election as the first black president. Jefferson was the lone African American candidate in the runoff in heavily black New Orleans.

Just a month later, Jefferson inexplicably lost to a Republican in one of the most Democratic districts in the country. Clearly, this had a lot to do with Obama.

The other exception was Sen. Blanche Lincoln (D-Ark.), who in 2010 got a big dose of help from national Democrats concerned with keeping her seat in Democratic hands. She won the runoff -- taking more "up for grabs" voters than her opponent, Lt. Gov. Bill Halter -- but lost big in the general election.

The rest of the seven races above demonstrate the idea that the primary is generally all about the incumbent, and if someone doesn't vote for the incumbent in the primary, it's unlikely they'll be wooed in that direction in the runoff.

On top of that, turnout in runoffs is often much lower, which generally leads to a more ideologically polarized electorate. More motivated voters tend to be more conservative in GOP primaries, which again hurts Cochran.

Now, this data shouldn't be oversold. After all, there are less than 2 percentage points worth of votes up for grabs -- far less than in any of the examples above. And all Cochran needs to do to get to 50 percent plus one is gain a little more than 1 percentage point. That's certainly doable, and Lincoln's example should be heartening, especially if the national GOP rallies for Cochran.

But if history is any guide, those third-candidate voters will favor McDaniel, as will the

turnout in the runoff — which is likely an even bigger factor.

Aaron Blake covers national politics and writes regularly for The Fix.

## Get The Fix

Daily updates delivered just for you.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| HOLMES, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civ. No. 14-1243 (RMC) |
| ) | |
| v. ) | |
| ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 26

## State of Alaska 2010 General Election
## November 2, 2010
## Official Results

Date:12/28/10
Time:14:32:52
Page:1 of 1

Registered Voters 494876 - Cards Cast 258746    52.29%          Num. Report Precinct 438 - Num. Reporting 438    100.00%

**US SENATOR**

| | | Total | |
|---|---|---|---|
| Number of Precincts | | 438 | |
| Precincts Reporting | | 438 | 100.0  % |
| Times Counted | | 258746/494876 | 52.3  % |
| Total Votes | | 255962 | |
| Carter, Tim | NA | 927 | 0.36% |
| Gianoutsos, Ted | NA | 458 | 0.18% |
| Haase, Fredrick | LIB | 1459 | 0.57% |
| McAdams, Scott T. | DEM | 60045 | 23.46% |
| Miller, Joe | REP | 90839 | 35.49% |
| Write-in Votes | | 102234 | 39.94% |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HOLMES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. No. 14-1243 (RMC) |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |

# DECLARATION OF JAYCI A SADIO

# EXHIBIT 27

# The Washington Post

Advertisement



# In Alaska's Senate race, Murkowski's write-in bid bears fruit

By Sandhya Somashekhar
Washington Post Staff Writer
Thursday, November 4, 2010; 12:25 AM

First, she was the shoo-in. Then she was the underdog. Now, in the closing moments of a quirky midterm election season, Sen. Lisa Murkowski (R-Alaska) appeared to be on the verge of making history as the first successful write-in candidate for Senate in more than 50 years.

In a six-week blitz aimed at defeating the tea party-backed candidate who toppled her in the primary, Murkowski barnstormed the state, handing out bracelets and reminding voters how to spell her name. She rebuffed fellow Republicans who implored her to drop out. She seemed to be having fun.

By late Wednesday, with 99 percent of precincts reporting, Murkowski was presumed to be on the brink of reelection. That's because 41 percent of Alaska voters wrote in their choice for Senate, compared to 34 percent who voted for Republican nominee Joe Miller and 24 percent who voted for Democrat Scott McAdams, according to preliminary results. Final tallies likely won't be available for weeks.

A Murkowski victory would be a remarkable turnaround for an incumbent who had been disowned by her party, and signaled the limitations of novice tea party candidacies. Many of the movement's candidates have been skillful at pushing the GOP to the right and energizing primary voters. But some, like Miller, found greater difficulty appealing to a broader electorate this season. Lisa Murkowski's decision not to accept a primary defeat may be a lesson for other Republicans worried about insurgent attacks in the future. Not that mounting a winning write-in campaign for Senate is easy. No one has done it successfully since South Carolina's Strom Thurmond in 1954.

Alaska is vast of land but sparse of voters, a state where campaigning door-to-door

USCA Case #15-5130      Document #1568250           Filed: 08/17/2015     Page 201 of 313

can mean climbing into a puddle-jumper. It is known for its political dynasties and its family feuds, one of which, between the Murkowskis and the Palins, played out in this election. (Sarah Palin, who defeated Murkowski's father, Frank, for governor in 2006, was a big backer of Miller's campaign.)

"There is a very, very strong propensity to elect Republicans" in Alaska, said Ivan Moore, a pollster in the state whose clients include Republicans and Democrats. "But from an ideological standpoint, there is a very, very large moderate center up here. It was the centrists who elected Lisa yesterday because of Scott McAdams's inexperience and Joe Miller's loony-tunes, firebrand style of conservatism."

Not that Miller is conceding the race.

"With tens of thousands of absentee votes yet to be counted, and the disposition of the write-in ballots cast unknown, who will be Alaska's next United States senator is yet to be determined," spokesman Randy DeSoto wrote in an e-mail to The Washington Post. "We will all have to have some patience as we allow the Division of Elections to complete the ballot counting process."

Election officials in Alaska say they are still counting absentee ballots and have yet to develop a plan to start scrutinizing the write-in ballots. Once they begin, they will be studying the ballots for "voter intent," a subjective standard that will have attorneys from both sides hovering over the canvassers' shoulders. Depending on the closeness of the results, there could be lawsuits.

But Tuesday night, a beaming Murkowski all but declared victory at an election party in Anchorage.

"We are in the process of making history," she told a CNN reporter. "They said it couldn't be done . . . We looked at that and said, 'If it can be done anywhere, it can be done in Alaska.' "

Miller, meanwhile, kept a low profile on election night and has since. Though he was the front-runner for weeks, his public approval rating took a nose dive after it emerged that, while working for the Fairbanks North Star Borough, he used a government computer for political purposes and lied about it. In addition, he earned ridicule after his private security guards handcuffed a reporter who sought to question him at a campaign event.

As Senate races go, this one was among the stranger stories of 2010. Murkowski, a

USCA Case #15-5120    Document #1568250     Filed: 09/17/2015     Page 202 of 313

one-term senator, was one of those establishment-blessed candidates who was expected to cruise to victory. But she was caught off guard by the tea party, whose activists were bent on rattling the sense of entitlement they felt so many in power held.

In August, Miller, a politically inexperienced attorney from Fairbanks, surged to a surprise win in the primary with the help of tea party voters. He had the backing of the Tea Party Express, which poured $500,000 into his campaign, and the endorsement of former governor Palin, a personal friend whose enmity with the Murkowski family is legendary in Alaska politics.

(Frank Murkowski, a former U.S. senator, had considered appointing Palin to fill out his Senate term when he was elected governor. Instead, he picked his daughter.)

Like other Republicans who fell victim to the tea party's wrath, such as Sen. Robert F. Bennett in Utah and Sen. Mike Castle in Delaware, Murkowski initially conceded to allow Miller a clear shot at the seat. Weeks later, though, she changed her mind and decided to wage what even many of her supporters believed was a quixotic campaign - in part because of the challenge of persuading voters to bypass the multiple-choice ballot and pencil in a long and difficult-to-spell name.

To solve that problem, Murkowski focused enormous attention on her name in advertisements and public appearances. In one of the more absurd turns in the race, Murkowski spelled her own name wrong in a television ad meant to encourage people to write it in at the ballot box.

This is how she and Strom Thurmond became linked forever. When Thurmond mounted his successful Senate write-in campaign, he was a former governor who had returned to the private sector to practice law and entered the race to succeed Burnet R. Maybank, a Democrat, who had died in office.

Now, Murkowski is hoping to return to Washington as the first-ever sitting senator to win reelection by write-in ballot.

View all comments that have been posted about this article.

---

**Post a Comment**

View all comments that have been posted about this article.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAURA HOLMES ET AL.,            :
                                :
              Plaintiffs,       :        Docket No. CA 14-1243
                                :
      v.                        :        Washington, D.C.
                                :        Tuesday, March 31, 2015
                                :              9:40 a.m.
FEDERAL ELECTION COMMISSION,    :
                                :
              Defendant.        :
----------------------------x


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:    ALLEN DICKERSON, Esquire
                       Center for Competitive Politics
                       124 S. West Street
                       Suite 201
                       Alexandria,VA


For the Defendant:     CHARLES KITCHER, Esquire
                       ERIN CHLOPAK, Esquire
                       STEVE HAJJAR, Esquire
                       Federal Election Commission
                       999 E Street, NW
                       Washington, DC  20463


Court Reporter:        CRYSTAL M. PILGRIM, RPR, FCRR
                       Official Court Reporter
                       United States District Court
                       District of Columbia
                       333 Constitution Avenue, NW
                       Washington, DC  20001



Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 204 of 313

P-R-O-C-E-E-D-I-N-G-S

       THE DEPUTY CLERK:  Civil Action 14-1243, Laura Holmes, et al. versus Federal Election Commission.

       For the plaintiff, Allen Dickerson.  For the defense, Charles Kitcher, Erin Chlopak and Steve Hajjar.

       THE COURT:  Good morning, everyone.

       MR. DICKERSON:  Good morning, Your Honor.

       MR. KITCHER:  Good morning.

       THE COURT:  Somebody was borrowing my courtroom and left the gavel right there.  I used this gavel, you probably don't know, but I had neck surgery some years ago and I had lost my voice because half of my larynx got paralyzed, which is why I look like Beyoncé now.  But anyway, I use this gavel all the time because I could never make lawyers stop talking.  So I hope this is not a sign, but I'll put it over here.  How's that?

       All right, good morning. I promise I have read all the briefs.  And I'm not sure who should go first.  Have you guys talked about that?

       MR. DICKERSON:  We have not, Your Honor.

       MR. KITCHER:  We have not talked about it.

       THE COURT:  Oh, you have not talked about it?

       MR. DICKERSON:  No.

       THE COURT:  Okay.  Well, let's let the plaintiffs go first since plaintiffs usually go first and they're the ones

USCA Case #15-5120     Document #1568250     Filed: 08/17/2015     Page 205 of 313

who want me to sort of take action, all right?

       MR. DICKERSON:  Gladly, Your Honor.

       And I understand the Court's confusion since, as you well know, it's our position that the burden is upon the FEC at this stage of the proceeding.

       THE COURT:  I think the burden is on me actually, but it's okay, go ahead.

       MR. DICKERSON:  It is fair to say that Congress has done that to you, Your Honor.

       The FEC has raised a question of this Court's jurisdiction and issue of mootness.

       THE COURT:  No, I'm sorry, don't waste your time.

       MR. DICKERSON:  Thank you.

       THE COURT:  With all respect and admiration and all of that, I can't go there.  Keep going.

       MR. DICKERSON:  Well, then, I'll move on to the standard.  There's been, as Your Honor knows, a great deal of ink bled on this.  I'm not sure that there's an enormous difference between the parties.  At least in this circuit --

       THE COURT:  Well, the enormous difference is whether or not this is a case that has already been decided by the Supreme Court.

       MR. DICKERSON:  I think that is a fair statement of where we disagree.

       THE COURT:  Okay.  And so then the next question is

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 206 of 313

you say no, no, no, we disagree.  It hasn't been decided

because the -- can I call them -- no, I'll say Ms. Holmes

because -- because Ms. Holmes can't contribute $5200 to the

general election campaign of her preferred candidate when a

candidate on the other party who doesn't face a primary

opponent, the supporters can contribute $5200; right?

        MR. DICKERSON:  In a sense.  I mean, I think that --

        THE COURT:  But that's not accurate; right?  I mean,

it might be the consequence, but it's not an accurate

statement, is it?

        MR. DICKERSON:  Well, I'd like to back up with the

Court's permission.

        THE COURT:  Okay.

        MR. DICKERSON:  There's two separate claims here.

        THE COURT:  Well, I just thought I'd come at you

really, you know, this is where we need to -- the rubber hits

the road.

        MR. DICKERSON:  And absolutely, I'm happy to answer

that question.  I want to begin by pointing out that in some

ways there's been a conflation of the First and Fifth Amendment

arguments.  The First Amendment argument isn't that.  The First

Amendment argument is as Congress decides that elections

progress, and as Congress decides that the amount of money that

does not corrupt a candidate increases, there's no

anti-corruption rationale as a matter of logic on why that

money may not be given later.  There may be reasons of administrative convenience or equity or various other concerns as the Supreme Court has said may not be used, but there's no anti-corruption reason why the same $5200 that could have been given over time can't be given at once.

THE COURT:  Now wait a minute.  I don't think that's been in your case.  I mean, if you want my opinion --

MR. DICKERSON:  Very much.

THE COURT:  -- I would say, why isn't it?  But I don't think it is.  You have not argued that point, at least not before you stand here today.

MR. DICKERSON:  And with the Court's permission I'd go find our briefing.

THE COURT:  Feel free, go back to the beginning, though.

MR. DICKERSON:  Okay, that's fair.

THE COURT:  Go back to the beginning because I mean when I -- it's one of the things that I wrote somewhere along the line here said --

MR. DICKERSON:  In the preliminary injunction.

THE COURT:  -- how very interesting.  They're not even relying on Citizens United, they're just -- and you have insisted that this is a very narrow claim, and it's an as applied claim.

MR. DICKERSON:  Yes.

THE COURT:  So if it's a very narrow claim and it's an as applied claim, it can't be as broad as the argument you just made, which I promise I've read the briefs.  There's a word like the one you just said, but there's no argument.  Oh, oh, keep going.

MR. DICKERSON:  All right.  I mean, I --

THE COURT:  I actually, you know, keep going if you think it's there.  But I'll go back and look, but I think it's new, but keep going.  You're invited by the Court to keep up with your argument, how's that?

MR. DICKERSON:  Thank you, I appreciate that, Your Honor.

I would say a few things in response.  The first is it's true that this is an as applied challenge.  And it's true that the Fifth Amendment as applied challenge has to do with the presence or absence of a primary challenger.

The First Amendment as applied challenge has to do with the fact we're at the general election stage.  And you'll see that this disagreement spills over into the facts where our objections on things like the FEC regs at the primary stage isn't because -- is because the primary stage is not at issue here.  The as applied contributions that our client wants to give are contributions at the general election stage.  So in that sense the temporal aspect, the anti-corrupting $5200 aspect, the aspect that *McCutcheon* said, you know, this is the

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 209 of 313

anti-corruption interest.  And I think we've pled that all along.

THE COURT:  Okay.  Let's assume for present purposes that you did and that your First Amendment argument is that there's no anti-corruption rationale.  And why is *Buckley* insufficient to provide an anti-corruption rationale?

MR. DICKERSON:  Well, it may provide an anti-corruption rationale.  I think -- I think the best way of thinking about this is just look at what happened in *McCutcheon* last term.  And this is a case where, and the FEC's argument and Your Honor agreed with this in the preliminary injunction stage.  But the FEC's argument is that because the existence of per election contribution limits, the existence of those limits was reviewed in *Buckley*.

THE COURT:  Right.

MR. DICKERSON:  Of course, the fact they were per election was not reviewed in *Buckley* or even raised or even discussed in *Buckley*.  By contrast in *McCutcheon* you had to challenge the aggregate limits on contributions to candidates, and *Buckley* specifically spoke to and specifically upheld, specifically the aggregate nature of those contribution limits.

Nonetheless that case proceeded under an expedited three judge court under the BCRA procedure, the McCain Feingold analogous procedure everyone agrees is substantively similar.  No, there was no complaint about that being foreclosed in some

way by *Buckley* in a way that was unlawful.  And then after going through precisely the analogous procedure, despite that statement by *Buckley* very much on point, it went to the Supreme Court and the District Court was reversed.

In a situation where you can have the expedited procedure for something *Buckley* specifically spoke about, I don't see how you can't have it for something *Buckley* didn't specifically speak about.  And I think in many way that's the best precedent we've got.  It's just the last -- in the last couple of years this was a lot to go forward.

And without -- the FEC has not explained the difference between that procedure in *McCutcheon* where everyone agrees there's three sentences.  There's a paragraph in *Buckley* that says, of course, you can have aggregate limits.  And this procedure where there's exactly nothing on the per election nature of the contribution limit.  So that's, I think, the first argument.

THE COURT:  Okay.

MR. DICKERSON:  And the second argument is that, and again, since, you know, as -- because Congress has chosen to give merits jurisdiction to the Court of Appeals, and I understand that there are a large number of judges and practitioners who disagree with that choice, but it is up to Congress to make that call.

THE COURT:  Believe me, I have no dog in that fight.

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 211 of 313

I have no sense of ownership.  I'm just trying to do this right, which I already think I did, to be perfectly frank.

MR. DICKERSON:  Well, we agree, Your Honor.

THE COURT:  Yes.  Well, the Court of Appeals doesn't.

MR. DICKERSON:  The Court of Appeals -- well, perhaps I can get to the Court of Appeals momentarily.

THE COURT:  Okay.

MR. DICKERSON:  That's the center of our argument. The center of our argument is that it is on the FEC to show that this is necessarily decided by the Supreme Court or at least so they can meet a 12(b)(6) standard, and they haven't been able to show they can meet a 12(b)(6) standard, which is what all their precedent points do.

I mean, *Goland*, the case they most closely rely upon is a case where the Court spent about a page and a half explaining that frivolousness isn't Rule 11.  That's it's somewhere south of Rule 11 and roughly where 12(b)(6) is.  And, you know, they're not asking for this case to be dismissed. They're asking for summary judgment, they're building a record. They're doing all the other things.  And I think that when you look at what happened in *McCutcheon*, when you look at the way they've handled this case procedurally it's pretty clear there's no on point case discussing the per election nature of the limits full stop.  And that's enough to take this up to the Court of Appeals for a merits determination.

THE COURT:  Well, the problem that I have with the argument is that the argument in the briefs is somewhat different; that is, it is a per election limit.  You argue it as if it were a limit, your Fifth Amendment argument as if it were a limit that prevented your clients from contributing $5200 to the general election while other persons were able to contribute $5200 to the general election campaigns of their preferred candidates.  And my problem with that argument is that it's factually untrue.

You see, now, allowing that to go forward if it were factually true, you know, take it up, feel free.  I already did this once, remember?

MR. DICKERSON:  I do.

THE COURT:  You remember that, don't you?

MR. DICKERSON:  We, in fact, briefed it in the Court of Appeals.

THE COURT:  Yes, I'm so sorry.  I thought I gave them sufficient facts, maybe you too, but the FEC has given us more facts so if you go up again you have more facts to deal with.

MR. DICKERSON:  They certainly have.

THE COURT:  But the point is that it is -- as I think I already said in the preliminary injunction hearing -- decision, your clients can or could have contributed $2600 to the primary campaigns.  I know they didn't want to. I know they only wanted to spend the money on the person in the general

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 213 of 313

election.  That doesn't mean that their desire is not to spend
money when they couldn't tell who was going to win the primary,
means that they've been treated unfairly, does it?  That's a
choice that they made.  That's a perfectly fine choice, but
they can't make a, quote, federal case.  So sorry for that pun.

        MR. DICKERSON:  Unfortunately, all of my cases are
federal cases, Your Honor, as are yours.

        THE COURT:  Unfortunately so are mine, so it's okay.

        MR. DICKERSON:  I take Your Honor's point.  I think
that there's a couple responses.  One is, honestly, it feels
like sophistry.  There's a per election limit in the statute
that says you can give $2600 on day A and $2600 on day B.

        THE COURT:  Or C or D.

        MR. DICKERSON:  Or C or -- I don't know of D, but
certainly C.

        THE COURT:  Well, there are caucuses and things like
that.

        MR. DICKERSON:  That's theoretically D.

        THE COURT:  Well, no, there are a lot of states with
caucuses so keep going.  Anyway.

        MR. DICKERSON:  But they don't necessarily also have
the other three.  It's not really relevant.

        THE COURT:  It's not, you're correct.

        MR. DICKERSON:  The point is that Congress has said
that A, B, C and D added together are not corrupting.  That's

our First Amendment claim.  In the Fifth Amendment context I
don't understand how you can say that, you know, it's $2600 on
day A and $2600 from point B, but we're not allowed to add
these up.  It's a strange and counterintuitive way to read a
statute.

        THE COURT:  Well, except it's what the statute says.
I mean, it's not a strange way to read a statute if that's
exactly what the statute says.

        MR. DICKERSON:  But the implication of the statute is
that there's an overall amount of money that may be given to a
candidate.

        THE COURT:  The implication is that there is an
overall amount of money that may be given in each contest that
a candidate faces.

        MR. DICKERSON:  I think that's correct, and we think
that that's an unconstitutional distinction.  And that, again,
no court has ever spoken to whether or not that's an
unconstitutional distinction.

        THE COURT:  So why is that unconstitutional?  I mean,
if I want to support, and I'll use Representative Sanford as an
example because it happens to be in the record.  And he had a
variety of contests before he finally won the position as
representative from his state; right?

        MR. DICKERSON:  Yes.

        THE COURT:  And limiting contributions to each of

those contests, if we limit it to $5200, let's say, overall, and one really wanted him to win the first primary, you'd be out.  You couldn't contribute any more; right?

MR. DICKERSON:  That's correct, though it's not our case.

THE COURT:  Well, but the point is that you would then be barred from expressing your opinion monetarily in any future contest.

MR. DICKERSON:  I think that's correct.

THE COURT:  That would be a problem.

MR. DICKERSON:  But I think that that's -- that's the difference between the way the FEC is framing our case and how we actually pled the case.  Which is that we're not claiming that you should be able to get in a time machine and go back to the primary and figure out what level of contributions Congress will determine in the future based on how many elections the person is in are non-corrupting.

We're saying sitting here now, when we know to a matter of moral certainty that someone is present in the general, or theoretically, though, this is not our case as applied in a runoff or in a later, you know, special election. We know how much Congress has said is non-corrupting --

THE COURT:  But what's non-corrupting in the thesis of the law, what's non-corrupting is so much money in any contest.  Not more money for one contest and no money for

another.  I mean, that's the concept.

Now, okay, I'm running in a primary.  Lucky me.  I'm a democrat in Maryland or maybe a democrat in D.C.  I'm a democrat in Montgomery County in Maryland, to be more precise, or in D.C., and I'm running in a, quote, primary and I don't have an opponent.  Well, who's going to win the primary?  But please, give me your money.  It's a contest nonetheless.  I have to win that primary.  Somebody might be a write-in candidate, you don't actually know.

MR. DICKERSON:  Well, I think there's two levels of response.  The first is that Your Honor may very well be right, but that's a merits determination, and Congress said the merits determination should be made by the Court of Appeals.

THE COURT:  No -- well, that's a fair statement.  That is an absolutely fair statement, and if it's a merits determination you are clearly right.  I can't reach that, it's not my job.  And I'm happy to let someone else decide that question.

The real question is whether it's been decided before.

MR. DICKERSON:  That's precisely, I completely agree with that.

THE COURT:  Okay.

MR. DICKERSON:  And the point is that no case has ever been pointed to going through what you and I are

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 217 of 313

discussing here.  Going through and saying, you know, why is it the per election aspect of the contribution limit constitutional or unconstitutional.  That's simply never been discussed.

THE COURT:  Okay.  So tell me why you're pursuing this case?  Because in all honesty, whether it gets certified again or not, as you know from me, I don't think it has much merit.  So what is it that you think you're going to accomplish for your clients?

I mean, now I'm only a single judge and I'm only a District Court judge, and there's the Court of Appeals and there's the Supreme Court.  But you have narrowed this case so much, you don't have any evidence to support a broader argument.  You've just got this tiny little point.

MR. DICKERSON:  Well, as the Chief Justice said in *Wisconsin Right to Life*, we don't pry into the -- into the motivations of people exercising their political rights.  And sometimes -- sometimes their decisions may look irrational, but I have a client who did not want to use his or her money to go into a primary and have it spent to defeat other republicans and wanted to spend in the general support of a preferred party.

THE COURT:  Okay.

MR. DICKERSON:  And that's what they want, that's all the relief we're asking for is the ability to do that.

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 218 of 313

THE COURT:  I agree, I agree.  And -- no, you have fully answered my question, and it's certainly their constitutional right under the First Amendment to pursue the argument, and so I thank you.

MR. DICKERSON:  You're welcome.  I feel like I may not have adequately answered Your Honor's question about the Fifth Amendment.  I think we've spent some time on the First Amendment.

The question, I think, and I just want to anticipate some arguments that have been made before.  Your Honor used the example of a primary, a democratic primary in Montgomery County, Maryland in which there might be an uncontested primary.  I think again it sort of -- it feels a little bit, it feels like sophistry to say you don't have an opponent.  You're running unopposed, and yet people who give for your, quote/unquote, primary are not actually giving, so that money will be used in the general election or that money, in fact, will not be used, you know, principally to elect you in the election or entirely to elect you in the election where you actually face an opponent.

THE COURT:  And I understand your point, but let me circle back with the next question about that point.  If I'm so secure and I don't have a primary opponent, I might even be so secure that my general election opponent is not meaningful. And so I collect all the money I can for my primary, woo, woo,

woo, and I collect a lot of money.  And then I collect money
for my general election, aah, aah, aah, and I collect a lot of
money, and I don't spend it on those elections.  And guess
what?  Whew, I have it for the next election.  And then --

       MR. DICKERSON:  Or for various other reasons.

       THE COURT:  Or various other reasons.  And then if I
leave the Hill, I'm assuming we're talking federal elections.
If I leave the Hill, I get to keep all that money that I have
collected over the years; isn't that right?

       MR. DICKERSON:  There's a -- I think there's a few
responses.  One is it is correct that your campaign committee
gets to keep the money, you do not personally get to keep the
money, which I think is kind of a big difference in terms of a
corruption rationale.  When *Buckley* was decided, a candidate
actually could personally convert the money.  The Supreme Court
has considered this relevant.  First of all, that.

       Second of all, we're talking as an applied challenge
for two cases, two elections where an unchallenged democratic
candidate faced significant republican challengers as showed by
the final vote total.  And the money was spent, and there were
people who gave the maximum in the primary period to those
unopposed candidates.

       And for purposes of the Fifth Amendment analysis, I
think it's closing one's eyes to facts to say that, of course,
when people contribute to a candidate who has no primary

opponent and will face any sort of a challenge in the general, but that's different in kind from a case where someone is facing a primary candidate.  And that it's simply beggar's belief that that's not intended to be used to elect that person to the House of Representatives.

Which is the other part of this piece; right?  Is that it makes sense for people to care about the general election because that's when the actual, that's when governmental power actually adheres onto the candidate.  You know, winning the primary can mean absolutely nothing.  I mean, we could go down the list of TV personalities to prove this.

I understand that the FEC are creatures of a particular statute and that they owe fidelity and they've been honest servants to that statute.  But I think they're blinded by the fact that if the underlying decision to make this per election in the context of general elections where we know what Congress has said the un-corrupting amount of money is.

If that is unconstitutional, then it's no answer to say we've got this big regulatory environment on how to deal with contributions in the primary period.  Especially when we're not talking about contributions in the primary period. We're talking about contributions in the general election period.

THE COURT:  Okay, I got it.

MR. DICKERSON:  If Your Honor has no further

questions.

THE COURT:  Not right now.  Thank you very much, sir.

MR. DICKERSON:  Thank you.

THE COURT:  I hope that you heard and appreciated the honest service to the statute.

MR. KITCHER:  I did, Your Honor, and thank you very much.

THE COURT:  Okay.

MR. KITCHER:  Charles Kitcher on behalf of the FEC.

The questions the plaintiff want this Court to recertify to the Court of Appeals asks simply whether they could have made an excess $5200 general contribution to a candidate in the last election cycle.  That is an insubstantial question because it's settled.  This Court has already recognized in its preliminary injunction decision that by objecting to the specific base limit on how much an individual may contribute per election, plaintiffs challenge the analysis and conclusion of *Buckley* and its progeny, which neither this Court nor the D.C. Circuit can overrule, that's right.

THE COURT:  Okay, so let me ask you this question.  So I certified the questions to the Court of Appeals, as I said, out of an abundance of caution, and if they had proceeded at that time it would all be decided by now; right?

MR. KITCHER:  Your Honor, I believe under the schedule the Court of Appeals set argument, merits argument

would have occurred yesterday.

THE COURT:  Okay, well almost decided.

The FEC said, oh, no, no, we need a bigger record.
And so the Court of Appeals said, oh, well, we don't have a
record.  We might as well send this back.  How can we decide an
important constitutional question on this little itsy-bitsy
record that the Court sent us.  And then you gave me all these
facts, and I appreciate that they show sort of the operation of
the statute over time.

But your entire argument, your entire argument comes
from my decision in the preliminary injunction hearing.  So why
isn't this just a motion for reconsideration?  Why isn't the
FEC saying to me, listen, you got it wrong.  So we went to the
circuit and we said, oh, lordy, lordy, lordy, we don't have a
record and here we are back again, and we're just asking you,
Judge, think about it harder this time because you shouldn't
have certified.  Why isn't that all that's happening here?  Why
is this any more important, and I'm not saying it's not
important, you know, don't misunderstand me.  I'm not insulting
you or at least I hope not.  But basically, isn't this just a
motion for reconsideration?  You didn't hear us well the first
time, listen harder?

MR. KITCHER:  Your Honor, it's not a motion for
reconsideration.

THE COURT:  Well, I know it isn't.  It's not a

motion, it's not a motion for reconsideration, I know.  I

understand, but it is.  It's sort of like it isn't and it is.

Go on.

MR. KITCHER:  We moved the Court of Appeals to remand

the matter to this Court to perform the functions mandated by

*Wagner*, which include the record development and which include

the frivolousness screening that's required prior to

certification.

THE COURT:  Well, but I did do that.  I did do that.

I didn't agree with you.  I did do that.  And I mean, you may

not have thought the record was sufficient, clearly you didn't.

And if we do this again, it's all going to go in.  I am not --

I mean, it's all going in.  I'll make such adjustments so

anything that the plaintiffs want to have said will be said,

anything you want to be said will be said, and, oh, man,

they'll be happy.  They'll have a thousand and ten numbered

paragraphs.  So rest assured, that's okay.

The question is insubstantiality or has it already

been decided?

MR. KITCHER:  That's right.

THE COURT:  And the last time, if you remember, I

said -- I issued an order to show cause.  Why shouldn't I just

dismiss this?  And the plaintiff said, no, wait, and so out of

an abundance of caution, I certified it.

Now, why was -- I mean, granted, you have all this

argument about the record, put that aside.  Why was that not exactly what the statute ordered me to do?

MR. KITCHER:  Setting aside the record issue, which was part of the reason we sought the remand.  The reason why the case should not have been certified in the first place is that plaintiffs can't meet the 12(b)(6) standard.  We do prevail on the 12(b)(6) standard.  The plaintiff's case fails to state a claim because what they are asking for is for the Court to conclude that the per election limit of $2600 shouldn't apply to them when they want to make a double limit contribution because *Buckley* already upheld the per election base contribution limit as constitutionally valid against a broad facial challenge.  And it also upheld it against an over-breadth challenge.  There's nothing left of plaintiff's case after we consider that.  This is exactly like the case in *Khachaturian.*

In *Khachaturian* a candidate said, I have eleven people who are ready to give me $200,000.  In court I have just one problem.  I can't accept that $200,000 under the per election individual contribution limit because they're going to blow through the max.  So please, give me a variance, give me an exemption from the per election contribution limit that applies to every American in every election, and the Court said --

THE COURT:  Federal election.

MR. KITCHER:  Every federal election, correct, correct, excuse me.

THE COURT:  I'm just a little --

MR. KITCHER:  Didn't want to overstate.  And the Court said, you haven't even come close to stating a case.  This is the same case.  The only difference is instead of the candidate making the complaint, it's the contributor.  It's exactly the same case and should be dismissed as settled for exactly the same reason.  And that precludes the Court's obligation to recertify facts, recertify questions to the Court of Appeals.

THE COURT:  Well, it's all going in whether -- I mean, this is going to go up.  The issue is whether it goes to a three judge panel or the entire en banc court.  So I hear your argument.

Now, what the Court said in its short order, presumably sort of suggested by you, but in their own hand, so-to-speak.  Okay, "The Court grants the motion to remand in order to provide the parties an opportunity to develop the factual record necessary for en banc review of the plaintiff's constitutional challenge."  That's scolding me for not sending a complete record.

"Further, the District Court shall complete the functions mandated by Section 30-110 and described in *Wagner v. FEC*, including development of a record for appellate review,

and certify any constitutional questions."

MR. KITCHER:  Correct.

THE COURT:  So, am I free not to certify a constitutional question?

MR. KITCHER:  Absolutely, Your Honor.  The functions mandated by Section 30-110 as interpreted by the Supreme Court and as interpreted by *Wagner* in its controlling opinion, which is controlling on all the districts of this court, is that there are three --

THE COURT:  Yes, I agree.

MR. KITCHER:  There are three functions.  The first is the record development function.  The second is the substantiality screening.  The Court is directed to figure out whether or not the case has been resolved.  And the third is to certify all non-frivolous questions to the Court of Appeals. The Court can and should dismiss this case as frivolous, and it should apply its own reasoning in the preliminary injunction ruling which disposes of this case.

The Court, on the likelihood of success factor with respect to the preliminary injunction ruling, didn't rule that plaintiffs were unlikely to prevail.  It ruled that they have no case because they're challenging *Buckley*, and this Court can't overrule *Buckley*.  It also concluded that their Fifth Amendment case was meritless.

As Your Honor said just this morning, the case

doesn't have any merit.  If the case doesn't have any merit,
then the appropriate resolution is judgment for the FEC under a
12(b)(6) standard or to the extent facts are necessary the
summary judgment standard.  That should dispose of the case,
and if the plaintiffs then want to take that, the Court's
frivolousness analysis, which is absolutely correct, to a three
judge panel of the Court of Appeals, they may do so, but that
Court of Appeals will affirm.

       THE COURT:  Okay.  So now are you suggesting that
when I certified this the last time I didn't consider the
frivolousness issue?  I didn't write a long analysis, I'll
grant you, because I thought this was about as simple as ten
pennies in a line, forgive me, sir, but nonetheless I'm
precluded from deciding the merits.  And so I look at Jim
Robertson's decision and I look at the statute, and I say the
fact that I might not think it has a lot of merit doesn't mean
that they shouldn't be able to argue it on appeal.

       MR. KITCHER:  Your Honor, that's not the approach
that Judge Wilkins took in the *LNC* case.  In the *LNC* case the
plaintiffs brought a purportedly novel question to the Court.
Does *Buckley's* contribution limit, again contribution limit,
apply to bequests by the deceased to leave as part of their
estate a large amount that exceeds the contribution caps to a
party?

       THE COURT:  He certainly couldn't have had a

corrupting influence plan because he's dead.

        MR. KITCHER:  Exactly.  So that case is actually far more novel than this case in which the plaintiffs do intend to contribute again.  And what did Judge Wilkins say?  Judge Wilkins said that the plaintiffs are bringing a broad facial challenge and the Court can't overrule *Buckley*.  And the questions they're seeking to have certified have been settled by *Buckley*.  So just like in *Khachaturian*, just like in *Goland*, Judge Wilkins concluded that he couldn't certify that question.  So to answer Your Honor's question --

        THE COURT:  What was the question he certified?  It's unclear to me.

        MR. KITCHER:  I will read it for you because I have it right here.

        THE COURT:  Oh, I knew you would.  Thank you, sir.

        MR. KITCHER:  The question Judge Wilkins certified was an extremely narrow question and it follows:  "Does imposing annual contribution limits against the bequest of Raymond Groves Burrington violate the First Amendment rights of the Libertarian National Committee?"  That is an as applied question as applied to a particular contribution request.

        And I will note, I know the Court said earlier that it doesn't want to hear about mootness, but the Court of Appeals ultimately dismissed this case on mootness grounds because the bequest that had been given in a series of

contributions that over the years ultimately was given before

the Court reached the merits, and so --

       THE COURT:  Well, that would make it moot.

       MR. KITCHER:  Precisely.

       THE COURT:  I agree with that.  If all the money has

been spent, that would make it moot, and he's dead, and so

there's no chance of future.  Read that one more time.  Wait,

wait, wait.  I just need the question one more time.

       MR. KITCHER:  Of course, Your Honor.

       THE COURT:  "Does imposing annual contribution limits

on the bequest of"?

       MR. KITCHER:  "Against the bequest of Raymond Groves

Burrington violate the First Amendment rights of the

Libertarian National Committee?"

       THE COURT:  Okay.

       MR. KITCHER:  If I could just make a point about

mootness.  If this Court were to certify, there is no narrower

question that this Court can certify.  But if this Court were

to certify a question, did FECA's $2600 contribution limit

violate the First and Fifth Amendment rights of the plaintiffs

in this case as applied to their desire in 2014 to have

contributed to the general election campaigns if two people who

were candidates then, but are not candidates now, did that

violate their First Amendment rights?  That question is already

moot.  So the only difference between the *LNC* question is that

became moot after Judge Wilkins certified it.  The
corresponding as applied question here is already moot.

THE COURT:  Well, although if I were to do that
narrowing, it would be more along the lines of does imposing
the annual contribution limit against the plaintiffs in federal
elections in which the opposing party candidate does not have a
primary opponent so that plaintiffs cannot contribute a full
$5200, something like that.

MR. KITCHER:  Well, Your Honor, that question, were
the Court to certify it, would be problematic for a number of
reasons.  First of all, it directly contests *Buckley's* holding
that the per election individual contribution limit is valid.

Another problem with that question is it's purely
hypothetical.  The plaintiff's haven't put in any facts showing
that this actually happens.  And the Supreme Court said in
*Cal.Med* that the 30-110 procedure, this special procedure that
exists, does not apply and is not appropriate for purely
hypothetical questions about the application of the statute.

A further problem with that question is they would be
asking the Court of Appeals to legislate in disrespect of
Congress, who are the experts in this field, in order to enter
some type of rule that is subjective, unfair, unconstitutional
and in-administrable on its face.  The FEC does not have and
FECA does not contemplate a neat silver-like person who can
predict the outcomes of elections in order to decide whether or

not a particular candidate is so insubstantial that his or her theoretical opponent in a future general election should be allowed to receive excess contributions in that election. That's a policy proposal that belongs in Congress, not before the D.C. Circuit. It's not even clear what the circuit could do other than rewrite the statute, which is not a constitutional remedy that the D.C. Circuit is empowered to provide the plaintiffs.

So the narrower as applied question has many problems.

THE COURT:  Okay.

MR. KITCHER:  Further, if I could respond to some of the other points that counsel raised during the opening presentation.  Counsel said that there's no anti-corruption reason why a person can't give $5200.  Of course, there's an anti-corruption reason.  The limit is $2600 per election.  This Court has already found that no one can give $5200 and know that it's going to be spent on a general election.

The Court has provided its own example of perhaps a candidate wants to make a strong showing in the primary or there are lots of other reasons.  As Your Honor said, the candidate might prefer to keep it, or maybe the candidate wants to transfer it to other committees or the national committee or maybe there's an outside group that's --

THE COURT:  So has the law changed and the candidate

could not keep it to himself if he left office?

          MR. KITCHER:  Well, what the candidate can do with the money after he retires from office is governed by the personal use provision which is fairly liberal, but you can't keep it and buy a house.

          THE COURT:  Okay.  Thank you.

          MR. KITCHER:  There is an anti, in other words there is an anti-corruption purpose.  And if, think about this:  If it were true what the plaintiffs are arguing that it is equivalent giving $5200 to a candidate on the last day of the primary and then giving -- or $2600 on the last day of the primary and then giving $2600 the next day.  If that were equivalent to giving $5200 in the general, why didn't the plaintiffs themselves do it?  That option was open to them.

          THE COURT:  Well, yes, but the logic of the plaintiffs is not foolish, if you will.  As I sort of infer from the arguments made, I can't remember the names of the candidates so forgive me.  Bob Smith was running for reelection, and one of the plaintiffs, Ms. Holmes, let's say, really, really didn't want Bob Smith to be reelected.  And as to those republicans who were trying to vie to run against Bob Smith, she just wanted the strongest one.  Whichever one won the primary, it didn't matter because she didn't know them very well.  They're from another state.  Whoever it was, whoever wins, that's the one, that's the horse because I want Bob Smith

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 233 of 313

defeated.

MR. KITCHER:  She could have given $2600 to each of them on the last day.  Their theory is that that's money for the general.  If that's true, they could have done that.  It's totally self-defeating.

The FEC had a case conceptually like this just last year called "Stop This Insanity."

THE COURT:  Yes.

MR. KITCHER:  Where a group wanted to do something that was illegal that they claimed was identical to something that was legal.  And the District Court, the D.C. Circuit and the Supreme Court all rejected the challenge.  The Supreme Court denied cert.  And what the D.C. Circuit opened its opinion with was, I'm not making this up, Mick Jagger and the Rolling Stones, you can't always get what you want, but sometimes if you try, you might just find you get what you need.

What the D.C. Circuit found is they already --

THE COURT:  That must have been David Tatel or somebody.

MR. KITCHER:  I think it was Janice Brown.

THE COURT:  Okay.

MR. KITCHER:  Another point, the plaintiffs claim, as this Court has already suspected in footnote 8 of its preliminary injunction opinion, and what the plaintiffs have

now admitted in their papers, is that they're not really challenging the statute. What they're challenging is the reg that the FEC has enacted that allows candidates to take money that they received in the primary and transfer it to their general. That's what they're challenging they say on page 15 of their response. That allows for the result to which they object. But the special review provision of 30-110 is only for challenges to the statute. It's not for rule-making challenges. So that's another reason that facially certification is just a non-starter.

The 30-110 procedure that the plaintiffs are purporting to invoke does not apply to a challenge to a rule. And the Court has already suspected and the plaintiffs have admitted that what they're really challenging is the rule. And it's actually quite apparent that they're challenging the rule because that's the "but for" cause.

If the FEC had promulgated a regulation that didn't allow transfers, the plaintiffs wouldn't be here because no money could be transferred from one election to another.

We also heard a little bit about *McCutcheon* this morning. *McCutcheon* distinguished the aggregate limits analysis of *Buckley* and said that there was a new regime in place, which accounted for why there was a different result. By contrast the per election individual contribution base limit that *Buckley* upheld as constitutionally valid has been upheld

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 235 of 313

repeatedly, and in *McCutcheon*, the Court itself said that the base limits are the primary means of combating corruption.

And with respect to the procedural nuance that counsel was referring to earlier, *McCutcheon* was a case that proceeded under BCRA's special review provision. BCRA's special review provision requires the convocation of a three judge court, and then Supreme Court jurisdiction is mandatory.

By contrast, the Section 30-110 procedure does not have mandatory Supreme Court jurisdiction. It used to, but Congress actually deleted that in the early '80s after *Cal.Med* said that FECA is not an unlimited font of constitutional questions.

I'd like to close with a point about the certification standard. The plaintiffs have insisted to the Court that the standard is one that is so narrow that requires a Court to have ruled on the same provision for the same legal reason with practically the same facts. That is not the standard. It's not a res judicata or collateral estoppel type standard. The question is whether or not the issues in the case have been settled.

It is not surprising that *Buckley* didn't consider whether or not there was a $5200 bifurcated contribution limit because the contribution limit isn't bifurcated. Congress didn't create a bifurcated $5200 contribution limit and neither did the Supreme court in *McCutcheon*. The plaintiffs can't have

been deprived of making contributions up to a limit that doesn't exist.

As this Court said in its preliminary injunction opinion that plaintiffs elected not to exercise their right to contribute in the primary does not render the law unconstitutional as applied. They simply chose not to associate during the primary. It's a self-imposed injury. They had the constitutional right to associate with their candidates if they wanted to, but they chose not to.

THE COURT: And let me circle back because I understand your arguments. Let me circle back to the point of whether or not you actually think in light of your requests for remand to develop a record and the order from the circuit if I really have -- I don't quite -- I certainly have jurisdiction, but authority or expectation or something. If it never comes back to them they'll probably never notice, but some year somebody might say, wait, what happened to that case?

MR. KITCHER: Your Honor, I don't think that the Court of Appeals expected the Court to send the case back necessarily. Your Honor absolutely has --

THE COURT: Somebody is going see it because you know it's going to get appealed one way or the other.

MR. KITCHER: Whether or not the plaintiffs appeal is out of my control, Your Honor.

THE COURT: Fair.

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 237 of 313

MR. KITCHER:  This Court has the authority to dismiss this case.  It should dismiss this case for the reasons I've given.  And the preliminary injunction opinion the Court has already rendered resolves this case.  As I said before, the Court didn't find that plaintiffs were unlikely to succeed on the merits, it found that they have no case.

THE COURT:  I can tell that you agreed with me because you argued how right I was.

MR. KITCHER:  You are so right.  If they have no case, how could it possibly merit the Court of Appeals attention?  It's a frivolous settled case, that's the end of it.  That's my argument, Your Honor.

THE COURT:  Okay, okay.  That's why it sounds more like reconsideration to me, but it's okay.  I won't say that in writing.

MR. KITCHER:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. KITCHER:  If the Court has no further questions.

THE COURT:  No, I appreciate your argument, Mr. Kitcher.  You came very well prepared.

Mr. Dickerson, did you want to respond?

MR. DICKERSON:  Yes, Your Honor, I would, thank you.

As often happens I feel like the FEC and I are reading different cases.  Where to start.

It is true that -- let's start with *McCutcheon*.  In

*McCutcheon* it is true that it referred to the fact that *Buckley* had -- had talked about the exacting limit or the aggregate limit standard. But the Chief Justice said in the controlling opinion, the reason that we're going to go back to this isn't because it doesn't bind us. It's not because it's in part because there's this new legal regime. But it's also because the question wasn't briefed and argued.

If the *Buckley* Court had no insight on something and nonetheless added three actual sentence of holding and that's not considered binding under the exact same provision, how is it that something that was never briefed or argued it is somehow relevant. It's interesting to watch the way the FEC frames this argument over and over again. You know, *Buckley* upheld the per election. Yes, it did, but it didn't uphold it -- it didn't uphold it as a per election limit. It upheld the existence of underlying contribution limits. That's all it said.

If you go back and read *Buckley*, if you read any of these cases, you read *Nixon v. Shrink Missouri Pack*.

THE COURT: Okay. But what you're arguing is that since the law says you can contribute $2600 in a primary and $2600 in a general election, that must mean you can properly contribute $5200 in the general election.

MR. DICKERSON: Provided you do not contribute in the primary, which is important.

THE COURT:  I accept the addition.

Why -- why is that necessarily so?  I mean, if a limit to -- a personal limit to contributions to an election is lawful.  We have a personal limit to contributions -- forgive me for misspeaking.  We have a limitation on personal contributions to the primary and to the general election, and you want to put them together.  And why is that a constitutional necessity?

MR. DICKERSON:  It's a constitutional necessity because the Supreme Court has said in the context of the contribution limits that the state must have a closely drawn regime to its -- and a quid pro quo anti-corruption interest.

THE COURT:  Correct.

MR. DICKERSON:  And if Congress says this amount of money going from this contributor to this candidate is not corrupting at this point in time, what is the anti-corruption rationale for saying you cannot give that money now?

THE COURT:  Okay, thank you.

MR. DICKERSON:  And in some ways, you know, it's probably more fair to say that we're asking for reconsideration in a sense, not on the certification, but, you know, we do disagree with one element of Your Honor's well-reasoned opinion.

THE COURT:  Oh, I'm sure.

MR. DICKERSON:  And that is the portion where Your

Honor says --

    THE COURT:  I was expecting you to disagree with that.

    MR. DICKERSON:  That's fair.  It was my motion.

    THE COURT:  Yes.

    MR. DICKERSON:  But the fact that, you know, Your Honor characterized *Buckley* as upholding the per limit contribution limit because Congress had made the determination that there should be equal resources in each election.  That's simply never been held by any court.  You may be right.  That may be a correct statement of the merits, but we don't know that until the Court of Appeals says so.  Because the Supreme Court has never said that specifically, and that's our case.

    Our case is that the Court has never been asked and this question has never been briefed.  And the fact that Congress chose per election limits and they were upheld as election limits does not mean that they were upheld as per election limits when that question was never presented.

    THE COURT:  Okay, I got it.

    MR. DICKERSON:  Okay.

    THE COURT:  That's the -- the last couple of paragraphs is particularly helpful.

    MR. DICKERSON:  Thank you.

    THE COURT:  Uh-huh.

    MR. DICKERSON:  I also want to take some issue with

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 241 of 313

counsel's use of its precedent on the standard.  If you look at *Goland* or you look at *Khachaturian*, these are cases that, I think *Khachaturian* is in many ways the best case.  This is what happened in *Khachaturian*.  The District Court, actually a magistrate judge of the District Court received a complaint under Section 30-110.  And seeing that it requested certification to the Court of Appeals sent the complaint and only the complaint and nothing else without any hearing to the Court of Appeals.

        THE COURT:  Was that in this court?

        MR. DICKERSON:  Eastern District of Louisiana, Your Honor.

        THE COURT:  Thank you.  I mean, I may not have had a sufficient record of facts, although I think I did, but okay.

        MR. DICKERSON:  Yes.

        THE COURT:  But I would not have sent just the complaint.  I know.

        MR. DICKERSON:  Okay.  And then on remand what the District Court said in dismissing the complaint was it's not that you -- you've stated in the substantial question not because we disagree with the merits of your question.  It's because you're claiming an as applied challenge and you didn't plead an as applied challenge.  To the extent that all you're doing is repleading the facial challenge in *Buckley*, we can't give you relief.

THE COURT:  Okay, okay, wait.  I'm glad you said that because this raises the question of whether you really have an as applied challenge.  The argument being made by the FEC that it's really a facial challenge because the remedy, not the words that you use in presenting your challenge, but the remedy of invalidating the per election limit of $2600 would apply to everybody, and since it would apply to everybody, it's actually not -- it's not a real as applied challenge.

MR. DICKERSON:  And I think -- I think that's a source of fair confusion.  Our case, which, either the FEC is expanding or has not understood, which is understandable.  Our case is that, here's the remedy we're asking for.  In the primary election $2600 is the level that Congress has said is non-corrupting, and consequently that should be the contribution limit in the primary.

In the general, Congress has said the non-corrupting amount of money that can go to that candidate is $2600 plus $2600.  So when you're sitting in the general election the remedy is now you can get $5400 in the general election.  We're not saying that there shouldn't be that you can give $5400 in the primary.  And the FEC has given a large amount of information about why that would be problematic.  The fact that you have to have segregated accounts.  The fact that you don't know who's going to make it to the general, which is, in fact, our point.

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 243 of 313

THE COURT:  No, no, no, no, no, no, you're not talking about giving $5200 in the primary.  You're talking about not giving anything in the primary and giving it all in the general.

MR. DICKERSON:  Precisely.

THE COURT:  But where did Congress say that $5200 in the general election was okay?

MR. DICKERSON:  They said that $5200 given to this candidate is okay.

THE COURT:  When did they say that?

MR. DICKERSON:  When they said you can give them $2600 earlier and $2600 now.

THE COURT:  For two different contests.

MR. DICKERSON:  And that's -- I think that's again where -- I don't know if Your Honor is correct or not on that insight, but that's a merits insight, and that's a merits insight that's never been found by any court.  That's where we get into this merits discussion about what exactly the state's interest is, but it's not what we're arguing.

THE COURT:  Wait, wait, wait.  I mean, isn't it clear that it's only $2600 per election?

MR. DICKERSON:  Yes, it is.

THE COURT:  I mean, you just told me.  So, you said $2600 to the primary and $2600 to the general.

MR. DICKERSON:  Uh-hmm.

THE COURT: And then you said, and then since Congress has authorized $2600 plus $2600, that's $5200, we ought to be able to give $5200 in the general.

MR. DICKERSON: Precisely.

THE COURT: Okay, let's back up.

MR. DICKERSON: Yes, Your Honor.

THE COURT: $2600 in the primary and $2600 in the general. Those are two different contests; right?

MR. DICKERSON: Yes.

THE COURT: I didn't make that up. I'm not inferring insight anything. I'm just saying two different contests; right?

MR. DICKERSON: Yes.

THE COURT: So where did Congress, Congress say that you could give $5200 to the general?

MR. DICKERSON: It didn't. It just said it was non-corrupting.

THE COURT: When did it say that?

MR. DICKERSON: When it said you could give the money over time to the candidate. McCutcheon saw this. McCutcheon referred to the non-corrupting amount of money that could be given to a candidate as $5200.

THE COURT: Okay.

MR. DICKERSON: We view this as an elementary insight, and the Supreme Court skipped right to it without any

[42]
JA 242

USCA Case #15-5120     Document #1568250     Filed: 08/17/2015     Page 245 of 313

real discussion, presumably seeing it as obvious.

THE COURT:  Okay.

MR. DICKERSON:  We're saying the constitutional problems that Congress has declared that amount of money non-corrupting and then said you can't give it.  We wouldn't have a claim if we could give it.

THE COURT:  No, I understand.  Okay.

MR. DICKERSON:  So, first of all, I mean, that's the as applied challenge.  And *Khachaturian* is not helpful precedent because they've never pled an as applied challenge.  Their entire as applied challenge was where a third party, we're a third party which can bring in more money.  Which is exactly what *Buckley* ruled on.

THE COURT:  But the point is, if, let's assume we go forward, and the Court of Appeals agrees that Congress has already said that $5200 is a non-corrupting amount of money, and so therefore your clients could have and in the future would be able to give $5200 to the general.  Why doesn't that apply to everybody?

MR. DICKERSON:  It would apply to everyone in the general election.  But that's still as applied.  That's not just -- the remedy is not all per election limits go away.  The remedy is as you move forward in time and Congress says you can give more money without corrupting the candidate, you can give more money without corrupting the candidate.

THE COURT:  But that applies to everybody.  That's not just to your clients.  It would be me, everybody in the room, everybody outside in Washington D.C., everybody -- they don't actually have these federal elections very much.  We'll go to Maryland, Virginia and the other states where they do have elections of this kind a lot.  They would all be benefited, if you will, and all those primary small candidates would be injured, whatever.  They wouldn't raise as much money.  So why doesn't that make it not an as applied challenge?

MR. DICKERSON:  I mean, the only -- the scope of the -- the scope of those who are similarly situated to the as applied plaintiffs isn't the sole element of an as applied challenge.

THE COURT:  No, it's the scope of the remedy is what I'm talking about.

MR. DICKERSON:  Right.

THE COURT:  The remedy would not -- I mean, I can do more work on this, clearly as I need to, but the scope of the remedy goes well beyond your plaintiffs.  It goes to anybody who wants to do this.  Anybody who never thought they could, wholly smokes, yea.

MR. DICKERSON:  But that's very common in election law cases.  In *Davis v. FEC* or in -- you know, you have these cases where a plaintiff comes in and says, you know, we've got this particular set of facts that impacted us.  I mean, look at

Citizens United.  Citizens United was an as applied challenge.

Citizens United was explicitly an as applied challenge.

Citizens United was about a particular movie and a particular

set of advertisers for that movie, and I don't -- obviously

that's had substantial effects.

THE COURT:  Yes.

MR. DICKERSON:  But I mean, I think that's the

perfect example.

THE COURT:  Okay.

MR. DICKERSON:  The most famous election law case is

as applied.

THE COURT:  Okay.

MR. DICKERSON:  So that -- I would distinguish their

precedent on that basis.  I mean, the same thing is true for

*Goland* where, you know, *Goland* was a case where -- I don't even

think a question of association was necessarily raised.  I

mean, *Goland* wanted to poison the well of a senate race in

California by filtering $120,000 in anonymous money through a

bunch of straw donors because he knew the guy he was supporting

wouldn't accept the money.  I mean, that's pretty different.

That's not claiming an associational right of this nature.

THE COURT:  I agree that the facts are very

different.

MR. DICKERSON:  So our view is that the standard is

very high too, and these attempts to sort of use words like

substantial when they really mean slightly north of Rule 11 aren't terribly helpful, and that their own cases show this.

Let's see.

THE COURT:  And you need to finish because I have other things I need to turn to.

MR. DICKERSON:  I understand, Your Honor.  Full disclosure, I was one of the counsel in the *LNC* case that Judge Wilkins handled.  I think Judge Wilkins was correct to certify it an as applied challenge.  He certified an as applied challenge.  We don't know how that would have worked out, but that I would point out is again is a case that blew right past the contribution limits as such.  It was not an attempt to balance Congress's, you know, sort of view of corruption.

And just finally, I don't think it's true that we've admitted anything of the sort that the reg is what we're challenging.

The *Cal*. case said that you have to read the statute that's being challenged in light of the regs.  That's a fairly standard understanding of constitutional challenges.  And it can't be a one way rachet where the FEC can just inoculate a statute by having a good reg.  It has a bad reg, that doesn't happen.  So I think that's a bit far afield.  And again goes back to the fact that they want to claim that what we're asking for is an overall $5200 limit.  That's not what we're asking for.  And a lot of this just, a lot of these arguments simply

USCA Case #15-5120     Document #1568250     Filed: 08/17/2015     Page 249 of 313

aren't relevant in light of that. And I appreciate the Court's patience.

THE COURT: All right, thank you very much.

MR. KITCHER: May I, Your Honor?

THE COURT: Did you feel the -- you feel the absolute necessity to say two sentences, you may say two sentences.

MR. KITCHER: I'll try, Your Honor. The first sentence is that the Court has figured out the remedies is the key to this whole case. And that it does go to anybody. If it does go to anybody, then what we're talking about in this case has nothing to do with whether or not a particular candidate was substantially opposed, a little bit opposed, kind of opposed, totally unopposed at all. Plaintiffs are just making an as applied challenge.

Final sentence, I know I'm more than two.

THE COURT: No, keep going.

MR. KITCHER: *Khachaturian* presented itself as an as applied challenge. The fact that it was really a facial challenge is the same problem the plaintiffs in this case have.

Thank you, Your Honor.

THE COURT: Thank you.

You know, the best part about these cases is that you get good lawyers.

MR. KITCHER: Thank you.

THE COURT: And I want to thank you both because

USCA Case #15-5120    Document #1568250    Filed: 08/17/2015    Page 250 of 313

you've presented good briefs, and I love your arguments.  They

have been quite helpful.  I don't quite know what I'm going to

do.  That's the best place to leave a judge after oral

argument, isn't it?  I thank you both.  I thank you all,

forgive me.  I thank you all.  Thanks for coming.

      MR. DICKERSON:  Thank you, Your Honor.

      THE COURT:  This will be out no later than April

24th, I promise.

      MR. KITCHER:  Does the Court still want the

electronic copies?

      THE COURT:  Yes, yes.

      MR. KITCHER:  Shall I give them to the deputy?

      THE COURT:  Yes, please.  We need it to go in the

file, so that if the Court of Appeals wants to, you know they

would never ask us to send them what you have sent us so

nicely.  So we'll just stick it in the file and we'll note it

when it goes up if they want it too, okay.

      MR. KITCHER:  Thank you Your Honor.

      THE COURT:  Thank you, thank you, thank you.

      THE DEPUTY CLERK:  All rise.  This Honorable Court

stands in recess.

      (Proceedings concluded @ 10:40 a.m.)

      -oOo-

USCA Case #15-5120     Document #1568250     Filed: 08/17/2015     Page 251 of 313

```
 1                         CERTIFICATE

 2           I certify that the foregoing is a true and correct

 3  transcript, to the best of my ability, of the above pages, of

 4  the stenographic notes provided to me by the United States

 5  District Court, of the proceedings taken on the date and time

 6  previously stated in the above matter.

 7           I further certify that I am neither counsel for,

 8  related to, nor employed by any of the parties to the action in

 9  which this hearing was taken, and further that I am not

10  financially nor otherwise interested in the outcome of the

11  action.

12

13  _____        _____

14  /s/Crystal M. Pilgrim, RPR,FCRR        Date: June 23, 2015

15

16

17

18

19

20

21

22

23

24

25
```

USCA4 Appeal: 16-1245/18 Document 32/20833/13 36/2 Filed: 07/17/2016 wing Pg: 10/10 313

**$**

$120,000 [1] 15/18
$200,000 [2] 22/18 22/19
$2600 [26] 10/23 11/12
 11/12 12/2 12/3 22/9
 27/19 29/16 30/11 30/12
 31/2 36/21 36/22 40/6
 40/13 40/17 40/18 41/12
 41/12 41/21 41/24 41/24
 42/2 42/2 42/7 42/7
$5200 [26] 4/3 4/6 5/4
 6/24 10/6 10/7 13/1 19/12
 28/8 29/15 29/17 30/10
 30/13 33/22 33/24 36/23
 41/2 41/6 41/8 42/2 42/3
 42/15 42/22 43/16 43/18
 46/24
$5400 [2] 40/19 40/20

**'**

'80s [1] 33/10

**-**

------------------------
 1/8
-oOo [1] 48/23

**/**

/s/Crystal [1] 49/13

**1**

10:40 [1] 48/22
11 [3] 9/16 9/17 46/1
110 [7] 23/24 24/6 28/16
 32/7 32/11 33/8 39/6
12 [6] 9/11 9/12 9/17
 22/6 22/7 25/3
124 [1] 1/14
1243 [2] 1/4 2/2
14-1243 [2] 1/4 2/2
15 [1] 32/5

**2**

20001 [1] 1/22
201 [1] 1/14
2014 [1] 27/21
2015 [2] 1/5 49/13
20463 [1] 1/18
23 [1] 49/13
24th [1] 48/8

**3**

30-110 [7] 23/24 24/6
 28/16 32/7 32/11 33/8
 39/6
31 [1] 1/5
333 [1] 1/21

**9**

999 [1] 1/18
9:40 [1] 1/6

**A**

a.m [2] 1/6 48/22
aah [3] 17/2 17/2 17/2
ability [2] 15/25 49/3
able [6] 9/12 10/6 13/14
 25/17 42/3 43/18
about [31] 2/19 2/21 2/22
 7/9 7/25 8/6 8/8 9/15
 16/6 16/22 18/7 18/21

18/22 20/16 22/1 25/12
 26/23 27/16 28/18 30/8
 32/20 35/13 36/2 40/22
 41/2 41/3 41/18 44/15
 45/3 47/10 47/22
above [2] 49/3 49/6
absence [1] 6/16
absolute [1] 47/5
absolutely [6] 4/18 14/15
 18/10 24/5 25/6 34/20
abundance [2] 19/22 21/24
accept [3] 22/19 37/1
 45/20
accomplish [1] 15/8
accounted [1] 32/23
accounts [1] 40/23
accurate [2] 4/8 4/9
action [4] 2/2 3/1 49/8
 49/11
actual [2] 18/8 36/9
actually [16] 3/6 6/7
 13/13 14/9 16/16 16/20
 17/15 18/9 26/2 28/15
 32/15 33/10 34/12 39/4
 40/7 44/4
add [1] 12/3
added [2] 11/25 36/9
addition [1] 37/1
adequately [1] 16/6
adheres [1] 18/9
adjustments [1] 21/13
administrable [1] 28/23
administrative [1] 5/2
admiration [1] 3/14
admitted [3] 32/1 32/14
 46/15
advertisers [1] 45/4
affirm [1] 25/8
afield [1] 46/22
after [6] 8/1 22/15 28/1
 30/3 33/10 48/3
again [13] 8/20 10/19
 12/16 15/7 16/13 20/15
 21/12 25/21 26/4 36/13
 41/14 46/11 46/22
against [6] 22/12 22/13
 26/18 27/12 28/5 30/21
aggregate [5] 7/19 7/21
 8/14 32/21 36/2
ago [1] 2/11
agree [8] 9/3 14/21 16/1
 16/1 21/10 24/10 27/5
 45/22
agreed [2] 7/11 35/7
agrees [3] 7/24 8/13
 43/15
ahead [1] 3/7
aided [1] 1/24
al [2] 1/3 2/3
Alexandria,VA [1] 1/15
all [41] 2/13 2/17 2/17
 3/1 3/14 3/14 6/6 7/1
 9/13 9/20 11/6 15/6 15/24
 16/25 17/8 17/16 17/17
 19/23 20/7 20/17 21/12
 21/13 21/25 23/12 24/8
 24/15 27/5 28/11 31/12
 36/16 39/23 41/3 43/8
 43/22 44/6 44/7 47/3
 47/13 48/4 48/5 48/20
ALLEN [2] 1/13 2/4

allow [1] 32/18
allowed [2] 12/3 29/3
allowing [1] 10/10
allows [2] 32/3 32/6
almost [1] 20/2
along [3] 5/18 7/2 28/4
already [15] 3/21 9/2
 10/11 10/22 19/14 21/18
 22/11 27/24 28/2 29/17
 31/18 31/24 32/13 35/4
 43/16
also [6] 11/21 22/13
 24/23 32/20 36/6 38/25
although [2] 28/3 39/14
always [1] 31/15
am [4] 21/12 24/3 49/7
 49/9
Amendment [18] 4/20 4/21
 4/22 6/15 6/17 7/4 10/4
 12/1 12/1 16/3 16/7 16/8
 17/23 24/24 26/19 27/13
 27/20 27/24
American [1] 22/23
amount [11] 4/23 12/10
 12/13 18/17 25/23 37/14
 40/17 40/21 42/21 43/4
 43/16
analogous [2] 7/24 8/2
analysis [5] 17/23 19/17
 25/6 25/11 32/22
annual [3] 26/18 27/10
 28/5
anonymous [1] 45/18
another [6] 14/1 28/13
 30/24 31/23 32/9 32/19
answer [3] 4/18 18/18
 26/10
answered [2] 16/2 16/6
anti [13] 4/25 5/4 6/24
 7/1 7/5 7/6 7/8 29/14
 29/16 30/7 30/8 37/12
 37/16
anti-corrupting [1] 6/24
anti-corruption [11] 4/25
 5/4 7/1 7/5 7/6 7/8 29/14
 29/16 30/8 37/12 37/16
anticipate [1] 16/9
any [16] 13/3 13/7 13/24
 15/13 18/1 20/18 24/1
 25/1 25/1 28/14 36/18
 38/10 39/8 41/17 42/25
 49/8
anybody [4] 44/19 44/20
 47/9 47/10
anything [5] 21/14 21/15
 41/3 42/11 46/15
anyway [2] 2/13 11/20
apparent [1] 32/15
appeal [2] 25/17 34/23
appealed [1] 34/22
Appeals [26] 8/21 9/4 9/5
 9/6 9/25 10/16 14/13
 15/11 19/11 19/21 19/25
 20/4 21/4 23/11 24/15
 25/7 25/8 26/24 28/20
 34/19 35/10 38/12 39/7
 39/9 43/15 48/14
APPEARANCES [1] 1/12
appellate [1] 23/25
application [1] 28/18
applied [32] 5/24 6/2

USCA Case #15-1301    Document #1584624    Filed 08/17/2015    Page 47/25 48/213

**A**

applied [5]   6/14 6/15
6/17 6/22 13/21 17/17
26/20 26/21 27/21 28/2
29/9 34/6 39/22 39/23
40/3 40/8 43/9 43/10
43/11 43/21 44/9 44/12
44/12 45/1 45/2 45/11
46/9 46/9 47/14 47/18
applies [2]   22/23 44/1
apply [9]   22/10 24/17
25/22 28/17 32/12 40/6
40/7 43/19 43/20
appreciate [4]   6/11 20/8
35/19 47/1
appreciated [1]   19/4
approach [1]   25/18
appropriate [2]   25/2
28/17
April [1]   48/7
are [34]   6/23 8/22 11/6
11/7 11/8 11/16 11/19
11/25 13/17 14/16 14/25
16/16 18/12 20/15 22/8
22/18 24/9 24/11 25/3
25/9 26/5 27/23 28/21
29/21 30/9 32/11 33/2
35/9 35/23 39/2 42/8
44/11 45/22 47/13
aren't [2]   46/2 47/1
argue [2]   10/3 25/17
argued [4]   5/10 35/8 36/7
36/11
arguing [3]   30/9 36/20
41/19
argument [29]   4/21 4/22
6/2 6/4 6/10 7/4 7/10
7/12 8/17 8/19 9/8 9/9
10/2 10/2 10/4 10/8 15/14
16/4 19/25 19/25 20/10
20/10 22/1 23/15 35/12
35/19 36/13 40/3 48/4
arguments [6]   4/21 16/10
30/17 34/11 46/25 48/1
as [81]
aside [2]   22/1 22/3
ask [2]   19/20 48/15
asked [1]   38/14
asking [10]   9/18 9/19
15/25 20/15 22/8 28/20
37/20 40/12 46/23 46/24
asks [1]   19/11
aspect [4]   6/24 6/25 6/25
15/2
associate [2]   34/7 34/8
association [1]   45/16
associational [1]   45/21
assume [2]   7/3 43/14
assuming [1]   17/7
assured [1]   21/17
attempt [1]   46/12
attempts [1]   45/25
attention [1]   35/11
authority [2]   34/15 35/1
authorized [1]   42/2
Avenue [1]   1/21
away [1]   43/22

**B**

back [16]   4/11 5/14 5/17
6/8 13/14 16/22 20/5
20/15 34/10 34/11 34/16
34/19 36/4 36/18 42/9
46/23
bad [1]   46/21
balance [1]   46/13
banc [2]   23/14 23/20
barred [1]   13/7
base [4]   19/16 22/12
32/24 33/2
based [1]   13/16
basically [1]   20/20
basis [1]   45/14
BCRA [1]   7/23
BCRA's [2]   33/5 33/5
be [53]
became [1]   28/1
because [46]   2/12 2/14
4/2 4/3 4/3 5/17 6/21
6/21 7/12 8/20 12/21 15/6
18/8 19/14 20/16 22/8
22/11 22/20 24/22 25/12
26/1 26/13 26/25 30/23
30/25 32/16 32/18 33/23
34/10 34/21 35/8 36/5
36/5 36/6 36/6 37/10 38/8
38/12 39/21 39/22 40/2
40/4 43/10 45/19 46/4
47/25
been [28]   3/17 3/21 4/1
4/20 5/4 5/7 9/12 11/3
14/19 14/25 15/3 16/10
18/13 21/19 22/5 24/14
26/7 26/25 27/6 31/19
32/25 33/20 34/1 38/10
38/14 38/15 41/17 48/2
before [8]   1/10 5/11
12/22 14/20 16/10 27/1
29/4 35/4
beggar's [1]   18/3
begin [1]   4/19
beginning [2]   5/14 5/17
behalf [1]   19/9
being [3]   7/25 40/3 46/18
belief [1]   18/4
believe [2]   8/25 19/24
belongs [1]   29/4
benefited [1]   44/7
bequest [4]   26/18 26/25
27/11 27/12
bequests [1]   25/22
best [6]   7/8 8/9 39/3
47/22 48/3 49/3
between [4]   3/19 8/12
13/12 27/25
Beyoncé [1]   2/13
beyond [1]   44/19
bifurcated [3]   33/22
33/23 33/24
big [2]   17/13 18/19
bigger [1]   20/3
bind [1]   36/5
binding [1]   36/10
bit [4]   16/13 32/20 46/22
47/12
bitsy [1]   20/6
bled [1]   3/18
blew [1]   46/11
blinded [1]   18/14
blow [1]   22/21
Bob [4]   30/18 30/20 30/21

**C**

30/25
borrowing [1]   2/9
both [2]   47/25 48/2
breadth [1]   22/14
briefed [4]   10/15 36/7
36/11 38/15
briefing [1]   5/13
briefs [4]   2/18 6/3 10/2
48/1
bring [1]   43/12
bringing [1]   26/5
broad [3]   6/2 22/13 26/5
broader [1]   15/13
brought [1]   25/20
Brown [1]   31/21
Buckley [27]   7/5 7/14
7/17 7/18 7/20 8/1 8/3
8/6 8/7 8/13 17/14 19/18
22/11 24/22 24/23 26/6
26/8 32/22 32/25 33/21
36/1 36/8 36/13 36/18
38/7 39/24 43/13
Buckley's [2]   25/21 28/11
building [1]   9/19
bunch [1]   45/19
burden [2]   3/4 3/6
Burrington [2]   26/19
27/13
buy [1]   30/5

**C**

CA [1]   1/4
Cal [1]   46/17
Cal.Med [2]   28/16 33/10
California [1]   45/18
call [2]   4/2 8/24
called [1]   31/7
came [1]   35/20
campaign [2]   4/4 17/11
campaigns [3]   10/7 10/24
27/22
can [31]   4/2 4/6 8/5 8/14
9/6 9/11 9/12 10/23 11/12
12/2 16/25 18/10 19/19
20/5 24/16 27/18 28/24
29/17 30/2 35/7 36/21
36/22 40/17 40/19 40/20
41/11 43/12 43/23 43/24
44/17 46/20
can't [19]   3/15 4/3 5/5
6/2 8/7 11/5 14/16 22/6
22/19 24/23 26/6 29/15
30/4 30/17 31/15 33/25
39/24 43/5 46/20
candidate [30]   4/4 4/5
4/24 12/11 12/14 14/9
17/14 17/19 17/25 18/3
18/9 19/13 22/17 23/7
28/6 29/1 29/20 29/22
29/22 29/25 30/2 30/10
37/15 40/17 41/9 42/20
42/22 43/24 43/25 47/11
candidates [9]   7/19 10/8
17/22 27/23 27/23 30/18
32/3 34/9 44/7
cannot [2]   28/7 37/17
caps [1]   25/23
care [1]   18/7
case [63]
cases [10]   11/6 11/7
17/18 35/24 36/19 39/2

USCA Case #13-5124   Document #1469234   Filed: 08/17/2013   Page 271 of 313

**C**

caesses #1 [1] 14/23

caucuses [2]   11/16 11/20

cause [2]   21/22 32/16

caution [2]   19/22 21/24

center [3]   1/13 9/8 9/9

cert [1]   31/13

certainly [5]   10/20 11/15
 16/2 25/25 34/14

certainty [1]   13/19

CERTIFICATE [1]   49/1

certification [5]   21/8
 32/10 33/14 37/21 39/7

certified [11]   15/6 19/21
 20/17 21/24 22/5 25/10
 26/7 26/11 26/16 28/1
 46/9

certify [11]   24/1 24/3
 24/15 26/9 27/17 27/18
 27/19 28/10 46/8 49/2
 49/7

challenge [32]   6/14 6/15
 6/17 7/19 17/17 18/1
 19/17 22/13 22/14 23/21
 26/6 31/12 32/12 39/22
 39/23 39/24 40/3 40/4
 40/5 40/8 43/9 43/10
 43/11 44/9 44/13 45/1
 45/2 46/9 46/10 47/14
 47/18 47/19

challenged [1]   46/18

challenger [1]   6/16

challengers [1]   17/19

challenges [3]   32/8 32/9
 46/19

challenging [7]   24/22
 32/2 32/2 32/5 32/14
 32/15 46/16

chance [1]   27/7

changed [1]   29/25

characterized [1]   38/7

CHARLES [3]   1/16 2/5 19/9

Chief [2]   15/15 36/3

CHLOPAK [2]   1/16 2/5

choice [3]   8/23 11/4 11/4

chose [3]   34/6 34/9 38/16

chosen [1]   8/20

circle [3]   16/22 34/10
 34/11

circuit [10]   3/19 19/19
 20/14 29/5 29/5 29/7
 31/11 31/13 31/18 34/13

Citizens [5]   5/22 45/1
 45/1 45/2 45/3

Civil [1]   2/2

claim [9]   5/23 5/24 6/1
 6/2 12/1 22/8 31/23 43/6
 46/23

claimed [1]   31/10

claiming [3]   13/13 39/22
 45/21

claims [1]   4/14

clear [3]   9/22 29/5 41/20

clearly [3]   14/16 21/11
 44/18

client [2]   6/22 15/19

clients [5]   10/5 10/23
 15/9 43/17 44/2

close [2]   23/5 33/13

closely [2]   9/14 37/11

closing [1]   17/24

collateral [1]   33/18

collect [4]   16/25 17/1
 17/1 17/2

collected [1]   17/9

COLLYER [1]   1/10

COLUMBIA [2]   1/1 1/21

combating [1]   33/2

come [2]   4/15 23/5

comes [3]   20/10 34/15
 44/24

coming [1]   48/5

COMMISSION [3]   1/6 1/17
 2/3

committee [4]   17/11 26/20
 27/14 29/23

committees [1]   29/23

common [1]   44/22

Competitive [1]   1/13

complaint [7]   7/25 23/7
 39/5 39/7 39/8 39/17
 39/19

complete [2]   23/22 23/23

completely [1]   14/21

computer [1]   1/24

computer-aided [1]   1/24

concept [1]   14/1

conceptually [1]   31/6

concerns [1]   5/2

conclude [1]   22/9

concluded [3]   24/23 26/9
 48/22

conclusion [1]   19/18

conflation [1]   4/20

confusion [2]   3/3 40/10

Congress [26]   3/8 4/22
 4/23 8/20 8/24 11/24
 13/15 13/22 14/12 18/17
 28/21 29/4 33/10 33/23
 37/14 38/8 38/16 40/13
 40/16 41/6 42/2 42/14
 42/14 43/4 43/15 43/23

Congress's [1]   46/13

consequence [1]   4/9

consequently [1]   40/14

consider [3]   22/15 25/10
 33/21

considered [2]   17/16
 36/10

Constitution [1]   1/21

constitutional [13]   15/3
 16/3 20/6 23/21 24/1 24/4
 29/7 33/11 34/8 37/8 37/9
 43/3 46/19

constitutionally [2]
 22/12 32/25

contemplate [1]   28/24

contest [5]   12/13 13/8
 13/25 13/25 14/7

contests [6]   12/22 13/1
 28/11 41/13 42/8 42/11

context [3]   12/1 18/16
 37/10

contrast [3]   7/18 32/24
 33/8

contribute [12]   4/3 4/6
 10/7 13/3 17/25 19/17
 26/4 28/7 34/5 36/21
 36/23 36/24

contributed [2]   10/23

27/22

contributing [1]   10/5

contribution [27]   7/13
 7/21 8/16 15/2 19/12
 22/11 22/12 22/20 22/22
 25/21 25/21 25/23 26/18
 26/21 27/10 27/19 28/5
 28/12 32/24 33/22 33/23
 33/24 36/16 37/11 38/8
 40/15 46/12

contributions [14]   6/22
 6/23 7/19 12/25 13/15
 18/20 18/21 18/22 27/1
 29/3 34/1 37/3 37/4 37/6

contributor [2]   23/7
 37/15

control [1]   34/24

controlling [3]   24/7 24/8
 36/3

convenience [1]   5/2

convert [1]   17/15

convocation [1]   33/6

copies [1]   48/10

correct [14]   11/23 12/15
 13/4 13/9 17/11 23/1 23/2
 24/2 25/6 37/13 38/11
 41/15 46/8 49/2

corresponding [1]   28/2

corrupt [1]   4/24

corrupting [17]   6/24
 11/25 13/17 13/22 13/23
 13/24 18/17 26/1 37/16
 40/14 40/16 42/17 42/21
 43/5 43/16 43/24 43/25

corruption [14]   4/25 5/4
 7/1 7/5 7/6 7/8 17/14
 29/14 29/16 30/8 33/2
 37/12 37/16 46/13

could [20]   2/14 5/4 10/23
 17/15 18/11 19/12 27/16
 29/5 29/12 30/1 31/2 31/4
 32/19 35/10 42/15 42/19
 42/21 43/6 43/17 44/20

couldn't [4]   11/2 12/3
 25/25 26/9

counsel [5]   29/13 29/14
 33/4 46/7 49/7

counsel's [1]   39/1

counterintuitive [1]   12/4

County [2]   14/4 16/12

couple [3]   8/10 11/10
 38/21

course [5]   7/16 8/14
 17/24 27/9 29/15

court [105]

Court's [7]   3/3 3/10 4/12
 5/12 23/9 25/5 47/1

courtroom [1]   2/9

create [1]   33/24

creatures [1]   18/12

CRYSTAL [2]   1/19 49/13

cycle [1]   19/13

**D**

D.C [10]   1/5 14/3 14/5
 19/19 29/5 29/7 31/11
 31/13 31/18 44/3

date [2]   49/5 49/13

David [1]   31/19

Davis [1]   44/23

day [7]   11/12 11/12 12/3

USCA Case #15-5010    Document #6/68250    Filed: 08/17/2013    Page 253 of 313

**D**

day.case [4] 30/10 30/11
30/12 31/3
DC [2] 1/18 1/22
dead [2] 26/1 27/6
deal [3] 3/17 10/19 18/19
deceased [1] 25/22
decide [3] 14/17 20/5
28/25
decided [8] 3/21 4/1 9/10
14/19 17/14 19/23 20/2
21/19
decides [2] 4/22 4/23
deciding [1] 25/14
decision [5] 10/23 18/15
19/15 20/11 25/15
decisions [1] 15/18
declared [1] 43/4
defeat [1] 15/20
defeated [1] 31/1
defeating [1] 31/5
Defendant [2] 1/7 1/16
defense [1] 2/4
deleted [1] 33/10
democrat [3] 14/3 14/3
14/4
democratic [2] 16/11
17/18
denied [1] 31/13
deprived [1] 34/1
deputy [1] 48/12
described [1] 23/24
desire [2] 11/1 27/21
despite [1] 8/2
determination [5] 9/25
14/12 14/13 14/16 38/8
determine [1] 13/16
develop [2] 23/19 34/13
development [3] 21/6
23/25 24/12
DICKERSON [3] 1/13 2/4
35/21
did [20] 7/4 9/2 10/11
15/19 19/6 21/9 21/9
21/10 26/4 27/19 27/23
33/25 35/21 36/14 39/14
41/6 41/10 42/14 42/18
47/5
didn't [22] 8/7 10/24
20/21 21/10 21/11 23/4
24/20 25/10 25/11 30/13
30/20 30/23 30/23 32/17
33/21 33/24 35/5 36/14
36/15 39/22 42/10 42/16
difference [7] 3/19 3/20
8/12 13/12 17/13 23/6
27/25
different [9] 10/3 18/2
32/23 35/24 41/13 42/8
42/11 45/20 45/23
directed [1] 24/13
directly [1] 28/11
disagree [6] 3/24 4/1
8/23 37/22 38/2 39/21
disagreement [1] 6/19
disclosure [1] 46/7
discussed [2] 7/18 15/4
discussing [1] 9/23 15/1
discussion [2] 41/18 43/1
dismiss [4] 21/23 24/16

35/1 35/2
dismissed [3] 9/18 23/8
26/23
dismissing [1] 39/19
dispose [1] 25/4
disposes [1] 24/18
disrespect [1] 28/20
distinction [2] 12/16
12/18
distinguish [1] 45/13
distinguished [1] 32/21
DISTRICT [14] 1/1 1/1
1/11 1/20 1/21 8/4 15/11
23/23 31/11 39/4 39/5
39/11 39/19 49/5
districts [1] 24/8
do [27] 6/15 6/19 9/1
9/13 10/13 15/25 17/12
21/9 21/9 21/10 21/12
22/2 22/6 25/7 26/3 28/3
29/6 30/2 30/14 31/9
36/24 37/21 44/5 44/17
44/20 47/11 48/3
Docket [1] 1/4
does [17] 4/24 11/3 25/21
26/17 27/10 28/4 28/6
28/17 28/23 28/24 32/12
33/8 34/5 38/17 47/9
47/10 48/9
doesn't [12] 4/5 9/4 11/1
25/1 25/1 25/16 26/23
34/2 36/5 43/18 44/9
46/21
dog [1] 8/25
doing [2] 9/20 39/24
don't [31] 2/11 3/12 5/6
5/10 8/7 10/14 11/14
11/21 12/2 14/5 14/9 15/7
15/13 15/16 16/14 16/23
17/3 20/4 20/14 20/19
34/14 34/18 38/11 40/23
41/15 44/4 45/4 45/15
46/10 46/14 48/2
done [2] 3/9 31/4
donors [1] 45/19
double [1] 22/10
down [1] 18/11
drawn [1] 37/11
during [2] 29/13 34/7

**E**

each [4] 12/13 12/25 31/2
38/9
earlier [3] 26/22 33/4
41/12
early [1] 33/10
Eastern [1] 39/11
effects [1] 45/5
either [1] 40/10
elect [3] 16/18 16/19
18/4
elected [1] 34/4
election [63]
elections [10] 4/22 13/16
17/3 17/7 17/18 18/16
28/6 28/25 44/4 44/6
electronic [1] 48/10
element [2] 37/22 44/12
elementary [1] 42/24
eleven [1] 22/17
else [2] 14/17 39/8

employed [1] 49/8
empowered [1] 29/7
EN [2] 23/14 23/20
enacted [1] 32/3
end [1] 35/11
enormous [2] 3/18 3/20
enough [1] 9/24
enter [1] 28/21
entire [4] 20/10 20/10
23/14 43/11
entirely [1] 16/19
environment [1] 18/19
equal [1] 38/9
equity [1] 5/2
equivalent [2] 30/10
30/12
ERIN [2] 1/16 2/5
Especially [1] 18/20
Esquire [4] 1/13 1/16
1/16 1/17
estate [1] 25/23
estoppel [1] 33/18
et [2] 1/3 2/3
even [7] 5/22 7/17 7/17
16/23 23/5 29/5 45/15
ever [2] 12/17 14/25
every [3] 22/23 22/23
23/1
everybody [7] 40/7 40/7
43/19 44/1 44/2 44/3 44/3
everyone [4] 2/6 7/24
8/12 43/20
evidence [1] 15/13
exact [1] 36/10
exacting [1] 36/2
exactly [9] 8/15 12/8
22/2 22/15 23/8 23/9 26/2
41/18 43/13
example [4] 12/21 16/11
29/19 45/8
exceeds [1] 25/23
except [1] 12/6
excess [2] 19/12 29/3
excuse [1] 23/2
exemption [1] 22/22
exercise [1] 34/4
exercising [1] 15/17
exist [1] 34/2
existence [3] 7/12 7/13
36/16
exists [1] 28/17
expanding [1] 40/11
expectation [1] 34/15
expected [1] 34/19
expecting [1] 38/2
expedited [2] 7/22 8/5
experts [1] 28/21
explained [1] 8/11
explaining [1] 9/16
explicitly [1] 45/2
expressing [1] 13/7
extent [2] 25/3 39/23
extremely [1] 26/17
eyes [1] 17/24

**F**

face [4] 4/5 16/20 18/1
28/23
faced [1] 17/19
faces [1] 12/14
facial [5] 22/13 26/5

USCA Case #15-1212    Document #1601862    Filed: 08/17/2015    Page 45 of 48/2

**F**

facial [3] 39/24 40/4 47/18
facially [1] 32/9
facing [1] 18/3
fact [14] 6/18 7/16 10/15 16/17 18/15 25/16 36/1 38/6 38/15 40/22 40/23 40/24 46/23 47/18
factor [1] 24/19
facts [13] 6/19 10/18 10/19 10/19 17/24 20/8 23/10 25/3 28/14 33/17 39/14 44/25 45/22
factual [1] 23/20
factually [2] 10/9 10/11
fails [1] 22/7
fair [9] 3/8 3/23 5/16 14/14 14/15 34/25 37/20 38/4 40/10
fairly [2] 30/4 46/18
famous [1] 45/10
far [2] 26/2 46/22
FCRR [1] 1/19
FEC [24] 3/4 3/10 6/20 8/11 9/9 10/18 13/12 18/12 19/9 20/3 20/13 23/25 25/2 28/23 31/6 32/3 32/17 35/23 36/12 40/3 40/10 40/21 44/23 46/20
FEC's [2] 7/10 7/12
FECA [2] 28/24 33/11
FECA's [1] 27/19
federal [10] 1/6 1/17 2/3 11/5 11/7 11/7 22/25 23/1 28/5 44/4
feel [6] 5/14 10/11 16/5 35/23 47/5 47/5
feels [3] 11/10 16/13 16/14
Feingold [1] 7/23
few [2] 6/13 17/10
fidelity [1] 18/13
field [1] 28/21
Fifth [8] 4/20 6/15 10/4 12/1 16/7 17/23 24/23 27/20
fight [1] 8/25
figure [2] 13/15 24/13
figured [1] 47/8
file [2] 48/14 48/16
filtering [1] 45/18
final [2] 17/20 47/15
finally [2] 12/22 46/14
financially [1] 49/10
find [3] 5/13 31/16 35/5
fine [1] 11/4
finish [1] 46/4
first [26] 2/18 2/25 2/25 4/20 4/21 4/21 6/13 6/17 7/4 8/17 12/1 13/2 14/11 16/3 16/7 17/16 20/21 22/5 24/11 26/19 27/13 27/20 27/24 28/11 43/8 47/7
follows [1] 26/17
font [1] 33/11
foolish [1] 30/16
footnote [1] 31/24

foreclosed [1] 7/25
foregoing [1] 49/2
foregone [4] 25/13 30/18 37/4 48/5
forward [4] 8/10 10/10 43/15 43/23
found [4] 29/17 31/18 35/6 41/17
frames [1] 36/13
framing [1] 13/12
frank [1] 9/2
free [3] 5/14 10/11 24/3
frivolous [3] 24/15 24/16 35/11
frivolousness [4] 9/16 21/7 25/6 25/11
full [3] 9/24 28/7 46/6
fully [1] 16/2
function [1] 24/12
functions [4] 21/5 23/24 24/5 24/11
further [7] 18/25 23/23 28/19 29/12 35/18 49/7 49/9
future [3] 13/8 13/16 27/7 29/2 43/17

**G**

gave [3] 10/17 17/21 20/7
gavel [3] 2/10 2/10 2/13
general [37] 4/4 6/18 6/23 10/6 10/7 10/25 13/20 15/21 16/17 16/24 17/2 18/1 18/7 18/16 18/22 19/12 27/22 29/2 29/18 30/13 31/4 32/5 36/22 36/23 37/6 40/16 40/18 40/19 40/24 41/4 41/7 41/24 42/3 42/8 42/15 43/18 43/21
get [10] 9/6 13/14 17/8 17/12 31/15 31/16 34/22 40/19 41/18 47/23
gets [2] 15/6 17/12
give [23] 6/23 8/21 11/12 14/7 16/15 22/18 22/21 22/21 29/15 29/17 37/17 39/25 40/20 41/11 42/3 42/15 42/19 43/5 43/6 43/18 43/24 43/24 48/12
given [13] 5/1 5/5 5/5 10/18 12/10 12/13 26/25 27/1 31/2 35/3 40/21 41/8 42/22
giving [7] 16/16 30/10 30/11 30/13 41/2 41/3 41/3
glad [1] 40/1
Gladly [1] 3/2
go [27] 2/18 2/24 2/25 3/7 3/15 5/13 5/14 5/17 6/8 8/10 10/10 10/19 13/14 15/19 18/11 21/3 21/12 23/13 36/4 36/18 40/17 43/14 43/22 44/5 47/9 47/10 48/13
goes [5] 23/13 44/19 44/19 46/22 48/17
going [24] 3/15 6/5 6/7 6/9 8/2 11/2 11/20 14/6 14/25 15/1 15/8 21/12

21/13 22/20 23/12 23/13 29/18 34/21 34/21 34/22 36/4 37/15 40/24 47/16 48/2
Goland [6] 9/14 26/8 39/2 45/15 45/15 45/17
good [7] 2/6 2/7 2/8 2/17 46/21 47/23 48/1
got [8] 2/12 8/9 15/14 18/19 18/24 20/13 38/19 44/24
governed [1] 30/3
governmental [1] 18/9
grant [1] 25/12
granted [1] 21/25
grants [1] 23/18
great [1] 3/17
grounds [1] 26/24
group [2] 29/24 31/9
Groves [2] 26/19 27/12
guess [1] 17/3
guy [1] 45/19
guys [1] 2/19

**H**

had [16] 2/11 2/11 7/18 12/21 19/22 25/25 26/25 31/6 32/17 34/8 36/2 36/2 36/8 38/8 39/13 45/5
HAJJAR [2] 1/17 2/5
half [2] 2/12 9/15
hand [1] 23/17
handled [2] 9/22 46/8
happen [1] 46/22
happened [4] 7/9 9/21 34/17 39/4
happening [1] 20/17
happens [3] 12/21 28/15 35/23
happy [3] 4/18 14/17 21/16
harder [2] 20/16 20/22
has [49] 3/8 3/10 3/21 5/3 6/15 6/17 8/11 8/20 10/18 11/24 12/17 13/22 14/24 15/7 17/16 17/25 18/17 18/25 19/14 21/18 24/14 25/16 27/5 29/9 29/17 29/19 29/25 31/24 32/3 32/13 32/25 34/20 35/1 35/3 35/18 37/10 38/13 38/14 38/15 40/11 40/13 40/16 40/21 42/2 43/4 43/15 46/21 47/8 47/11
hasn't [1] 4/1
have [86]
haven't [3] 9/11 23/5 28/14
having [1] 46/21
he [10] 12/21 12/22 25/25 26/9 26/11 30/1 30/3 45/19 45/19 46/9
he's [2] 26/1 27/6
hear [3] 20/21 23/14 26/23
heard [2] 14/24 32/20
hearing [5] 1/10 10/22 20/11 39/8 49/9
held [1] 38/10
helpful [4] 38/22 43/9 46/2 48/2

USCA Case #14/4115/19 29/11 Document #1594250[1] 23/25 Filed: 08/17/15 dicata Page 257 of 313

**H**

here [12]   2/15 4/14 5/11 5/19 6/22 13/18 15/1 20/15 20/17 26/14 28/2 32/18
here's [1]   40/12
high [1]   45/25
Hill [2]   17/7 17/8
him [1]   13/2
himself [1]   30/1
his [3]   12/23 15/19 29/1
hits [1]   4/16
hmm [1]   41/25
holding [2]   28/11 36/9
HOLMES [5]   1/3 2/3 4/2 4/3 30/19
honest [2]   18/14 19/5
honestly [1]   11/10
honesty [1]   15/6
Honor [38]   2/7 2/20 3/2 3/9 3/17 6/12 7/11 9/3 11/7 14/11 16/10 18/25 19/6 19/24 20/23 24/5 24/25 25/18 27/9 28/9 29/21 34/18 34/20 34/24 35/12 35/16 35/22 38/1 38/7 39/12 41/15 42/6 46/6 47/4 47/7 47/20 48/6 48/18
Honor's [4]   11/9 16/6 26/10 37/22
HONORABLE [2]   1/10 48/20
hope [3]   2/15 19/4 20/20
horse [1]   30/25
house [2]   18/5 30/5
how [13]   5/21 8/7 12/2 13/12 13/16 13/22 18/19 19/16 20/5 35/8 35/10 36/10 46/10
how's [2]   2/15 6/10
huh [1]   38/24
hypothetical [2]   28/14 28/18

**I**

I'd [4]   4/11 4/15 5/12 33/13
I'll [8]   2/15 3/16 4/2 6/8 12/20 21/13 25/11 47/7
I'm [27]   2/18 3/12 3/18 4/18 9/1 10/17 14/2 14/2 14/3 14/5 14/17 15/10 15/10 16/22 17/7 20/18 20/19 23/3 25/13 31/14 37/24 40/1 42/10 42/11 44/15 47/15 48/2
I've [2]   6/3 35/2
identical [1]   31/10
illegal [1]   31/10
impacted [1]   44/25
implication [2]   12/9 12/12
important [4]   20/6 20/18 20/19 36/25
imposed [1]   34/7
imposing [3]   26/18 27/10 28/4
in-administrable [1]

28/23
include [2]   21/6 21/6
including [1]   23/25
increases [1]   4/24
individual [4]   19/16 22/20 28/12 32/24
infer [1]   30/16
inferring [1]   42/10
influence [1]   26/1
information [1]   40/22
injunction [10]   5/20 7/11 10/22 19/15 20/11 24/17 24/20 31/25 34/3 35/3
injured [1]   44/8
injury [1]   34/7
ink [1]   3/18
inoculate [1]   46/20
Insanity [1]   31/7
insight [6]   36/8 41/16 41/16 41/17 42/11 42/25
insisted [2]   5/23 33/14
instead [1]   23/6
insubstantial [2]   19/13 29/1
insubstantiality [1]   21/18
insufficient [1]   7/6
insulting [1]   20/19
intend [1]   26/3
intended [1]   18/4
interest [3]   7/1 37/12 41/19
interested [1]   49/10
interesting [2]   5/21 36/12
interpreted [2]   24/6 24/7
invalidating [1]   40/6
invited [1]   6/9
invoke [1]   32/12
irrational [1]   15/18
is [177]
isn't [16]   4/21 5/9 6/21 9/16 17/9 20/12 20/12 20/17 20/20 20/25 21/2 33/23 36/4 41/20 44/12 48/4
issue [6]   3/11 6/21 22/3 23/13 25/11 38/25
issued [1]   21/22
issues [1]   33/19
it [134]
it's [69]
its [66]   19/15 19/18 23/16 24/7 24/17 28/23 29/19 31/3 31/24 34/3 37/12 39/1
itself [2]   33/1 47/17
itsy [1]   20/6
itsy-bitsy [1]   20/6

**J**

Jagger [1]   31/14
Janice [1]   31/21
Jim [1]   25/14
job [1]   14/17
judge [18]   1/11 7/23 15/10 15/11 20/16 23/14 25/7 25/19 26/4 26/4 26/9 26/16 28/1 33/7 39/5 46/7 46/8 48/3
judges [1]   8/22

judgment [3]   9/19 25/2 25/4
judicata [1]   33/18
June [1]   49/13
jurisdiction [5]   3/11 8/21 33/7 33/9 34/14
just [35]   4/15 5/22 6/3 6/4 7/9 8/9 9/1 15/14 16/9 20/12 20/15 20/20 21/22 22/18 23/3 24/25 26/8 26/8 27/8 27/16 30/22 31/6 31/16 32/10 39/16 41/23 42/11 42/16 43/22 44/2 46/14 46/20 46/25 47/13 48/16
Justice [2]   15/15 36/3

**K**

keep [13]   3/15 6/5 6/7 6/9 6/9 11/20 17/8 17/12 17/12 29/22 30/1 30/5 47/16
key [1]   47/9
Khachaturian [8]   22/16 22/17 26/8 39/2 39/3 39/4 43/9 47/17
kind [4]   17/13 18/2 44/6 47/12
KITCHER [4]   1/16 2/5 19/9 35/20
knew [2]   26/15 45/19
know [45]   2/11 3/4 4/16 6/7 6/25 8/20 9/18 10/11 10/24 10/24 11/14 12/2 13/18 13/21 13/22 14/9 15/1 15/7 16/18 18/10 18/16 20/19 20/25 21/1 26/22 29/17 30/23 34/21 36/13 37/19 37/21 38/6 38/11 39/17 40/24 41/15 44/23 44/24 45/15 46/10 46/13 47/15 47/22 48/2 48/14
knows [1]   3/17

**L**

large [3]   8/22 25/23 40/21
larynx [1]   2/12
last [11]   7/10 8/9 8/9 19/13 21/21 25/10 30/10 30/11 31/3 31/6 38/21
later [3]   5/1 13/21 48/7
LAURA [2]   1/3 2/2
law [6]   13/24 29/25 34/5 36/21 44/23 45/10
lawful [1]   37/4
lawyers [2]   2/14 47/23
least [4]   3/19 5/10 9/11 20/20
leave [4]   17/7 17/8 25/22 48/3
left [3]   2/10 22/14 30/1
legal [3]   31/11 33/16 36/6
legislate [1]   28/20
let [6]   2/24 14/17 16/21 19/20 34/10 34/11
let's [8]   2/24 7/3 13/1 30/19 35/25 42/5 43/14 46/3

USCA Case #15-1363 Document #1660508 Filed 02/17/2017 Page 357 of 371

**L**

levels [1]   14/10
liberal [1]   30/4
Libertarian [2]   26/20
  27/14
Life [1]   15/16
light [3]   34/12 46/18
  47/1
like [19]   2/13 4/11 6/4
  6/20 11/11 11/16 16/5
  16/14 21/2 22/15 26/8
  26/8 28/8 28/24 31/6
  33/13 35/14 35/23 45/25
likelihood [1]   24/19
limit [35]   8/16 10/3 10/4
  10/5 11/11 13/1 15/2
  19/16 22/9 22/10 22/12
  22/20 22/22 25/21 25/21
  27/19 28/5 28/12 29/16
  32/24 33/22 33/23 33/24
  34/1 36/2 36/3 36/15 37/3
  37/3 37/4 38/7 38/8 40/6
  40/15 46/24
limitation [1]   37/5
limiting [1]   12/25
limits [17]   7/13 7/13
  7/19 7/21 8/14 9/24 26/18
  27/10 32/21 33/2 36/16
  37/11 38/16 38/17 38/18
  43/22 46/12
line [2]   5/19 25/13
lines [1]   28/4
list [1]   18/11
listen [2]   20/13 20/22
little [6]   15/14 16/13
  20/6 23/3 32/20 47/12
LNC [4]   25/19 25/19 27/25
  46/7
logic [2]   4/25 30/15
long [1]   25/11
look [11]   2/13 6/8 7/9
  9/21 9/21 15/18 25/14
  25/15 39/1 39/2 44/25
lordy [3]   20/14 20/14
  20/14
lost [1]   2/12
lot [8]   8/10 11/19 17/1
  17/2 25/16 44/6 46/25
  46/25
lots [1]   29/21
Louisiana [1]   39/11
love [1]   48/1
Lucky [1]   14/2

**M**

machine [2]   1/24 13/14
made [8]   6/3 11/4 14/13
  16/10 19/12 30/17 38/8
  40/3
magistrate [1]   39/5
make [13]   2/14 8/24 11/5
  18/15 21/13 22/10 27/3
  27/6 27/16 29/20 40/24
  42/10 44/9
makes [1]   18/7
making [5]   23/7 31/14
  32/8 34/1 47/13
man [1]   21/15
mandated [3]   21/5 23/24

mandatory [2]   33/7 33/9
many [4]   8/8 13/16 29/9
  39/3
March [1]   1/5
Maryland [4]   14/3 14/4
  16/12 44/5
matter [5]   4/25 13/19
  21/5 30/23 49/6
max [1]   22/21
maximum [1]   17/21
may [17]   5/1 5/1 5/3 7/7
  12/10 12/13 14/11 15/18
  16/5 19/7 21/10 25/7
  38/10 38/11 39/13 47/4
  47/6
maybe [4]   10/18 14/3
  29/22 29/24
McCain [1]   7/23
McCutcheon [14]   6/25 7/9
  7/18 8/12 9/21 32/20
  32/21 33/1 33/4 33/25
  35/25 36/1 42/20 42/20
me [30]   3/1 3/6 8/25 14/2
  14/7 15/5 15/7 16/21
  19/20 20/7 20/13 20/19
  22/2 22/18 22/21 22/21
  23/2 23/21 25/13 26/12
  30/18 34/10 34/11 35/7
  35/14 37/5 41/23 44/2
  48/5 49/4
mean [33]   4/7 4/8 5/7
  5/17 6/6 9/14 11/1 12/7
  12/19 14/1 15/10 18/10
  18/10 21/10 21/13 21/25
  23/13 25/16 36/22 37/2
  38/17 39/13 41/20 41/23
  43/8 44/10 44/17 44/25
  45/7 45/14 45/17 45/20
  46/1
meaningful [1]   16/24
means [2]   11/3 33/2
meet [3]   9/11 9/12 22/6
merit [5]   15/8 25/1 25/1
  25/16 35/10
meritless [1]   24/24
merits [14]   8/21 9/25
  14/12 14/12 14/15 19/25
  25/14 27/2 35/6 38/11
  39/21 41/16 41/16 41/18
Mick [1]   31/14
might [9]   4/9 14/8 16/12
  16/23 20/5 25/16 29/22
  31/16 34/17
mine [1]   11/8
minute [1]   5/6
Missouri [1]   36/19
misspeaking [1]   37/5
misunderstand [1]   20/19
momentarily [1]   9/6
monetarily [1]   13/7
money [41]   4/23 5/1 10/25
  11/2 12/10 12/13 13/24
  13/25 13/25 14/7 15/19
  16/16 16/17 16/25 17/1
  17/1 17/3 17/8 17/12
  17/13 17/15 17/20 18/17
  27/5 30/3 31/3 32/3 32/19
  37/15 37/17 40/17 42/19
  42/21 43/4 43/12 43/16
  43/24 43/25 44/8 45/18

45/20
Montgomery [2]   14/4 16/11
moot [5]   27/3 27/6 27/23
  28/1 28/2
mootness [4]   3/11 26/23
  26/24 27/17
moral [1]   13/19
more [17]   10/18 10/19
  13/3 13/25 14/4 20/18
  26/3 27/7 27/8 28/4 35/13
  37/20 43/12 43/24 43/25
  44/18 47/15
morning [6]   2/6 2/7 2/8
  2/17 24/25 32/21
most [2]   9/14 45/10
motion [8]   1/10 20/12
  20/21 20/23 21/1 21/1
  23/18 38/4
motivations [1]   15/17
move [2]   3/16 43/23
moved [1]   21/4
movie [2]   45/3 45/4
Mr. [2]   35/20 35/21
Mr. Dickerson [1]   35/21
Mr. Kitcher [1]   35/20
Ms [1]   30/19
Ms. [2]   4/2 4/3
Ms. Holmes [2]   4/2 4/3
much [12]   5/8 8/3 13/22
  13/24 15/7 15/13 19/2
  19/7 19/16 44/4 44/8 47/3
must [3]   31/19 36/22
  37/11
my [16]   2/9 2/12 2/12 5/7
  10/8 11/6 14/17 16/2
  16/24 16/25 17/2 20/11
  34/24 35/12 38/4 49/3

**N**

names [1]   30/17
narrow [4]   5/23 6/1 26/17
  33/15
narrowed [1]   15/12
narrower [2]   27/17 29/9
narrowing [1]   28/4
national [3]   26/20 27/14
  29/23
nature [4]   7/21 8/16 9/23
  45/21
neat [1]   28/24
necessarily [5]   9/10
  11/21 34/20 37/2 45/16
necessary [2]   23/20 25/3
necessity [3]   37/8 37/9
  47/6
neck [1]   2/11
need [8]   4/16 20/3 27/8
  31/17 44/18 46/4 46/5
  48/13
neither [3]   19/18 33/24
  49/7
never [14]   2/14 15/3
  34/15 34/16 36/11 38/10
  38/13 38/14 38/15 38/18
  41/17 43/10 44/20 48/15
new [3]   6/9 32/22 36/6
next [4]   3/25 16/22 17/4
  30/12
nicely [1]   48/16
Nixon [1]   36/19
no [49]   1/4 2/23 3/12 4/1

USCA Case #15-5412 Document 1580984 Filed: 06/17/2016 Page 259 of 313

**N**

N [10] 3/1 4/1 4/2
4/24 5/3 6/4 7/5 7/25
7/25 8/25 9/1 9/23 11/19
12/17 13/25 14/14 14/24
16/1 17/25 18/18 18/25
20/3 20/3 21/23 24/22
27/7 27/17 29/14 29/17
32/18 35/6 35/9 35/18
35/19 36/8 41/1 41/1 41/1
41/1 41/1 41/1 43/7 44/14
47/16 48/7
non [12] 13/17 13/22
13/23 13/24 24/15 32/10
40/14 40/16 42/17 42/21
43/5 43/16
non-corrupting [10] 13/17
13/22 13/23 13/24 40/14
40/16 42/17 42/21 43/5
43/16
non-frivolous [1] 24/15
non-starter [1] 32/10
nonetheless [4] 7/22 14/7
25/13 36/9
north [1] 46/1
not [117]
note [2] 26/22 48/16
notes [1] 49/4
nothing [5] 8/15 18/10
22/14 39/8 47/11
notice [1] 34/16
novel [2] 25/20 26/3
now [16] 2/13 5/6 10/10
13/18 14/2 15/10 19/2
19/23 21/25 23/16 25/9
27/23 32/1 37/17 40/19
41/12
nuance [1] 33/3
number [2] 8/22 28/10
numbered [1] 21/16
NW [2] 1/18 1/21

**O**

object [1] 32/7
objecting [1] 19/16
objections [1] 6/20
obligation [1] 23/10
obvious [1] 43/1
obviously [1] 45/4
occurred [1] 20/1
office [2] 30/1 30/3
official [1] 1/20
often [1] 35/23
oh [9] 2/22 6/4 6/5 20/3
20/4 20/14 21/15 26/15
37/24
okay [44] 2/24 3/7 3/25
4/13 5/16 7/3 8/18 9/7
11/8 14/2 14/23 15/5
15/23 18/24 19/8 19/20
20/2 21/17 23/18 25/9
27/15 29/11 30/6 31/22
35/13 35/13 35/14 36/20
37/18 38/19 38/20 39/14
39/18 40/1 40/1 41/7 41/9
42/5 42/23 43/2 43/7 45/9
45/12 48/17
once [2] 5/5 10/12
one [20] 5/18 6/4 11/10
13/2 13/25 17/11 22/19

27/7 27/8 29/17 30/19
30/22 30/22 30/25 32/19
33/15 33/22 37/22 46/7
36/6 37/1 37/22 46/7
46/20
one's [1] 17/24
ones [1] 2/25
only [9] 10/25 15/10
15/10 23/6 27/25 32/7
39/8 41/21 44/10
oOo [1] 48/23
open [1] 30/14
opened [1] 31/13
opening [1] 29/13
operation [1] 20/8
opinion [9] 5/7 13/7 24/7
31/14 31/25 34/4 35/3
36/4 37/23
opponent [7] 4/6 14/6
16/14 16/20 16/23 16/24
18/1 28/7 29/2
opportunity [1] 23/19
opposed [3] 47/12 47/12
47/13
opposing [1] 28/6
option [1] 30/14
oral [1] 48/3
order [6] 21/22 23/16
23/19 28/21 28/25 34/13
ordered [1] 22/2
other [17] 4/5 5/2 9/20
10/6 11/22 15/20 17/5
17/6 18/6 29/6 29/13
29/21 29/23 30/7 34/22
44/5 46/5
otherwise [1] 49/10
ought [1] 42/3
our [16] 3/4 5/13 6/19
6/22 9/8 9/9 12/1 13/4
13/12 13/20 38/13 38/14
40/10 40/11 40/25 45/24
out [16] 4/19 13/3 13/15
19/22 21/23 24/13 34/24
46/10 46/11 47/8 48/7
outcome [1] 49/10
outcomes [1] 28/25
outside [2] 29/24 44/3
over [10] 2/15 5/5 6/19
17/9 20/9 22/14 27/1
36/13 36/13 42/20
over-breadth [1] 22/14
overall [4] 12/10 12/13
13/1 46/24
overrule [3] 19/19 24/23
26/6
overstate [1] 23/4
owe [1] 18/13
own [4] 23/17 24/17 29/19
46/2
ownership [1] 9/1

**P**

P-R-O-C-E-E-D-I-N-G-S [1]
2/1
Pack [1] 36/19
page [2] 9/15 32/5
pages [1] 49/3
panel [2] 23/14 25/7
papers [1] 32/1
paragraph [1] 8/13
paragraphs [2] 21/17
38/22

paralyzed [1] 2/12
part [5] 18/6 22/4 25/22
36/5 47/22
particular [7] 18/13
26/21 29/1 44/25 45/3
45/3 47/11
particularly [1] 38/22
parties [3] 3/19 23/19
49/8
party [6] 4/5 15/22 25/24
28/6 43/11 43/12
past [1] 46/11
patience [1] 47/2
pennies [1] 25/13
people [7] 15/17 16/15
17/21 17/25 18/7 22/18
27/22
per [24] 7/13 7/16 8/15
9/23 10/3 11/11 15/2
18/15 19/17 22/9 22/11
22/19 22/22 28/12 29/16
32/24 36/14 36/15 38/7
38/16 38/17 40/6 41/21
43/22
perfect [1] 45/8
perfectly [2] 9/2 11/4
perform [1] 21/5
perhaps [2] 9/5 29/19
period [4] 17/21 18/20
18/21 18/23
permission [2] 4/12 5/12
person [5] 10/25 13/17
18/4 28/24 29/15
personal [4] 30/4 37/3
37/4 37/5
personalities [1] 18/11
personally [2] 17/12
17/15
persons [1] 10/6
piece [1] 18/6
PILGRIM [2] 1/19 49/13
place [3] 22/5 32/23 48/3
plaintiff [4] 2/4 19/10
21/23 44/24
plaintiff's [4] 22/7
22/14 23/20 28/14
plaintiffs [34] 1/4 1/13
2/24 2/25 19/17 21/14
22/6 24/21 25/5 25/20
26/3 26/5 27/20 28/5 28/7
29/8 30/9 30/13 30/16
30/19 31/23 31/25 32/11
32/13 32/18 33/14 33/25
34/4 34/23 35/5 44/12
44/19 47/13 47/19
plan [1] 26/1
plead [1] 39/23
please [3] 14/7 22/21
48/13
pled [3] 7/1 13/13 43/10
plus [2] 40/17 42/2
point [20] 5/10 8/3 9/23
10/21 11/9 11/24 12/3
13/6 14/24 15/14 16/21
16/22 27/16 31/23 33/13
34/11 37/16 40/25 43/14
46/11
pointed [1] 14/25
pointing [1] 4/19
points [2] 9/13 29/13
poison [1] 45/17

USCA Case #13-5202    Document #1462259         Filed: 08/87/2013    Page 260 of 313

**P**

police [1] 29/4
political [1] 15/17
Politics [1] 1/13
portion [1] 37/25
position [2] 3/4 12/22
possibly [1] 35/10
power [1] 18/9
practically [1] 33/17
practitioners [1] 8/23
precedent [5] 8/9 9/13
 39/1 43/10 45/14
precise [1] 14/4
precisely [5] 8/2 14/21
 27/4 41/5 42/4
precluded [1] 25/14
precludes [1] 23/9
predict [1] 28/25
prefer [1] 29/22
preferred [3] 4/4 10/8
 15/21
preliminary [10] 5/20
 7/11 10/22 19/15 20/11
 24/17 24/20 31/25 34/3
 35/3
prepared [1] 35/20
presence [1] 6/16
present [2] 7/3 13/19
presentation [1] 29/14
presented [3] 38/18 47/17
 48/1
presenting [1] 40/5
presumably [2] 23/17 43/1
pretty [2] 9/22 45/20
prevail [2] 22/7 24/21
prevented [1] 10/5
previously [1] 49/6
primary [45] 4/5 6/16
 6/20 6/21 10/24 11/2 13/2
 13/15 14/2 14/5 14/6 14/8
 15/20 16/11 16/11 16/13
 16/16 16/23 16/25 17/21
 17/25 18/3 18/10 18/20
 18/21 28/7 29/20 30/11
 30/12 30/23 32/4 33/2
 34/5 34/7 36/21 36/25
 37/6 40/13 40/15 40/21
 41/2 41/3 41/24 42/7 44/7
principally [1] 16/18
prior [1] 21/7
pro [1] 37/12
probably [3] 2/10 34/16
 37/20
problem [7] 10/1 10/8
 13/10 22/19 28/13 28/19
 47/19
problematic [2] 28/10
 40/22
problems [2] 29/10 43/4
procedural [1] 33/3
procedurally [1] 9/22
procedure [10] 7/23 7/24
 8/2 8/6 8/12 8/15 28/16
 28/16 32/11 33/8
proceeded [3] 7/22 19/22
 33/5
proceeding [1] 3/5
proceedings [3] 1/24
 48/22 49/5
produced [1] 1/24

progeny [1] 19/18
progress [1] 4/23
promise [3] 2/17 6/3 48/8
promulgated [1] 32/17
properly [1] 36/22
proposal [1] 29/4
prove [1] 18/11
provide [4] 7/6 7/7 23/19
 29/8
provided [3] 29/19 36/24
 49/4
provision [6] 30/4 32/7
 33/5 33/6 33/16 36/10
pry [1] 15/16
pun [1] 11/5
purely [2] 28/13 28/17
purportedly [1] 25/20
purporting [1] 32/12
purpose [1] 30/8
purposes [2] 7/3 17/23
pursue [1] 16/3
pursuing [1] 15/5
put [4] 2/15 22/1 28/14
 37/7

**Q**

question [39] 3/10 3/25
 4/19 14/18 14/19 16/2
 16/6 16/9 16/22 19/14
 19/20 20/6 21/18 24/4
 25/20 26/9 26/10 26/11
 26/16 26/17 26/21 27/8
 27/18 27/19 27/24 27/25
 28/2 28/9 28/13 28/19
 29/9 33/19 36/7 38/15
 38/18 39/20 39/21 40/2
 45/16
questions [10] 19/1 19/10
 19/21 23/10 24/1 24/15
 26/7 28/18 33/12 35/18
quid [1] 37/12
quite [4] 32/15 34/14
 48/2 48/2
quo [1] 37/12
quote [3] 11/5 14/5 16/16
quote/unquote [1] 16/16

**R**

race [1] 45/17
rachet [1] 46/20
raise [1] 44/8
raised [4] 3/10 7/17
 29/13 45/16
raises [1] 40/2
rationale [6] 4/25 7/5
 7/6 7/8 17/14 37/17
Raymond [2] 26/19 27/12
reach [1] 14/16
reached [1] 27/2
read [10] 2/17 6/3 12/4
 12/7 26/13 27/7 36/18
 36/18 36/19 46/17
reading [1] 35/24
ready [1] 22/18
real [3] 14/19 40/8 43/1
really [12] 4/16 11/22
 13/2 30/20 30/20 32/1
 32/14 34/14 40/2 40/4
 46/1 47/18
reason [9] 5/4 22/4 22/4
 23/9 29/15 29/16 32/9

33/17 36/4
reasoned [1] 37/22
reasoning [1] 24/13
reasons [6] 5/1 17/5 17/6
 28/11 29/21 35/2
receive [1] 29/3
received [2] 32/4 39/5
recertify [3] 19/11 23/10
 23/10
recess [1] 48/21
recognized [1] 19/15
reconsideration [6] 20/12
 20/21 20/24 21/1 35/14
 37/20
record [16] 9/19 12/21
 20/3 20/5 20/7 20/15 21/6
 21/11 22/1 22/3 23/20
 23/22 23/25 24/12 34/13
 39/14
recorded [1] 1/24
reelected [1] 30/20
reelection [1] 30/19
referred [2] 36/1 42/21
referring [1] 33/4
reg [4] 32/2 46/15 46/21
 46/21
regime [3] 32/22 36/6
 37/12
regs [2] 6/20 46/18
regulation [1] 32/17
regulatory [1] 18/19
rejected [1] 31/12
related [1] 49/8
relevant [4] 11/22 17/16
 36/12 47/1
relief [2] 15/25 39/25
rely [1] 9/14
relying [1] 5/22
remand [5] 21/4 22/4
 23/18 34/13 39/18
remedies [1] 47/8
remedy [10] 29/7 40/4
 40/5 40/12 40/19 43/22
 43/23 44/14 44/17 44/19
remember [4] 10/12 10/14
 21/21 30/17
render [1] 34/5
rendered [1] 35/4
repeatedly [1] 33/1
repleading [1] 39/24
Reporter [2] 1/19 1/20
representative [2] 12/20
 12/23
Representatives [1] 18/5
republican [1] 17/19
republicans [2] 15/20
 30/21
request [1] 26/21
requested [1] 39/6
requests [1] 34/12
required [1] 21/7
requires [2] 33/6 33/15
res [1] 33/18
resolution [1] 25/2
resolved [1] 24/14
resolves [1] 35/4
resources [1] 38/9
respect [3] 3/14 24/20
 33/3
respond [2] 29/12 35/21
response [3] 6/13 14/11

USCA Case #15-5111    Document #1615256    Filed: 08/17/2016    Page 262 of 313

**R**

response [1]   32/6
responses [2]   11/10 17/11
rest [1]   21/17
result [2]   32/6 32/23
retires [1]   30/3
reversed [1]   8/4
review [5]   23/20 23/25
 32/7 33/5 33/6
reviewed [2]   7/14 7/17
rewrite [1]   29/6
right [33]   2/10 2/17 3/1
 4/6 4/8 6/6 7/15 9/2
 12/23 13/3 14/11 14/16
 15/16 16/3 17/9 18/6 19/2
 19/19 19/23 21/20 26/14
 34/4 34/8 35/8 35/9 38/10
 42/8 42/12 42/25 44/16
 45/21 46/11 47/3
rights [5]   15/17 26/19
 27/13 27/20 27/24
rise [1]   48/20
road [1]   4/17
Robertson's [1]   25/15
Rolling [1]   31/15
room [1]   44/3
ROSEMARY [1]   1/10
roughly [1]   9/17
RPR [1]   1/19
RPR,FCRR [1]   49/13
rubber [1]   4/16
rule [9]   9/16 9/17 24/20
 28/22 32/8 32/12 32/14
 32/15 46/1
rule-making [1]   32/8
ruled [3]   24/21 33/16
 43/13
ruling [2]   24/18 24/20
run [1]   30/21
running [4]   14/2 14/5
 16/15 30/18
runoff [1]   13/21

**S**

said [52]
same [10]   5/4 23/6 23/8
 23/9 33/16 33/16 33/17
 36/10 45/14 47/19
Sanford [1]   12/20
saw [1]   42/20
say [23]   3/8 4/1 4/2 5/9
 6/13 12/2 13/1 16/14
 17/24 18/19 25/15 26/4
 30/19 32/5 34/17 35/14
 37/20 41/6 41/10 42/14
 42/18 47/6 47/6
saying [8]   13/18 15/1
 20/13 20/18 37/17 40/20
 42/11 43/3
says [10]   8/14 11/12 12/6
 12/8 36/21 37/14 38/1
 38/12 43/23 44/24
schedule [1]   19/25
scolding [1]   23/21
scope [4]   44/10 44/11
 44/14 44/18
screening [2]   21/7 24/13
second [3]   8/19 17/17
 24/12
Section [4]   23/24 24/6

33/8 39/6
secure [2]   16/23 16/24
see [5]   3/6 3/19 8/7 10/10
 34/21 46/3
seeing [2]   39/6 43/1
seeking [1]   26/7
segregated [1]   40/23
self [2]   31/5 34/7
self-defeating [1]   31/5
self-imposed [1]   34/7
senate [1]   45/17
send [3]   20/5 34/19 48/15
sending [1]   23/21
sense [5]   4/7 6/24 9/1
 18/7 37/21
sent [4]   20/7 39/7 39/16
 48/15
sentence [3]   36/9 47/8
 47/15
sentences [3]   8/13 47/6
 47/6
separate [1]   4/14
series [1]   26/25
servants [1]   18/14
service [1]   19/5
set [3]   19/25 44/25 45/4
Setting [1]   22/3
settled [5]   19/14 23/8
 26/7 33/20 35/11
shall [2]   23/23 48/12
she [3]   30/22 30/23 31/2
short [1]   23/16
shorthand [1]   1/24
should [12]   2/18 13/14
 14/13 22/5 23/8 24/16
 24/17 25/4 29/2 35/2 38/9
 40/14
shouldn't [5]   20/16 21/22
 22/10 25/17 40/20
show [5]   9/9 9/12 20/8
 21/22 46/2
showed [1]   17/19
showing [2]   28/14 29/20
Shrink [1]   36/19
sign [1]   2/15
significant [1]   17/19
silver [1]   28/24
silver-like [1]   28/24
similar [1]   7/24
similarly [1]   44/11
simple [1]   25/12
simply [6]   15/3 18/3
 19/11 34/6 38/10 46/25
since [6]   2/25 3/3 8/20
 36/21 40/7 42/1
single [1]   15/10
sir [3]   19/2 25/13 26/15
sitting [2]   13/18 40/18
situated [1]   44/11
situation [1]   8/5
skipped [1]   42/25
slightly [1]   46/1
small [1]   44/7
Smith [4]   30/18 30/20
 30/22 30/25
smokes [1]   44/21
so [65]
so-to-speak [1]   23/18
sole [1]   44/12
some [10]   2/11 4/19 7/25
 16/7 16/10 28/22 29/12

34/16 37/19 38/25
somebody [5]   2/9 14/8
 31/20 34/17 36/21
somehow [1]   36/12
someone [3]   13/19 14/17
 18/2
something [8]   8/6 8/7
 28/8 31/9 31/10 34/15
 36/8 36/11
sometimes [3]   15/18 15/18
 31/16
somewhat [1]   10/2
somewhere [2]   5/18 9/17
sophistry [2]   11/11 16/14
sorry [3]   3/12 10/17 11/5
sort [10]   3/1 16/13 18/1
 20/8 21/2 23/17 30/16
 45/25 46/13 46/15
sought [1]   22/4
sounds [1]   35/13
source [1]   40/10
south [1]   9/17
speak [2]   8/8 23/18
special [5]   13/21 28/16
 32/7 33/5 33/6
specific [1]   19/16
specifically [6]   7/20
 7/20 7/21 8/6 8/8 38/13
spend [4]   10/25 11/1
 15/21 17/3
spent [6]   9/15 15/20 16/7
 17/20 27/6 29/18
spills [1]   6/19
spoke [2]   7/20 8/6
spoken [1]   12/17
stage [6]   3/5 6/18 6/20
 6/21 6/23 7/12
stand [1]   5/11
standard [15]   3/17 9/11
 9/12 22/6 22/7 25/3 25/4
 33/14 33/15 33/18 33/19
 36/3 39/1 45/24 46/19
stands [1]   48/21
start [2]   35/24 35/25
starter [1]   32/10
state [4]   12/23 22/8
 30/24 37/11
state's [1]   41/18
stated [2]   39/20 49/6
statement [6]   3/23 4/10
 8/3 14/14 14/15 38/11
states [6]   1/1 1/11 1/20
 11/19 44/5 49/4
stating [1]   23/5
statute [18]   11/11 12/5
 12/6 12/7 12/8 12/9 18/13
 18/14 19/5 20/9 22/2
 25/15 28/18 29/6 32/2
 32/8 46/17 46/21
stenographic [1]   49/4
STEVE [2]   1/17 2/5
stick [1]   48/16
still [2]   43/21 48/9
Stones [1]   31/15
stop [3]   2/14 9/24 31/7
strange [2]   12/4 12/7
straw [1]   45/19
Street [2]   1/14 1/18
strong [1]   29/20
strongest [1]   30/22
subjective [1]   28/22

USCA Case #11-5151   Document #... Filed: 11/18/17...   Page ... of ...

**S**

substantial [5] [3]   39/20
45/5 46/1
substantiality [1]   24/13
substantially [1]   47/12
substantively [1]   7/24
succeed [1]   35/5
success [1]   24/19
such [2]   21/13 46/12
sufficient [3]   10/18
21/11 39/14
suggested [1]   23/17
suggesting [1]   25/9
Suite [1]   1/14
summary [2]   9/19 25/4
support [3]   12/20 15/13
15/21
supporters [1]   4/6
supporting [1]   45/19
Supreme [16]   3/22 5/3 8/3
9/10 15/12 17/15 24/6
28/15 31/12 31/12 33/17
33/9 33/25 37/10 38/12
42/25
sure [3]   2/18 3/18 37/24
surgery [1]   2/11
surprising [1]   33/21
suspected [2]   31/24 32/13

**T**

take [7]   3/1 9/24 10/11
11/9 25/5 32/3 38/25
taken [2]   49/5 49/9
talked [4]   2/19 2/21 2/22
36/2
talking [9]   2/14 17/7
17/17 18/21 18/22 41/2
41/2 44/15 47/10
Tatel [1]   31/19
tell [3]   11/2 15/5 35/7
temporal [1]   6/24
ten [2]   21/16 25/12
term [1]   7/10
terms [1]   17/13
terribly [1]   46/2
than [4]   26/3 29/6 47/15
48/7
thank [27]   3/13 6/11 16/4
19/2 19/3 19/6 26/15 30/6
35/16 35/17 35/22 37/18
38/23 39/13 47/3 47/20
47/21 47/24 47/25 48/4
48/4 48/5 48/6 48/18
48/19 48/19 48/19
Thanks [1]   48/5
that [301]
that's [78]
their [20]   9/13 10/7 11/1
15/17 15/18 16/2 23/17
24/23 25/22 27/21 27/24
31/3 32/1 32/4 32/6 34/4
34/8 43/11 45/13 46/2
them [11]   4/2 10/17 22/10
30/14 30/23 31/3 34/16
37/7 41/11 48/12 48/15
themselves [1]   30/14
then [20]   3/16 3/25 8/1
13/7 17/1 17/4 17/6 18/18
20/7 25/2 25/5 27/23
30/11 30/12 33/7 39/18

**T** (cont.)

42/1 42/1 43/5 47/10
theoretical [1]   29/2
theoretically [2]   11/18
13/20
theory [1]   31/3
there [22]   2/10 3/15 5/1
6/8 7/25 8/22 11/16 11/19
12/12 16/12 17/20 24/9
24/11 27/17 29/21 30/7
30/7 32/22 32/23 33/22
38/9 40/20
there's [27]   3/17 3/18
4/14 4/20 4/24 5/3 6/3
6/4 7/5 8/13 8/13 8/15
9/23 11/10 11/11 12/10
14/10 15/11 15/12 17/10
17/10 22/14 27/7 29/14
29/15 29/24 36/6
therefore [1]   43/17
these [9]   12/4 20/7 36/19
39/2 44/4 44/23 45/25
46/25 47/22
thesis [1]   13/23
they [50]
they'll [3]   21/16 21/16
34/16
they're [17]   2/25 5/21
5/22 9/18 9/19 9/19 9/20
18/14 22/20 24/22 26/7
30/24 32/1 32/2 32/5
32/14 32/15
they've [4]   9/22 11/3
18/13 43/10
thing [1]   45/14
things [6]   5/18 6/13 6/20
9/20 11/16 46/5
think [46]   3/6 3/23 4/7
5/6 5/10 6/8 6/8 7/1 7/8
7/8 8/8 8/16 9/2 9/20
10/21 11/9 12/15 12/15
13/9 13/11 14/10 15/7
15/8 16/7 16/9 16/13
17/10 17/13 17/24 18/14
20/16 25/16 30/8 31/21
34/12 34/18 39/3 39/14
40/9 40/9 41/14 45/7
45/16 46/8 46/14 46/22
thinking [1]   7/9
third [3]   24/14 43/11
43/12
this [106]
those [9]   7/13 7/21 13/1
17/3 17/21 30/21 42/8
44/7 44/11
though [3]   5/15 13/4
13/20
thought [5]   4/15 10/17
21/11 25/12 44/20
thousand [1]   21/16
three [9]   7/23 8/13 11/22
23/14 24/9 24/11 25/6
33/6 36/9
through [5]   8/2 14/25
15/1 22/21 45/18
time [17]   2/14 3/12 5/5
13/14 16/7 19/23 20/9
20/16 20/22 21/21 25/10
27/7 27/8 37/16 42/20
43/23 49/5
tiny [1]   15/14
today [1]   5/11

**T** (cont.)

together [2]   11/25 37/7
told [1]   41/23
tool [3]   10/18 45/23 48/17
took [1]   25/19
total [1]   17/20
totally [2]   31/5 47/13
transcript [3]   1/10 1/24
49/3
transcription [1]   1/24
transfer [2]   29/23 32/4
transferred [1]   32/19
transfers [1]   32/18
treated [1]   11/3
true [10]   6/14 6/14 10/11
30/9 31/4 35/25 36/1
45/14 46/14 49/2
try [2]   31/16 47/7
trying [2]   9/1 30/21
Tuesday [1]   1/5
turn [1]   46/5
TV [1]   18/11
two [11]   4/14 14/10 17/18
17/18 27/22 41/13 42/8
42/11 47/6 47/6 47/15
type [2]   28/22 33/18

**U**

uh [2]   38/24 41/25
Uh-hmm [1]   41/25
Uh-huh [1]   38/24
ultimately [2]   26/24 27/1
un [1]   18/17
un-corrupting [1]   18/17
unchallenged [1]   17/18
unclear [1]   26/12
unconstitutional [7]
12/16 12/18 12/19 15/3
18/18 28/22 34/6
uncontested [1]   16/12
under [9]   7/22 7/23 16/3
19/24 22/19 25/2 33/5
36/10 39/6
underlying [2]   18/15
36/16
understand [9]   3/3 8/22
12/2 16/21 18/12 21/2
34/11 43/7 46/6
understandable [1]   40/11
understanding [1]   46/19
understood [1]   40/11
unfair [1]   28/22
unfairly [1]   11/3
Unfortunately [2]   11/6
11/8
UNITED [9]   1/1 1/11 1/20
5/22 45/1 45/1 45/2 45/3
49/4
unlawful [1]   8/1
unlikely [2]   24/21 35/5
unlimited [1]   33/11
unopposed [3]   16/15 17/22
47/13
unquote [1]   16/16
until [1]   38/12
untrue [1]   10/9
up [13]   4/11 6/9 8/23
9/24 10/1 10/19 12/4
23/13 31/14 34/1 42/5
42/10 48/17
upheld [9]   7/20 22/11
22/13 32/25 32/25 36/14

USCA Case #15-1212    Document #1584610    Filed: 08/17/2015    Page 19 of 15

**U**

uphold [3] 36/15 38/16
 38/17
uphold [2] 36/14 36/15
upholding [1] 38/7
upon [2] 3/4 9/14
us [7] 10/18 20/7 20/21
 36/5 44/25 48/15 48/15
use [7] 2/13 12/20 15/19
 30/4 39/1 40/5 45/25
used [7] 2/10 5/3 16/10
 16/17 16/18 18/4 33/9
usually [1] 2/25

**V**

valid [3] 22/12 28/12
 32/25
variance [1] 22/21
variety [1] 12/22
various [3] 5/2 17/5 17/6
versus [1] 2/3
very [15] 5/8 5/21 5/23
 6/1 8/3 14/11 19/2 19/6
 30/23 35/20 44/4 44/22
 45/22 45/25 47/3
vie [1] 30/21
view [3] 42/24 45/24
 46/13
violate [4] 26/19 27/13
 27/20 27/24
Virginia [1] 44/5
voice [1] 2/12
vote [1] 17/20

**W**

Wagner [3] 21/6 23/24
 24/7
wait [10] 5/6 21/23 27/7
 27/8 27/8 34/17 40/1
 41/20 41/20 41/20
want [25] 3/1 4/19 5/7
 10/24 12/20 15/19 15/24
 16/9 19/10 21/14 21/15
 22/10 23/4 25/5 26/23
 30/20 30/25 31/15 35/21
 37/7 38/25 46/23 47/25
 48/9 48/17
wanted [7] 10/25 13/2
 15/21 30/22 31/9 34/9
 45/17
wants [5] 6/22 29/20
 29/22 44/20 48/14
was [54]
Washington [4] 1/5 1/18
 1/22 44/3
wasn't [1] 36/7
waste [1] 3/12
watch [1] 36/12
way [11] 7/8 8/1 8/1 8/8
 9/21 12/4 12/7 13/12
 34/22 36/12 46/20
ways [3] 4/20 37/19 39/3
we [43] 2/20 2/21 3/24
 4/1 4/16 9/3 10/15 12/15
 13/1 13/13 13/18 13/22
 15/16 18/11 18/16 20/3
 20/4 20/5 20/5 20/13
 20/14 20/14 20/15 21/4
 21/12 22/4 22/6 22/15
 32/20 37/4 37/5 37/21

38/11 39/21 39/24 41/17
 42/2 42/24 43/5 43/6
 43/14 46/10 48/13
we'll [3] 44/4 48/16
 48/16
we're [21] 6/18 12/3
 13/13 13/18 15/25 17/7
 17/17 18/21 18/22 20/15
 36/4 37/20 40/12 40/19
 41/19 43/3 43/12 46/15
 46/23 46/24 47/10
we've [6] 7/1 8/9 16/7
 18/19 44/24 46/14
welcome [1] 16/5
well [37] 2/24 3/4 3/16
 3/20 4/11 4/15 7/7 9/3
 9/4 9/5 10/1 11/16 11/19
 12/6 13/6 14/6 14/10
 14/11 14/14 15/15 20/2
 20/4 20/5 20/21 20/25
 21/9 23/12 27/3 28/3 28/9
 30/2 30/15 30/24 35/20
 37/22 44/19 45/17
well-reasoned [1] 37/22
went [2] 8/3 20/13
were [18] 7/16 10/4 10/5
 10/6 10/10 17/20 24/21
 27/17 27/18 27/23 28/3
 28/9 30/9 30/12 30/21
 35/5 38/16 38/17
West [1] 1/14
what [42] 7/9 9/13 9/21
 12/6 12/8 13/15 14/25
 15/8 15/24 17/4 18/16
 22/2 22/8 23/16 26/4
 26/11 29/5 30/2 30/9
 31/13 31/15 31/16 31/18
 31/25 32/2 32/5 32/14
 34/17 36/20 37/16 39/3
 39/18 41/18 41/19 43/13
 44/14 46/15 46/23 46/24
 47/10 48/2 48/15
what's [2] 13/23 13/24
whatever [1] 44/8
when [21] 4/4 5/18 9/20
 9/21 11/2 13/18 17/14
 17/25 18/8 18/8 18/20
 22/10 25/10 38/18 40/18
 41/10 41/11 42/18 42/19
 46/1 48/17
where [26] 3/24 4/16 6/19
 7/10 8/5 8/12 8/15 9/15
 9/17 16/19 17/18 18/2
 18/16 31/9 35/24 37/25
 41/6 41/15 41/17 42/14
 43/11 44/5 44/24 45/15
 45/15 46/20
whether [15] 3/20 12/17
 14/19 15/6 19/11 23/12
 23/13 24/14 28/25 33/19
 33/22 34/12 34/23 40/2
 47/11
whew [1] 17/4
which [28] 2/12 6/3 9/2
 9/12 13/13 16/12 17/13
 18/6 19/21 21/6 21/6 22/3
 24/7 24/18 25/6 26/3 28/6
 29/6 30/4 32/6 32/23
 36/25 40/10 40/11 40/24
 43/12 43/12 49/9
whichever [1] 30/22

while [1] 10/6
who [17] 2/18 3/1 4/5
 5/9 7/5 12/19 15/1 15/5
 20/11 20/12 20/17 20/17
 21/22 21/25 22/1 22/4
 29/15 30/13 32/23 35/13
 37/2 37/2 37/7 40/22
 43/18 44/9
Wilkins [8] 25/19 26/4
 26/5 26/9 26/16 28/1 46/8
 46/8
will [12] 13/16 16/17
 16/18 18/1 21/14 21/15
 25/8 26/13 26/22 30/16
 44/7 48/7
win [4] 11/2 13/2 14/6
 14/8
winning [1] 18/10
wins [1] 30/25
Wisconsin [1] 15/16
without [5] 8/11 39/8
 42/25 43/24 43/25
won [2] 12/22 30/22
won't [1] 35/14
woo [3] 16/25 16/25 17/1
word [1] 6/4
words [3] 30/7 40/5 45/25
work [1] 44/18
worked [1] 46/10
would [27] 5/9 6/13 13/6
 13/10 19/23 20/1 26/15
 27/3 27/6 28/4 28/10
 28/19 35/22 39/16 40/6
 40/7 40/22 43/18 43/20
 44/2 44/6 44/8 44/17
 45/13 46/10 46/11 48/15
wouldn't [4] 32/18 43/5
 44/8 45/20
write [2] 14/8 25/11
write-in [1] 14/8
writing [1] 35/15
wrong [1] 20/13
wrote [1] 5/18

**Y**

yea [1] 44/21
year [2] 31/7 34/16
years [4] 2/11 8/10 17/9
 27/1
yes [19] 5/25 9/4 10/17
 12/24 24/10 30/15 31/8
 35/22 36/14 38/5 39/15
 41/22 42/6 42/9 42/13
 45/6 48/11 48/11 48/13
yesterday [1] 20/1
yet [1] 16/15
you [171]
you'd [1] 13/2
you'll [1] 6/18
you're [12] 6/9 11/23
 15/5 15/8 16/5 16/14
 36/20 39/22 39/23 40/18

USCA Case #15-1201   Document #1568250      Filed: 08/17/2015      Page 264 of 313

**Y**

you're... [2]   41/1 41/2
you've [3]   15/14 39/20
 48/1
your [67]
yours [1]   11/7

USCA Case #15-5120       Document #1568250       Filed: 08/17/2015       Page 265 of 313

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————— )
                                        )
LAURA HOLMES, *et al.*,                 )
                                        )
                Plaintiffs,           )
                                        )        Civ. No. 14-1243 (RMC)
              v.                      )
                                        )
FEDERAL ELECTION COMMISSION,            )
                                        )
              Defendant.           )
—————————————————————————— )

## PLAINTIFFS' NOTICE CORRECTING STATEMENT
## MADE AT ORAL ARGUMENT

At the hearing held yesterday morning, in response to a question from the Court, undersigned counsel represented that *Citizens United v. FEC*, 558 U.S. 310 (2010) was an as-applied campaign finance challenge. That statement was incorrect.

*Citizens United* was brought, in relevant part, as an as-applied challenge to 2 U.S.C. § 441b. 558 U.S. at 329 ("Citizens United stipulated to dismissing count 5 of its complaint, which raised a facial challenge to § 441b."). Nevertheless, the Supreme Court chose to issue a facial ruling. 558 U.S. at 333 ("Citizens United's narrower arguments are not sustainable under a fair reading of the statute. In the exercise of its judicial responsibility, it is necessary then for the Court to consider the facial validity of § 441b").

1

Better examples of as-applied challenges leading to sweeping relief and regulatory adjustment would have included *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 457 (2007) (Roberts, C.J., controlling opinion) (corporate electioneering communications ban unconstitutional as applied to specific advertisements that were not "the functional equivalent of express advocacy"); 72 Fed. Reg. 72899 (Dec. 26, 2007) ("implement[ing] the Supreme Court's decision in *FEC v. Wisconsin Right to Life, Inc.*") and *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 241 (1986) (prohibition on corporate independent expenditures unconstitutional as applied to certain nonprofit organizations); 60 Fed. Reg. 35292, 35293 (July 6, 1995) ("new section 114.10 has been added to implement the *MCFL* Court's conclusion that nonprofit corporations possessing certain essential features may not be bound by the restrictions on independent expenditures contained in section 441b").

I regret this inadvertent misstatement, and ask the Court's pardon.

Respectfully submitted this 1st day of April, 2015,

/s/ Allen Dickerson
Allen Dickerson, DC Bar No. 1003781
CENTER FOR COMPETITIVE POLITICS
124 S. West Street, Suite 201
Alexandria, VA 22314
Phone: 703.894.6800
Facsimile: 703.894.6811
adickerson@campaignfreedom.org

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LAURA HOLMES, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )      Civil Action No. 14-1243 (RMC) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**OPINION**

Laura Holmes and Paul Jost challenge the constitutionality of a provision in the

Federal Election Campaign Act (FECA) that limits individual donors to contributing $2,600 per

election to candidates running for federal office.  Plaintiffs insist that they do not oppose the

*amount* of money that an individual may contribute to a candidate for an election ($2,600),

acknowledging that any such challenge would be foreclosed by *Buckley v. Valeo* and its progeny.

Instead, Plaintiffs argue that the central question, which has yet to be addressed by the Supreme

Court, is whether FECA's per-election contribution structure is unconstitutional under the First

and Fifth Amendments because it allegedly allows some contributors to give twice as much

money to some candidates for use in the general election while denying others that same right.

Specifically, Plaintiffs state that FECA's contribution restriction did not allow them to combine

their primary and general election contributions ($2,600 per election) in order to give $5,200 to

successful primary candidates for use in the 2014 general election.  Plaintiffs complain that

FECA's per-election limit unfairly benefits contributors supporting candidates who were

unopposed in their primary contests because those contributors could give $2,600 before the

primary, and the unopposed candidate could later use those funds during the general election

1

campaign (for a total of $5,200).  Conversely, Plaintiffs argue, the limit disadvantages

contributors who wish to support general election candidates who faced substantial opposition in

their primaries because those contributors could not give $5,200 for use in the general election.

        "In an abundance of caution," this Court initially certified two constitutional

questions to the *en banc* United States Court of Appeals for the District of Columbia.  *See*

*Holmes v. FEC*, No. CV 14-1243 (RMC), 2014 WL 6190937, at *1 (D.D.C. Nov. 17, 2014)

(Certification Order) [Dkt. 19].  The Circuit, however, remanded the case at the request of the

Federal Election Commission (FEC) to enlarge the record for appellate review and to determine

whether any constitutional questions were appropriate for certification.  Plaintiffs filed a motion

for certification [Dkt. 25]; FEC opposed, seeking summary judgment [Dkt. 27].[1]  The parties

presented oral argument on March 31, 2015.

        After full consideration of the entire record and all arguments, the Court finds that

Plaintiffs' challenge to FECA's temporal per-election restrictions on individual contributions to

federal candidates constitutes a veiled attack on the contribution limit set by Congress and

upheld by the Supreme Court as a legitimate means to combat corruption.  Because Plaintiffs'

claims rest on issues of settled law, the Court will deny Plaintiffs' motion for certification and

grant FEC's motion for summary judgment.

---

[1] FEC filed a "Brief Opposing Certification and In Support of Summary Judgment in Favor of
the Commission," in which it argues that the case should be dismissed as moot or, alternatively,
that summary judgment should be awarded to FEC.  *See* FEC Brief, Dkt. 27 at 2.  The Court
construes this as a motion for summary judgment.

# I.  BACKGROUND

## A.  District Court's Role as a Factfinder

The Court of Appeals for the District of Columbia Circuit remanded this case "in order to provide the parties an opportunity to develop, by expedited discovery or otherwise, the factual record necessary for en banc review of the plaintiffs' constitutional challenge."  Order [Dkt. 21].  The Circuit further ordered: "the district court shall complete the functions mandated by [52 U.S.C.] § 30110 and described in *Wagner v. FEC*, [717 F.3d 1007, 1009 (D.C. Cir. 2013)], including the development of a record for appellate review, by April 24, 2015.  The district court is to certify any constitutional question(s) by that date as well." *Id.*[2]  After a period of discovery, this Court ordered the parties to file briefs on the certification issue as well as proposed findings of fact.  *See* Order [Dkt. 24].

The Circuit granted FEC's motion for remand because, in the main, FEC sought a more fully developed record.  Accordingly, this Court has included the majority of FEC's proposed facts here with only slight modifications.  Indeed, this Court "is inclined to be overinclusive rather than underinclusive when presented with close evidentiary disputes, preferring to convey as detailed a record as possible to the reviewing court."  *Cao v. FEC*, 688 F. Supp. 2d 498, 504 (E.D. La.), *aff'd sub nom In re Cao*, 619 F.3d 410 (5th Cir. 2010)); *see also* Charles Wright and Arthur Miller, 9A Fed. Prac. & Proc. Civ. § 2411 (3d ed.) ("[I]n a nonjury case the court should be slow to exclude evidence challenged under one of the exclusionary rules.").

---

[2] *Wagner* provides that, first, a district court "must develop a record for appellate review by making findings of fact.  Second, the district court must determine whether the constitutional challenges are frivolous or involve settled legal questions.  Finally, the district court must immediately certify the record and all non-frivolous constitutional questions to the en banc court of appeals."  *Wagner*, 717 F.3d at 1009.

3

**B.  Objections**

Both parties have raised numerous objections to their opponents' proposed findings of facts.  Plaintiffs chiefly object to the relevance of many of FEC's proposed facts.  Pl. Objections [Dkt. 38-3] at 3.  Plaintiffs also argue that FEC's "findings of fact contain[ ] conclusory and argumentative phrases that are both irrelevant and inappropriate for certification," *id.* at 3 n.3, and that certain proposed facts are derived from inadmissible hearsay or improper expert opinion, *see, e.g.*, *id.* at 7.  FEC argues that Plaintiffs' facts are "incomplete, inaccurate, or misleading."  FEC Responses [Dkt. 30] at 2.

This Court has considered all of the above objections in entering its Factual Findings and overrules most of Plaintiffs' relevance objections.  *See Cao*, 688 F. Supp. 2d at 505 ("To the extent proposed facts that are tangential to the instant litigation nonetheless provide useful context for overall campaign finance regulation scheme, the above objections have been overruled.  However, to the extent those proposed facts obscure the most relevant issues being put before the appellate court, those objections have been sustained.").  The Court also overrules most of Plaintiffs' admissibility objections because the facts to which they object are legislative facts, which are "general facts which help the tribunal decide questions of law and policy, are without reference to specific parties, and need not be developed through evidentiary hearings." *Libertarian Nat'l Comm., Inc. v. FEC* (*LNC*), 930 F. Supp. 2d 154, 157 (D.D.C. 2013) (internal citations and quotations omitted).  This Court has omitted or modified any proposed finding of fact that was argumentative or drew legal conclusions.

4

## C. Factual Findings

<u>**The Parties**</u>

1.   Plaintiffs Laura Holmes and Paul Jost are a married couple, residing in Miami,

Florida.  Compl. ¶ 8; Declaration of Joyce Sadio (Sadio Decl.), Ex. 1 (Holmes

Interrog. Resp.) ¶ 8; *id.*, Ex. 2 (Jost Interrog. Resp.) ¶ 8.  Plaintiffs are citizens of

the United States.  Compl. ¶ 8; Holmes Decl. ¶ 3 [Dkt. 6-2] ¶ 3; Jost Decl. [Dkt.

6-3] ¶ 3.  Plaintiffs were eligible to vote in the 2012 presidential election.  Compl.

¶ 8; Holmes Decl. ¶ 5; Jost Decl. ¶ 5.  Plaintiff Laura Holmes sometimes uses the

name "Laura Holmes-Jost" when contributing to candidates.  Compl. ¶ 8.

2.   Defendant Federal Election Commission (FEC) is an independent agency of the

United States that administers, interprets, and civilly enforces the Federal Election

Campaign Act (FECA), 52 U.S.C. §§ 30101-30146 (formerly 2 U.S.C. §§ 431-

57),[3] and other statutes.  FEC is empowered to formulate policy with respect to

FECA, *id.* § 30106(b)(1) (§ 437c(b)(1)); to make, amend, and repeal such rules

and regulations necessary to carry out FECA, *id.* §§ 30107(a)(8), 30111(a)(8),

30111(d); and to enforce civilly FECA and the Commission's regulations, *id.*

§§ 30106(b)(1), 30109(a)(6).

<u>**Regulatory Framework: Statutory Contribution Limits**</u>

3.   Congress has been setting campaign contribution limits for nearly seventy-five

years.  In 1939, Senator Carl Hatch introduced, and Congress passed, S. 1871,

officially titled "An Act to Prevent Pernicious Political Activities" and commonly

---

[3] Effective September 1, 2014, the provisions of FECA codified at 2 U.S.C. §§ 431-57 were
recodified and transferred to 52 U.S.C. §§ 30101-30146.  This Opinion will refer to the
recodified provisions when citing to FECA.

referred to as the Hatch Act. S. Rep. No. 101-165, at *18 (1939); *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 560 (1973); 84 Cong. Rec. 9597-9600 (1939).  Congress established individual contribution limits in the 1940 amendments to the Hatch Act, Pub. L. No. 76-753, 54 Stat. 767 (1940). That legislation prohibited "any person, directly or indirectly" from making "contributions in an aggregate amount in excess of $5,000, during any calendar year" to any candidate for federal office.  *Id.* § 13(a), 54 Stat. 770.

4.     By 1971, when Congress began debating the initial enactment of FECA, the Hatch Act's $5,000 per-calendar-year individual contribution limit was being "routinely circumvented." 117 Cong. Rec. 43,410 (1971) (statement of Rep. Abzug).

5.     A 1974 congressional report identified multiple instances of such circumvention. For example, the dairy industry had avoided then-existing reporting requirements by dividing a $2,000,000 contribution to President Nixon among hundreds of committees in different States, "which could then hold the money for the President's reelection campaign." Final Report of the Select Committee on Presidential Campaign Activities, S. Rep. No. 981, 93d Cong., 2d Sess. 615 (1974) ("*Final Report*").  On another occasion, a presidential aide promised an ambassadorship to a particular individual in return for "a $100,000 contribution, which was to be split between 1970 Republican senatorial candidates designated by the White House and [President] Nixon's 1972 campaign." *Final Report* at 492.  That arrangement was not unique.  *Id.* at 501 (describing a similar arrangement with someone else); *see id.* at 493-94 (listing substantial

contributions by ambassadorial appointees); *see also* David W. Adamany &

George E. Agree, *Political Money: A Strategy for Campaign Financing in

America* 39-41 (1975) (collecting instances of large contributors "giving and

getting"); Herbert E. Alexander, *Financing Politics: Money, Elections and

Political Reform* 124-26 (1976) (describing contributions that gave the

appearance of quid pro quo corruption and may have raised "suspicio[ns] about

. . . large campaign gifts").

6.     The 1974 FECA Amendments that were enacted shortly after the Watergate

       scandal included tighter limits on the amounts that individuals, political parties,

       and political committees could contribute to candidates.  In particular, Congress

       established a $1,000 per-candidate, per-election limit on individual contributions

       to candidates and their authorized political committees.  FECA Amendments of

       1974, Pub. L. No. 93-443, § 101(b)(3), 88 Stat. 1263 (first codified at 18 U.S.C.

       § 608(b)(3)).

7.     FECA's contribution limits apply both to direct contributions of money and to in-

       kind contributions of goods or services. 52 U.S.C. § 30101(8)(A).

8.     The individual contribution limits apply on a per-candidate, per-election basis,

       with "election" defined to include each of the following: (A) a general, special,

       primary, or runoff election; (B) a convention or caucus of a political party which

       has authority to nominate a candidate; (C) a primary election held for the

       selection of delegates to a national nominating convention of a political party; and

       (D) a primary election held for the expression of a preference for the nomination

       of individuals for election to the office of President.  52 U.S.C. § 30101(1).  The

7

individual contribution limits apply separately with respect to each election, except that all elections held in any calendar year for the office of President of the United States (except a general election for such office) are considered to be one election.  52 U.S.C. §§ 30116(a)(1)(A); 30116(a)(6).

9.      The Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81 (BCRA), amended FECA to raise the individual per-candidate, per-election contribution limit and index it for inflation.  *See* BCRA § 307(b), 116 Stat. 102-103 (codified at 52 U.S.C. § 30116(a)(3) (2 U.S.C. § 441a(a)(3)); BCRA § 307(d), 116 Stat. 103 (codified at 52 U.S.C. § 30116(c) (2 U.S.C. § 441a(c)(1)).

10.     The limit that applied to individual contributions made to federal candidates during the 2013-2014 election cycle, including the contributions at issue in this case, was $2,600 per candidate, per election.  FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold*, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013).  The FEC recently raised the limit for the 2015-2016 election cycle to $2,700 per-candidate, per-election.  FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold*, 80 Fed. Reg. 5750, 5751 (Feb. 3, 2015).

11.     Because FECA defines "election" to include various types of electoral contests, the total amount that an individual may contribute to a particular candidate during a particular election cycle depends on the number of elections in which that candidate participates to pursue the federal office being sought.  This means that an individual who supported a candidate who participated in one primary election and one general election during the 2013-2014 election cycle was permitted to

contribute a total of $5,200 to that candidate—$2,600 for the candidate's primary-election campaign and $2,600 for the candidate's general-election campaign.  *See* 52 U.S.C. § 30116(a); FEC Price Index Adjustments, 78 Fed. Reg. at 8532. *Holmes v. FEC*, No. CV 14-1243 (RMC), 2014 WL 6190937, at *2 (D.D.C. Nov. 17, 2014) (Certification Order) [Dkt. 19].

12.     In an election cycle in which a candidate competes in one or more runoffs, special elections, or a political party caucus or convention, in addition to a primary and general election, the total amount that an individual may contribute to that candidate is higher.  52 U.S.C. §§ 30101(1), 30116(a)(1)(A) (2 U.S.C. §§ 431(1), 441a(a)(1)(A)); Certification Order at *2.

**<u>Plaintiffs' Experience with FECA's Maximum Per-Election Contribution Limits</u>**

13.     For instance, Plaintiffs contributed to Congressman Marshall "Mark" Sanford's campaigns during the 2013-2014 election cycle.  Sadio Decl., Ex. 1 ¶ 5; *id.*, Ex. 2 ¶ 5.

14.     In 2013-14, Sanford successfully pursued the congressional seat vacated by Representative Tim Scott, who had served as the United States Representative for the 1st Congressional District of South Carolina until he was appointed to the United States Senate. *Id.*, Ex. 23; Declaration of Eileen Leamon (Leamon Decl.), Ex. 2 at 95-97, 123-24.

15.     Between March and November 2013, plaintiff Laura Holmes contributed the maximum permissible $2,600 to Sanford for each of the following three elections: (1) the special-runoff election against Curtis Bostic for appearance on the ballot of the special-general election to fill the seat vacated by Representative Scott; (2) the

9

special-general election against Elizabeth Colbert Busch to fill the seat vacated by

Representative Scott; and (3) Congressman Sanford's primary election, in which

Sanford competed as an unopposed incumbent.  Sadio Decl., Ex. 1 ¶ 5; Leamon

Decl., Ex. 2 at 95-97, 123-24.

16.   Plaintiff Paul Jost contributed the exact same amounts during the same time

period to the Sanford campaign committee in connection with each of those three

elections. Sadio Decl., Ex. 2 ¶ 5.

**Primary and General Elections**

17.   Primary elections serve the purpose of determining, in accordance with State law,

which candidates are "nominated . . . for election to Federal office in a subsequent

election." 11 C.F.R. § 100.2(c)(1) (defining "primary election").

18.   General elections are those held to "fill a vacancy in a Federal office (*i.e.*, a

special election) and which [are] intended to result in the final selection of []

single individual[s] to the office at stake." 11 C.F.R. § 100.2(b)(2) (defining

"general election").

19.   Nearly all fifty states use some type of primary elections in their procedures for

electing individuals to serve in federal office.  Eleven states use "open" primaries,

in which any registered voter may vote.  Eleven states use "closed" primaries, in

which only voters previously registered as members of a political party may

participate in the nomination process of their party.  Two states use a "top two"

primary model.  *See infra* ¶ 36.  Twenty-four states use some "hybrid" primary

model, falling somewhere between the "open" and "closed" primary types.  Sadio

Decl., Ex. 15; *id.*, Ex. 4 at 1-2.

10

**FEC Implementing Regulations**

20. FEC regulations "encourage[]" contributors to designate in writing the particular

election for which an individual contribution is intended.  11 C.F.R.

§ 110.1(b)(2)(i); Certification Order at *2.

21. Undesignated contributions count against the donor's contribution limits for the

candidate's next election; designated contributions count against the donor's

contribution limits for the named election.  11 C.F.R. § 110.1(b)(2)(ii);

Certification Order at *2.

22. When a candidate has net debts outstanding from a past election—including a

primary election—a contributor may designate a contribution in writing for that

past election. Such contributions may only be accepted for the purpose of retiring

debt and only up to the extent of the debt.  11 C.F.R. §§ 110.1(b)(3)(i),

(b)(5)(i)(B); Certification Order at *2.

23. If a candidate's net outstanding debts from a past election amount to less than the

amount of a contribution designated for a previous election, Commission

regulations permit the candidate (or his committee) to refund the contribution,

redesignate it (with the donor's written authorization) for a subsequent election, or

reattribute the contribution as from a different person if it was intended to be a

joint contribution. 11 C.F.R. §§ 110.1(b)(3)(i)(A) & (C); 110.1(k)(3).

24. A primary contribution that is redesignated for use in a candidate's general

election counts against the contributor's general-election limit.  11 C.F.R.

§ 110.1(b)(5)(iii) ("A contribution  redesignated for another election shall not

exceed the limitations on contributions made with respect to that election.").

25.     If a primary candidate fails to qualify for the general election, then all general-election contributions received by that candidate must similarly be returned or redesignated or reattributed for a different election.  11. C.F.R. § 110.1(b)(3)(i)(C).

26.     In addition, FEC regulations permit any candidate participating in a general election who has remaining, unused primary contributions to transfer such unused primary contributions to pay for the candidate's general-election expenses.  11 C.F.R. § 110.3(c)(3) (stating that "contribution limitations . . . shall not limit . . . [t]ransfers of funds between the primary campaign and general election campaign of a candidate of funds unused for the primary").

27.     General-election candidates are also permitted to use general-election contributions to pay outstanding primary-election debts.  11. C.F.R. § 110.1(b)(3)(iv).  Candidates need not obtain contributor authorization to make such payments from their primary, general, and any other election accounts, and such payments by candidates do not change the per-election contribution limits for individual contributors.  11 C.F.R. §§ 110.1(b)(3)(iv), 110.3(c)(3); Sadio Decl., Ex. 3 (FEC Campaign Guide for Congressional Candidates and Committees) at 21.

28.     An individual contribution is considered to have been "made when the contributor relinquishes control over the contribution." 11 C.F.R. § 110.1(b)(6).  Generally, a recipient candidate and her campaign may spend contributions to the campaign however the campaign chooses.  Thus, the money can be spent on the candidate's next election campaign, transferred to a different political committee (within any

applicable contribution limits), or used for any "other lawful purpose unless prohibited."  52 U.S.C. § 30114(a).

29.     Past FEC interpretations illustrate the constraints that are placed on committees with respect to primary- and general-election financing.  *See infra* ¶¶ 30-34.

30.     In Advisory Opinion 1986-17, FEC approved a request on behalf of a candidate to use individual contributions for the general election prior to the date of the primary election where the requestor had pledged to account separately for such general election contributions and to refund all such contributions if the candidate lost the primary election and thus would not participate in the general election. *See* Sadio Decl., Ex. 5.  FEC found that FECA permits a committee to spend general-election contributions "prior to the primary election" where such expenditures are "exclusively for the purpose of influencing the prospective general election" and "it is necessary to make advance payments or deposits to vendors for services that will be rendered" after the candidate's general-election candidacy has been established.  *Id.* at 4.  FEC further explained that all general-election contributions must be refunded if the candidate does not qualify for the general election.  *Id.*

31.     More recently, in Advisory Opinion 2009-15, FEC responded to a series of questions regarding the designation, use, reattribution, redesignation, and potential refund of individual contributions made to an authorized committee of a candidate who intended to run for a Senate seat that was expected to be vacant in the next election cycle, but that might become vacant more immediately upon the anticipated resignation of the incumbent.  *See* Sadio Decl., Ex. 6.  Under the

13

circumstances, any midterm vacancy would have been filled by a special election

and, if necessary, a special run-off election. *Id.* at 1-2. In rendering a decision,

FEC explained that the committee could accept contributions for the anticipated

special election and special runoff election, but "must use an acceptable

accounting method to distinguish between the contributions received for each of

the two elections, *e.g.*, by designating separate bank accounts for each election or

maintaining separate books and records for each election." *Id.* at 5 (citing 11

C.F.R. § 102.9(e)(1)). FEC further advised the committee that it "must not spend

funds designated for the runoff election unless [the candidate] participates in the

runoff." *Id.* at 5 n.6 (citing 11 C.F.R. § 102.9(e)(3)).

32.     FEC has also pursued enforcement actions in instances where primary-election

candidates violated the rules requiring candidates who fail to qualify for a general

election to refund (or redesignate or reattribute) any general-election contributions

they have received. *See infra* ¶¶ 33-34 and Exhibits cited therein.

33.     In *In the Matter of Jim Treffinger for Senate, Inc.*, Matter Under Review 5388,

FEC, in April 2006, entered into a conciliation agreement with the "Treffinger for

Senate" committee and its treasurer to resolve their violations of FECA and FEC

regulations based on their failure to refund, reattribute, or redesignate nearly all of

the candidate's more than $200,000 in general-election contributions despite his

loss of the primary election. Sadio Decl., Ex. 7 at 4. The committee and treasurer

admitted the violations and agreed to pay a civil penalty of $57,000. *Id.* at 5.

34.     In *In re Wynn for Congress*, FEC in 2010 entered into a conciliation agreement

with the Wynn for Congress committee and its treasurer to resolve their violations

of FECA and FEC regulations based on, *inter alia*, their failure to employ an accounting method to distinguish between primary and general-election contributions and their failure to refund the excessive contributions within sixty days of the candidate's primary-election loss.  Sadio Decl., Ex. 8 at 2-4.  The Committee admitted to the violations and agreed to pay a civil penalty of $8,000.00.  *Id.* at 4.

**Variations in State Election Procedures**

35.    FECA's separate contribution limits for each election within a particular election cycle account for the lack of uniformity in federal electoral contests—including the races within different political parties for the same particular office.  *See infra* ¶ 36.

36.    California—the State in which plaintiff Paul Jost's preferred candidate sought election—and Washington each hold "top two" primary elections in which all candidates, regardless of their party, compete against one another.  Ballots in both States may include the candidates' party affiliation.  In both California and Washington, a candidate who lacks an intraparty primary challenger may still fail to proceed to the general election because all candidates for a particular office are listed on the same primary ballot and the two candidates who receive the greatest number of votes, regardless of party preference, then compete in the general election.  Sadio Decl., Exs. 9, 17; *see* Certification Order at *2 (describing top two system in California).

37.    Louisiana follows a unique electoral procedure in which no congressional primary election is held at all.  Sadio Decl., Ex. 4 at 2 n.8.  Only where a candidate fails to

win a majority of the vote does the State hold a second election, termed a

"runoff," in December of the same year. *Id.*; *see* Leamon Decl., Ex. 1 at 31

(identifying results of Louisiana congressional electoral contests featuring only a

November election and others featuring a second election in December of the

same year).

38.     In 2014, the first election for candidates seeking federal office in Louisiana was

the general election held on November 4, 2014. Because no candidate won a

majority of the vote in Louisiana's November 2014 election for U.S. Senate, the

State held a second election, a runoff, on December 6, 2014. Sadio Decl., Exs.

18-19. In the December election, incumbent Democrat Senator Mary Landrieu

lost her seat to a challenger, Republican and former Representative Bill Cassidy.

*Id.*, Ex. 19.

39.     Between 2008 and 2010, Louisiana followed a different procedure that included

regular primary and general elections, as well as runoff elections in instances

where no candidate received a majority of the vote in the primary or general

contest. *See, e.g.*, Leamon Decl., Ex. 1 at 55, 71.

40.     Ten states—Alabama, Arkansas, Georgia, Iowa, Mississippi, North Carolina,

Oklahoma, South Carolina, South Dakota, and Texas—currently provide for post-

primary runoff elections or conventions in federal electoral contests under varying

circumstances. Sadio Decl., Ex. 4 at 1-2.

41.     In the event of post-primary runoff elections or conventions, candidates may

receive additional contributions, up to the applicable per-election limit, for their

runoff election campaigns. 52 U.S.C. § 30101(1) (2 U.S.C. § 431(1)).

42.   Over the course of the last six election cycles, from the 2003-2004 cycle through the 2013-2014 cycle, 95 congressional races have included a primary runoff contest in at least one of the party primaries, averaging more than fifteen primary runoff elections per cycle.  *See infra* ¶¶ 43-51.

43.   During the 2013-2014 election cycle, fifteen congressional races in seven states included at least one primary runoff contest after the party primaries.  Leamon Decl., Ex. 1 at 1-24.

44.   In one primary runoff, six-term incumbent Mississippi Senator Thad Cochran failed to receive enough votes in the Mississippi Republican Senate primary election to avoid having to compete in an additional election against his primary opponent, Chris McDaniel, before proceeding to the general election.  *Id.* at 10, 12.  In the Mississippi Democratic Senate primary, by contrast, Travis Childers won his contest by a sufficient margin to avoid having to participate in a runoff.  *Id.* at 10.

45.   In the 2014 primary election for Iowa's Third Congressional District, no Republican primary candidate attained the 35 percent of the vote required under Iowa law to win the primary election.  *Id.* at 8.  The primary election was thus deemed "inconclusive" and the candidates were selected by a political party convention, IA Code § 43.52, for which a separate contribution limit applied, 52 U.S.C. § 30101(1)(B) (2 U.S.C. § 431(1)(B)).  *Id.* at 7-8; Sadio Decl., Ex. 22.

46.   During the 2011-2012 election cycle, 21 congressional races in seven states included at least one primary runoff contest after the party primaries.  Leamon Decl., Ex. 1 at 25-42.

47.   During the 2009-2010 election cycle, 29 congressional races in nine states included at least one primary runoff contest after the party primaries. *Id.* at 43-66.

48.   During the 2007-2008 election cycle, ten congressional races in six states included at least one primary runoff contest after the party primaries. *Id.* at 67-75.

49.   During the 2005-2006 election cycle, eight congressional races in five states included at least one primary runoff contest after the party primaries. *Id.* at 76-89.

50.   During the 2003-2004 election cycle, twelve congressional races in five states included at least one primary runoff contest after the party primaries. *Id.* at 90-102.

51.   FECA's separate contribution limits for each election within a particular election cycle also account for the occurrence of special elections—including special primary elections, special runoff elections, and special general elections — which are held, in accordance with state-specific procedures, in various special circumstances including when necessary to fill a seat vacated by an incumbent who left office before completing his or her full term.

52.   Over the course of the last six election cycles, from the 2003-2004 cycle through the 2013-2014 cycle, there have been 126 special elections, averaging more than 21 per cycle. *See infra* ¶¶ 53-58.

53.   During the 2013-2014 election cycle, twelve states held a total of 33 special elections—including special primary elections, special runoff elections, and special general elections—to fill fourteen separate federal offices in those states. Leamon Decl., Ex. 2 at 93-126.

54.   During the 2011-2012 election cycle, nine states held a total of seventeen special

elections—including special primary elections, special runoff elections, special general elections, and special party caucuses—to fill ten separate federal offices in those states. Leamon Decl., Ex. 2 at 76-92.

55. During the 2009-2010 election cycle, eleven states held a total of 25 special elections—including special primary elections, special runoff elections, and special general elections—to fill sixteen separate federal offices in those states. *Id.* at 50-75.

56. During the 2007-2008 election cycle, eleven states held a total of 27 special elections—including special primary elections, special runoff elections, and special general elections—to fill fifteen separate federal offices in those states. *Id.* at 23-49.

57. During the 2005-2006 election cycle, four states held a total of eighteen special elections—including special primary elections, special runoff elections, and special general elections—to fill thirteen separate federal offices in those states. *Id.* at 8-22.

58. During the 2003-2004 election cycle, five states held a total of six special elections—including special primary elections, special runoff elections, and special general elections—to fill five separate federal offices in those states. *Id.* at 1-7.

59. When candidates do not face an opponent listed on primary or general-election ballots, they are still subject to challenge in most states by potential write-in candidates. *See, e.g.*, Sadio Decl., Ex. 16 (describing varying procedures for write-in candidates).

19

60. Write-in contenders have won at least seven U.S. Congressional races and two

   U.S. Senate races.  *See, e.g.*, Sadio Decl., Ex. 16 (describing seven U.S.

   Congressional races and Strom Thurmond's U.S. Senate victory); *id.* Ex. 26 (State

   of Alaska's official results showing plurality of write-in votes); *id.* Ex. 27

   (describing Alaska Senator Lisa Murkowski's write-in victory).

**Facts of Plaintiffs' Case**

61. In 2014, Ms. Holmes supported Carl DeMaio, a Republican candidate for

   California's 52nd Congressional District (CA-52).  Compl. ¶ 19.

62. Ms. Holmes chose not to make any contributions to Mr. DeMaio for the primary

   election.  *Id.* ¶ 21; Sadio Decl. Ex. 1 ¶ 2.

63. There were four candidates on the ballot to represent CA-52:  Scott Peters, a

   Democrat and the incumbent; Carl DeMaio, a Republican; Kirk Jorgensen, a

   Republican; and Fred J. Simon, Jr., a Republican.  California Secretary of State,

   Statement of Vote, June 3, 2014, Statewide Direct Primary Election at 24,

   available at http://elections.cdn.sos.ca.gov/sov/2014-primary/pdf/2014-complete-

   sov.pdf (last visited April 1, 2015).

64. Mr. DeMaio finished second in California's June 3, 2014 "top two" congressional

   primary election behind incumbent Scott Peters, a Democrat.  Compl. ¶¶ 19-20;

   *see* Sadio Decl. Ex. 10 at 76.

65. Under California's "top two" primary system, Congressman Peters and Mr.

   DeMaio opposed each other again in the general election.  Sadio Decl., Exs. 10-

   11; *see also id.* Ex. 1 ¶ 3.

66. Scott Peters competed directly against three candidates in the 2014 California

congressional primary election; Mr. Peters was the sole Democratic candidate in that contest.  Sadio Decl. Ex. 10; *see also id.*, Ex. 1 ¶ 3.

67.    Ms. Holmes contributed $2,600 to Mr. DeMaio's campaign committee for his general-election campaign on or about July 21, 2015.  Compl. ¶ 21; Sadio Decl., Ex. 1 ¶ 1).

68.    Ms. Holmes wanted to contribute an additional $2,600 to Mr. DeMaio for his general-election campaign but did not do so because that contribution would have exceeded the $2,600 per-election contribution limit established by FECA for individual contributions to candidates during the 2013-2014 election cycle. Compl. ¶ 21; *see* FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold*, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013).

69.    In the November 4, 2014 general election, Congressman Scott Peters won reelection to represent CA-52 in the United States House of Representatives, defeating Carl DeMaio.  Sadio Decl., Ex. 11 at 8.

70.    In 2014, Mr. Jost supported Marianette Miller-Meeks, a Republican candidate for Iowa's Second Congressional District.  Compl. ¶¶ 22-24.

71.    Mr. Jost chose not to make any contributions to Dr. Miller-Meeks for the primary election, in which she faced two other Republican candidates, Mark Lofgren and Matthew Waldren.  Compl. ¶ 24; Sadio Decl., Ex. 2 ¶ 1; Iowa Secretary of State, 2014 Primary Election Results, Official Canvass by County at 10, available at https://sos.iowa.gov/elections/pdf/2014/primary/canvsummary.pdf (last visited April 1, 2015).

72.     Dr. Miller-Meeks won her primary election on June 3, 2014.  Sadio Decl., Ex. 21; Leamon Decl., Ex. 1 at 8.

73.     In the general election, Dr. Miller-Meeks faced incumbent Congressman David Loebsack, who had been the only candidate on the ballot in the June 3, 2014 Democratic Party primary for Iowa's Second Congressional District.  Sadio Decl., Ex. 20; Compl. ¶¶ 19-20.

74.     Mr. Jost contributed $2,600 to Dr. Miller-Meeks's campaign committee for her general-election campaign in July 2014.  Compl. ¶ 24.

75.     Mr. Jost wanted to contribute an additional $2,600 to Dr. Miller-Meeks for her general-election campaign but did not do so because that contribution would have exceeded FECA's $2,600 per-election contribution limit for individual contributions to candidates during the 2013-2014 election cycle.  Compl. ¶ 24; *see* FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold*, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013).

76.     In the November 4, 2014 general election, Congressman Loebsack won reelection to represent Iowa's 2nd Congressional District in the United States House of Representatives, defeating Dr. Miller-Meeks.  Sadio Decl., Ex. 20.

**D.  Plaintiffs' Arguments**

Plaintiffs argue that FECA's per-election contribution limit violates the First and Fifth Amendments, as applied to them, by limiting the amounts Ms. Holmes and Mr. Jost can lawfully contribute to the general election campaigns of their preferred candidates to $2,600, and preventing them from contributing $5,200.  Plaintiffs do not seek to contribute to their respective candidates in the primary elections, and do not claim a right to contribute both $2,600 in the

22

primary election and $5,200 in the general election.  Rather, Plaintiffs challenge FECA's

separate $2,600 per-election limit.  Plaintiffs' challenge "is not based on an incumbent/

challenger distinction, but rather on the asymmetry posed whenever a candidate who faces a

primary challenge competes in the general election against a candidate who ran virtually

unopposed during the primary."  Sadio Decl., Ex. 1 (Holmes RFA Responses) ¶ 4; *id.*, Ex. 2

(Jost RFA Responses) ¶ 3.[4]

### E.  Procedural Background

Plaintiffs filed suit on July 21, 2014, alleging that FECA's contribution limit of

$2,600 per-individual/per-candidate/per-election is unconstitutional as applied to them, where

Plaintiffs wanted to contribute no money to any primary candidate and instead contribute $5,200

to their preferred general-election candidates—the candidates who won their party primaries.

Plaintiffs sought a declaratory judgment and injunction barring enforcement against them of

FECA's per-election individual contribution limit.  On August 20, 2014, Plaintiffs filed a motion

for a preliminary injunction.  *See* Mot. for Prelim. Inj. [Dkt. 6].  After full briefing, this Court

denied the motion for a preliminary injunction on October 20, 2014.  *See* Order [Dkt 16].

---

[4] FEC proposes facts relating to Plaintiffs' assertion that a constitutional violation occurs where
the recipient candidate's opponent does not face a "substantial primary opponent."  Compl. ¶ 66.
In their Responses to FEC's Requests for Admission, Plaintiffs defined "substantial primary
opponent" as "[a] candidate for office who is a member of the same political party as his or her
opponent, must compete in the same primary election, and is sufficiently likely to succeed that
his or her candidacy would materially alter the competitive position of a candidate similarly
situated to Scott Peters during the 2014 primary."  Sadio Decl., Ex. 1 ¶ 2; *id.* Ex. 2 ¶ 2
(substituting "David Loebsack" for "Scott Peters")).  FEC states that neither FECA nor FEC's
regulations define or use the phrase "substantial primary opponent" or involve any inquiry
regarding whether a candidate is "sufficiently likely to succeed" such that "his or her candidacy
would materially alter the competitive position" of another candidate, including one "similarly
situated" to Congressmen Peters or Loebsack in their 2014 primary elections.  FEC also asserts
that there is currently no context in which it evaluates the substantiality of congressional
candidates (either on the ballots or write-ins) or forecasts their election prospects.  FEC Proposed
Findings of Fact ¶ 83.  The Court does not find any of these proposed facts relevant.

On November 17, 2014, the Court certified two constitutional questions to the

United States Court of Appeals for the District of Columbia Circuit for en banc consideration.

*See* Memorandum and Findings [Dkt. 19]; Certification Order at *3.  On January 30, 2015, the

United States Court of Appeals for the District of Columbia Circuit granted FEC's Motion to

Remand.  The Circuit ordered:

> The court grants the motion to remand this 52 U.S.C. § 30110
> (formerly 2 U.S.C. § 437h) case in order to provide the parties an
> opportunity to develop, by expedited discovery or otherwise, the
> factual record necessary for en banc review of the plaintiffs'
> constitutional challenge.  *See Cal. Med. Ass'n v. FEC*, 453 U.S. 182,
> 192 n.14 (1981); *Wagner v. FEC*, 717 F.3d 1007, 1009 (D.C. Cir.
> 2013).

Order Granting Motion for Remand [Dkt. 21].  It further ordered:

> that the district court shall complete the functions mandated by
> § 30110 and described in *Wagner v. FEC*, 717 F.3d at 1009,
> including the development of a record for appellate review, by April
> 24, 2015.  The district court is to certify any constitutional
> question(s) by that date as well.

*Id.*  The "functions" described in *Wagner* are as follows:

> First, [the district court] must develop a record for appellate review
> by making findings of fact.  Second, the district court must
> determine whether the constitutional challenges are frivolous or
> involve settled legal questions.  Finally, the district court must
> immediately certify the record and all non-frivolous constitutional
> questions to the en banc court of appeals.

*Wagner*, 717 F.3d at 1009 (citations omitted).

## II. JURISDICTION AND VENUE

This Court has jurisdiction over Plaintiffs' challenges under First and Fifth

Amendments to the United States Constitution pursuant to 28 U.S.C. § 1331.  However, a district

court's jurisdiction is limited by FECA, which states that a "district court immediately shall

certify all questions of constitutionality of this Act to the United States court of appeals for the

circuit involved, which shall hear the matter sitting en banc." 52 U.S.C. § 30110.  Venue in this

Court is proper under 28 U.S.C. §§ 1391(b)(2) and (e).

FEC argues that jurisdiction is wanting because this case is moot.  FEC is

incorrect.  The Supreme Court set forth the standard for mootness in *FEC v. Wisconsin Right To*

*Life, Inc.*, a case that involved challenges to the Bipartisan Campaign Reform Act's (BCRA) ban

of corporate advertisements prior to the 2004 election.  *FEC v. Wisconsin Right To Life, Inc.*, 551

U.S. 449 (2007).  Despite the fact that the election had already occurred, the Supreme Court held

that it "fit comfortably within the established exception to mootness for disputes capable of

repetition, yet evading review."  *Id.* at 462.  This mootness exception applies where "(1) the

challenged action is in its duration too short to be fully litigated prior to cessation or expiration,

and (2) there is a reasonable expectation that the same complaining party will be subject to the

same action again." *Id.* (internal quotation omitted).  With respect to the first factor, the Supreme

Court explained that BCRA's expedited review procedure often was insufficient to allow a

plaintiff to obtain complete judicial review in advance of an election.  *Id.*; *see also Davis v. FEC*,

554 U.S. 724, 735 (2008) (finding that plaintiff's case was capable of evading review because

case preceded 2004 general election season but could not be resolved before the 2006 election

concluded).

As for the second factor, the Supreme Court found:

> The second prong of the capable of repetition exception requires a
> reasonable expectation or a demonstrated probability that the same
> controversy will recur involving the same complaining party.  Our
> cases find the same controversy sufficiently likely to recur when a
> party has a reasonable expectation that it will again be subjected to
> the alleged illegality, or will be subject to the threat of prosecution
> under the challenged law . . . .

*Wisconsin Right to Life, Inc.*, 551 U.S. at 463 (internal quotations omitted).  The Court further

noted:

> We have recognized that the capable of repetition, yet evading
> review doctrine, in the context of election cases, is appropriate
> when there are "as applied" challenges as well as in the more
> typical case involving only facial attacks.  Requiring repetition of
> every "legally relevant" characteristic of an as-applied challenge—
> down to the last detail—would effectively overrule this statement
> by making this exception unavailable for virtually all as-applied
> challenges.  History repeats itself, but not at the level of specificity
> demanded by the FEC.

*Id.* (internal quotations omitted).

Plaintiffs' case easily satisfies this two-pronged exception to the mootness

doctrine.  Election controversies like this one "are paradigmatic examples of cases that cannot be

fully litigated before the particular controversy expires."  *Moore v. Hosemann*, 591 F.3d 741,

744 (5th Cir. 2009).  Indeed, Plaintiffs brought this case in July of 2014, challenging FECA's

applicability in the 2014 general election, and do not yet have determination on the merits;

clearly, relief could not have been granted in the time it will take to litigate this action.

As for the second prong, there is a reasonable expectation that Plaintiffs will again

be subject to FECA's per-election contribution limit.  Regardless of whether they will seek to

donate in the 2016 election to the exact same candidates, such specific repetition is not required.

Plaintiffs note that they have a long history of contributing to their preferred candidates,

including supporting those candidates only in their general elections.  Pl. Reply [Dkt. 28] at 6.

Plaintiffs also aver that they intend to make such contributions in the future.  *Id.* at 5-6; *see*

*Unity08 v. FEC*, 596 F.3d 861, 864 (D.C. Cir. 2010) (finding case was not moot where plaintiff

filed "a sworn declaration unambiguously stating a conditional intent to resume activities in a

future election cycle if the group wins its lawsuit against the Commission").  Therefore, there is

more than a "reasonable expectation" here that FECA will bar Plaintiffs from contributing as they desire in the future and that they will be subjected to the same restriction. *See Davis*, 554 U.S. at 736 (plaintiff's claim was capable of repetition because he made a public statement expressing intent to self-finance another bid for a House seat); *Branch v. FCC*, 824 F.2d 37, 41 (D.C. Cir. 1987) (finding case not moot "even though the 1984 town council election has long passed, since [plaintiff] seeks to preserve his right to run in a future election by preventing a recurrence of these events" and noting that "[c]ontroversies that arise in election campaigns are unquestionably among those saved from mootness under the exception for matters 'capable of repetition, yet evading review'") (quoting *Moore v. Ogilvie,* 394 U.S. 814, 816 (1969)); *Herron for Cong. v. FEC*, 903 F. Supp. 2d 9, 14-15 (D.D.C. 2012) (requirement of being subjected to same action is "easily met" when challenging electoral regulation).

       FEC contends that Plaintiffs have not produced evidence of a "demonstrated probability" that the same controversy will recur.  FEC Mem. [Dkt. 27] at 15-16; *see Herron*, 903 F. Supp. 2d at 14 ("Ordinarily, courts require plaintiffs to submit evidence suggesting that their controversy is likely to recur.").  However, Plaintiffs have stated their clear intentions to continue contributing to general-election candidates who won contested primaries, and they have provided evidence of the frequency of general elections in which candidates from uncontested primaries will face winners of contested primaries.  *See* Pl. Reply at 5-6.

       The cases cited by FEC are inapt.  In *Herron for Congress v. FEC*, an unsuccessful candidate for Congress sued FEC for failing to penalize his opponent for violating campaign disclosure laws, challenging a *specific* finding made by the FEC as to a *specific* opponent.  903 F. Supp. 2d 9 (D.D.C. 2012).  The district court noted that the irreversibility of elections did not make a case moot.  However, that plaintiff's case was moot because he was

only *considering* a run for office in the future, which he acknowledged was "somewhat conditional" on the court's ruling. *Id.* at 13-14. Indeed, the plaintiff had "made clear that he [would] not run for office" in the upcoming election, that he had not decided about whether he would ever run in the future, and that his decision turned in part on result of lawsuit. *Id.* at 13. In contrast, the instant Plaintiffs aver that that they will seek to contribute $5,200 to future candidates.

Nor are FEC's other cases persuasive. *Virginians Against a Corrupt Congress v. Moran* involved a challenge to mailings made by a Congressman in the 1992 general election. No. 92-5498, 1993 WL 260710 (D.C. Cir. June 29, 1993). The Circuit found the case moot in part because the election had passed, but more importantly, because the statute at issue had been repealed and the challenged conduct was not capable of repetition. In *Bois v. Marsh*, 801 F.2d 462 (D.C. Cir. 1986), the Circuit found a plaintiff's claim moot where she challenged Army grievance procedures because "the likelihood that she will re-enter active service in the Army either by re-enlisting or by being called up for active duty and the likelihood that she would again have occasion to employ the challenged procedures if she were to return. . . . is too remote to justify judicial review at this time." *Id.* at 466-67. Finally, *Murphy v. Hunt*, 455 U.S. 478 (1982), involved a prisoner's constitutional challenge to the denial of his pretrial requests for bail. The Supreme Court held that any claims about pretrial bail were moot; once the prisoner was convicted in state court, the issue was "no longer live because even a favorable decision on it would not have entitled [him] to bail." *Id.* at 481-82. Moreover, there was no reasonable expectation or demonstrated probability that the prisoner would again find himself in the same position because there was no reason to expect that all three of his convictions would be overturned and that he would again demand bail before trial. *Id.* at 482-83. None of these cases

bears any resemblance to the instant matter, where Plaintiffs have made plain their continuing desire to contribute $5,200 to selected candidates for use in their general election contests without "wasting" $2,600 on a primary candidate who may not advance to the general election. *See* Pl. Mem. in Support of Mot. for Prelim. Inj. [Dkt. 6-1] at 1.

## III.   ANALYSIS

### A.  Judicial Review of FECA Challenges

FECA sets forth the following judicial review procedure for any challenge to the statute's constitutionality:

> The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act.  The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

52 U.S.C. § 30110.

The D.C. Court of Appeals has held that 52 U.S.C. § 30110 requires a district court to perform three functions:

> First, it must develop a record for appellate review by making findings of fact.  Second, the district court must determine whether the constitutional challenges are frivolous or involve settled legal questions.  Finally, the district court must immediately certify the record and all non-frivolous constitutional questions to the en banc court of appeals.

*Wagner*, 717 F.3d at 1009.  The Supreme Court has also instructed that Section 30110 "should be construed narrowly, in part because it creates 'a class of cases that command the immediate attention of . . . the courts of appeals sitting en banc, displacing existing caseloads and calling court of appeals judges away from their normal duties for expedited en banc sittings.'"

*Libertarian Nat'l Comm., Inc. v. FEC* (*LNC*), 930 F. Supp. 2d 154, 157-61 (D.D.C. 2013)

(quoting *Bread Political Action Comm. v. FEC*, 455 U.S. 577, 580 (1982)), *aff'd in part*, No. 13-

5094, 2014 WL 590973 (D.C. Cir. Feb. 7, 2014).[5]

> The mandatory phrasing of Section 30110 "should not be read to require [district courts] automatically to certify every constitutional question to an en banc court of appeals." *Goland v. United States*, 903 F.2d 1247, 1257 (9th Cir. 1990). Section 30110 does not "require certification of constitutional claims that are frivolous" when they are either "insubstantial" or "settled." *Cal. Medical Ass'n v. FEC* (*Cal. Med.*), 453 U.S. 182, 192 n.14 (1981). Challenges to a core provision of FECA that has already been upheld are permissible only if they present an "unanticipated variation[]" of the law—"not every sophistic twist that arguably presents a 'new' question should be certified." *Goland*, 903 F.2d at 1257. A "district court need not certify legal issues that have been resolved by the Supreme Court." *Khachaturian v. FEC*, 980 F.2d 330, 331 (5th Cir. 1992); *Cal. Med.*, 453 U.S at 192 n.14 (cases that warrant certification involve issues that "are neither insubstantial nor settled"); *Goland*, 903 F.2d at 1258 ("[W]here the legal issue has been resolved by the Supreme Court, the district court need not certify the constitutional challenge.").

> The Ninth Circuit described the district court's role in a Section 30110 case "as similar to that of a single judge presented with a motion to convene a three judge court to hear constitutional challenges" that may "dismiss constitutional claims which already had been decided." *Goland*, 903 F.2d at 1257. *Goland* further noted that such a standard may resemble

---

[5] The Supreme Court has also noted that the burden placed upon Courts of Appeals by Section 30110 is not overwhelming. *Cal. Medical Ass'n v. FEC*, 453 U.S. 182, 192 n.13 (1981) ("To date, there have been only a handful of cases certified to the Courts of Appeals under this procedure . . . . we do not believe that [§ 30110] poses any significant threat to the effective functioning of the federal courts.").

the "failure to state a claim" applied under Rule 12(b)(6); it concluded that "at least where the

legal issue has been resolved by the Supreme Court, the district court need not certify the

constitutional challenge." *Id.* at 1257-58.  Finally, *Libertarian Nat'l Comm., Inc. v. FEC* noted

that the standard for determining the nature of a claim "was recently articulated as 'somewhere

between a motion to dismiss—where no factual review is appropriate—and a motion for

summary judgment—where the Court must review for genuine issues of material fact.'"  930 F.

Supp. 2d at 162 (quoting *Cao*, 688 F. Supp. 2d at 503), *aff'd in part*, No. 13-5094, 2014 WL

590973 (D.C. Cir. Feb. 7, 2014).

        Because "[s]ome review of the facts is inherently necessary to determine if a

colorable claim has been raised," any question that a court finds settled or insubstantial "is also

appropriate for summary judgment." *LNC*, 930 F. Supp. 2d at 162 (citing *Cao*, 688 F. Supp. 2d

at 502-03).  Summary judgment is warranted when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the

nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A

nonmoving party, however, must establish more than "the mere existence of a scintilla of

evidence" in support of its position. *Id.* at 252.   If the evidence "is merely colorable, or is not

significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations

omitted).

### B. Campaign Finance Law[6]

"The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1441 (2014). Although both are protected as First Amendment speech, the Supreme Court distinguishes between *expenditures by candidates*, which are essentially unlimited, and *limits on contributions* to a particular candidate. *See, e.g., id.* at 1444; *Buckley v. Valeo*, 424 U.S. 1, 19-21 (1976). Because "[a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support," limits on contributions to a candidate or a political committee entail "only a marginal restriction upon the contributor's ability to engage in free communication." *Buckley*, 424 U.S. at 20-21. Thus, in evaluating contribution restrictions, "[e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Id.* at 25 (internal citations omitted).

In *Buckley v. Valeo*, appellants challenged the constitutionality of various provisions in the 1974 amendments to FECA and related tax code provisions. *Buckley*, 424 U.S. at 6. The Supreme Court considered whether FECA's base individual contribution limit of $1,000 to any single candidate per election was an unjustifiable ceiling that burdened First Amendment freedoms. *Id.* at 24, 30. *Buckley* found generally that individual contribution limits advanced a "sufficiently important" state interest if they are appropriately designed to reduce *quid pro quo* corruption or the appearance of corruption. 424 U.S. at 28. *Buckley* upheld the

---

[6] *LNC* provides a cogent overview of the law regarding campaign finance. *LNC*, 930 F. Supp. 2d at 157-61. The Court relies on that analysis here.

$1,000 cap, stating that "Congress was surely entitled to conclude . . . that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed." *Id.* Further, the Supreme Court noted that if a court "is satisfied that some limit on contributions is necessary," then it "has no scalpel to probe" the specific level at which Congress has set the limit. *Buckley*, 424 U.S. at 30; *see also Davis*, 554 U.S. at 737 ("When contribution limits are challenged as too restrictive, we have extended a measure of deference to the judgment of the legislative body that enacted the law."); *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (Breyer, J., plurality) ("We cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives. In practice, the legislature is better equipped to make such empirical judgments, as legislators have particular expertise in matters related to the costs and nature of running for office. Thus ordinarily we have deferred to the legislature's determination of such matters.") (internal quotations omitted).

The Supreme Court has consistently reaffirmed *Buckley*'s finding that "the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling." *Buckley*, 424 U.S. at 29. *See, e.g., Davis*, 554 U.S. at 737 (The "Court has previously sustained the facial constitutionality of limits on discrete and aggregate individual contributions and on coordinated party expenditures.") (citing *Buckley*, 424 U.S. at 23-35, 38, 46-47, and n.53 and *FEC v. Colorado Republican Federal Campaign Comm.*, 533 U.S. 431, 437, 465 (2001)); *McCutcheon*, 134 S. Ct. at 1442 ("[W]e have previously upheld [base contribution limits] as serving the permissible objective of combatting corruption."). While contributions

33

JA 298

play an important role in financing political campaigns, contribution limits only pose a

constitutional problem if they "deny the individual *all* ability to exercise his expressive and

associational rights by contributing to someone who will advocate for his policy preferences."

*McCutcheon*, 134 S. Ct. at 1448 (emphasis added).

After *Buckley*, *McCutcheon* held that there is "only one legitimate governmental

interest for restricting campaign finances: preventing corruption or the appearance of

corruption." *McCutcheon*, 134 S. Ct. at 1450.  Further, "'[i]ngratiation and access . . . are not

corruption" and the only permissible restrictions are those that target "quid pro quo" corruption,

*i.e.*, "a direct exchange of an official act for money." *Id.* at 1441 (citing *Citizens United v. FEC*,

558 U.S. 310, 360 (2010)).  *McCutcheon* distinguished base campaign contribution limits, which

restrict how much money an individual may contribute to a particular candidate or committee per

election, and aggregate limits, which restrict how much money an individual may contribute in

total to all candidates or committees.  *Id.* at 1442.  The Supreme Court invalidated FECA's

aggregate limits under the First Amendment because aggregate limits do not further the

legitimate interest of combatting corruption, but "seriously restrict participation in the

democratic process." *Id.  McCutcheon* did not involve a challenge to individual base

contribution limits and thus did not alter *Buckley*'s finding that individual base contribution

limits advance an anti-corruption interest. *Id.* ("[W]e have previously upheld [base contribution

limits] as serving the permissible objective of combatting corruption.")

**C.  Plaintiffs' First Amendment Claim Involves Issues of Settled Law**

Plaintiffs argue that FECA's individual per-election contribution limit

unconstitutionally prohibits them from giving $5,200 to their preferred candidates in their

general elections.  They do not dispute that *Buckley* forecloses challenges to "the general

imposition of individual contribution limits."  Pl. Mem. [Dkt. 25] at 12 (citing *Buckley*, 424 U.S.

at 28-29).  Rather, Plaintiffs claim their case is novel because the Supreme Court has not

addressed the effect of FECA's "bifurcated" per-election campaign contribution limit, which

"prevents Plaintiffs and those similarly situated from giving the full, non-corrupting contribution

amount at the time they feel is most critical in the electoral cycle."  Pl. Mem. at 19.

As an initial matter, Plaintiffs' repeated description of FECA's per-election

structure as "bifurcated" is factually incorrect.  FECA does not dictate a maximum contribution

limit of $5,200 that may be split between the primary and general elections.  Rather, FECA sets a

per-election base limit of $2,600: an individual may contribute $2,600 to one candidate for each

"election," as defined, in which he participates.  *See* 52 U.S.C. § 30116(a).[7]  Donating $2,600 to

a candidate for his primary-election campaign and $2,600 to that same candidate for his general-

election campaign is not the same as donating $5,200 solely to his general election campaign.

Congress simply does not allow *any* contributor to give $5,200 for a general election.  Further,

Plaintiffs' assertion that there is a $5,200 cap that is "bifurcated" between the primary and

generally elections is a false construct.  Federal elections cycles vary from state to state, and may

include runoffs, special elections, and party conventions, all of which qualify for an individual

$2,600 contribution, in addition to primary and general elections.  52 U.S.C. § 30101(1).[8]

---

[7] As noted above, the per-candidate, per-election contribution limit for the 2013-2014 election cycle was $2,600; that limit since been raised to $2,700.  *See supra*, Factual Findings ¶ 10.  For purposes of clarity, this Opinion refers to a $2,600 limit.

[8] Plaintiffs' references to a "bifurcated" structure may be tied to their insistence that their case is an as-applied constitutional challenge and thus, the ostensible limit for the two elections in which Plaintiffs sought to contribute was $5,200.  But Plaintiffs' challenge is not, at base, an as-applied constitutional challenge to FECA.  *See infra* at 41 (citing *Doe v. Reed*, 561 U.S. 186, 194 (2010)).

35

With respect to their First Amendment claim, Plaintiffs are correct that *Buckley* upheld the dollar value of FECA's individual contribution limit and did not address the constitutionality of setting contribution limits on a per-election basis. *See Buckley*, 424 U.S. at 21-22. But Plaintiffs are mistaken that their claim raises an issue of unsettled law. By seeking to combine the permissible contribution amounts for both primary and general election in order to have flexibility to donate that aggregate amount to a general election campaign, Plaintiffs are effectively challenging Congress's decision to set a base dollar limit for individual per-election contributions to federal candidates—a decision that is contemplated and approved by *Buckley*. *Id.* at 28 ("Congress was surely entitled to conclude . . . that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions.").

Plaintiffs argue that FECA's limit is unconstitutional as-applied because they were prevented from contributing $5,200 to the 2014 general-election campaigns of their preferred candidates after they won their primary elections, unlike other contributors who allegedly could contribute $5,200 to their preferred candidates for use in the general election.[9] This claim is unsettled, according to Plaintiffs, because *Buckley* did not address *when* a contributor could give $5,200 during the election cycle, but instead upheld the base limit of $5,200 itself. Plaintiffs are wrong. The base limit is not $5,200. Congress has decided that the base limit—the maximum contribution to a candidate for his general election campaign—is $2,600, and *Buckley* mandates deference to that limit. *Id.* at 30 (If "it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $ 2,000 ceiling

---

[9] This alleged $5,200 contribution to a general election is the result of an FEC regulation, discussed below.

might not serve as well as $ 1,000.").  That *Buckley* did not consider whether FECA's per-election structure violates the First Amendment does not render Plaintiffs' claim unsettled because, stripped to the bare facts of their case, Plaintiffs are seeking simply to contribute more than Congress has authorized.

      Plaintiffs repeatedly maintain that individuals supporting candidates who faced little or no opposition in their primaries can allegedly contribute $5,200 to that candidate's general election campaign.[10]  However, the fact that $5,200 may be used for a candidate's general election campaign is only a consequence of an FEC regulation that permits a candidate in a general election who has unused primary contributions to transfer those primary contributions to pay for general-election expenses.  *See* 11 C.F.R. § 110.3(c)(3).  Neither FECA nor any Supreme Court opinion authorizes an individual contribution of $5,200 for a general election.[11]

      Plaintiffs' argument further reveals that their First Amendment claim challenges FECA's monetary restrictions.  Plaintiffs state that FECA's per-election limit "allows supporters of candidates without primary challengers to contribute twice as much money for the general election," and thus "doubles the scope of association that certain contributors enjoy."  Pl. Mem. at 32.  Plaintiffs also seek to "double the scope" of their association by increasing their own general-election contributions beyond the congressionally-mandated, judicially-approved limit. This challenge is precluded by *Buckley*'s finding that "the weighty interests served by restricting

---

[10] No contributor has control over how a candidate ultimately uses his contribution.  *See* 11 C.F.R. § 110.1(b)(6).

[11] Plaintiffs argue that their case warrants certification because 11 C.F.R. § 110.3(c)(3) "received not a single mention in the *Buckley* opinion."  Pl. Mem. at 16.  It is true that *Buckley* did not address this FEC regulation.  But Plaintiffs have not challenged the regulation in this case, *see Holmes*, 2014 WL 5316216, at *6 n.8, and it is not clear that they have standing to do so.  *See* FEC Mem. at 30.

the size of financial contributions to political candidates are sufficient to justify the limited effect

upon First Amendment freedoms caused by the $1,000 contribution ceiling." *Id.* at 29.

Plaintiffs cite *McCutcheon* for recognizing a legal limit of $5,200 for individual

campaign contributions, *see* Pl. Mem. at 19 (citing 134 S. Ct. at 1452), not limited to $2,600 per

election. But Plaintiffs place too much weight on *McCutcheon*'s shorthand comments,

particularly in light of *McCutcheon*'s explicit recognition of FECA's $2,600 per-election base

limit. *McCutcheon*, 134 S. Ct at 1442. Taken out of context, the dicta on which Plaintiffs rely—

"Congress's selection of a $5,200 base limit indicates its belief that contributions of that amount

or less do not create a cognizable risk of corruption," *id.* at 1452,—appears to bolster their

argument. However, Plaintiffs misread *McCutcheon* and would take its holding well beyond its

facts. In *McCutcheon*, an individual contributed the same base limit of $2,600 to 16 different

federal candidates, and sought to contribute the base limit to an additional 12 candidates, but was

prevented from doing so by the aggregate limit on contributions to candidates. *Id.* at 1436. The

Supreme Court noted that for the 2013-2014 election cycle, FECA's base limits "permit an

individual to contribute up to $2,600 per election to a candidate ($5,200 total for the primary and

general elections)." *Id.* at 1442. In contrast, the aggregate limits "permit an individual to

contribute a total of $48,600 to federal candidates and a total of $74,600 to other political

committees." *Id*. While the base limits "restrict how much money a donor may contribute to

any particular candidate or committee[,] the aggregate limits have the effect of restricting how

many candidates or committees the donor may support, to the extent permitted by the base

limits." *Id*. at 1443. The Supreme Court found FECA's aggregate limits were unconstitutional,

stating that:

> To put it in the simplest terms, the aggregate limits prohibit an
> individual from fully contributing to the primary and general

election campaigns of ten or more candidates, even if all contributions fall within the base limits Congress views as adequate to protect against corruption.  The individual may give up to $5,200 each to nine candidates, but the aggregate limits constitute an outright ban on further contributions to any other candidate.

*Id.* at 1448.[12]

In overruling the aggregate limits, however, *McCutcheon* did not alter *Buckley*'s finding that congressionally-selected base limits on individual contributions advance an anti-corruption interest.  Accordingly, *McCutcheon* does not stand for the proposition that a contribution of $5,200 to a candidate's general-election campaign is non-corrupting as a matter of law.  Rather, the Supreme Court confirmed that FECA's base individual contribution limit is $2,600 per-election.

The Court recognizes Plaintiffs' frustration that a contributor cannot give $5,200 to a candidate for use in a general election but may give $2,600 to a candidate the day before the primary and $2,600 the day after the primary, and that the FEC regulation allows a candidate to transfer unused primary funds for use in the general election (if she wins the primary).  But the fact that candidates may transfer contributions is a result of an agency regulation.  Neither Congress nor the Supreme Court has ever authorized individual contributors to give $5,200 to one candidate solely for use in a general election.  To the contrary, the Supreme Court has held that FECA's individual limits on base contributions are permissible and Congress set such a

---

[12] The Supreme Court's reference to $5,200 was a product of the facts in that case, where appellant made the maximum permissible base level contributions to his preferred candidates for their primary and general elections, in compliance with FECA.  While an individual may give $5,200 *overall*, it does not follow that Congress has also authorized a $5,200 contribution directly for a candidate's general-election campaign.

limit—at $2,600.  Thus, because Plaintiffs' claim rests on settled law, certification is not warranted.[13]

**D.  Plaintiffs' Fifth Amendment Claim Involves Issues of Settled Law**

Plaintiffs argue that their experience "demonstrates that favored contributors may give their preferred candidates $5,200 for the general election, while Plaintiffs and those similarly situated may not."  Pl. Mem. at 6.  They seek certification, contending that the Supreme Court has not decided whether the "asymmetry posed when a candidate who faces a primary challenge[r] competes in the general election against a candidate who ran virtually unopposed during the primary" constitutes a Fifth Amendment violation of their right to equal protection.[14] Pl. Mem. at 20.

*Buckley* addressed an argument that "the contribution limitations work such an invidious discrimination between incumbents and challengers that the statutory provisions must be declared unconstitutional on their face."  *Buckley*, 424 U.S. at 30-31.  The Supreme Court rejected the facial challenge because "the Act on its face treats all candidates equally with regard to contribution limitations."  *Id.* at 33.  It further stated that "[a]bsent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to

---

[13] Plaintiffs do not argue that *Citizens United v. FEC*, 558 U.S. 310 (2010), impacts the analysis in this case.

[14] The Fourteenth Amendment specifies that that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. 14, § 1.  Equal protection applies equally to the federal government through the Fifth Amendment Due Process Clause. U.S. Const. Amend. 5 ("No person . . . shall be deprived of life, liberty or property, without due process of law.").  *See, e.g., Buckley*, 424 U.S. at 93 ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."); *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 804 (D.C. Cir. 1988) ("Although the Equal Protection Clause appears only in the 14th Amendment, which applies only to the states, the Supreme Court has found its essential mandate inherent in the Due Process Clause of the Fifth Amendment and therefore applicable to the federal government.").

invalidate legislation which on its face imposes evenhanded restrictions." *Id.* at 31.

Contribution "limitations may have a significant effect on particular challengers or incumbents, but the record provides no basis for predicting that such adventitious factors will invariably and invidiously benefit incumbents as a class." *Id.* at 33.  The "danger of corruption and the appearance of corruption apply with equal force to challengers and to incumbents," and thus "Congress had ample justification for imposing the same fundraising constraints upon both." *Id.*

That *Buckley* found FECA's contribution limits constitutional on their face does not mean that the statute could not be unconstitutional in an as-applied challenge.  *See id.* at 31 n.33 (expressing no "opinion with regard to the alleged invidious discrimination resulting from the full sweep of the legislation as enacted"); *Doe v. Reed*, 561 U.S. 186, 201 (2010) (rejecting broad challenge to state disclosure law but noting that, as "in other election law disclosure cases," "upholding the law against a broad-based challenge does not foreclose a litigant's success in a narrower one").  Plaintiffs claim that *Buckley* does not foreclose their as-applied challenge, a characterization with which FEC disagrees.  In any event, "[t]he label is not what matters." *Doe*, 561 U.S. at 194.  "The important point is that plaintiffs' claim and the relief that would follow"—invalidating FECA's per-election individual contribution limit—"reach beyond the particular circumstances of these plaintiffs." *Id.*  "They must therefore satisfy our standards for a facial challenge to the extent of that reach." *Id.*

As in *Buckley*, this Court finds no evidence of invidious discrimination against these Plaintiffs or any purported class of individual contributors.  FECA treats all individual contributors equally by imposing uniform per-candidate, per-election contribution limits.  Although Plaintiffs "may be prevented from contributing $5,200 to their chosen candidates after their primary elections, Plaintiffs [are] only restricted *to the exact same extent* as any other

individuals wishing to contribute more than $2,600 per election." *Holmes*, 2014 WL 5316216, at

*5 (emphasis in original).

> As this Court previously stated:
>
> > No individual has the power to give $5,200 solely for use in the general election.  It may be that a contributor to an unopposed incumbent will contribute $2,600 before the primary election in anticipation that it will all be used in the general election.  How the funds are actually spent, of course, is wholly out of the contributor's control.  An unopposed candidate may well decide to campaign before the primary in order to get a head start on the general election campaign—or not, depending on the candidate's calculus of her reelection chances.  In either case, contributors have not been treated differently.  Plaintiffs' argument that the law works asymmetric and discriminatory effects by favoring one category of candidates over another is therefore misplaced.  It is the candidate who faces no primary challenger—whether an incumbent or a first-time candidate—who might be advantaged by saving campaign costs for the primary.  Accordingly, even if a candidate in a primary must spend money to advertise and win, it does not follow that the rights of his contributors have been treated unequally.

*Id.* at *6.

> > [FECA] creates *identical* contribution limits for all candidates based solely the number of elections in which they run for federal office.  The fact that a candidate may be fortunate enough not to face "significant opposition" in her primary does not render the statute's treatment of her contributors unconstitutional . . . . Any variance in the levels of funding is a natural result of the political process, not a result of the per-election contribution limit.

*Id.*

> Because there is simply no record evidence that the statute, which "applies the

same limitations on contributions to all candidates regardless of their present occupations,

ideological views, or party affiliations," *Buckley*, 424 U.S. at 31, works an asymmetric effect on

Plaintiffs as contributors, *Buckley*'s reasoning applies with equal force here. Certification is thus unwarranted as Plaintiffs' Fifth Amendment claim is based on settled law.[15]

Acknowledging that FECA's contribution scheme "'on its face' does not appear discriminatory," Plaintiffs argue that it works a "disparate impact in favor of contributors to candidates who do not face a primary challenge."  Pl. Mem. at 29.  But Plaintiffs cannot pursue an equal protection violation by arguing disparate impact when they have made no showing of purposeful discrimination.  *See Lewis v. Casey*, 518 U.S. 343, 375 (1996) ("[A]bsent proof of discriminatory purpose, a law or official act does not violate the Constitution solely because it has a . . . disproportionate impact.") (internal quotation omitted); *Harris v. McRae*, 448 U.S. 297, 323 n.26 (1980) ("The equal protection component of the Fifth Amendment prohibits only purposeful discrimination, and when a facially neutral federal statute is challenged on equal protection grounds, it is incumbent upon the challenger to prove that Congress selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.") ((internal quotations and citations omitted).[16]

---

[15] Even if Plaintiffs' claim were not foreclosed by *Buckley*, the Court finds it insubstantial and undeserving of certification.  The facts here make clear that "Plaintiffs' perceived inequality in contribution limits is not imposed by FECA or its regulations, but by the vagaries of the election process," *Holmes*, 2014 WL 5316216, at *6, and therefore Plaintiffs fail to state an equal protection claim under the Fifth Amendment.

[16] As noted in this Court's denial of Plaintiff's motion for a preliminary injunction, the Supreme Court has not decided the appropriate level of scrutiny in cases challenging political contribution limits on equal protection grounds.  *See Holmes*, 2014 WL 5316216, at *5 (applying same intermediate scrutiny to both First Amendment and equal protection challenges).  However, this gap in Supreme Court jurisprudence does not save Plaintiffs' Fifth Amendment claims because they are insubstantial under any level of scrutiny.

USCA Case #15-5120     Document #1568250         Filed: 08/17/2015     Page 311 of 313

**IV.  CONCLUSION**

For the reasons set forth above, the Court finds that no constitutional questions warrant certification because Plaintiffs' claims involve questions of settled law.  The Court will deny Plaintiffs' motion for certification and will grant FEC's motion for summary judgment.  Judgment will be entered in favor of FEC.  A memorializing Order accompanies this Opinion.


Date: April 20, 2015

_____/s/_____<br>
ROSEMARY M. COLLYER<br>
United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LAURA HOLMES, *et al.*,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 14-1243 (RMC)** |
| ) | |
| **FEDERAL ELECTION COMMISSION,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER

For the reasons stated in the Opinion issued simultaneously with this Order, it is

hereby

ORDERED that Plaintiffs' Motion for Order Regarding Certification [Dkt. 25] is

**DENIED**; and it is

FURTHER ORDERED that Defendant Federal Election Commission's Motion

for Summary Judgment [Dkt. 27] is **GRANTED**; and it is

FURTHER ORDERED that **JUDGMENT** is entered in favor of the Federal

Election Commission.

This is a final appealable order.  *See* Fed. R. App. P. 4(a).  This case is closed.


Date:  April 20, 2015


_____
          /s/
ROSEMARY M. COLLYER
United States District Judge

USCA Case #15-5120      Document #1568250      Filed: 08/17/2015      Page 313 of 313

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Laura Holmes, et al.
_____
                    Plaintiff

            vs.                         Civil Action No. __14-1243____

Federal Election Commission
_____
                    Defendant

# NOTICE OF APPEAL

Notice is hereby given this   24th     day of   April                    , 20 15    , that

Plaintiffs Laura Holmes and Paul Jost

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from

the judgment of this Court entered on the   20th       day of  April                   , 20 15

in  favor of   Defendant, Federal Election Commission

against said   Plaintiffs, Laura Holmes and Paul Jost.


                                        Allen Dickerson
                              _____
                                    Attorney or Pro Se Litigant


(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil action must be filed within 30 days after the date of entry of judgment or 60 days if the United States or officer or agency is a party)


**CLERK**        Please mail copies of the above Notice of Appeal to the following at the addresses
                 indicated: